STEPHEN V. BOMSE (Bar No. 40686)
stephen.bomse@hellerehrman.com
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone:  (415) 772-6000
Facsimile:   (415) 772-6268

NATHAN P. EIMER (*pro hac vice* pending)
neimer@eimerstahl.com
ANDREW G. KLEVORN (*pro hac vice* pending)
aklevorn@eimerstahl.com
CHAD J. DOELLINGER (*pro hac vice* pending)
cdoellinger@eimerstahl.com
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Telephone:  (312) 660 7600
Facsimile:  312-692-1718

Attorneys for Plaintiff
PRAXAIR, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PRAXAIR, INC., | ) Case No.: C-08-00869 JW (HRL) |
| | ) |
| Plaintiff, | ) **MOTION FOR PRELIMINARY** |
| | ) **INJUNCTION; MEMORANDUM OF** |
| v. | ) **POINTS AND AUTHORITIES** |
| | ) |
| ATMI, INC. and ADVANCED TECHNOLOGY | ) **ORAL ARGUMENT REQUESTED** |
| MATERIALS, INC., | ) Documents filed concurrently: |
| | ) 1.  Declaration of Paul Peeters |
| | ) 2.  Declaration of Raymond P. Roberge |
| Defendants. | ) 3.  [Proposed] Order Granting Plaintiff's |
| | )     Motion for Preliminary Injunction |
| | ) |
| | ) Date:  March 24, 2008 |
| | ) Time: 9:00 a.m. |
| | ) Ctrm: 8, 4th floor |
| | ) Hon.  James Ware |
| | ) |

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................. ii

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 1

I.  Introduction ...................................................................................................................... 1

II.  Factual Background ......................................................................................................... 4

    A.  Gases and the fabrication of semiconductors .......................................................... 4

    B.  ATMI's attempt to drive Praxair out of the global market for
sub-atmospheric gas delivery systems .................................................................... 6

        1.  ATMI'S chokehold on isotopically enriched boron trifluoride ..................... 6

        2.  ATMI's abuse of its limited patents in Europe to hinder
global competition ........................................................................................ 8

III.  Argument ......................................................................................................................... 11

    A.  ATMI Must Be Immediately Restrained from Cutting Off Praxair's
Supply of $B^{11}F_3$ .......................................................................................... 12

        1.  Absent Entry of a Preliminary Injunction, ATMI's Exclusive Supply
Agreement with Nukem Will Inflict Irreparable Injury Upon Praxair .......... 12

        2.  Praxair Is Likely to Succeed on Its Claims Because ATMI's Exclusive
Supply Agreement with Nukem Is a Plain Violation of Law ...................... 14

            a.  ATMI's Unlawful Monopolization or Attempt to Monopolize ........ 14

                i.  ATMI Has Market Power ..................................................... 14

                ii.  ATMI Has Engaged in Predatory Conduct ........................... 16

            b.  ATMI's Chokehold Over Nukem Constitutes an
Unlawful Exclusive Dealing Arrangement That
Violates Section 1 of the Sherman Act ............................................ 19

    B.  ATMI should be enjoined from using the Belgian court's preliminary advertising
ban to inhibit competition in the United States and around the world ...................... 20

        1.  ATMI has improperly used its limited European patent to

adversely affect competition in the United States and

to cause Praxair irreparable injury ................................................................ 20

    2.    ATMI's Overreaching and Extraterritorial Application of its Challenged

European Patent Rights is Unlawful .......................................................... 22

IV.    Conclusion.................................................................................................................. 25

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869
JW (HRL)

# TABLE OF AUTHORITIES

**CASES**

*Acquaire v. Canada Dry Bottling Co. of New York, Inc.*, 24 F.3d 401 (2d Cir. 1994) .......................13

*Advanced Technology Materials, Inc. v. Praxair, Inc.*,

     No. 03 CV 5161 (RO), 2006 WL 1006341 (S.D.N.Y. Apr. 18, 2006) .................................8

*Advanced Tech. Materials, Inc. v. Praxair, Inc.*, 228 Fed. Appx. 983 (Fed. Cir. 2007).....................8

*Alaska v. Native Village of Venetie*, 856 F.2d 1384 (9th Cir. 1988) ...........................................11, 12

*Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572 (9th Cir. 1990) ...........................24

*Bachchan v. India Abroad Publ'ns, Inc.*, 585 N.Y.S.2d 661 (N.Y. Sup. Ct. 1992).........................24

*Benda v. Grand Lodge of the Int'l Assoc. of Machinists & Aerospace Workers*,

     584 F.2d 308 (9th Cir. 1978) ........................................................................................14, 25

*Blackwelder Furniture Co. of Statesville, Inc.  v. Seilig Mfg Co. Inc.*,

     550 F.2d 189 (4th Cir. 1977) ...............................................................................................13

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989) ..............................................24

*Bristol Tech., Inc. v. Microsoft Corp.*, 42 F. Supp. 2d 153 (D. Conn. 1998) ....................................13

*Cass Student Adver., Inc. v. National Ed. Adver. Serv., Inc.*,

     407 F. Supp. 520 (N.D. Ill. 1976) .......................................................................................18

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*,

     447 U.S. 557 (1980) ..............................................................................................................23

*Conwood Co., L.P. v. United States Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) .............................18

*Davis & Co. Auto Parts, Inc. v. Allied Corp.*, 651 F. Supp. 198 (S.D.N.Y. 1986)...........................15

*Dawson Chemical Co. v. Rohm and Haas Co.*, 448 U.S. 176 (1980)................................................24

*E. & J. Gallo Winery v. Andina Licores, S.A.*, 446 F.3d 984 (9th Cir. 2006) ....................................22

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992)...............................14

*Elrod v. Burns*, 427 U.S. 347 (1976).................................................................................................21

*Filtrol Corp. v. Slick Corp.*, No. 69-607-ALS, 1969 WL 219 (C.D. Cal. Dec. 29,1969).................17

*Foremost Int'l Tours, Inc. v. Qantas Airways Ltd.*, 379 F. Supp. 88 (D. Haw. 1974)......................14

*Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997)...................................................................15

iii

*Geneva Pharm. Tech. Corp. v. Barr Lab. Inc.*, 386 F.3d 485 (2d Cir. 2004) ..............................15, 17

*Gilder v. PGA Tour, Inc.*, 936 F.2d 417 (9th Cir. 1991) ...................................................................12

*Greater New Orleans Board, Ass'n. Inc. v. United States*, 527 U.S. 173 (1999) .............................23

*Grid Sys. Corp. v. Texas Instruments, Inc.*, 771 F. Supp. 1033 (N.D. Cal. 1991) ...........................18

*Hawaii ex rel. Anzai v. Gannett Pacific Corp.*, 99 F. Supp. 2d 1241 (D. Hawaii 1999) ..................17

*Hynix Semiconductor v. Rambus, Inc.*,

    --- F. Supp. 2d ----, 2007 WL 3284069 (N.D. Cal. Nov. 4, 2007) .................................. 18-19

*Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997)............15, 16

*In re Citric Acid Litigation*, 191 F.3d 1090 (9th Cir. 1999)...............................................................14

*Insignia Systems, Inc. v. News America Marketing In-Store, Inc.*,

    No. 04-4213, 2006 WL 1851137 (D. Minn. June 30, 2006)...................................................17

*Int'l Boxing Club of New York, Inc. v. U.S.*, 358 U.S. 242 (1959) ....................................................15

*JamSports and Entm't, LLC v. Paradama Prods., Inc.*, 336 F. Supp. 2d 824 (N.D. Ill. 2004) .........18

*Lands Council v. Martin*, 479 F.3d 636 (9th Cir. 2007) ....................................................................11

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001)................................................................21, 24

*Lucent Techs., Inc. v. Gateway, Inc.*,

    No. 02-2060-B(CAB), 2007 WL 2900484, at *17 (S.D. Cal. Oct. 1, 2007)........................19

*Matusevitch v. Telnikoff*, 877 F. Supp. 1 (D.D.C. 1995).................................................................24

*Microsoft Corp. v. Lindows.Com, Inc*, 319 F. Supp. 2d 1219 (W.D. Wa. 2004).......................22, 23

*Moser v. F.C.C.*, 811 F. Supp. 541 (D. Or. 1992)............................................................................21

*Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997) ...............................................20

*Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221 (10th Cir. 2005)............................................22

*Penn-Central Merger and N & W Inclusion Cases*, 389 U.S. 486 (1968).........................................25

*Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club*,

    351 F. Supp. 462 (E.D. Pa. 1972) .......................................................................................17

*Praxair, Inc. v. ATMI, Inc.*, 489 F. Supp. 2d 387 (D. Del. 2007) ......................................................8

*Regents of Univ. of Cal. v. American Broad. Co., Inc.*, 747 F.2d 511 (9th Cir. 1984) .....................13

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869
JW (HRL)

944 F.2d 597 (9th Cir. 1991)......................................................................................13

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993)..............................................19

