STEPHEN V. BOMSE (Bar No. 40686)
steve.bomse@hellerehrman.com
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone:  (415) 772-6000
Facsimile:   (415) 772-6268

NATHAN P. EIMER (*pro hac vice* pending)
neimer@eimerstahl.com
ANDREW G. KLEVORN (*pro hac vice* pending)
aklevorn@eimerstahl.com
CHAD J. DOELLINGER (*pro hac vice* pending)
cdoellinger@eimerstahl.com
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Telephone:  (312) 660 7600
Facsimile:  312-692-1718

Attorneys for Plaintiff
PRAXAIR, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PRAXAIR, INC., | ) Case No.: C-08-00869 JW (HRL) |
| Plaintiff, | ) **DECLARATION OF RAYMOND P. ROBERGE IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRILIMINARY INJUNCTION** |
| v. | ) |
| ATMI, INC. and ADVANCED TECHNOLOGY MATERIALS, INC., | ) Date:  March 24, 2008 |
| | ) Time: 9:00 a.m. |
| Defendant. | ) Ctrm: 8, 4th floor |
| | ) Hon.  James Ware |

_____

Pursuant to 28 U.S.C. § 1746, Raymond P. Roberge declares as follows:

1.      I am Raymond P. Roberge, President of the Electronics Division of Praxair, Inc. (hereinafter "Praxair Electronics").  I submit this Declaration in support of Praxair's Motion for a Preliminary Injunction.

2.      My Declaration is based upon my personal knowledge and my responsibilities as President of Praxair Electronics.

<u>Background Regarding Sub-Atmospheric Gas Delivery Systems</u>

3.      The fabrication of certain semiconductors requires the implantation of certain ions into a silicon wafer.

4.      Such ions can only be implanted into the silicon wafer by exposing it to certain specialized gases, including, but not limited to, arsine, phosphine, and isotopically enriched boron trifluoride ($B^{11}F_3$) (the specialty gasses used in ion implant are known in the industry as "dopant gases").

5.      These gases are not fungible.  Indeed, each is necessary in this process because each is used to provide different electrical properties to the semiconductor material.

6.      In the past, the dopant gases used in semiconductor manufacture and fabrication were stored in pressurized cylinders or pressurized tanks.  However, the use of such pressurized cylinders posed certain safety and health risks.  For instance, an unintended opening of the outlet valve in a pressurized cylinder could cause the immediate release of gases into the workplace and environment, leading to potentially serious injury (possibly even death) and environmental risks.

7.      To mitigate such risks, sub-atmospheric gas delivery systems were developed.  Such delivery systems restrict the release of gas only if a vacuum (*i.e.*, through a line with sub-atmospheric air pressure) is attached to the cylinder containing the gas.

8.      Sub-atmospheric gas delivery systems offer substantial safety and technical advantages, provide productivity improvements, and are priced at a premium to gas delivery systems based on pressurized gas cylinders.  Despite the premium price, more than ninety percent (90%) of the semiconductor industry uses sub-atmospheric gas delivery systems.

9.      ATMI was the first to market a sub-atmospheric gas delivery system through the use of chemical adsorbent materials (known as the SDS® system).  The SDS® system was a commercial

success. With its introduction of the SDS® system in the mid-1990s, ATMI soon became the sole provider of sub-atmospheric gas delivery systems, creating an initial monopoly position for ATMI.

10.    In the late 1990's, a company called UOP developed the first mechanical sub-atmospheric delivery system. This alternative technology to the SDS® system provided the equivalent safety benefits in a novel design and avoided any possible infringement of the SDS® patents. UOP obtained US patents related to this system and the patents were purchased by an affiliate of Praxair Electronics in 2002.

11.    To inject competition into this market, Praxair Electronics completed the development of the mechanical-based system for the sub-atmospheric delivery of gases, which Praxair Electronics now markets under the brand UpTime®. The UpTime® system is a pressured cylinder with a specialized valve designed to only open when a vacuum is drawn on the outlet. It is covered by U.S. Patent Nos. 6,045,115, 6,007,609, and 5,937,895.