*Springs Ambulance Servs, Inc. v. Indio*,

No. CV-84-1076, 1984 WL 418 (C.D. Cal. May 4, 1984) ....................................12

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961)..........................................19

*Telecor Comms., Inc. v. Southwestern Bell Telephone Co.*, 305 F.3d 1124 (10th Cir. 2002) ...........17

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982).................19

*Ultronics, Inc. v. Cox Cable of San Diego, Inc.*,

No. 88CV1718K, 1991 WL 1302931 (S.D. Cal. May 29, 1991)..........................18

*U.S.  v. American Can Co.*, 230 F. 859 (D. Md. 1916)..................................................20

*U.S.  v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005)............................................19, 20

*U.S. v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)................................................19, 20

*U.S. Anchor Mfg. v. Rule Indus., Inc.*, 7 F.3d 986 (11th Cir. 1993) ..............................15

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,

425 U.S. 748 (1976) ........................................................................................21, 23

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,

668 F.2d 1014 (9th Cir. 1981)..........................................................................19

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 169 F. Supp. 2d 1181

(N.D. Cal. 2001), *rev'd on other grounds*, 433 F.3d 1199 (9th Cir. 2006).........................23

**TREATISES**

Antitrust Law Developments (Sixth), Vol. I......................................................................19

Restatement (Third), Foreign Relations Law of the United States ...................................23

**OTHER AUTHORITIES**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2004 Supp.) ...........................19

11 Herbert Hovenkamp, *Antitrust Law* (2d ed. 2005)......................................................20

1    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE that on March 24, 2008, at 9:00 a.m. or as soon thereafter as the

3    matter may be heard, in the United States District Court for the Northern District of California, San

4    Jose Division, Courtroom 8, 4th Floor, before the Honorable James Ware, Plaintiff Praxair, Inc.

5    will, and hereby does move the Court, pursuant to Rule 65 of the Federal Rules of Civil Procedure,

6    for a preliminary injunction against ATMI, Inc. and Advanced Technology Materials, Inc.

7    (collectively, "ATMI") as set forth in Proposed Order, filed contemporaneously herewith.

8    The motion is based upon this notice, the accompanying memorandum of points and

9    authorities, the Declarations of Paul Peeters and Raymond P. Roberge filed with this motion, and

10   such other matters as we may call to the Court's attention at or before the time of the hearing.

11                                   **Relief Requested.**

12   Praxair, Inc., on behalf of its Praxair Electronics division (hereinafter "Praxair"), asks this Court

13   to preliminarily enjoin ATMI[1] from:

14   (1) enforcing an exclusive supply contract that prevents Praxair from obtaining isotopically

15       enriched boron triflouride ($B^{11}F_3$), which is necessary for it to compete in the relevant

16       market;

17   (2) attempting improperly to enforce a Belgian court's preliminary equitable relief so as to have

18       any effect outside of the European nations in which ATMI has registered patent rights; and

19   (3) seizing Praxair assets or seeking further penalty orders from the Belgian court without prior

20       approval of this Court.

21                      **MEMORANDUM OF POINTS AND AUTHORITIES**

22   **I.      Introduction.**

23   Praxair, Inc.'s Electronics division (hereinafter "Praxair") and ATMI are competitors in the

24   global market for sub-atmospheric gas delivery systems, which are used in connection with the

25   manufacture and fabrication of semiconductors, a multi-billion dollar industry centered in the

26   Silicon Valley. ATMI was the first to introduce a chemically-based sub-atmospheric gas delivery

27   _____

28   [1] ATMI is used collectively to refer to the defendants in this action, ATMI, Inc. and Advanced Technology Materials, Inc.

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869 JW (HRL)

1  system into the marketplace in or around 1996. In 2003, Praxair sought to introduce competition

2  into the market by introducing a mechanically-based sub-atmospheric gas delivery system – known

3  as UpTime® – that offers improvements over ATMI's chemical-based product at a lower cost.

4  Notably, more than ninety-eight percent of Praxair's customers previously used ATMI's SDS®

5  system.

6      Faced with the prospective loss of its monopoly position due to the entry of Praxair's competing

7  delivery system, ATMI has sought to maintain its dominance through a series of predatory activities

8  that threaten to drive Praxair from the market entirely, thereby foreclosing competition and causing

9  irreparable injury both to Praxair and to the manufacturers and consumers of semiconductors.

10     ATMI is now interfering with Praxair's supply of $B^{11}F_3$, one of the necessary dopant gases that

11  semiconductor manufacturers employ and which is a vital component of any viable product line of

12  sub-atmospheric gas delivery systems. Other key dopant gases that semiconductor manufacturers

13  require include phosphine and arsine, with each gas having a specific purpose. Semiconductor

14  manufacturers require sellers of sub-atmospheric gas delivery systems to provide the full

15  complement of these gases because they cannot "mix-and-match" amongst the various gas delivery

16  systems. Thus, the inability of a supplier to provide one of the key dopant gases would effectively

17  disable its ability to compete.

18     To that end, Praxair has recently been advised that ATMI has entered into an exclusive supply

19  contract with Nukem GmbH ("Nukem") – a German firm that controls the vast majority of the

20  global supply of $B^{11}F_3$ – and which has been Praxair's primary supplier of this critical commodity.[2]

21  Because of ATMI, Nukem has thus cut off Praxair's supply of $B^{11}F_3$ (purportedly because of the

22  imposition of a large penalty provision against Nukem contained in the exclusive supply

23  agreement). Because of the supply boycott engineered by ATMI, Praxair will run out of saleable

24

25     [2] Praxair understands that ATMI markets its sub-atmospheric delivery systems in conjunction
   with Matheson Tri-Gas, Inc. ("Matheson"). According to ATMI's most recent 10-K, ATMI sells
26  its chemical-based sub-atmospheric gas delivery systems directly to certain end-users and through
   an exclusive distribution agreement with Matheson. *See* Annual Report for Calendar Year 2006 on
27  Form 10-K of ATMI, Inc., p. 10. Praxair believes that ATMI, either acting alone or in concert with
   Matheson, has blocked the supply of $B^{11}F_3$ from Nukem through the exclusive supply agreement.
28  For present purposes, and ease of reference, Praxair refers to the supply agreement as one between
   ATMI and Nukem, but incorporates Matheson as an agent or co-conspirator of ATMI.

$B^{11}F_3$ UpTime® product in a few months.

Given Nukem's dominance in the supply of $B^{11}F_3$ worldwide, it is far from clear that an alternative, reliable and adequate supply of that gas can be secured. However, that is largely beside the point since one of the hallmarks of the semiconductor business is that any sub-atmospheric gas delivery supplier must go through extensive, expensive, and time consuming product qualification to ensure that the product being supplied meets all specifications prior to its use in the very sensitive chip manufacturing process. Thus, before semiconductor fabricators would employ Praxair's UpTime® system with an alternatively-sourced $B^{11}F_3$, Praxair would need to re-qualify its product—a process that can take up to nine months to complete per each production line—all the while being knocked out of the business. Meanwhile, ATMI, which had previously been qualified by the customers it had lost to Praxair, will be able to walk in, and with little effort, resume serving those customers. In other words, ATMI's exclusive control of Nukem's $B^{11}F_3$ supply imminently threatens Praxair's entire business in this market.

ATMI is also misusing and abusing a patent registered in a few European countries to improperly prevent competition in the United States, Asia, and other European countries. In earlier litigation in the United States between Praxair and ATMI, ATMI's purported U.S. patents with respect to its mechanically-based sub-atmospheric gas delivery systems have been declared finally and conclusively invalid and unenforceable on the grounds of obviousness. Shortly thereafter, and based solely on an alleged patent registered in a handful of European countries (patent rights which have not yet even been finally adjudicated on the merits), ATMI persuaded a Belgian court to enter preliminary equitable relief against Praxair. ATMI now is seeking to use that order improperly as a *global* advertising ban against Praxair's UpTime® product. The effect of ATMI's efforts is to prevent Praxair from being able to advertise its product in the United States, Asia, and other European countries—where Praxair has unfettered rights to freely manufacture, market, and sell its UpTime® product. In fact, ATMI has gone so far as to force Praxair to remove its UpTime® product from its primary United States website, www.praxair.com, which is located on a server in the United States. In other words, Praxair is currently barred from advertising products made in the United States to American customers, even though ATMI has no United States patent rights with

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869 JW (HRL)

1    respect to the products at issue.  Such restrictions—restrictions that go far beyond the scope of

2    ATMI's limited patent rights in a few European countries and the geographic area over which the

3    Belgian court has jurisdiction—have a crippling effect on Praxair's ability to compete, and are

4    repugnant to the law of the United States and Praxair's right to engage freely in truthful commercial

5    speech.

6         At bottom, the purpose and effect of ATMI's predatory conduct is to allow ATMI to maintain

7    an unlawful and anticompetitive monopoly in the market for sub-atmospheric delivery systems.