12.    ATMI has also introduced a mechanical system for the sub-atmospheric delivery of gases. It calls this product VAC®, and ATMI obtained patents for this system in the United States, some Europe countries and some Asian countries. The VAC® patents were filed in the US after the UpTime® patents. The VAC® system represents only a very small portion of ATMI's sales of sub-atmospheric delivery systems.

13.    Praxair Electronics' UpTime® system supplies substantially the same safe delivery as SDS in a higher volume package. Although Praxair Electronics' UpTime® system is sold in a variety of sizes, the most common holds 335 grams of gas for $B^{11}F_3$. Once a customer uses all of the dopant gas contained in an UpTime® cylinder, the cylinder is returned to Praxair Electronics for refilling.

14.    Semiconductor manufacturers require sellers of sub-atmospheric gas delivery systems to provide the full line of dopant gases because they cannot "mix-and-match" amongst the various systems. Thus, the inability of a supplier to provide one of the key dopant gases could effectively disable its ability to compete.

15.    Customers purchase the UpTime® system as a package (i.e., customers do not purchase the cylinders and necessary gases as separate components). Pricing is made on the basis of dollars per

1  gram of gas supplied (*e.g.,* $X/g of $B^{11}F_3$), typically without any separate charge for the use of the
2  sub-atmospheric cylinder.

3  16.  Praxair Electronics' UpTime® system offers substantial advantages over ATMI's delivery
4  system. Among other things, Praxair Electronics' UpTime® system is on average sold at about
5  twenty percent (20%) below the prevailing rate for ATMI's SDS® system. It also allows for the use
6  of significantly greater volume of gas per cylinder size, (thereby increasing semiconductor
7  fabrication productivity) while permitting a greater portion of the gas to be removed from the
8  cylinder (thereby reducing waste and costs). Because of these advantages, Praxair Electronics'
9  UpTime® system is believed to have a lower total cost of ownership to the customer.

10  17.  Even though Praxair Electronics was a new entrant that faced a firm with a dominant market
11  position and the advantages of incumbency, the UpTime® system made inroads with semiconductor
12  customers. More than ninety-eight percent of Praxair Electronics' customers had previously used
13  ATMI's SDS® system.

14  18.  Notwithstanding Praxair Electronics' introduction of its UpTime® system at a lower cost to
15  the customer, ATMI has maintained a dominant position in the market for sub-atmospheric gas
16  delivery systems. ATMI accounts for approximately 94% of the sales of sub-atmospheric gas
17  delivery systems. Praxair Electronics has an estimated market share of 6%.

18  19.  Although some of Praxair Electronics' UpTime® systems are manufactured and filled
19  overseas, most are made domestically at a facility in Arizona.

20  20.  The market for sub-atmospheric gas delivery systems is distinct. Buyers generally do not
21  substitute another product for the sub-atmospheric gas delivery systems.

22  21.  Very few customers still use other delivery methods (*e.g.,* pressurized cylinders), principally
23  because sub-atmospheric delivery systems are substantially safer, increase productivity, and
24  generate efficiencies.

25  22.  Similarly, a customer that has chosen to employ a sub-atmospheric delivery system is
26  unlikely to switch back to the use of pressurized cylinders, because of the unique features that the
27  sub-atmospheric gas delivery systems provide, including increased safety; decreased cost of
28  ownership; higher capacity; and reduced gas box ventilation and other equipment costs.

4

23. Praxair Electronics' and ATMI's sub-atmospheric gas delivery system products sell for a premium compared to the price pressurized cylinders containing the same dopant gas.

24. The barriers for another competitor to enter this market are substantial.

25. For instance, it would be extremely difficulty for a new firm to obtain a steady and sufficient supply of the full line of gases, including $B^{11}F_3$. This problem is even more difficult now in light of what I understand is an exclusive supply agreement between ATMI and Nukem GmBh.