8    Due to its unlawful acts, ATMI still accounts for more than ninety percent (90%) of the market.

9    Absent immediate injunctive relief, ATMI may push Praxair out of the market entirely, thereby

10   inflicting irreparable harm to Praxair's business reputation and customer goodwill and infringing

11   upon Praxair's fundamental free speech rights (in addition to the rights of the consumers to hear

12   such commercial speech and the benefits that flow from free and fair competition).  Such

13   monopolistic and predatory acts are antithetical to the antitrust laws and repugnant to the First

14   Amendment.  Praxair requires immediate injunctive relief.

15        **II.     Factual Background.**

16             A.  <u>Gases and the fabrication of semiconductors.</u>

17        The fabrication of semiconductors requires the implantation of certain ions into a silicon wafer.

18   (Declaration of Raymond P. Roberge (hereinafter "Roberge Decl."), ¶ 3.)  Such ions can only be

19   implanted into the silicon wafer by exposing it to specialized highly toxic dopant gases, including,

20   but not limited to, arsine, phosphine, and $B^{11}F_3$.  (*Id.*, ¶ 4.)  These gases are not fungible.  (*Id.*, ¶ 5.)

21   Rather, each is necessary in this process to provide different electrical properties to the

22   semiconductor material.  (*Id.*, ¶ 5.)  In the past, these dopant gases were stored in ordinary

23   pressurized cylinders.  (*Id.*, ¶ 6.)  However, because of the toxicity of these gases, the use of

24   pressurized cylinders posed safety and health risks.  (*Id.*)  For instance, an unintended opening of

25   the outlet valve in an ordinary pressurized cylinder could cause the immediate release of toxic gases

26   into the workplace and environment, leading to potentially serious injury (possibly even death) and

27   environmental risks.  (*Id.*)

28        To mitigate such risks, sub-atmospheric gas delivery systems were developed.  These systems

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869
JW (HRL)

1   allow the release of gas only if a vacuum (through a line with sub-atmospheric air pressure) is

2   attached to the cylinder outlet containing the gas.  (*Id.*, ¶ 7.)  Sub-atmospheric gas delivery systems

3   thus offer substantial safety and technical advantages, provide productivity improvements, and are

4   priced at a significant premium to gas delivery systems based on pressurized gas cylinders.  (*Id.*, ¶

5   8.)  Despite the premium price, more than ninety percent (90%) of the semiconductor industry now

6   uses sub-atmospheric gas delivery systems. (*Id.*)

7       ATMI was the first to market a chemical-based sub-atmospheric gas delivery system through

8   the use of adsorbent materials (known as the SDS®·system).  (*Id.*, ¶ 9.)  With its introduction of the

9   SDS® system in the mid-1990s, ATMI became the sole provider of sub-atmospheric gas delivery

10  systems, creating an initial monopoly position for ATMI.  (*Id.*)

11      In the late 1990s, a company called UOP developed the first mechanical sub-atmospheric

12  delivery system and obtained patents for the underlying technology.  (*Id.*, ¶ 10.)  Those patents

13  were purchased by an affiliate of Praxair in 2002.  (*Id.*)  To inject competition into this market,

14  Praxair completed the development of a mechanical-based system for the sub-atmospheric delivery

15  of gases (*i.e.*, the use of a valve mechanism), which Praxair now markets under the brand UpTime®.

16  (*Id.*, ¶ 11.)  The UpTime® system is a cylinder with a specialized valve designed to open only when

17  a vacuum is drawn on the outlet of the cylinder.  (*Id.*)  It is covered by U.S. Patent Nos. 6,045,115,

18  6,007,609, and 5,937,895.  (*Id.*)  Praxair's UpTime® system supplies substantially the same safe

19  delivery of gases as SDS® in a higher volume package.  (*Id.*, ¶ 13.)  Although Praxair's UpTime®

20  system is sold in a variety of sizes, the most common holds 335 grams of gas for $B^{11}F_3$.  (*Id.*)  Once

21  a customer uses all of the gas contained in an UpTime® cylinder, the cylinder is returned to Praxair

22  for refilling.  (*Id.*)

23      ATMI has also introduced a mechanical system for the sub-atmospheric delivery of gases,

24  called VAC®.  (*Id.*, ¶ 12.)[3]  It obtained patents for this system in the United States, some European

25  countries, and some Asian countries.  (*Id.*)

26      Customers purchase the UpTime® system as a package (*i.e.*, customers do not purchase the

27  ────────────────────

28      [3] The VAC® system represents only a very small portion of ATMI's sales of sub-atmospheric
    delivery systems.  (*Id.*, ¶ 12.)

- 5 -

cylinders and gases as separate components).  (*Id.*, ¶ 15.)  Pricing is made on the basis of dollars per gram of gas supplied (*e.g.*, $x/g of $B^{11}F_3$), typically without any separate charge for the use of the cylinder.  (*Id.*)  The UpTime® system offers substantial advantages over ATMI's SDS® systems.  (*Id.*, ¶ 16.)  Since its entry into the market, Praxair's UpTime® system has on average sold at twenty percent (20%) below the prevailing rate for ATMI's SDS® system.  (*Id.*)  Besides a lower price, the UpTime® system has significantly greater volume of gas per cylinder size (thereby increasing productivity), while permitting a greater portion of the gas to be removed from the cylinder (thereby reducing waste and costs).  (*Id.*)  Praxair's UpTime® system is thus believed to have a lower total cost of ownership to the customer.  (*Id.*)

Even though Praxair was a new entrant that faced a company with a dominant market position and the advantages of incumbency, Praxair's UpTime® system made inroads with semiconductor customers.  (*Id.*, ¶ 17.)  More than ninety-eight percent of Praxair's customers had previously used ATMI's SDS®.  (*Id.*)

Notwithstanding Praxair's introduction of its UpTime® system at a lower cost to the customer, ATMI has maintained a dominant position in the market for sub-atmospheric gas delivery systems.  (*Id.*, ¶ 18)  It is estimated that ATMI accounts for more than ninety percent (90%) of the global sales of sub-atmospheric gas delivery systems.  (*Id.*)

      B.  <u>ATMI's attempt to drive Praxair out of the global market for sub-atmospheric gas delivery systems.</u>

         1.  <u>ATMI's chokehold on isotopically enriched boron trifluoride.</u>

$B^{11}F_3$ is particularly important to the manufacture and fabrication of semiconductors.  (*Id.*, ¶ 29.)  It accounted for roughly forty percent (40%) of Praxair's sale of gases delivered via Praxair's UpTime® system in 2007.  (*Id.*)  Customers that utilize $B^{11}F_3$ require it to be of high purity and consistent quality.  (*Id.*, ¶ 30.)  Consequently, before a customer will purchase a sub-atmospheric gas delivery system, the customer subjects the dopant gases used in the system, as well as the delivery system itself, to a rigorous qualification process in which the gases are tested for quality, purity, and consistency.  (*Id.*)  Such a process may take up to nine months to complete (or longer, if a customer is unwilling or unable to begin the process immediately) and costs as much as $100,000

1  per semiconductor line.  (*Id.*, ¶ 31.)  The qualification process is undertaken because the

2  introduction of impurities into the semiconductor manufacturing process could result in unusable

3  products, increase expense, and manufacturing delays.  (*Id.*)

4      Nukem is the largest manufacturer of $B^{11}F_3$ in the world.  (Declaration of Paul Peeters

5  (hereinafter "Peeters Decl."), ¶ 4.)  Until recently, Praxair had obtained the vast majority of its

6  $B^{11}F_3$ from Nukem since Praxair entered the market.  (*Id.*, ¶ 3.)  However, in late December 2007,

7  Nukem unexpectedly informed Praxair that it would not be able to supply $B^{11}F_3$ at that time

8  because it was in discussions with ATMI (alone or in conjunction with Matheson) regarding an

9  exclusive supply agreement.  (*Id.*, ¶ 5.)  Apparently ATMI (which Praxair understands currently

10  purchases approximately ninety-five percent (95%) of Nukem's total $B^{11}F_3$ output),[4] was unhappy

11  that Nukem had been providing $B^{11}F_3$ to Praxair.  (*Id.*, ¶ 6.)  In late January 2008, Nukem

12  confirmed that it had, for its part, signed an exclusive supply agreement with ATMI at ATMI's

13  insistence and that it would not be able to supply $B^{11}F_3$ to Praxair.  (*Id.*)

14      ATMI's exclusive supply agreement with Nukem purportedly has a two-year term and imposes

15  a substantial monetary penalty upon Nukem in the event Nukem supplies others—*i.e.*, Praxair—

16  with $B^{11}F_3$.  (*Id.*, ¶ 7.)  Praxair's last shipment of $B^{11}F_3$ from Nukem was received on or about

17  October 23, 2007.  (*Id.*, ¶ 8.)  Its remaining inventory of ready to ship $B^{11}F_3$ will last only a few

18  more months, and it takes 4-8 weeks of lead time between order date and receipt for Praxair to

19  obtain additional $B^{11}F_3$ from Nukem.  (Roberge Decl., ¶ 34.)  In addition, Praxair must provide

20  customers with notice as soon as it reasonably knows that it can no longer supply qualified product.