26. Developing a sub-atmospheric delivery system is also expensive and difficult. Among other things, it requires scale in manufacture, development of a knowledgeable sales force, and substantial capital investment.

27. Even if a potential competitor could develop such a competing product, any new market entrant would likely be deterred by ATMI's pattern of aggressive patent litigation over sub-atmospheric gas delivery systems. Similarly, the validity of Praxair Electronics' patents for its UpTime® product has yet to be firmly resolved.

28. A new firm would also have difficulty making inroads into the market because customers are unlikely to switch suppliers because of the difficult and expensive qualification process to which customers subject new suppliers.

The Supply of $B^{11}F_3$

29. $B^{11}F_3$ is particularly important to the manufacture and fabrication of semiconductors. It accounted for roughly forty percent (40%) of Praxair's sale of gases delivered via Praxair's UpTime® system in 2007.

30. Customers that utilize $B^{11}F_3$ require it to be of high purity and consistent quality. Consequently, before a customer will purchase a sub-atmospheric gas delivery system, the customer subjects the gases used in the system, as well as the delivery system itself, to a rigorous qualification process in which the gases are tested for quality, purity, and consistency.

31. Such a qualification process may take up to nine months to complete and costs as much as $100,000 per semiconductor line. The qualification process is multi-faceted, including evaluating (1) the source material producer, (2) where the gas is transfilled; (3) the physical cylinder itself: and (4) the delivery system. It is undertaken because the introduction of any impurities into the

5

1  semiconductor manufacturing process could result in unusable products, increased expense, and
2  manufacturing delays.

3  32.    I understand that ATMI, in conjunction with Matheson Tri-Gas, Inc. ("Tri-Gas") purchases
4  approximately ninety-five percent (95%) of the total $B^{11}F_3$ output of Nukem GmbH ("Nukem"), a
5  firm with its principal place of business in Germany that is the world's predominant supplier of
6  $B^{11}F_3$. It is believed that Praxair Electronics purchases virtually all of the remaining five percent of
7  Nukem's supply.

8  33.    I understand that Nukem has entered into an exclusive supply agreement with ATMI (alone
9  or in conjunction with Tri-Gas) for $B^{11}F_3$. This presents serious problems for Praxair Electronics.
10  In particular, because Nukem supplies nearly all of the $B^{11}F_3$ that has been qualified with
11  semiconductor manufacturers, the exclusive supply agreement will cut off the supply of qualified
12  $B^{11}F_3$ to Praxair Electronics.

13  34.    Praxair Electronics is attempting to secure an adequate and reliable supply of high quality,
14  high purity $B^{11}F_3$, but has not yet been able to do so. Currently, Praxair Electronics has a few
15  months supply of saleable $B^{11}F_3$. I understand that for Praxair Electronics to obtain an additional
16  supply of $B^{11}F_3$ from Nukem, it must provide advance notice of 4-8 weeks between the date of
17  order and receipt of the $B^{11}F_3$.

18  35.    Even if Praxair Electronics were able to secure an adequate and reliable supply of high
19  quality, high purity $B^{11}F_3$, this alternative source of gas would still need to be subjected to the
20  rigorous and costly qualification testing of customers, with the outcome and timing of such testing
21  far from certain. It may be more than a year before Praxair Electronics' alternatively-sourced gas
22  could be qualified with customers.

23  36.    Further, we must provide our customers with notice as soon as we reasonably know we can
24  no longer supply qualified product. The uncertainty of supply of Nukem qualified product is a
25  serious business concern.

26  37.    Given these constraints, it would be easier for Praxair Electronics' current customers to
27  switch back to ATMI's SDS® system than to remain with Praxair Electronics and qualify the
28  UpTime® system using alternatively-sourced $B^{11}F_3$.