21  (*Id.*, ¶ 36.)  The uncertainty of supply of Nukem qualified product is thus a serious business

22  concern.  (*Id.*)

23      Given Nukem's dominance in the supply of $B^{11}F_3$ worldwide, it is far from clear that a reliable

24  and adequate supply of that gas even could be secured.  However, that is largely beside the point

25  because even if Praxair could find an alternative long-term supplier of $B^{11}F_3$, Praxair still finds

26  itself in a perilous competitive posture due to the chokehold that ATMI has placed on the supply of

27

28      _____

      [4] Praxair understands that it takes virtually all of the remaining five percent of Nukem's
   production, making it Nukem's only other customer.  (Roberge Decl., ¶ 32.)

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869
JW (HRL)

1  *qualified* $B^{11}F_3$.  (*Id.*, ¶ 35.)  That is because, as referenced above, customers of sub-atmospheric

2  gas delivery systems do not easily change from one supplier to another; rather, customers conduct

3  extensive and costly qualification processes.  (*Id.*, ¶ 31.)  It would take more than one year before

4  Praxair's alternatively-sourced gas could be qualified with all current customers, assuming

5  customers cooperated. (*Id.*)  Accordingly, it is far easier for Praxair's current customers to switch

6  back to ATMI's SDS® using $B^{11}F_3$ from Nukem than to remain with Praxair—who may be unable

7  to supply qualified $B^{11}F_3$ for nearly a year, even if customers do not delay—and qualify the

8  UpTime® system using $B^{11}F_3$ obtained from another source.  (*Id.*, ¶ 37.)

9          2.    ATMI's abuse of its limited patents in Europe to hinder global competition.

10  Praxair and ATMI have been engaged in litigation regarding the scope, validity and purported

11  infringement of Praxair's United States patents for UpTime® and ATMI's United States and

12  European patents for VAC®.  (*Id.*, ¶ 41.)  In July 2003, ATMI sued Praxair in the United States

13  District Court for the Southern District of New York, alleging that Praxair's UpTime® system

14  infringed ATMI's patents covering its VAC® system.  (*Id.*, ¶ 42.)  By order dated April 16, 2006,

15  the court granted summary judgment in favor of Praxair on the grounds that ATMI's patents were

16  invalid and unenforceable because the claimed invention(s) were obvious.[5]  (*Id.*, ¶ 43.)  This

17  judgment was affirmed on appeal.[6]  (*Id.*)  *Thus, as a result of a final judgment, ATMI has no*

18  *enforceable patent rights in the United States for a mechanical sub-atmospheric gas delivery*

19  *system.*

20  In December 2003, Praxair sued ATMI in the United States District Court for the District of

21  Delaware, alleging that ATMI's VAC® system infringed Praxair's patents covering the UpTime®

22  system.  (*Id.*, ¶ 44.)  The jury agreed with Praxair that ATMI's VAC® system infringed Praxair's

23  valid patents; however, post-verdict, the court held Praxair's patents unenforceable based on

24  alleged inequitable conduct primarily by UOP, the original patent holder whose rights Praxair

25  acquired.[7]  (*Id.*, ¶ 45.)  This matter is currently on appeal before the United States Court of Appeals

26

27      [5] *See Advanced Technology Materials, Inc. v. Praxair, Inc.*, No. 03 CV 5161 (RO), 2006 WL
    1006341 (S.D.N.Y. Apr. 18, 2006).

28      [6] *See Advanced Tech. Materials, Inc. v. Praxair, Inc.*, 228 Fed. Appx. 983 (Fed. Cir. 2007).
    [7] *See Praxair, Inc. v. ATMI, Inc.*, 489 F. Supp. 2d 387 (D. Del. 2007).

1  for the Federal Circuit.  (*Id.*)  Thus, at this time, neither ATMI nor Praxair has any valid or

2  enforceable patent rights with respect to mechanically-based sub-atmospheric gas delivery systems

3  in the United States.

4      Having failed to restrict Praxair's competition in the United States through patent litigation, in

5  August 2006—*a few months after a United States court determined that ATMI's U.S. patents were*

6  *invalid*—ATMI filed suit *in Belgium* against Praxair, charging infringement of ATMI's patent in

7  certain European countries relating to its VAC® system and immediately sought to misuse that

8  patent and proceeding to restrict Praxair's competition in the United States, Asia, and the countries

9  in Europe in which ATMI did not have patent rights.  (*Id.*, ¶ 47.)[8]  While the merits of this suit in

10  Belgium have not yet been addressed, in October 2006, ATMI obtained preliminary relief from a

11  Belgian trial court that restricted Praxair from engaging in advertising of its UpTime® product (the

12  Court, however, denied ATMI's request to enjoin Praxair from commercializing its UpTime®

13  system).  (*Id.*, ¶ 48.)  Any breach of this advertising ban carried a penalty of €100,000

14  (approximately $150,000) per occurrence.  (*Id.*)

15      Both Praxair and ATMI appealed the lower court's order, with Praxair objecting to the ban on

16  advertising and ATMI objecting to the court's refusal to ban Praxair from commercializing

17  Uptime® in the European countries where ATMI's patent was registered.  (*Id.*, ¶ 49.)  On April 26,

18  2007, the Belgian appellate court upheld the restriction on Praxair's advertisement of Uptime® and

19  further barred its commercialization, with any violation of its order with respect to

20  commercialization carrying a penalty of €40,000 (approximately $60,000) per occurrence.  (*Id.*)

21      ATMI has broadly construed this order and has sought penalties against any global advertising

22  efforts by Praxair.  For instance, as reflected in its most recent 10-K, filed with the United States

23  Securities and Exchange Commission, ATMI baldly asserts that the Belgian court has issued an

24  injunction "against the public marketing of the UpTime system ***worldwide.***"  (*Id.*, ¶ 51.)  ATMI has

25  thus sought to obstruct Praxair in its efforts to compete against ATMI by asserting that the

26  preliminary relief constitutes a global ban—even covering those countries, including the United

27

28      [8] ATMI also filed suit in Germany in July of 2005; there, however, the German court's relief
was limited to Germany.

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869
JW (HRL)

States, where Praxair has an unfettered right to market and sell its UpTime® system—and aggressively seeking to obstruct Praxair in its efforts to compete against ATMI and further its unlawful monopoly. (*See id.*, ¶ 52.) For instance, ATMI obtained a penalty order against Praxair, including a monetary penalty of €200,000 (approximately $300,000) for including a truthful and accurate general overview of the UpTime® technology (*e.g.*, a product description, safety features, and product attributes) on its U.S. website, www.praxair.com, and which is hosted on servers located in the United States. (*Id.*, ¶ 53.)

ATMI sought and obtained the penalty order, notwithstanding the fact that the particular web pages about which ATMI complained contained a clearly visible disclaimer that read: "The UpTime® product family is not available in Belgium and any references to the UpTime® system set forth on this website are not intended for use in the Belgium market and/or by current or potential Belgium customers of Praxair." (*Id.*, ¶ 54.) Praxair had previously removed all UpTime® references from its Belgian website, located at www.praxair.be, but had inadvertently left a hyperlink to the www.praxair.com site domiciled in the United States. (*Id.*, ¶ 55.)

As a result of ATMI's efforts to use the preliminary relief improperly and to avoid the imposition of further penalties, Praxair has been forced to remove all references to its UpTime® product line from its www.praxair.com website, thereby precluding customers in the United States and other countries outside of the European nations covered by ATMI's challenged patent from obtaining information regarding UpTime® through Praxair's website. (*Id.*, ¶ 56.) In effect, even though Praxair has every right to advertise and publicize its product in the United States, its fundamental right to engage in such speech, as guaranteed by the United States Constitution, has been and is currently being abridged, causing Praxair to suffer irreparable injury.[9] Praxair is currently appealing the penalty order that ATMI obtained. (*Id.*, ¶ 58.)

To further hamper Praxair's ability to compete, ATMI has recently brought still more proceedings against Praxair in which it alleges further violations of the Belgian court's preliminary equitable relief, including:

---

[9] This harm is also felt by the consumer public, who have a corollary right to receive such advertising.

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869 JW (HRL)

- ATMI has claimed that *notice* of a scientific presentation relating to Praxair's UpTime® system given by a Praxair employee in Taiwan (a country in which Praxair is entitled to sell and market the UpTime® system) posted on two of Praxair's United States websites (www.praxairtechforum.com and www.praxair.com/techforum), violated the Belgian court's preliminary relief. (*Id.*, ¶ 59.) The presentation itself was not available online; only a brief notice that the presentation was scheduled to occur in Asia. (*Id.*)

- ATMI has claimed that web pages of a third party (a San Francisco firm known as Montgomery Research, Inc.) which purportedly contain product brochures and other information regarding the UpTime® system violate the Belgian court's preliminary relief. (*Id.*)

While these matters are still pending before the Belgian court, they further demonstrate the predatory tactics that ATMI has undertaken to maintain its monopoly position around the world, including the United States, by overextending, on an extraterritorial basis, the scope and effect of its limited preliminary relief obtained in Belgium.