6

38.     As a result of the exclusive supply agreement with Nukem, Praxair Electronics faces the distinct probability of being forced out of the market for sub-atmospheric gas delivery systems because, as a practical matter, the time-consuming, costly and uncertain qualification process that Praxair Electronics would have to undergo places it at a severe disadvantage in the marketplace.

39.     The loss of Nukem-supplied $B^{11}F_3$ would force Praxair Electronics to stop supplying customers with sub-atmospheric delivery systems for $B^{11}F_3$ within a few months. Such an abrupt withdrawal would place Praxair Electronics' reputation as a reliable supplier in jeopardy, not just for sub-atmospheric gas delivery systems but other products that Praxair Electronics supplies to semiconductor manufacturers as well.

ATMI's Patent Misuse

40.     Praxair, Inc. (of which Praxair Electronics is a division) obtained United States patents (U.S. Patent Nos. 6,045,115, 6,007,609, and 5,937,895) for its UpTime® system, while ATMI obtained United States patents (U.S. Patent Nos. 6,101,816 and 6,343,476) and a patent (EP 1 000 291 B1) for its VAC® system that was registered in some European countries.

41.     Praxair, Inc. and ATMI have been engaged in litigation regarding the scope, validity and purported infringement of these patents.

42.     In July 2003, ATMI sued Praxair, Inc. in the United States District Court for the Southern District of New York, alleging that the UpTime® system violated certain of ATMI's patents pertaining to the VAC® sub-atmospheric gas delivery system.

43.     By order dated April 16, 2006, the court granted summary judgment in favor of Praxair, Inc. on the ground that ATMI's patents were invalid and unenforceable on the ground that the claimed invention(s) were obvious. This judgment was affirmed on appeal.

44.     In December 2003, Praxair, Inc. sued ATMI in the United States District Court for Delaware, alleging that ATMI's VAC system infringed Praxair, Inc.'s patent(s) for the UpTime® system.

45.     The jury determined that the Praxair, Inc. patent(s) were valid, and ATMI's VAC system infringed Praxair's patent(s); however, post-verdict, the court held Praxair, Inc.'s patent(s) unenforceable because of purported inequitable conduct primarily by UOP, the original patent

holder whose rights Praxair, Inc. had acquired.  This matter is currently on appeal before the United States Court of Appeals for the Federal Circuit.

46.    At the present time, neither ATMI nor Praxair, Inc. has any valid or enforceable patent rights with respect to mechanically-based sub-atmospheric gas delivery systems in the United States, and both are free to produce, market, advertise and sell their respective systems in the United States.

47.    In August 2006, ATMI filed suit in Belgium against Praxair, Inc., charging infringement of ATMI's European patent registered in Belgian for mechanically-based sub-atmospheric gas delivery systems.

48.    While the merits of this suit have not yet been addressed, on October 26, 2006, ATMI obtained preliminary relief from a Belgian court which restricted Praxair Electronics from engaging in advertising of the UpTime® system; however, Praxair Inc., including Praxair Electronics, was permitted to continue to commercialize its UpTime® system. Any breach of this order carried a penalty of €100,000 (approximately $150,000) per occurrence.

49.    Both Praxair, Inc. and ATMI appealed the lower court's order, with Praxair, Inc. objecting to the ban on advertising and ATMI objecting to the court's refusal to ban Praxair, Inc. from commercializing its UpTime® product in Europe.  By order dated April 26, 2007, the Belgian appellate court summarily upheld the restriction on advertisement of its UpTime® system, and further barred its commercialization, with any violation of its order with respect to commercialization carrying a penalty of €40,000 (approximately $60,000) per occurrence.

50.    ATMI has utilized the preliminary relief that it obtained in the Belgian courts to adversely affect competition in the United States.

51.    For instance, as reflected in its most recent 10-K, filed with the United States Securities & Exchange Commission, ATMI has taken the position that the Belgian court has issued an injunction "against the public marketing of the UpTime system *worldwide.*"[1]

_____

[1] A true and correct copy of the Feb. 23, 2007 10-K (Annual Report) is attached hereto as Exhibit A.