ATMI recently took further preemptive and anticompetitive action against Praxair. In mid-January, ATMI attempted to seize assets of Praxair, Inc.—assets not associated with the subject matter of the Belgian patent dispute—located in Belgium as a means to satisfy payment of the €200,000 penalty referenced above. (*Id.*, ¶ 60.) Put differently, ATMI was seeking to seize the assets, located in Belgium, of an American entity to satisfy an order entered because an American company advertised in the United States. After negotiations between the parties, ATMI agreed to forestall its efforts to seize the assets of Praxair, Inc. provided Praxair agrees not to contest an award against Praxair N.V., but only until February 18, 2008. (*Id.*, ¶ 61.) Praxair had little choice in the matter; if it did not comply, it would have been forced, pursuant to the Belgian court procedure, to provide a description of all of its assets (even assets unrelated to the proceeding) to ATMI—a key business competitor. (*Id.*, ¶ 61.)

### III.    Argument.

The test for a preliminary injunction is familiar and well-settled. Praxair must show either "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious

- 11 -

1  questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's]

2  favor." *Lands Council v. Martin*, 479 F.3d 636, 639 (9th Cir. 2007).  These are not two separate

3  tests "but merely extremes of a single continuum." *Alaska v. Native Village of Venetie*, 856 F.2d

4  1384, 1389 (9th Cir. 1988) (citation omitted).  Put differently, where "the balance of harm tips

5  decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on

6  the merits." *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991).

7  　　　　Here, Praxair clearly meets this requirement for injunctive relief.  As discussed more fully

8  *infra*, Praxair is currently suffering irreparable harm *and* has a strong chance of success on the

9  merits.  Accordingly, Praxair asks that ATMI be immediately enjoined as Praxair has requested.

10  　　　　A.  Underline{ATMI Must Be Immediately Restrained from Cutting Off Praxair's Supply of $B^{11}F_3$.}

11  　　　　　　1.  <u>Absent Entry of a Preliminary Injunction, ATMI's Exclusive Supply Agreement

12  　　　　　　　　with Nukem Will Inflict Irreparable Injury Upon Praxair.</u>

13  　　ATMI's exclusive supply agreement with Nukem is a blatant effort to preserve its monopoly

14  over sub-atmospheric delivery systems by effectively, and almost certainly permanently, impairing

15  Praxair's ability to compete against ATMI.   Absent immediate intervention by this Court, Praxair

16  will soon find itself unable to supply many of its customers with sub-atmospheric systems for the

17  delivery of $B^{11}F_3$ because of the supply boycott that ATMI has engineered.  Indeed, it is estimated

18  Praxair's current supply of saleable $B^{11}F_3$ will run out in a few months.  (Roberge Decl., ¶ 39.)

19  　　The harm to Praxair is not simply losing a few customers; rather, if ATMI is permitted to

20  enforce its exclusive supply contract with Nukem, Praxair faces the very real prospect of being

21  forced out of the relevant market *in toto*, because, as a practical matter, up to a nine-month

22  qualification process renders Praxair unable to compete in the relevant market. (*Id.*, ¶ 38.)  For

23  Praxair to remain an effective competitor in the supply of sub-atmospheric gas delivery systems, it

24  must have a reliable source of high quality, high purity $B^{11}F_3$.  (*Id.*, ¶¶ 14, 29, 30.)   Because

25  Nukem controls the vast majority of the qualified $B^{11}F_3$, ATMI's exclusive supply agreement with

26  Nukem, as a practical matter, denies Praxair the ability to serve as an effective competitor – a

27  paradigmatic instance of irreparable harm.  *See Springs Ambulance Servs, Inc. v. Indio*, No. CV-84-

28  1076, 1984 WL 418, *3 (C.D. Cal. May 4, 1984) (finding irreparable harm and granting

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869
JW (HRL)

preliminary injunction because "unless [defendant] is enjoined from attempting to monopolize or monopolizing access to calls for emergency ambulance services, . . . Springs will be prevented from engaging in the emergency ambulance business in the Indio market").[10]

Moreover, this inability to supply customers damages Praxair's goodwill and business reputation, causing Praxair further irreparable harm.  Simply put, customers of Praxair's UpTime® system—many of whom also buy additional products from Praxair—will no longer see Praxair as a reliable supplier and will abandon it.  (Roberge Decl., ¶ 39.)  Once lost, such damage to a firm's goodwill and reputation is almost impossible to restore.  Accordingly, it constitutes irreparable injury.  *See Regents of Univ. of Cal. v. American Broad. Co., Inc.*, 747 F.2d 511, 520 (9th Cir. 1984) (holding that diminution of reputation constitutes irreparable harm); *Blackwelder Furniture Co. of Statesville, Inc.  v. Seilig Mfg Co. Inc.,* 550 F.2d 189, 196-97 (4th Cir. 1977) (holding that a seller who was completely cut off by a supplier suffered irreparable harm because of the loss of good will and reputation resulting from its inability to provide customers with the product).[11]

Even if Praxair can secure an alternate and reliable long-term supply of $B^{11}F_3$, Praxair still finds itself in a perilous competitive posture due to the chokehold that ATMI has placed on the supply of Nukem *qualified* $B^{11}F_3$.  That is because, as discussed *supra*, customers of sub-atmospheric gas delivery systems do not easily change from one supplier to another; rather, because of the extreme importance of quality control to avoid contamination of large quantities of semiconductor chips, customers conduct extensive and costly qualification processes before they will allow a new supplier to become part of the manufacturing process.  Thus, even if Praxair can secure sufficient quantities of $B^{11}F_3$, Praxair would still be irreparably harmed because it would be unable to supply its customers for up to nine months until Praxair, using its new source of gas, went through the lengthy and expensive qualification process—assuming that customers would even give Praxair the

---

[10] *See also Acquaire v. Canada Dry Bottling Co. of New York, Inc.*, 24 F.3d 401 (2d Cir. 1994) (under section 1 claim, district court did not abuse discretion in enjoining bottler from withholding supply from distributors who failed to adhere to promotional discount procedures); *Bristol Tech., Inc. v. Microsoft Corp.*, 42 F. Supp. 2d 153 (D. Conn. 1998) (finding Microsoft's refusal to supply plaintiff with source code would result in irreparable harm).

[11] *See also Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)  ("we have also recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm").

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869 JW (HRL)

1    chance and do so immediately.  Plainly, Praxair "has established the existence of its business life as

2    a competitor in the [relevant] market is threatened.  This is a sufficient showing of irreparable harm

3    to warrant a preliminary injunction."  *Foremost Int'l Tours, Inc. v. Qantas Airways Ltd.*, 379 F.

4    Supp. 88, 97 (D. Haw. 1974).

5        In stark contrast to the irreparable harm Praxair is suffering, ATMI would not be harmed at all

6    if this Court were to enter the requested injunctive relief.  ATMI would not lose its supply of $B^{11}F_3$.

7    In fact, the only "harm" to ATMI is that it would continue to face competition from Praxair.

8    Needless to say, that is not a harm at all.  Indeed, "the very purpose of the antitrust laws is to

9    promote competition."  *In re Citric Acid Litigation*, 191 F.3d 1090, 1094 (9th Cir. 1999) (citation

10   omitted).  The balance of harms thus tips decidedly in favor of injunctive relief.

11           2.   Praxair Is Likely to Succeed on Its Claims Because ATMI's Exclusive Supply

12                Agreement with Nukem Is a Plain Violation of Law.

13       Given the substantial irreparable harm Praxair will suffer absent an injunction (and the total

14   absence of harm facing ATMI), Praxair need only show a "fair chance of success on the merits" to

15   obtain injunctive relief.  *Benda v. Grand Lodge of the Int'l Assoc. of Mechinists & Aerospace*

16   *Workers*, 584 F.2d 308, 315 (9th Cir. 1978).  Praxair more than meets this standard because

17   ATMI's exclusive contract with Nukem—an entity that supplies the vast majority of the qualified

18   $B^{11}F_3$ worldwide—constitutes unlawful monopolization and an unreasonable restraint of trade, in

19   violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

20           *a.  ATMI's Unlawful Monopolization or Attempt to Monopolize.*

21       The Supreme Court has explained that monopoly power is "the power to control prices or

22   exclude competition." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 481

23   (1992) (citation omitted).  Section 2 of the Sherman Act prohibits the acquisition of such monopoly

24   power through anti-competitive means.  To prevail on its monopolization claim, Praxair must

25   establish two elements: "(1) the possession of monopoly power in the relevant market and (2) the

26   willful acquisition or maintenance of that power." *Id.* at 481.

27           i.  ATMI Has Market Power.

28       To demonstrate that ATMI has market power, Praxair must "(1) define the relevant market, (2)

                                        - 14 -

1    show that the defendant owns a dominant share of that market, and (3) show that there are

2    significant barriers to entry and . . . that existing competitors lack the capacity to increase their

3    output in the short run."  *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195,

4    1202 (9th Cir. 1997).