8

52.    ATMI has sought to obstruct Praxair Electronics in its efforts to compete against ATMI by asserting that the preliminary relief constitutes a global ban on advertising – even covering those countries, including the United States, where Praxair Electronics has an unfettered right to market and sell its UpTime® system.

53.    ATMI obtained an order against Praxair, Inc., including a monetary penalty of €200,000 (approximately $300,000) for including a truthful and accurate general overview of the UpTime® technology (*e.g.*, a product description, safety features, and product attributes) on its primary website, located at the domain www.praxair.com, and which is hosted on servers located in the United States.

54.    ATMI sought and obtained the penalty order, notwithstanding the fact that the particular web pages about which ATMI complained contained a clearly visible disclaimer that read: "The UpTime® product family is not available in Belgium and any references to the UpTime® system set forth on this website are not intended for use in the Belgium market and/or by current or potential Belgium customers of Praxair."

55.    Praxair, Inc. had previously removed all UpTime® references from its Belgian website, located at www.praxair.be but inadvertently left a hyperlink to the www.praxair.com website domiciled in the United States. The page showing the UpTime® system was indicated as being the .com site. This was found to be a violation of the advertising ban by Praxair NV and the Belgian court imposed a penalty of €200,000.

56.    To avoid the imposition of further penalties, Praxair, Inc. has been forced to remove all references to its UpTime® product line from its www.praxair.com website, thereby precluding customers in the United States and other areas outside of the European countries where the patent is registered (*e.g.*, Asia and parts of Europe) from obtaining information regarding UpTime® through Praxair Electronics' website.

57.    In effect, though Praxair Electronics has every right to advertise and publicize its product in the United States, it has been prohibited from doing so because of ATMI's overextension of its limited European patent rights and assertion of the preliminary relief.

58.    Praxair, Inc. is currently appealing the penalty order that ATMI obtained.

9

59.    To further hamper Praxair Electronics' ability to compete, ATMI has recently brought still more proceedings against Praxair, Inc. in which it alleges further violations of the Belgian court's preliminary relief order, including:

- ATMI has claimed that a notice of a scientific presentation relating to Praxair Electronics' UpTime® system, which was given by a Praxair Electronics employee at an October 16, 2007 conference in Taiwan (a country in which Praxair Electronics is fully entitled to sell and market the UpTime® system) and subsequently posted on two of Praxair Electronics' websites directed to technical presentations (at www.praxairtechforum.com and www.praxair.com/techforum) violated the Belgian court's order of preliminary relief. The presentation itself was not available online; only a brief notice that the presentation was going to occur in Asia. I also understand that no one from Belgium or any European country in which ATMI has a registered patent attended the conference.

- ATMI has claimed that web pages which purportedly contain product brochures and other information regarding the UpTime® system and which have been maintained on the website of an unrelated third party (a firm known as Montgomery Research, Inc., located in San Francisco) violate the Belgian court's order of preliminary relief.

60.    In mid-January, ATMI attempted to seize assets of Praxair, Inc. not associated with the subject matter of this dispute, but located in Belgium as a means to satisfy payment of the €200,000 penalty referenced above.

61.    After negotiations between the parties, ATMI agreed to forestall its efforts to seize the assets of Praxair, Inc., provided Praxair, Inc. agrees not to contest an award against Praxair N.V., but only until February 18, 2008. Praxair had little choice in the matter; if it did not comply, it would have been forced, pursuant to the Belgian court procedure, to provide a description of all of its US owned assets (even assets unrelated to the proceeding and to its Electronics business) to its competitor ATMI.

62.    By being unable to advertise on its own web site, Praxair Electronics has been prevented from making truthful statements to consumers about its own lawful products in the United States and American consumers have lost the right to see such advertising.

1

2  I declare under penalty of perjury under the laws of the United States of America that the foregoing

3  is true and correct.