5        Applying this standard here, the relevant market is the global production and sale of sub-

6    atmospheric gas delivery systems because buyers will not substitute another product for the sub-

7    atmospheric gas delivery systems.  (Roberge Decl., ¶ 20.)  For instance, few, if any, customers still

8    use other delivery methods (*e.g.*, pressurized cylinders), principally because the new sub-

9    atmospheric delivery systems are substantially safer, increase productivity, and generate

10   efficiencies.  (*Id.*, ¶ 21.)[12]  Similarly, a customer that has chosen to employ a sub-atmospheric

11   delivery system is unlikely to switch back to the pressurized method, because of the unique features

12   that the sub-atmospheric gas delivery systems provide, including increased safety; decreased cost of

13   ownership; higher capacity; and reduced gas box ventilation and equipment costs.  (*Id.*, ¶ 22.)

14   Indeed, that Praxair's and ATMI's sub-atmospheric gas delivery system products are priced at a

15   premium compared to pressurized cylinders containing the same gas, (*Id.*, ¶ 23), demonstrates that

16   customers do not consider them to be viable substitutes.  *See, e.g.*, *Forsyth v. Humana, Inc.*, 114

17   F.3d 1467, 1477 (9th Cir. 1997) ("[W]hen demand for the commodity of one producer shows no

18   relation to the price for the commodity of another producer, it supports the claim that the two

19   commodities are not in the same relevant market.")[13]  In short, there can simply be no dispute that

20

---

21   [12] *See Int'l Boxing Club of New York, Inc. v. U.S.*, 358 U.S. 242, 249-51 (1959) (although all
     boxing contests include one ring, two boxers, one referee, the same rules, and an audience,
22   championship boxing was a separate market because it is "the 'cream' of the boxing business, and,
     as has been shown [by evidence of higher prices and the particular and special demands involved in
23   licensing these contests], is a sufficiently separate part of the trade or commerce to constitute the
     relevant market for Sherman Act purposes"); *U.S. Anchor Mfg. v. Rule Indus., Inc.*, 7 F.3d 986, 996
24   (11th Cir. 1993) (finding that, although functionally interchangeable, brand name anchors
     constituted a separate market because they sold at prices 50-96% higher than generic anchors and
25   were characterized by a distinct customer base, inelastic demand, and limited substitution).
       [13] *See also Geneva Pharm. Tech. Corp. v. Barr Lab. Inc.*, 386 F.3d 485, 496-97 (2d Cir. 2004)
26   (price disparity between functionally equivalent name brand and generic drugs "is evidence of a
     distinct customer group with brand allegiance and/or high risk sensitivity that was unwilling to
27   switch from the known brand name even in the face of a discounted alternative"); *Davis & Co. Auto
     Parts, Inc. v. Allied Corp.*, 651 F. Supp. 198, 202 (S.D.N.Y. 1986) ("markets for new and rebuilt
28   automotive products are two distinct markets whose quality differs so greatly that they exist in
     completely separate price categories").

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869
JW (HRL)

1 the relevant market is for sub-atmospheric gas delivery systems.

2     ATMI has monopoly power both in the United States and around the world in the market for

3 sub-atmospheric gas delivery systems.  That ATMI controls more than ninety percent of the sales of

4 sub-atmospheric gas delivery systems, (Roberge Decl., ¶ 18), is strong, *prima facie*, evidence of

5 ATMI's market power.  *See*, *e.g.*, *id*.at 1206 ("Courts generally require a 65% market share to

6 establish a *prima facie* case of market power.").  In addition to market share, substantial barriers to

7 entry exist with respect to the market for sub-atmospheric gas delivery systems.  *See generally*

8 *Image Technical Servs.*, 125 F.3d at 1208 (explaining that "[c]ommon entry barriers include:

9 patents or other legal licenses, control of essential or superior resources, entrenched buyer

10 preferences, high capital entry costs and economies of scale").

11     Here, several of the factors identified by the Ninth Circuit in *Image Technical Services* are

12 present.  For instance, as discussed *supra*, the difficulty of obtaining sufficiently pure and qualified

13 $B^{11}F_3$ is substantial.  Now, because of the exclusive agreement between ATMI and Nukem, Praxair

14 (the only viable competitor) has been foreclosed from obtaining sufficient amounts of qualified

15 high quality $B^{11}F_3$ to compete with ATMI. (Roberge Decl., ¶ 25).   Developing a sub-atmospheric

16 delivery system is also expensive and difficult.  (*Id.*, ¶ 26.)  It requires scale in manufacture,

17 development of a knowledgeable sales force, and substantial capital investment.  (*Id.*)  Even if a

18 potential competitor could develop such a competing product, any new market entrant would likely

19 be deterred by ATMI's pattern of aggressive patent litigation over sub-atmospheric gas delivery

20 systems.  (*Id.*, ¶ 27.)  Similarly, the validity of Praxair's patent for its UpTime® product has yet to

21 be finally resolved.  (*Id.*)  A new company would also have difficulty making inroads into the

22 market because customers are unlikely to switch suppliers because of the difficult and expensive

23 qualification process to which customers subject new suppliers.   (*Id.*, ¶ 28.)

24          ii.  ATMI Has Engaged in Predatory Conduct.

25     ATMI has willfully obtained and maintained its monopoly power in the production and sale of

26 sub-atmospheric gas delivery systems in numerous ways, including its efforts to cut-off Praxair's

27 primary supplier of qualified $B^{11}F_3$.  ATMI's exclusive contract with Nukem is unquestionably

28 predatory and anticompetitive.  ATMI is not competing on the merits of its product, but rather has

pressured Praxair's primary vendor for a critical raw material, $B^{11}F_3$, to cease dealing with Praxair. Indeed, "[p]reliminary injunctions have often been granted against dominant companies to keep open the source of supply to their competitors because the dominant concern was breaching the antitrust laws in its refusals to deal with competitors." *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club*, 351 F. Supp. 462, 514 (E.D. Pa. 1972) (numerous citations omitted).[14]

Here, because customers require qualification before approving a new vendor, this exclusive agreement will have the practical effect of excluding Praxair from nearly the entire market, leaving no viable competitor for ATMI. *See Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*, 386 F.3d 485, 508 (2d Cir. 2004) ("Since [defendant] was aware that clathrate was in short supply—and in fact believed ACIC/Brantford was the only available supplier—the decision to use an exclusive supply contract as opposed for example to a requirements contract . . . suggest intent to control the supply of clathrate.")

In *Philadelphia World Hockey*, the court granted a preliminary injunction to prevent the enforcement of exclusive contracts because such contracts prevented new market entrants from obtaining the resources necessary for competition. The court explained by analogy that "[o]ne who builds the most modern steel mill cannot operate without an adequate supply of iron ore." *Id*. at 509. The same logic applies here. ATMI is attempting to deprive Praxair of the resources necessary to compete in the sub-atmospheric gas delivery market. It has thus willfully acquired and maintained its monopoly power. *See generally Telecor Comms., Inc. v. Southwestern Bell Telephone Co.*, 305 F.3d 1124 (10th Cir. 2002) (affirming jury verdict of antitrust violation where defendant had used long-term contracts for the location of pay telephones such that independent

---

[14] *See generally Hawaii ex rel. Anzai v. Gannett Pacific Corp.*, 99 F.Supp.2d 1241 (D. Hawaii 1999) (granting preliminary injunction when plaintiff claimed that defendant's planned termination of state-approved joint operating agreement between two defendant newspapers would violate sections 1 and 2 because termination of agreement was designed to have one of the two defendants fail, leaving other defendant as sole newspaper in state); *Filtrol Corp. v. Slick Corp.*, No. 69-607-ALS, 1969 WL 219 (C.D. Cal. Dec. 29,1969) (granting preliminary injunction preventing defendant from acquiring "supplier of indispensable commodity needed by it and by its competitors" which would give defendant control of 80 to 90% of the supply of the commodity, because defendant "would have power to deny supply to competitors or to supply inferior quality" and this could "substantially [] lessen competition, or tend to create a monopoly").

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869 JW (HRL)

1    pay phone providers were unable to break into the market).[15]

2         In addition to its exclusive (and exclusionary) contract intended to prevent Praxair from

3    obtaining $B^{11}F_3$, ATMI has engaged in additional anticompetitive and predatory conduct, the effect

4    of which is to further acquire and maintain its unlawful monopoly over the sub-atmospheric gas

5    delivery system market.  As discussed in more detail *infra*, (pp. ** to **), ATMI has improperly

6    used its limited patent monopoly in some European countries to stifle competition in the United

7    States, Asia and other European countries.  For instance, ATMI has used the preliminary relief

8    issued by the Belgian court as a lever to force Praxair to remove all references to its UpTime®

9    product on its www.praxair.com website, a site hosted and managed on servers in the United States.