4

5  Executed on February 8, 2008.                    *Raymond P. Roberge*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

Exhibit A

# ATMI INC

## FORM 10-K
(Annual Report)

## Filed 2/23/2007 For Period Ending 12/31/2006

| | |
|---|---|
| Address | 7 COMMERCE DRIVE |
| | DANBURY, Connecticut 06810-4169 |
| Telephone | 203-794-1100 |
| CIK | 0001041577 |
| Industry | Semiconductors |
| Sector | Technology |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com/
© Copyright 2006. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online's Terms of Use.

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2006**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file Number: 1-16239**

# ATMI, Inc.
(Exact name of registrant as specified in its charter)

| Delaware | 06-1481060 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 7 Commerce Drive, Danbury, CT | 06810 |
| (Address of principal executive offices) | (Zip Code) |

203-794-1100
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| None | Not Applicable |

Securities registered pursuant to Section 12(g) of the Act:

Common Stock, $.01 par value
(Title of each class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in rule 405 of the Securities Act. Yes ☑  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act (Check one):
Large accelerated filer ☑   Accelerated filer ☐   Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☑

The aggregate market value of the voting stock held by non-affiliates of the registrant at June 30, 2006, was approximately $894,931,362 based on the closing price of $24.62 per share.

The number of shares outstanding of the registrant's common stock as of February 12, 2007 was 35,237,617.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of our proxy statement for the annual meeting of stockholders to be held on May 22, 2007 (Part III).

**ATMI, INC.**
**Annual Report on Form 10-K**
**For the Fiscal Year Ended December 31, 2006**

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| Part I | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 13 |
| Item 1B. | Unresolved Staff Comments | 17 |
| Item 2. | Properties | 17 |
| Item 3. | Legal Proceedings | 18 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 18 |
| Part II | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 18 |
| Item 6. | Selected Financial Data | 20 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 22 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 35 |
| Item 8. | Financial Statements and Supplementary Data | 35 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 35 |
| Item 9A. | Controls and Procedures | 35 |
| Item 9B. | Other Information | 36 |
| Part III | | 37 |
| Part IV | | |
| Item 15. | Exhibits and Financial Statement Schedule | 37 |
| Signatures | | 41 |
| Index to Consolidated Financial Statements and Financial Statement Schedule | | F-1 |

EX-10.20: FORM OF EXECUTIVE MANAGEMENT RESTRICTED STOCK GRANT AGREEMENT
EX-10.21: FORM OF EMPLOYEE NON-QUALIFIED STOCK OPTION AGREEMENT
EX-10.23: FORM OF EMPLOYEE RESTRICTED STOCK GRANT AGREEMENT
EX-10.24: FORM OF NON-EMPLOYEE DIRECTOR RESTRICTED STOCK GRANT
EX-10.27: SECOND AMENDMENT TO AGREEMENT OF LEASE
EX-10.28: THIRD AMENDMENT TO AGREEMENT OF LEASE
EX-10.29: FORM OF NON-EMPLOYEE DIRECTORS NON-QUALIFIED STOCK OPTION AGREEMENT
EX-21: SUBSIDIARIES OF ATMI
EX-23: CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
EX-31.1: CERTIFICATION
EX-31.2: CERTIFICATION
EX-32: CERTIFICATION

Table of Contents

Other company, product, or service names may be trademarks or service marks of others.

## Customers, Sales and Marketing

ATMI sells and distributes its products worldwide primarily through a direct global sales and service organization. For a breakdown of revenue by geography, see Note 15 in Part II, Item 8 of this Form 10-K. ATMI markets and sells its materials products to end-use customers, chemical suppliers and equipment suppliers through its direct sales force in North America, Europe, Taiwan, South Korea, Japan, China, and Singapore, with limited use of regional manufacturing representatives in certain parts of Asia. Additionally, ATMI's materials delivery systems product lines are marketed and sold to semiconductor equipment OEMs, who in turn resell to end-users. NOWPak containers are generally sold to chemical suppliers, who sell their high purity chemicals in NOWPak containers at the request of end-users. Newform materials handling products are sold directly to semiconductor and life sciences companies, predominantly in Europe and to an increasing extent in the United States. ATMI sells its SDS products for ion implant applications directly to certain end-users and through an exclusive distribution agreement with Matheson. Investors and others should consider the cautionary statements and risk factors discussed in Item 1A below.