10   Put differently, ATMI has used preliminary equitable relief entered by a Belgian court to protect

11   limited intellectual property rights in some European countries to prevent a U.S. company from

12   lawfully marketing and advertising a product in the United States.  ATMI has also aggressively

13   asserted patent rights in the United States that have been easily revealed to be invalid and

14   unenforceable.  Such predatory conduct clearly has the intent and effect to acquire and maintain

15   ATMI's unlawful monopoly.  *See Conwood Co., L.P. v. United States Tobacco Co.*, 290 F.3d 768

16   (6th Cir. 2002) (upholding $1.05 billion dollar verdict on Section 2 claim predicated on a variety of

17   tortious conduct designed to prevent plaintiff from being able to market its products); *Hynix*

18   *Semiconductor v. Rambus, Inc.*, --- F. Supp. 2d ----, 2007 WL 3284069, at *5 (N.D. Cal. Nov. 4,

---

19        [15] *See also Insignia Systems, Inc. v. News America Marketing In-Store, Inc.*, No. 04-4213, 2006

20   WL 1851137, at *4 (D. Minn. June 30, 2006) (holding that plaintiff, a company that buys
     advertising space on grocery store shelves, had alleged a valid antitrust claim against defendant

21   competitor by claiming that "[defendant competitor] used its dominant position in the market to
     bring about a situation where the grocery retailers would sign exclusive contracts with [defendant

22   competitor]" to the exclusion of plaintiff); *JamSports and Entm't, LLC v. Paradama Prods., Inc.*,
     336 F. Supp. 2d 824 (N.D. Ill. 2004) (denying defendant's summary judgment motion attacking

23   plaintiff's section 2 claim when plaintiff sports promoter alleged that defendant used its market
     power to threaten and entice stadiums not to contract with plaintiff, denying plaintiff venues for

24   events and therefore hindering competition); *Ultronics, Inc. v. Cox Cable of San Diego, Inc.*, No.
     88CV1718K, 1991 WL 1302931 (S.D. Cal. May 29, 1991) (denying defendant's summary

25   judgment motion when plaintiff offered evidence that defendant, a competitor in the San Diego
     cable market, held exclusive license to allow cable carriers to show Padres games, sold the rights to

26   other competitors in the relevant market, and expressed a desire to eliminate the plaintiff "at any
     cost"); *Cass Student Adver., Inc. v. National Ed. Adver. Serv., Inc.*, 407 F. Supp. 520 (N.D. Ill.

27   1976) (enjoining enforcement of exclusive contracts upon finding that exclusive representative
     contracts between college newspapers by defendant ad placement company violated section 2

28   where defendant had large market share and performance of the contracts would foreclose
     competition from the market).

2007) (holding that "an antitrust plaintiff may [] include good faith patent litigation as part of the anticompetitive scheme").[16]

Even if one were to suppose that ATMI has not yet obtained a full-blown monopoly, it is plain that ATMI has *attempted* to acquire a monopoly over the global market for sub-atmospheric gas delivery systems based on the aforementioned predatory conduct. "The elements of attempted monopolization are: '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Lucent Techs., Inc. v. Gateway, Inc.*, No. 02-2060-B(CAB), 2007 WL 2900484, at *17 (S.D. Cal. Oct. 1, 2007) (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993)). Importantly, "specific intent may be established . . . by circumstantial evidence . . . of illegal conduct." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1027 (9th Cir. 1981).[17]  Plainly, the exclusive agreement with Nukem, along with ATMI's overreaching and unjustified extraterritorial extension of its limited patent rights, demonstrates a specific intent to monopolize.  These predatory acts, when combined with ATMI's market share, demonstrate that ATMI has raised a dangerous probability of achieving monopoly power.[18]  In sum, Praxair has a high likelihood of success on its section 2 claim.

   b. *ATMI's Chokehold Over Nukem Constitutes an Unlawful Exclusive Dealing Arrangement That Violates Section 1 of the Sherman Act.*

Exclusive dealing is one of many types of conduct that "can be an improper means of maintaining a monopoly."  *U.S.  v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (monopolist's use of exclusive dealing subject to more rigorous scrutiny than that of non-monopolist); *see also Twin City Sportservice, Inc. v.*

---

[16] *See also Grid Sys. Corp. v. Texas Instruments, Inc.*, 771 F. Supp. 1033, 1039 (N.D. Cal. 1991) (holding that "misuse of patent rights may amount to the sort of 'willful' or 'predatory' misconduct that would render a monopoly or attempted monopoly illegal under Section 2") (citations omitted).

[17] *See generally* Antitrust Law Developments (Sixth), Vol. I, at 310.

[18] *See Spectrum Sports, Inc.*, 506 U.S. at 459 ("[D]emonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographic market and the defendant's economic power in that market."). *See generally* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 807a (2004 Supp.) ("[D]angerous probability of achieving monopoly power [is] normally measured through an analysis of market share.")

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869 JW (HRL)

*Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982).  The test for determining whether exclusive dealing contracts violate the antitrust laws is whether they "foreclose competition in a substantial share of the line of commerce affected."  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997).  In assessing foreclosure, courts consider the defendant's conduct in light of the "economic reality of the market at issue."  *Dentsply*, 399 F.3d at 189 (citation omitted).  The amount of foreclosure at issue often takes on "greater significance" where it is a monopolist that has entered into an exclusive contract.  *Microsoft*, 253 F.3d at 72.  These same general principles apply to circumstances in which a monopolist has entered into exclusive supply agreements that deprive competitors of access to a critical input they need to compete.  *See* 11 Herbert Hovenkamp, *Antitrust Law* ¶ 1803a (2d ed. 2005); *id.* ¶ 1803c.[19]

Here, Praxair needs qualified $B^{11}F_3$ to compete in the sub-atmospheric gas delivery system market, and both ATMI (controlling more than ninety percent of the sub-atmospheric gas delivery system market) and Nukem (controlling the vast majority of qualified $B^{11}F_3$) possess dominant positions.  ATMI's exclusive supply agreement locks up a critical input that is necessary for Praxair to compete in the sub-atmospheric gas delivery market and substantially reduces competition.  It is an unreasonable restraint of trade that violates Section 1 of the Sherman Act.

> B.   ATMI Should be Enjoined from Using the Belgian Court's Preliminary Advertising Ban to Inhibit Competition in the United States and Around the World.
>
> > 1.   ATMI has improperly used its patent in certain European countries to adversely affect competition in the United States and cause irreparable injury.

ATMI is acting as if the preliminary equitable relief it obtained in connection with a patent registered in a handful of European countries is limitless, boasting to the world that "a preliminary injunction is currently in place against the public marketing of the UpTime system **worldwide**."[20]  To that end, ATMI has aggressively attempted to enforce the purported advertising ban against

---

[19] *See also U.S.  v. American Can Co.*, 230 F. 859 (D. Md. 1916) (monopolist's long term contracts to buy entire supply of can-making machinery violated antitrust laws), *appeal dismissed*, 256 U.S. 706 (1921).

[20] Feb. 23, 2007 Form 10-K (Annual Report), at 18 (emphasis supplied).

Praxair *in the United States*.  As a result of ATMI's overreaching, Praxair is now in the position of being barred from advertising non-infringing products made in the United States to American customers.[21]  For instance, as set forth in more detail *supra*, ATMI has already succeeded in forcing Praxair to remove all references to UpTime® on its primary website, a site hosted on servers in the United States and available to customers in the United States.  Similarly, ATMI is now complaining that Praxair's website provided a brief notice regarding a presentation about a variety of topics, including the UpTime® system, that was to be given at a scientific conference in Taiwan —a country in which ATMI has no basis to exclude Praxair.[22]  Finally, ATMI has objected to the presence of UpTime® references on unrelated, third party websites in the United States, arguing that Praxair ought to be sanctioned for conduct it does not even control.   If left unchecked, ATMI will continue to interfere with the ability of Praxair to lawfully market its UpTime® product in the United States and around the world.

The Belgian court's preliminary equitable relief, as it is being brandished and overextended by ATMI, poses a direct threat to—and indeed has already curtailed—Praxair's constitutionally guaranteed right to free speech.  As the Supreme Court has repeatedly explained, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citations omitted).[23]  Here, by being unable to advertise on its website, Praxair has been inhibited in its ability to exercise its First Amendment freedoms to make truthful statements to consumers *about its own lawful products in the United States*, and American consumers have lost the right to see such advertising.  Indeed, this harm is inflicted on society as a whole.  *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 564 (2001) ("We must consider that [] retailers and manufacturers have an interest in conveying truthful information about their products [], and [consumers] have a corresponding interest in receiving

---

[21] Praxair manufacturers most of its UpTime® products in Arizona.  (Roberge Decl., ¶ 19.)
[22] Notably, no one from Belgium or any European country in which ATMI has a registered patent attended the conference.  (Roberge Decl., ¶ 59.)
[23] This principle holds equally true in the context of commercial speech.  *See, e.g., Moser v. F.C.C.*, 811 F. Supp. 541, 546 (D. Or. 1992) (holding "that first amendment infringements can have a profound impact, and regards the loss of plaintiffs' rights to express one form of  commercial speech as a significant hardship").