## Manufacturing

The following table summarizes the locations, products manufactured and size of ATMI's various manufacturing facilities as of December 31, 2006.

| Location | Products | Square Footage |
|---|---|---|
| Anseong, South Korea | • liquid materials | 9,000 |
| Burnet, TX | • liquid materials and delivery systems | 75,000 |
| Bloomington, MN | • high-purity materials packaging systems | 68,000 |
| Danbury, CT | • gas delivery systems<br>• liquid materials | 75,000 |
| Hoegaarden, Belgium | • high-purity materials packaging and mixing systems | 71,000 |

We use an exclusive contract manufacturer for the manufacture and distribution of our SDS products (the "Licensed Products"). Under the terms of the manufacturing agreement, ATMI retains the right to manufacture 25 percent of all Licensed Products, which we manufacture in our Danbury, CT facility, while the contract manufacturer has the right to manufacture 75 percent of all Licensed Products. We also use contract manufacturers for certain of our other materials and delivery equipment products both in the U.S. and in Asia.

Table of Contents

## Competition

ATMI's primary competitors in the semiconductor materials product lines include Air Products and Chemicals (Electronics Division), DuPont Electronic Technologies, and Rohm and Haas Electronic Materials. There are several additional companies outside the United States that compete with ATMI.

ATMI's SDS products currently have no widely established direct competition. Several companies compete with high-pressure gas cylinders and solid sources. There are numerous domestic and foreign companies that offer products that compete with ATMI's materials, materials packaging and materials delivery systems. ATMI believes that its ability to compete in the markets for containers and dispensing systems is dependent largely upon its patented NOWPak technology and its proven ability to enhance and improve its products and technologies. Increased competition has, and may continue to, affect the prices we are able to charge for our products. In addition, our competitors could have or could obtain intellectual property rights which could restrict our ability to market our existing products and/or to innovate and develop new products.

## Research and Development

The Company's research and development expenses ("R&D") consist of personnel and other direct and indirect costs for internally funded project development. ATMI also participates in joint development efforts with certain semiconductor manufacturers, advanced technology developers, and semiconductor equipment OEMs. Total expenses for research and development for the years ended December 31, 2006, 2005 and 2004 were $26.2 million, $22.3 million and $19.6 million, respectively. Total research and development expenditures represented 8.0 percent, 7.9 percent and 7.9 percent of revenues in 2006, 2005 and 2004, respectively.

The Company has invested in non-marketable equity securities of private companies that engage in new product and technology development, which range from early-stage companies that are often still defining their strategic direction to more mature companies whose products or technologies may directly support or complement an ATMI product or initiative. As part of the negotiation process for making these investments, ATMI normally secures certain rights to jointly develop, market, and sell any resulting products from these research efforts.

## Strategic Alliances

ATMI forms strategic alliances, including joint development programs and collaborative marketing efforts, to develop new products and to accelerate the introduction of its products. These programs have led to significant technological advances, including the development of proprietary advanced materials and semiconductor manufacturing processes. ATMI has entered into an exclusive license, manufacture and distribution agreement with Matheson), whereby ATMI has granted licensing rights for the manufacturing and worldwide distribution of certain SDS products to Matheson. Both ATMI and Matheson manufacture SDS products for worldwide distribution under this exclusive agreement. ATMI has also entered into a strategic alliance with Enthone, Inc., a subsidiary of Cookson Electronics ("Enthone"), whereby in 2003, ATMI purchased the exclusive worldwide selling and distribution rights to Enthone's copper ECD products, including its ViaForm products, for a period of ten years, subject to automatic renewal upon satisfaction of certain conditions. Under the terms of the agreement, Enthone continues to manufacture the ViaForm products for ATMI. In 2005, ATMI acquired a 30 percent interest in Anji Microelectronics Co., Ltd., with operations in Shanghai, China, and entered into a joint development agreement with it to engage in development and marketing efforts around copper CMP and other advanced materials. Most of ATMI's other strategic alliances are with leading semiconductor manufacturers or OEMs, each of which has participated with the Company in advanced materials and process development programs. These programs enhance ATMI's core technology base and promote the introduction of targeted products.