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869 JW (HRL)

1   truthful information about [] products."); *Virginia State Board of Pharmacy v. Virginia Citizens*

2   *Consumer Council, Inc.*, 425 U.S. 748, 764 (1976) (recognizing public interest "in the free flow of

3   commercial information").

4        The harm caused by Praxair's lost advertising is irreparable; it cannot be quantified merely by

5   its lost sales or revenue.  As one court explained, "[c]ommercial speech merits First Amendment

6   protection not simply because it enables sellers to hawk their wares and gain a profit, but because it

7   equips consumers with valuable information and because it contributes to the efficiency of a market

8   economy."  *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1236 (10th Cir. 2005) (citation

9   omitted) (affirming grant of preliminary injunction because "the injury incurred through the

10  deprivation of commercial speech rights cannot be quantified solely in terms of transaction costs

11  and lost profits to a single market participant").[24]  In short, by interfering with Praxair's right to

12  truthfully market its UpTime® product in the United States – a product that cannot infringe any

13  American patent – both Praxair, in particular, and the consuming public, in general, have suffered

14  and are suffering irreparable injury.

15        2.   ATMI's Overreaching and Extraterritorial Application of its Challenged European

16             Patent Rights is Unlawful.

17        There is no doubt that ATMI has every right to seek relief in other jurisdictions to protect

18  whatever intellectual property rights it may claim to have there.  At the same time, however, it is

19  equally clear that there are limits to the prerogatives of parties to use foreign courts to obtain orders

20  that interfere with the operation of businesses elsewhere. *See E.&J. Gallo Winery v. Andina*

21  *Licores, S.A.,* 446 F.3d 984, 991 (9th Cir. 2006).  Here, ATMI is using a Belgian preliminary order

22  to restrain commerce and affect speech in the United States in a way that would never be permitted

23  by a United States court.  Such conduct is not permitted.

24      *Microsoft Corp. v. Lindows.Com, Inc,* 319 F. Supp. 2d 1219 (W.D. Wa. 2004) is instructive.

25  There, Lindows sought relief in a United States court, arguing that a Dutch court's injunction

26

27      _____

        [24] In addition to encroaching on Praxair's First Amendment rights, ATMI's use of the Belgian
28  preliminary relief is causing additional irreparable harm by interfering with Praxair's ability to
    market its products effectively in countries around the world, including the United States, thereby
    adversely affecting Praxair's business reputation and goodwill.  *See* discussion, *supra* at ** - **.

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869
JW (HRL)

required it to cease using its primary website.  Although the court declined to grant Lindow's relief, it explained that it would reconsider its ruling "[s]hould the Dutch court decide that compliance with its preliminary injunction can only be accomplished by the extraordinary act of shutting down the Lindows.com website [because] [i]t is well-established that neither a rule of customary international law nor a provision of a treaty, and by logical extension, a foreign court order can abrogate a right granted under the Constitution." 319 F. Supp. 2d at 1223.  The only reason why the court did not apply those limitations was its stated belief that the Dutch court would not interpret its order in such an expansive fashion and that "Microsoft will not seek such drastic relief from the Dutch court" (*id*. at 1224)—two circumstances notably—absent in this case.

That ATMI was able to persuade a Belgian administrative official to adopt its expansive and extraterritorial reading of the order is inapposite.  Indeed, "[a] court in the United States need not recognize a judgment of the court of a foreign state if . . . the judgment itself [] is repugnant to the public policy of the United States or the State where recognition is sought."  Restatement (Third), Foreign Relations Law of the United States § 482 (2).  *See generally See Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 169 F. Supp. 2d 1181 (N.D. Cal. 2001) (refusing to enforce French injunction against Yahoo! in the United States because of free speech concerns), *rev'd on other grounds*, 433 F.3d 1199, 1215 (9th Cir. 2006).  Here, the Belgian preliminary equitable relief is being used and enforced in a way that is repugnant to the public policy of the United States.

*First, it is repugnant to Praxair's right to free speech and that of consumers guaranteed by the First Amendment.*  Prohibiting Praxair from truthfully advertising in the *United States* offends the policy underlying the protection of commercial speech—including advertising—as articulated by the Supreme Court.  *See, e.g., Virginia State Board of Pharmacy*, 425 U.S. at 765.[25]  ATMI's use of the Belgian preliminary injunction to cut off speech related to Praxair's UpTime® products cannot be reconciled with this strong and constitutionally mandated public policy.  Indeed, ATMI could not have obtained such relief in the United States; it should not be permitted to do an end run around Praxair's constitutionally guaranteed rights by running to a foreign court.

---

[25] *See also Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 563 (1980) ("The First Amendment's concern for commercial speech is based on the informational function of advertising.") (citation omitted).

MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES/ C-08-00869 JW (HRL)

To justify such a restraint in the United States, ATMI would face a heavy burden.  *See Greater New Orleans Board, Ass'n. Inc. v. United States*, 527 U.S. 173, 183 (1999) (party seeking to enforce the restraint "bears the burden of identifying a substantial interest and justifying the challenged restriction").   ATMI must establish that (1) the interest in maintaining a global injunction is "substantial," (2) the injunction "directly advance[s] the governmental interest," and (3) the global injunction is not "more extensive than is necessary" to serve that interest.  *Lorillard Tobacco*, 533 U.S. at 554 (citation omitted).

ATMI fails on all three prongs.  First, ATMI has not demonstrated any legitimate interest in regulating competition or related free speech for sub-atmospheric gas delivery systems in the United States, Asia, and other European nations, let alone a "substantial" one.  To the extent ATMI relies on the interest in protecting its patent rights *in a handful of the European countries*, its overbroad assertion of the injunction does not "directly advance" that interest and is clearly "more extensive" than necessary to achieve the limited purpose.[26]  As discussed in detail *supra*, ATMI continues to seek broader and more offensive restraints against Praxair, now even attempting to hold Praxair liable for the commercial speech of an unrelated third party.  This is repugnant to the First Amendment and the commercial speech doctrine as carefully crafted by the Supreme Court.[27]

*Second, it is repugnant to the policies underlying patent law*.  The purpose of the patent laws is "encouraging innovation, industry and competition."  *Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572, 1576 (9th Cir. 1990).[28]  Indeed, "[t]he novelty and nonobviousness requirements of patentability embody a congressional understanding, implicit in the Patent Clause itself, that free exploitation of ideas will be the rule, to which the protection of a federal patent is the exception." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 151 (1989).  By

_____

[26] Notably, the injunction is not merely an "internet" ban; rather, it prohibits, in the words of ATMI, all "public marketing of the UpTime system worldwide."

[27] *See generally Matusevitch v. Telnikoff*, 877 F. Supp. 1 (D.D.C. 1995) (rejecting British judgment because libel standards used there were repugnant to free speech policies of the US); *Bachchan v. India Abroad Publ'ns, Inc.*, 585 N.Y.S.2d 661 (N.Y. Sup. Ct. 1992) (declining to enforce a British judgment because of its chilling effect on First Amendment rights).

[28] *See generally Dawson Chemical Co. v. Rohm and Haas Co.*, 448 U.S. 176, 221 (1980) ("The policy of free competition runs deep in our law.  It underlies both the doctrine of patent misuse and the general principle that the boundary of a patent monopoly is to be limited by the literal scope of the patent claims.").

aggressively enforcing an advertising ban against Praxair in the United States—a country where it is permitted to manufacture, market, and sell its UpTime® products—ATMI is, attempting through the inappropriate use of its patent in a few European countries, to undermine this foundational policy and foster a monopoly in the United States over a product that a United States court has already determined is undeserving of such protection.  This is improper.

Third, it is repugnant to the policies underlying antitrust law.  As the Supreme Court has explained, "our traditional national policy, reflected in the antitrust laws, is of insisting upon the primacy of competition as the touchstone of economic regulation." Penn-Central Merger and N & W Inclusion Cases, 389 U.S. 486, 500 (1968).  ATMI's use of the Belgian order is contrary to this "traditional national policy."  Indeed, ATMI is using the Belgian preliminary relief to not only facially violate the antitrust laws but also to exclude all competition in a way that is antithetical to the very spirit and purpose of those laws, namely fair and free competition.

At bottom, because of Praxair's strong showing of irreparable harm, it need only show a "fair chance of success on the merits."  Benda, 584 F.2d at 315.  Here, Praxair has done far more. ATMI's efforts to turn the Belgian court's preliminary order—intended to protect a limited European intellectual right in certain European countries— into a global advertising ban is repugnant to the public policies of the United States embodied in the First Amendment, the patent laws, and the antitrust laws.  It has been used as a tool to further ATMI's monopoly unlawfully.  It undermines free speech, the public domain, and the free market.  It cannot stand.

**IV.    Conclusion.**

For the foregoing reasons, Praxair respectfully requests that this Court enter a preliminary injunction against ATMI.

February 8, 2008                          Respectfully submitted,

                                          By: /s/ STEHPEN V. BOMSE

                                          Attorney for Plaintiff

                                          Praxair, Inc.

- 25 -