11

Table of Contents

ATMI also leases various sales offices throughout the world, each one of which occupies less than 5,000 square feet.

## Item 3. Legal Proceedings

In July 2003, a subsidiary of ATMI filed suit against Praxair, Inc., the parent company of Praxair Electronics, in the United States District Court for the Southern District of New York, charging it with infringing two patents ATMI holds for certain gas storage and delivery systems. ATMI is seeking damages and an injunction against Praxair marketing its UpTime system. In April 2006, the New York District Court granted Praxair's request for summary judgment that all asserted claims of ATMI's two VAC patents are invalid. ATMI has appealed the decision and will continue to pursue its claims vigorously.

On December 22, 2003, Praxair, Inc. and Praxair Technology, Inc. filed suit against ATMI, Inc. and Advanced Technology Materials, Inc. in the United States District Court for the District of Delaware alleging infringement of three patents owned by Praxair Technology, Inc. related to certain gas storage and delivery systems. Praxair is seeking damages and an injunction against ATMI marketing its VAC system. In 2005, the Delaware District Court granted ATMI's request for summary judgment that all asserted claims of one of Praxair's patents are invalid. At trial, a jury found the remaining claims asserted by Praxair valid and infringed by ATMI's VAC products. ATMI seeks to have those remaining claims held unenforceable by the Court. The determination of any damage amount has been deferred to a later proceeding. ATMI intends to continue to pursue a vigorous defense against Praxair's claims. ATMI, Inc. has a limited contingent fee arrangement with certain outside counsel relating to the Delaware litigation.

In 2005, a subsidiary of ATMI filed suit against Praxair, Inc. and Praxair GmbH in Dusseldorf, Germany, charging infringement of a patent ATMI holds for certain gas storage and delivery systems. Since the third quarter of 2006, a preliminary injunction against Praxair selling or supplying its UpTime system in Germany has been in effect.

In August 2006, a subsidiary of ATMI filed suit in Belgium against Praxair, Inc. and Belgian affiliates of Praxair, Inc. charging infringement of a patent ATMI holds for certain gas storage and delivery systems. In September 2006 , a request for preliminary injunction against Praxair, Inc. and its Belgian affiliates was filed. The request was granted in part and a preliminary injunction is currently in place against the public marketing of the UpTime system worldwide. Both parties appealed and a decision of the appeal court in Antwerp, Belgium is expected shortly.

ATMI is, from time to time, subject to various legal actions, governmental audits, and proceedings relating to various matters incidental to its business including product liability and environmental claims. While the outcome of such matters cannot be predicted with certainty, in the opinion of management, after reviewing such matters and consulting with ATMI's counsel and considering any applicable insurance or indemnifications, any liability which may ultimately be incurred, including the Praxair litigations, is not expected to materially affect ATMI's consolidated financial position, cash flows or results of operations.

## Item 4. Submission of Matters to a Vote of Security Holders

No matter was submitted to a vote of security holders, through the solicitation of proxies or otherwise, during the fourth quarter of the fiscal year ended December 31, 2006.

## PART II.

## Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

The information required by Item 5 with respect to securities authorized for issuance under equity compensation plans is hereby incorporated by reference from the Company's definitive proxy statement (to be filed with the Securities and Exchange Commission pursuant to Regulation 14A), which proxy statement will be filed no later than 120 days after December 31, 2006.

18