1  LATHAM & WATKINS LLP
      Daniel M. Wall (Bar No. 102580)
2     Timothy L. O'Mara (Bar No. 212731)
      Sadik Huseny (Bar No. 224659)
3  505 Montgomery Street, Suite 2000
   San Francisco, California  94111-6538
4  Telephone:  (415) 391-0600
   Facsimile:  (415) 395-8095
5  Email:   Dan.Wall@lw.com
   Email:   Tim.OMara@lw.com
6  Email:   Sadik.Huseny@lw.com

7  Attorneys for Defendants
   ATMI, INC. and ADVANCED TECHNOLOGY
8  MATERIALS, INC.

9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                          SAN JOSE DIVISION

13  PRAXAIR, INC.,                          CASE NO. C 08-00869 JW (HRL)

14                                          **DEFENDANTS ATMI, INC.'S AND**
              Plaintiff,                    **ADVANCED TECHNOLOGY MATERIALS,**
15                                          **INC.'S MEMORANDUM OF POINTS AND**
        v.                                  **AUTHORITIES IN OPPOSITION TO**
16                                          **PLAINTIFF'S MOTION FOR**
                                            **PRELIMINARY INJUNCTION**
17  ATMI, INC. and ADVANCED
    TECHNOLOGY MATERIALS, INC.,             Date:       April 21, 2008
18                                          Time:       9:00 AM
                                            Place:      Courtroom 8, 4th Floor
19              Defendants.                 Judge:      The Honorable James Ware

20

21

22

23

24

25

26

27

28

                                   OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
                                   CASE NO. C-08-00869 JW (HRL)

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................... 3

    A.    The Parties ................................................................................................ 4

    B.    Qualified $B^{11}F_3$ Suppliers:  Nukem GmbH and Ceradyne Boron
        Products............................................................................................... 5

    C.    ATMI's "Take or Pay" Contracts With Nukem ...................................... 7

    D.    European Enforcement of European Patent Rights ................................. 9

III.  LEGAL STANDARD ........................................................................................ 13

IV.   ARGUMENT ...................................................................................................... 14

    A.    Plaintiff's Claim that ATMI is "Cutting Off Praxair's Supply of
        $B^{11}F_3$" Through Anticompetitive Exclusive Dealing is False as a
        Factual Matter and Legally Groundless ................................................. 14

        1.    A Necessary (But Not Sufficient) Condition for
            Demonstrating an Anticompetitive Output Contract is the
            Foreclosure of Rivals From the Relevant Market .................................. 14

        2.    Praxair Has Failed to Demonstrate That Its "Business Life"
            Is Threatened ...................................................................................... 17

    B.    Plaintiff's Request for this Court to Enjoin ATMI from Lawfully
        Pursuing its Judicial Rights in Europe is a Meritless Attempt to
        End-Run a Proper European Judicial Proceeding ................................. 20

        1.    Praxair's Description of the Belgian Court Proceedings and
            ATMI's Actions is Wildly Misleading ................................................... 21

        2.    There is No Legal Basis for the Type of "Anti-Suit
            Injunction" that Praxair Seeks ............................................................. 23

        3.    A U.S. District Court Has Neither Jurisdiction Nor
            Authority to Regulate Foreign Litigation on the Ground
            that a Party is Seeking or Obtaining Relief "Repugnant" to
            U.S. Interests or Policy ........................................................................ 27

        4.    Praxair Has Waited Too Long to Now Seek Injunctive
            Relief.................................................................................................. 29

V.    CONCLUSION ................................................................................................... 30

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3

*3D Sys. Inc. v. Aarotech Lab. Inc.*,
 160 F.3d 1373 (Fed. Cir. 1998).................................................................................. 29

4

*American Passage Media Corp. v. Cass Communications, Inc.*,
 750 F.2d 1470 (9th Cir. 1985) .................................................................................... 13

5

*Baden Sports, Inc., v. Kabushiki Kaisha Molten*,
 2007 WL 279077 (W.D. Wash. 2007)................................................................. 22, 29

6

7

*Barry Wright Corp. v. ITT Grinnell Corp. et al.*,
 724 F.2d 227 (1st Cir. 1983) ...................................................................................... 16

8

*Bhan v. NME Hosp., Inc.*,
 929 F.2d 1404 (9th Cir. 1991) .................................................................................... 15

9

10

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962) ................................................................................................... 17

11

*Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc.*,
 412 F.2d 577 (1st Cir. 1969)................................................................................. 25, 26

12

13

*Caribbean Marine Services Co., Inc. v. Baldrige*,
 844 F.2d 668 (9th Cir. 1988) ...................................................................................... 13

14

*Determined Productions, Inc. v. R. Dakin & Co.*,
 514 F.Supp. 645 (N.D. Cal. 1979) ............................................................................. 16

15

*DVD Copy Control Association, Inc. v. Bunner*,
 31 Cal. 4th 864 (Cal. Sup. Ct. 2003).......................................................................... 28

16

17

*E. & J. Gallo Winery v. Andina Licores S.A.*,
 446 F.3d 984 (9th Cir. 2006) ...................................................................................... 24

18

*Earth Island Inst. v. U.S. Forest Serv.*,
 442 F.3d 1147 (9th Cir. 2006) .................................................................................... 13

19

20

*Financial & Sec. Products Ass'n v. Diebold, Inc.*,
 2005 WL 1629813  (N.D. Cal. 2005) ......................................................................... 13

21

*Foremost Int'l Tours, Inc. v. Qantas Airways Ltd.*,
 379 F. Supp. 88 (D. Haw. 1974) ................................................................................ 17

22

23

*General Business Systems v. North American Philips Corp.*,
 699 F.2d 965 (9th Cir. 1983) ...................................................................................... 16

24

*Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*,
 491 F.3d 355 (8th Cir. 2007) ...................................................................................... 25

25

26

*Holmes Products Corp. v. Dana Lighting, Inc.*,
 958 F. Supp. 27 (D. Mass. 1997) ............................................................................... 16

27

*Hudgens v. NLRB*,
 424 U.S. 507 (1976)................................................................................................... 24

28

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................................................ 15

*Laker Airways Ltd. v. Sabena Belgian World Airlines*,
    731 F.2d 909 (D.C. Cir. 1984) ............................................................................ 25

*LGS Architects, Inc. v. Concordia Homes of Nev.*,
    434 F.3d 1150 (9th Cir. 2006) ............................................................................ 13

*Microsoft Corp. v. Lindows.com, Inc.*,
    319 F. Supp. 2d 1219 (W.D. Wash. 2004) ......................................................... 24

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
    762 F.2d 1374 (9th Cir. 1985) ............................................................................ 29

*Omega Envt'l, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ............................................................................ 15

*Paddock Publications, Inc. v. Chicago Tribune Co.*,
    103 F.3d 42 (7th Cir. 1996) ........................................................................ 14, 16

*Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*,
    361 F.3d 11 (1st Cir. 2004) ................................................................................ 25

*Raines v. Byrd*,
    521 U.S. 811 (1997) ............................................................................................ 23

*Reilly v. MediaNews Group, Inc.*,
    2006 U.S. Dist. Lexis 61696 (N.D. Cal. July 28, 2006) .................................... 13

*San Francisco Arts & Athletics, Inc. v. United States Olympic Com.*,
    483 U.S. 522 (1987) ............................................................................................ 28

*Sanders v. Brown*,
    504 F.3d 903 (9th Cir. 2007) .............................................................................. 24

*Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*,
    652 F.2d 852 (9th Cir. 1981) .............................................................................. 24

*Sewell Plastics, Inc. v. Coca-Cola Co.*,
    720 F. Supp. 1196 (W.D.N.C. 1989) .................................................................. 14

*Sperry Rand Corp. v. Sunbeam Corp.*,
    285 F.2d 542 (7th Cir. 1960) .............................................................................. 25

*Stein Assoc., Inc. v. Heat and Control, Inc.*,
    748 F. 2d 653 (Fed. Cir. 1984) ........................................................................... 25

*Sun World, Inc. v. Lizarazu Olivarria*,
    804 F. Supp. 1264 (E.D. Cal. 1992) ................................................................... 24

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ...................................................................................... 14, 15

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
    986 F.2d 589 (1st Cir. 1993) .............................................................................. 15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*United States v. Microsoft Corp,*
    253 F.3d 34 (D.C. Cir. 2001) ............................................................................................ 14

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004) .......................................................................................................... 16

*Vermont Agency of Natural Res. v. United States ex rel. Stevens,*
    529 U.S. 765 (2000) .......................................................................................................... 23

*Yahoo! Inc. v. La Ligue Contre Le Racisme et l'Antsemitisme* case,
    169 F. Supp. 2d 1181 (N.D. Cal. 2001) ................................................................ 24, 27, 28

**OTHER AUTHORITIES**

35 U.S.C. § 271(a) (1994) ........................................................................................................ 29

**TREATISES**

3 Roger M. Milgrim, MILGRIN ON TRADE SECRETS § 14.01[2][a], at 14-26 n.15
    (2d ed. 2000) ..................................................................................................................... 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Defendants ATMI, Inc. and Advanced Technology Materials, Inc. (collectively, "ATMI")

2    submit this Memorandum in opposition to the Motion for Preliminary Injunction submitted by

3    Plaintiff Praxair, Inc. ("Praxair").

4    **I.    INTRODUCTION**

5    Plaintiff Praxair asks this Court to grant it the extraordinary relief of a preliminary

6    injunction, prior to any discovery, claiming:  (1) that defendant ATMI has locked up the world

7    supply of highly enriched Boron trifluoride ("$B^{11}F_3$"), a dopant gas allegedly vital to plaintiff's

8    sub-atmospheric gas delivery business, by entering into an exclusive dealing contract with

9    Nukem GmbH ("Nukem"), allegedly the only supplier able to provide $B^{11}F_3$; and (2) that this

10    Court should issue a "trumping" injunction stopping defendant ATMI from exercising its legal

11    rights in a European court with respect to on-going patent litigation taking place between the

12    parties (an issue entirely unrelated to the $B^{11}F_3$ supply issue).  Plaintiff has fundamentally

13    misrepresented the facts on both issues, and is not entitled to an injunction under either theory.

14    **The Exclusive Dealing Claim**

15    First, plaintiff's unqualified representation that "ATMI's exclusive supply agreement

16    with Nukem" will force Praxair "out of the relevant market *in toto*" is irrefutably false.  Praxair

17    has grossly – irresponsibly – misstated the facts in three respects.

18    **A.  The alleged exclusive supply contract at issue does not exist.**  For all intents and

19    purposes, ATMI put Nukem into the $B^{11}F_3$ business.  And since 2005, ATMI has had a series of

20    guaranteed $B^{11}F_3$ supply contracts with Nukem that, on account of volume commitments, have

21    always been nearly exclusive as a practical matter.  That is, Nukem agreed to sell and ATMI

22    agreed to buy nearly all of Nukem's supply of $B^{11}F_3$.  The contracts, however, *expressly allow*

23    Nukem to sell 100 kilograms of $B^{11}F_3$ to third parties each year.  ATMI and Nukem are currently

24    negotiating a new two-year supply contract, the most recent draft of which contains an

25    "exclusivity" clause, but also contains the same term allowing Nukem to sell 100 kilograms of

26    $B^{11}F_3$ to third parties each year.  Thus, in substance, Nukem's rights to sell $B^{11}F_3$ to third parties

27    do not meaningfully change.  Praxair's claim that it cannot buy $B^{11}F_3$ from Nukem any longer is

28    simply wrong.

**B.  Nukem does not by any means control the worldwide supply of $B^{11}F_3$.**  Praxair could scarcely have been more absolute in its contentions about its $B^{11}F_3$ supply options, claiming that Nukem controls the "vast majority" of this gas and likening this case to others in which the defendant completely locked up a critical input.  But this is wrong too.  As plaintiff well knows, there are *two* active providers of $B^{11}F_3$:  Nukem and Ceradyne Boron Products, LLC ("Boron Products").  Boron Products has the largest Boron isotope enrichment facility in the world, with annual production of over one metric ton, and current capacity to produce several times that amount.  Indeed, Praxair is not only able to, but has in fact, purchased $B^{11}F_3$ from both Boron Products and Nukem.  Plaintiff's failure to disclose this critical fact to the Court is remarkable.  Not only is Nukem's alleged "chokehold" on the worldwide $B^{11}F_3$ market central to the exclusive dealing analysis, it is hardly appropriate for one appealing to the Court's equitable powers to so blatantly misrepresent the facts.

**C.  Praxair cannot be as dependent on Nukem as it claims.**  A corollary to Praxair's misstatements about the $B^{11}F_3$ gas market is its contention that it satisfies nearly all of its $B^{11}F_3$ needs from Nukem.  In fact, Nukem has supplied only a modest amount of $B^{11}F_3$ to Praxair over the past several years:  about 70 kilograms a year on average, and at most 140 kilograms (in 2007).  It strains credulity to believe that even the 140 kilograms could be nearly all of Praxair's $B^{11}F_3$ needs, or that the loss of 40 kilograms of $B^{11}F_3$ per year (since in all events Nukem can sell Praxair 100 kilograms per year) would threaten Praxair's business selling subatmospheric gas delivery systems.  It seems much more likely that Boron Products is Praxair's primary $B^{11}F_3$ supplier.[1]  But if not, and all Praxair needs are the small quantities it has been purchasing from Nukem, then it can easily meet those needs by buying 100 kilograms from Nukem and the tiny balance from Boron Products.  ATMI has no contractual rights to prevent that.

Under these circumstances, preliminary injunctive relief – prior to any discovery – is plainly improper.

---

[1]    Remarkably, Praxair has refused to release Boron Products from a confidentiality agreement so that ATMI could learn and state for certain how much $B^{11}F_3$ Praxair purchases from Boron Products.

1    **The Belgian Injunction**

2    Plaintiff requests that this Court trump a European court order addressing the parties'

3    European patent rights by enjoining ATMI from taking certain positions in that litigation.  This

4    request is also specious.  The only legal and jurisdictional basis for such an order would be an

5    "anti-suit injunction," which is an equitable doctrine that permits a United States court to protect

6    its jurisdiction and deter international forum-shopping by enjoining the pursuit of parallel,

7    duplicative, foreign litigation.  Here, Praxair is committing the offense that the "anti-suit

8    injunction" doctrine seeks to prevent:  it is opening a second front in ongoing European patent

9    litigation in hopes of doing better in a home forum.  As will be shown below, the technical

10    requirements for issuance of an anti-suit injunction are not nearly met in this case.  But that's not

11    the half of it.  Praxair's request is an affront to everything the "anti-suit injunction" doctrine

12    seeks to accomplish.

13    Praxair's back-up argument attempts a sleight-of-hand, invoking the legal standard for

14    when a U.S. federal court will grant a declaratory judgment holding that a foreign court order is

15    not enforceable in the United States.  That standard has no bearing on the relief requested by

16    plaintiff's preliminary injunction motion – namely, that this Court affirmatively enjoin

17    defendants from exercising their legal rights in Europe.  Were this Court to grant the requested

18    relief, this Court would become a gatekeeper over the European litigation, charged with pre-

19    approving – on an ongoing and continual basis – ATMI's actions in that litigation.  No authority

20    supports such a remarkable request.

21    In sum, both claims are patently frivolous, flirt dangerously with sanctionable

22    misrepresentations, and are particularly ill-suited for preliminary injunctive relief.

23    **II.    FACTUAL BACKGROUND**

24    Plaintiff seeks injunctive relief on two unrelated grounds.  We address the relevant facts

25    of each in turn, after first briefly discussing the business operations of the parties in this action.[2]

26    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27    [2]    We appreciate that Praxair tries to relate the two grounds for injunction, arguing that ATMI's efforts to enforce its European patent rights contribute to a violation of U.S. antitrust law.  That is so plainly a stretch, however, that for organizational purposes we will keep the two factual stories distinct.

28

**A.    The Parties**

ATMI is a leading materials and delivery system manufacturer in the semiconductor industry and has long been a pioneer in the development of innovative, cost-efficient, and safe ion implantation technologies.  It has sales and research centers in the United States, Europe, and Asia.  In the 1990s, ATMI developed its revolutionary Safe Delivery Source (or "SDS®") system.  This patented sub-atmospheric dopant gas delivery system is capable of delivering >99.9% pure gas for use in the manufacture of semiconductor chips.  The SDS system is "sub-atmospheric" in the sense that it stores the dopant gases at very low pressure in a cylinder containing adsorbent materials,[3] such that were the cylinder to leak or otherwise breach, outside air would be drawn <u>into</u> the cylinder rather than having the highly toxic dopant gases escape outside the cylinder.  The SDS system thus minimizes the potential for an accidental release of the dopant gases, and consequently improves plant safety and customer productivity.  The SDS system has proved to be a highly successful alternative to the high pressure gas delivery systems that once dominated and still command a majority of the market for delivering gases for use in the semiconductor wafer manufacturing process.  ATMI later developed a mechanical sub-atmospheric delivery system under the name "VAC®," for which the European patent EP 1 000 291 B1 was granted on September 28, 2005.  Today, ATMI, despite its small size,[4] is one of the top suppliers worldwide of materials and systems to the semiconductor industry – thanks in large part to its SDS and VAC systems.

Praxair is a $9 billion a year multinational corporation with approximately 28,000 employees and operations in more than 30 countries.  Praxair supplies atmospheric gases, process and specialty gases, and related services and technologies to a wide variety of customers.  The company also sells cryogenic and non-cryogenic supply systems.

---

[3]   An a<u>d</u>sorbent material causes another substance to stick to its surface.  This is in contrast to an a<u>b</u>sorbent material, which, like a sponge, takes-up or draws something into itself.

[4]   ATMI had approximately 800 employees and annual revenues of approximately $360 million in 2007.

1   In the late 1990s, Praxair developed, in collaboration with a company known as UOP

2   LLC, a mechanical storage and dispensing system for sub-atmospheric delivery of dopant gases.

3   The Praxair mechanical delivery system is commercialized under the name "UpTime®." $B^{11}F_3$ is

4   only one of the gases that Praxair delivers to its customers through the UpTime system.

5   Because of the issues concerning the Belgian preliminary injunction, it is important to

6   note that Praxair's UpTime business is to a very large degree based in Belgium. Indeed, Praxair

7   only fills $B^{11}F_3$ cylinders at its facility in Oevel, Belgium.[5] Praxair has been doing business in

8   Belgium for more than 35 years.

9   **B.   Qualified $B^{11}F_3$ Suppliers: Nukem GmbH and Ceradyne Boron Products**

10   Boron trifluoride is used as an additive to semiconductor grade silicon as a "doping"

11   agent in ion implantation and other semiconductor processes.[6]   ATMI pioneered the sub-

12   atmospheric delivery of $B^{11}F_3$ for use in the ion implantation process.[7] Prior to ATMI's

13   commercialization of $B^{11}F_3$ in its SDS system, boron trifluoride was used by semiconductor

14   manufacturers in its "natural abundance" form, not the highly enriched form of Boron trifluoride

15   known as $B^{11}F_3$.[8]

16   Accordingly, as an adjunct to its development of the SDS system, ATMI literally created

17   the market for $B^{11}F_3$. It invested in and developed both of the *two* gas suppliers that today are

18   the primary worldwide providers of $B^{11}F_3$ – Nukem and Boron Products.[9] In business school

19   terms, ATMI developed the supply chain that supports its sub-atmospheric gas delivery systems.

20   The suggestion in Praxair's papers that ATMI "locked-up" existing $B^{11}F_3$ suppliers with

21   exclusive dealing contracts – the typical concern of the antitrust laws – is simply wrong.

22   Boron Products was established in the early 1970s as a subsidiary of EaglePicher, Inc.,

23

24   [5]   *See infra* note 44 and accompanying text.

    [6]   Declaration of Richard Fricke, Senior Director of Implant Technologies, ATMI, Inc. ("Fricke Decl.")

25   ¶ 5. In ion implantation, a "dopant" such as boron, phosphorus or arsenic, in the form of a gas, is
    implanted into the surface of a silicon wafer, changing the electrical properties of the silicon. Ion

26   implantation is one of many steps in the fabrication of semiconductors. *Id.*

    [7]   *Id.* at ¶ 6.

27   [8]   *Id.*

    [9]   *Id.* at ¶ 7.

28

1  and was recently acquired by Ceradyne, Inc.  Boron Products is located in Quapaw, Oklahoma,

2  and has "the largest Boron isotope enrichment facility in the world."[10]  ATMI began purchasing

3  $B^{11}F_3$ from Boron Products in 1997.  As recently as two to three years ago, ATMI received the

4  majority of its $B^{11}F_3$ from Boron Products – not Nukem.[11]  Today, ATMI continues to purchase

5  significant quantities of qualified $B^{11}F_3$ from Boron Products.[12]

6          In 2007, Boron Products sold over 1,000 kg (one metric ton) of $B^{11}F_3$.[13]  This *annual*

7  output is *nearly four times* the amount of $B^{11}F_3$ that Praxair purchased from Nukem *over a four-*

8  *year period.*[14]  Moreover, Boron Products has the present capacity to produce three times its

9  current sales – *i.e.,* over 300 kg per month (3,600 kg per year) of its purest $B^{11}F_3$.[15]  Thus, Boron

10  Products' *annual* production capacity is *over twelve times* the amount of $B^{11}F_3$ that Praxair

11  purchased from Nukem *over a four year period.*  Contrary to the strong implication in Praxair's

12  papers, the attached declaration of Boron Products Director Jim Waugh confirms that Praxair

13  does in fact purchase $B^{11}F_3$ from Boron Products.[16]  ATMI does not know how much $B^{11}F_3$

14  Praxair purchased from Boron Products (because Praxair has refused to release Boron Products

15  from a customer-confidentiality agreement[17]), but we do know that ATMI and its business

16  partner purchased less than half of Boron Products' $B^{11}F_3$ output in 2007.[18]  Since $B^{11}F_3$ has few

17  if any other uses, it is likely that a significant amount, if not the entire balance, of the

18  approximately 500 kg of $B^{11}F_3$ that Boron Products is producing annually is purchased by

19  Praxair.

20          Praxair makes much of the need for "qualified" $B^{11}F_3$.  It is a fact of life in the

---

[10]  *See* http://www.ceradyne.com/about/boron-products.aspx; Declaration of James Waugh, Ceradyne Boron Products Supply Chain Manager ("Waugh Decl.") ¶¶ 2, 3.

[11]  Fricke Decl. ¶ 8.

[12]  *Id.*

[13]  Waugh Decl. ¶ 6.

[14]  Joint Declaration of Michael Kievel, Nukem GmbH Senior Manager Stable Isotope, and Jürgen Laucht, Nukem GmbH General Manager Isotopes ("Nukem Decl.") ¶ 3 ("from 2004 to 2007, Nukem accepted individual purchase orders [for $B^{11}F_3$] by Praxair in the total amount of 280 kg").

[15]  Waugh Decl. ¶ 5.

[16]  *Id.* at ¶ 4.

[17]  O'Mara Decl. ¶ 2, Exh. 1.

[18]  Fricke Decl. ¶ 9.

1   semiconductor industry that nearly everything sold into a fab must be qualified with the fab

2   owners.  The qualification process is highly customer specific, and blanket generalizations –

3   such as those Praxair attempts to rely on – are of little value.[19]  The only irrefutable fact is that

4   whatever "qualification" requirements any given customer has, those requirements are a cost of

5   doing business in this industry and require no greater investment on the part of Praxair than for

6   ATMI.  Praxair has no cause to whine about the burdens of qualifying what it sells.

7        That said, in order to develop a viable sub-atmospheric gas delivery business, ATMI

8   made the investment of time and money to qualify nearly all of its semiconductor manufacturer

9   customers on the $B^{11}F_3$ produced *by both Nukem and Boron Products*.[20]  This reveals another

10  gross misrepresentation by Praxair:  the suggestion that only Nukem $B^{11}F_3$ is accepted by

11  semiconductor manufacturers.  That is just not true.  In fact, historically more ATMI customers

12  have been qualified on Boron Products' $B^{11}F_3$ than have been qualified on Nukem's $B^{11}F_3$.[21]

13  Qualifying these suppliers was indeed a lot of work for ATMI.  But today, because ATMI made

14  that investment, virtually all of ATMI's customers are unaware of, and indifferent to, whether

15  any given shipment of $B^{11}F_3$ purchased from ATMI originates from Nukem or Boron Products.[22]

16        **C.    ATMI's "Take or Pay" Contracts With Nukem**

17        In 2005, ATMI and Nukem entered into a guaranteed (i.e., "take or pay") output supply

18  contract that obligated ATMI to buy, and Nukem to supply, no less than 1,400 kg (1.4 metric

19  tons) of $B^{11}F_3$ per contract year.[23]  At that time, this was close to Nukem's maximum $B^{11}F_3$

20

---

21  [19]  In some instances, qualification of a new gas source – such as a switch from Nukem $B^{11}F_3$ to Boron
     Products $B^{11}F_3$ – can take as little as three months.  Fricke Decl. ¶ 10.  This is a far cry from the nine
22   to twelve months that plaintiff portrays as a deathblow to its very existence (setting aside plaintiff's
     own admission that $B^{11}F_3$ compromises a mere 40% of its sale of gases delivered via its UpTime
23   system in 2007).
     [20]  *Id.* at ¶ 11.
24   [21]  *Id.* at ¶ 12.
     [22]  *Id.* at ¶ 11.
25   [23]  *Id.* at ¶ 13, Exh. 1.  Nukem is a gas broker, not a gas producer.  Nukem obtains $B^{11}F_3$ from a producer
     in the Republic of Georgia (the South Caucasus nation, formerly part of the Soviet Union).  As Fricke
26   Declaration Exhibits 1 through 5 reflect, the formal parties to the successive iterations of the Nukem
     supply contract have varied; Matheson Tri-Gas, Inc. is ATMI's business partner, and in referring to
27   the Nukem supply contracts, we are using "ATMI" to refer to Matheson and ATMI interchangeably.
     *Id.* at ¶ 15, Exhs. 1-5.
28

1    capacity.  The 2005 contract, however, specifically states that Nukem can annually sell 100 kg of

2    $B^{11}F_3$ to third parties.[24]  The 2005 contract has been amended several times as Nukem's capacity

3    to supply – and ATMI's demand for – $B^{11}F_3$ increased.  In each iteration of the ATMI supply

4    contract, ATMI has made a similar "take or pay" commitment to buy nearly all of Nukem's

5    $B^{11}F_3$, but Nukem has retained the right to supply other parties with small quantities of $B^{11}F_3$ in

6    each contract year.[25]

7         ATMI and Nukem are presently negotiating a new two-year supply contract for $B^{11}F_3$.

8    ATMI's "take or pay" obligation is larger than ever, but once again the contemplated contract

9    gives Nukem the right to sell 100 kg of $B^{11}F_3$ per year to third parties.[26]  This is explicit in the

10   draft "exclusivity" provision about which Praxair complains:

11               During the term of this Agreement, Seller (including any affiliates
             of Seller) shall not sell B-11 F3 in any form to any customer other
12           than Buyer if the Seller, after due inquiry, has knowledge or has
             reason to believe that such customer, or its customers, intends to
13           use such material for the purpose of ion implantation; *provided,*
             *however, that Seller has the option to sell up to 100 kg of B-11 F3*
14           *per contract year.*[27]

15

16        We acknowledge Praxair's claim that it was *told* by Nukem that Praxair could no longer

17   purchase $B^{11}F_3$ from Nukem.  Candidly, at this early stage of the litigation, we are not in a

18   position to contest that claim.  However, the contract governs, and it unequivocally does and will

19   allow Nukem to sell "up to 100 kg of B-11 F3 per contract year" to anyone.  Over the last four

20   years Nukem has sold to Praxair 280 kg of $B^{11}F_3$.[28]  Half of this – 140 kg – was sold in 2007.[29]

21   Accordingly, at present and under the proposed 2008 supply contract, the third-party 100 kg limit

22   ────────────────

23   [24]  *Id*. at ¶ 13.
     [25]  *Id*. at ¶ 16, Exhs. 1-4.  In the course of this litigation, ATMI learned that Nukem interpreted
24        "Amendment No. 2" to the contract, which was in effect from March 24, 2007 through January 1,
          2008, to have eliminated the restriction on sales of more than 100 kg of $B^{11}F_3$ to third parties in any
25        contract year.  Nukem therefore sold 140 kg of $B^{11}F_3$ to Praxair in 2007.  ATMI understood the
          100 kg limitation to have been in effect at all relevant times.
26   [26]  *Id*. at ¶ 17.
     [27]  *Id*. at ¶ 17, Exh. 5 at Article 5.1 (emphasis added).
27   [28]  Nukem Decl. ¶ 3.
     [29]  *Id*.
28

1    would permit Nukem to supply Praxair with over 70% of the $B^{11}F_3$ Praxair purchased in 2007.

2    The shortfall would be just 40 kg, a "drop in the bucket" that Praxair could easily obtain from

3    Boron Products.[30]

4       ATMI's business justifications for entering into a volume supply contract with Nukem

5    are numerous. First and foremost, the contract protects the $B^{11}F_3$ supply chain that ATMI had to

6    create from scratch when it created the business of delivering $B^{11}F_3$ through sub-atmospheric

7    delivery systems.[31] ATMI effectively put Nukem in this business by bank-rolling through its

8    "take or pay" obligations the investments in production capacity that led to this source of supply

9    for $B^{11}F_3$. There is absolutely no reason why Praxair – a company nearly ten times ATMI's size

10   – could not have done what ATMI did to develop a reliable $B^{11}F_3$ supply chain. Obviously,

11   Praxair would rather take the easier course and create through litigation a supply obligation on

12   behalf of Nukem, thereby hijacking the $B^{11}F_3$ supplies ATMI invested in and is counting on.

13   The contract protects ATMI from this kind of behavior by rightfully guaranteeing that ATMI

14   will get the supplies it needs. Furthermore, ATMI is presently trying to achieve a product

15   differentiation advantage in the marketplace by working with Nukem and its $B^{11}F_3$ source to

16   produce a higher purity of $B^{11}F_3$ than is currently available on the market.[32] It is neither fair nor

17   procompetitive for ATMI to have to share that advantage with Praxair.

18      **D.**      **European Enforcement of European Patent Rights**

19       On September 28, 2005, ATMI obtained European Patent No. 1 000 291 B1, which grants

20   ATMI certain patent rights related to its mechanical VAC sub-atmospheric delivery system.[33]

21   ATMI's European patent has been validated in and is effective in Belgium.[34] (It has also been

22   validated and is effective in Germany, France, the United Kingdom, Italy, Ireland, and the

23

---

24   [30] Another way of looking at 100 kg is that it is an eight-month supply of Nukem $B^{11}F_3$ at Praxair's 2007 purchasing levels. That would give Praxair more than enough time to qualify Boron Products $B^{11}F_3$ with any customers that are not already qualified.

25   [31] Fricke Decl. ¶ 18.

26   [32] *Id.* at ¶ 19.

27   [33] Declaration of Bruno Vandermeulen, Esq., Belgian Counsel for Advanced Technology Materials, Inc. (Vandermeulen Decl.") ¶ 3, Exh. A.

28   [34] *Id.* at ¶ 3, Exh. B.

1   Netherlands.)[35]  Belgium – which Praxair's papers denigrate as if it were some rogue State of no

2   relevance to its business – is the site of the only Praxair facility worldwide that fills Praxair

3   UpTime gas cylinders with $B^{11}F_3$.  Praxair and its Belgian subsidiaries, Praxair NV and Praxair

4   Holding NV, violated ATMI's European patent rights by filling infringing gas cylinders in Belgium

5   that were subsequently marketed and shipped worldwide.

6        Consequently, ATMI commenced patent infringement and preliminary injunction

7   proceedings in the Belgium Court of First Instance in Antwerp.[36]  ATMI requested that the court

8   enjoin, *inter alia*, the manufacture and sale of the infringing gas cylinders being filled in

9   Belgium.  Praxair was represented by counsel, and at no time has it ever disputed that the

10   Belgian courts have proper jurisdiction over it.[37]

11        The Belgian courts have been extraordinarily respectful of the limits of their jurisdiction

12   and have bent over backwards not to damage Praxair's business outside of Europe.  The Court of

13   First Instance found that because Praxair filled its entire worldwide supply of certain UpTime

14   cylinders in Belgium (*e.g.,* those containing $B^{11}F_3$), banning the infringing conduct in Belgium

15   was tantamount to taking Praxair's UpTime product off the market.[38]  Therefore, even when by

16   Order dated October 26, 2006 the Court found that a preliminary injunction was appropriate, the

17   Court granted only limited relief, essentially a marketing injunction:

18
19
20
21
22
> For these reasons … [the Court] Order[s] each one of the defendants, pending an intervening decision on the merits, to stop publishing and distributing information and/or advertising which present the litigious "UpTime" cylinders as a replacement product for the claimant's competing product and enjoin the defendants from making publicity for this product in any way, subject to a fine for non-performance of 100,000.00 EURO per violation established.[39]

23

---

24   [35]   Fricke Decl. ¶ 20.  The European patents are owned by defendant Advanced Technology Materials,
25   Inc., not co-defendant ATMI, Inc. and, consequently, all references herein to ATMI in connection
with such patents should be understood as being correspondingly limited.

26   [36]   Vandermeulen Decl. ¶ 4.
[37]   *Id*.

27   [38]   *Id*. at ¶ 5, Exh. C at 4 (corrected transcript).
[39]   *Id*. at ¶ 5, Exh. C at 6-7 (corrected transcript).

28

1    In November 2006, Praxair appealed the October 2006 preliminary injunction to the

2 Court of Appeal in Antwerp and also commenced proceedings before the Court of First Instance

3 in Antwerp to revoke the October 2006 preliminary injunction.[40]  Again, Praxair never

4 challenged the jurisdiction of the Belgian court.  The Court of First Instance in Antwerp denied

5 the request to revoke the October 2006 preliminary injunction in an Order dated January 4,

6 2007.[41]  No appeal was filed against this decision.[42]

7    Following briefing and oral argument by both parties in January 2007, the Court of

8 Appeal in Antwerp, on April 25, 2007, rejected Praxair's appeal as "unfounded," affirmed the

9 October 2006 preliminary injunction, and expanded the preliminary injunction to prohibit the

10 sale and distribution of UpTime cylinders by Praxair into any European country where ATMI

11 had validated European Patent No. 1 000 291 B1.[43]  In reaching this result, the Court found that:

12    ▪    "Filling 'UpTime®' gas cylinders with BF3 gas takes place exclusively for the
          entire Praxair group and all its customers worldwide from the high technology
13        installation in Oevel [Belgium]"; and

14    ▪    "[I]n order to safeguard the interests of the parties urgently, there is good reason
          indeed to enjoin Praxair, subject to a penalty, from acting aggressively in order to
15        steal additional market share from ATMI."[44]

16    Praxair then appealed the April 25, 2007 Order to the Court of Cassation (the highest

17 appellate court in Belgium) by papers dated July 26, 2007, solely challenging the expansion of

18 the preliminary injunction.[45]  It did not appeal the preliminary injunction against publicity and

19 marketing or its affirmance by the Court of Appeal in Antwerp.  This July 26 appeal is

20 pending.[46]

21    The origin of the present dispute traces to November 26, 2006, at which time ATMI

22
---
23  [40]  *Id.* at ¶¶ 6, 8, Exh. D.
    [41]  *Id.* at ¶ 7.
24  [42]  *Id.*
    [43]  *Id.* at ¶ 9, Exh. E.
25  [44]  *Id.*
    [45]  *Id.* at ¶ 10.
26  [46]  *Id.*  In the meantime, Praxair filed another challenge against the Order of April 25, 2007 to the Court
    of First Instance in Antwerp by papers dated August 27, 2007.  *Id.* at ¶ 11.  In an opinion dated
27  October 11, 2007, the Court of First Instance in Antwerp again denied Praxair's challenge and upheld
    the order of April 25, 2007.  *Id.*  Praxair has appealed this decision as well.
28

1   presented to a Belgian bailiff evidence that Praxair was engaging in web-marketing of UpTime

2   cylinders that was plainly accessible in Europe.  At that time the Belgian bailiff recorded

3   multiple violations of the preliminary injunction in the form of advertising and promotional

4   materials displayed at the www.praxair.com and www.praxair.be websites.[47]  As a result, ATMI

5   claimed 600,000 Euros in penalties for such violations.  On November 20, 2006, Praxair filed

6   papers in the Court of First Instance in Turnhout to challenge ATMI's effort to collect these

7   penalties.[48]  By Order dated September 27, 2007, the Court of First Instance in Turnhout

8   awarded 200,000 Euros in penalties against Praxair NV and 200,000 Euros in penalties against

9   Praxair, Inc.[49]  The Court reasoned:

> The websites mentioned could be easily consulted in Belgium and
> undoubtedly also in other European countries where the patent of
> the defendant is protected.  Publicity via Internet sites has a cross-
> border character; it is for this reason that this type of publicity is
> often chosen.  This means that the place where the database, which
> forms the basis of the publicity, is located is only a starting point
> with the consumer-internet user being the destination.  In the case
> of violation of an injunction on publicity via Internet sites, the
> offense is not only being carried out at the place where the
> database is located, but also at the place where the challenged
> publicity is being seen by the internet-consumer, for instance in
> Belgium….
>
> The violations via the Internet of the injunction imposed by the
> disputed decision were carried about by the aforementioned
> company in Belgium and in other European countries which the
> patent of [ATMI] enjoys protection.  For the enforcement of the
> penalty payment related to the violation of the injunction in
> Belgium a writ of execution in the United States is not required.[50]

On December 14, 2007, Praxair filed papers in the Court of First Instance in Antwerp to

challenge ATMI's effort to collect a further 1,200,000 Euros in penalties for additional violations

of the preliminary injunction.[51]  A hearing in this action is scheduled for September 2008.

---

[47] *Id.* at ¶ 12.
[48] *Id.*
[49] *Id.* at ¶ 13, Exh. F.
[50] *Id.*
[51] *Id.* at ¶ 14.

1    Praxair NV paid the 200,000 Euro penalty plus interest on March 10, 2008.[52]  Praxair

2    Inc. appealed the 200,000 Euro penalty award to the Court of Appeal in Antwerp.   That appeal

3    is pending.  A trial on the merits is currently scheduled for September 2008.[53]

## III.    LEGAL STANDARD

5    A plaintiff seeking the extraordinary, preliminary relief of a preliminary injunction must

6    demonstrate its entitlement to such relief in one of two ways.  Under the "traditional criteria," the

7    plaintiff must demonstrate "(1) a strong likelihood of success on the merits, (2) the possibility of

8    irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships

9    favoring the plaintiff, and (4) advancement of the public interest (in certain cases)."  *Earth Island*

10   *Inst. v. U.S. Forest Serv.,* 442 F.3d 1147, 1158 (9th Cir. 2006).  Under the alternative test, a

11   plaintiff must show "*either* a combination of probable success on the merits and the possibility of

12   irreparable harm *or* that serious questions are raised and the balance of hardships tips sharply in

13   his favor."  *Id.* (emphasis in original).  As the Ninth Circuit states, the alternate test's two

14   formulations "represent two points on a sliding scale in which the required degree of irreparable

15   harm increases as the probability of success decreases."  *LGS Architects, Inc. v. Concordia*

16   *Homes of Nev.,* 434 F.3d 1150, 1155 (9th Cir. 2006).[54]

17   A party seeking such relief bears a high burden of proof in establishing the requisite

18   immediate or imminent irreparable harm:

19   
20   At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm.
21   Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.  A plaintiff must do
22   more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury
23   as a prerequisite to preliminary injunctive relief.

24   *Caribbean Marine Services Co., Inc. v. Baldrige,* 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in

---

52   *Id.* at ¶ 15.

53   *Id.* at ¶ 16.

54   *Reilly v. MediaNews Group, Inc.*, 2006 U.S. Dist. Lexis 61696, at *11-12 (N.D. Cal. July 28, 2006); *see also American Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1472 (9th Cir. 1985) (same, in antitrust context).

original) (internal citations omitted); *see also Financial & Sec. Products Ass'n v. Diebold, Inc.,* 2005 WL 1629813, at *6 (N.D. Cal. 2005) (J. Alsup) ("Irreparable harm must not be speculative or merely alleged to be imminent; … [w]hile the threat of being driven out of business would be sufficient to establish irreparable harm, mere loss of revenue is not; such injury would be compensable in damages.").

## IV.    ARGUMENT

### A.    Plaintiff's Claim that ATMI is "Cutting Off Praxair's Supply of B$^{11}$F$_3$" Through Anticompetitive Exclusive Dealing is False as a Factual Matter and Legally Groundless

#### 1.    A Necessary (But Not Sufficient) Condition for Demonstrating an Anticompetitive Output Contract is the Foreclosure of Rivals From the Relevant Market

Praxair's antitrust attack on the ATMI-Nukem agreement is ostensibly grounded in exclusive dealing law, but it is important to note at the outset that it is complaining about a particular kind of exclusive contract:  the output contract.  *See generally,* 11 P. AREEDA & H. HOVENKAMP, ANTITRUST LAW ¶1803 (2d ed. 2005).  While exclusive dealing is, in general, treated leniently by the courts, the case law recognizes particularly strong efficiency benefits to output contracts such as the ATMI-Nukem agreement, including that they facilitate co-investment in the supply chain, contribute to stability of supply, and allow for supply-based product differentiation.  *See, e.g., Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 333 (1961) (assuring steady supply); *Paddock Publications, Inc. v. Chicago Tribune Co.,* 103 F.3d 42 (7th Cir. 1996) (Easterbrook, J.) (product differentiation); *Sewell Plastics, Inc. v. Coca-Cola Co.,* 720 F. Supp. 1196, 1219 (W.D.N.C. 1989), *aff'd per curiam,* 1990-2 Trade Cas. ¶69,165, 912 F.2d 463 (4th Cir. 1990, unpublished) (co-investment:  agreement to buy 80% of bottle needs from jointly formed bottle producer was reasonable to justify the investment in plant and equipment).  For these and other reasons, the leading antitrust treatise notes that "the great majority of output contracts are at least presumptively procompetitive."  ANTITRUST LAW ¶1803.

Exclusive dealing may be challenged under Section 1 of the Sherman Act, which prohibits contracts and conspiracy that restrain trade, or Section 2 of the Sherman Act, which prohibits actual and attempted monopolization.  There are differences in Section 1 and 2 standards that need not

1    concern the Court at this time, for example with respect to the required showing of market or

2    monopoly power. *See United States v. Microsoft Corp,* 253 F.3d 34, 69-70 (D.C. Cir. 2001) (en

3    banc). [55] The more important point for present purposes is that there are "well-recognized

4    economic benefits" of exclusive dealing arrangements, and consequently the courts analyze any

5    exclusive dealing arrangement under the relatively forgiving "rule of reason." *Omega Envt'l, Inc.*

6    *v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997). Among other things this requires the

7    plaintiff to demonstrate anticompetitive effects, such as higher prices or reduced choice in the

8    relevant market. *Bhan v. NME Hosp., Inc.,* 929 F.2d 1404, 1413 (9th Cir. 1991); *U.S. Healthcare,*

9    *Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596-97 (1st Cir. 1993). It also requires consideration of

10   the defendant's business justifications for the exclusive arrangement, and typically antitrust law

11   does not condemn exclusive supply or distribution contracts when there are significant

12   procompetitive justifications for them. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 334

13   (1961).

14          Whatever the plaintiff's theory, foreclosure of rivals is the *sine qua non* of any challenge

15   to an exclusive dealing contract. *Tampa Elec.*, 365 U.S. at 327; *U.S. Healthcare,* 986 F.2d at 596

16   (the "ultimate issue in exclusivity cases remains the issue of foreclosure and its consequences").

17   The antitrust concern is that by "locking-up" scarce supplies or distribution outlets, one

18   competitor can impair "the ability of competitors … to reach the market." ABA Section of

19   Antitrust Law, Antitrust Law Developments 217 (6th ed. 2007); *Jefferson Parish Hosp. Dist. No.*

20   *2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring) ("Exclusive dealing is an

21   unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out

22

23   [55] Plaintiff contends that the relevant antitrust market here is the "global production and sale of sub-
     atmospheric gas delivery systems." Plaintiff's Opening Br. at 15. This is not a properly defined
24   relevant market. The relevant antitrust market is for all gas delivery systems used in semiconductor
     processes and includes not only sub-atmospheric delivery systems, but also the more prevalent high
25   pressure delivery systems. When the market is properly defined, ATMI's alleged monopoly vanishes.
     The Court, however, need not determine what the relevant antitrust market is and/or the extent of
26   ATMI's alleged market power within that market in order to deny Praxair's preliminary injunction
     motion. Plaintiff's entire motion turns on its mistaken belief that there is an exclusive supply contract
27   between ATMI and Nukem, when there is not, and that there are no other gas sources when there
     most certainly are. Thus a comprehensive analysis of the relevant antitrust market is not warranted at
28   this time.

1  of a market by the exclusive deal.").  Unless competitive foreclosure will result, antitrust law is

2  essentially indifferent to whether individual suppliers or distributors are "locked-up" – in other

3  words, whether a company like Praxair has to buy gas from Boron Products rather than Nukem.

4  *See Barry Wright Corp. v. ITT Grinnell Corp. et al.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer,

5  J) ("virtually *every* contract to buy 'forecloses' or 'excludes' alternative sellers from *some*

6  portion of the market, namely the portion consisting of what was bought").

7       For these reasons, an exclusive dealing claim fails as a matter of law if, notwithstanding

8  the output or exclusive dealing contract, alternate supplies are available.  *Gilbarco*, 127 F.3d at

9  1162-63 (affirming summary judgment where "[t]he record contains undisputed evidence that

10 direct sales to end-users are an alternative channel of distribution in this market"); *Paddock*

11 *Publications,* 103 F.3d at 4; *Holmes Products Corp. v. Dana Lighting, Inc.*, 958 F. Supp. 27, 32-

12 33 (D. Mass. 1997).  So long as the plaintiff has reasonable supply alternatives, it makes no

13 difference that the defendant's supply relationships are in some sense superior to plaintiff's

14 options.  *Gilbarco*, 127 F.3d at 1163.

15      There is an important policy rationale for this principle, which is the fact that competition

16 *includes rivalry for advantageous supply (and distribution) arrangements.  Cf. Verizon*

17 *Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 407-08 (2004)

18 (firms strive to establish "an infrastructure that renders them uniquely suited to serve their

19 customers").  *Trinko* recognizes that "[c]ompelling such firms to share the source of their

20 advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the

21 incentive … to invest in those economically beneficial facilities."  *Id.*  In the context of exclusive

22 dealing claims, the Ninth Circuit has recognized this repeatedly, especially in *Gilbarco*, where it

23 rejected an exclusive dealing claim in part because "the antitrust laws were not designed to equip

24 [one] competitor with Gilbarco's legitimate competitive advantage" obtained through exclusivity

25 contracts.  *Gilbarco*, 127 F.3d at 1163.  The Court also cited its earlier decision in *General*

26 *Business Systems v. North American Philips Corp.*, 699 F.2d 965, 979 (9th Cir. 1983), for the

27 proposition that "a defendant, having succeeded in legitimately controlling 'the best, most

28 efficient and cheapest source of supply,'... does not have to share 'the fruits of its superior

1   acumen and industry,'" (citing *Determined Productions, Inc. v. R. Dakin & Co.*, 514 F.Supp.

2   645, 648 (N.D. Cal. 1979)).  In short, the purposes of the antitrust laws "to preserve competition,

3   not competitors"[56] are disserved when firms like Praxair that do in fact have reasonable supply

4   options seek forced access to their rival's supply chain.

5           The case law on preliminary injunctions against exclusive dealing takes the conservative

6   approach one would expect in light of these policies.  Indeed, the cases Praxair cites get the

7   standard right:  an exclusive supply contract is properly enjoined where plaintiff can show that

8   the very "existence of its business life as a competitor in the [relevant] market is threatened."

9   *E.g.*, *Foremost Int'l Tours, Inc. v. Qantas Airways Ltd.*, 379 F. Supp. 88, 97 (D. Haw. 1974);

10  Plaintiff's Opening Brief at 12-14.  In all other cases, including whenever money damages would

11  compensate a plaintiff for a mere loss of business, injunctive relief is inappropriate.

12              2.      **Praxair Has Failed to Demonstrate That Its "Business Life" Is
                        Threatened**
13

14          Praxair does not come within a country mile of making this required showing under the

15  case law – even though its papers would lead one to believe that it has a near-perfect case.

16  Praxair can neither show the threshold predicate of a truly exclusive contract, nor meet its burden

17  of showing that it cannot purchase $B^{11}F_3$ from suppliers other than Nukem.  Thus, its claims fail

18  as a matter of law.

19          Praxair apparently filed this case because it "has recently been advised that ATMI has

20  entered into an exclusive supply contract with Nukem."[57]  Perhaps it was so advised.  It does not

21  change the fact that ATMI and Nukem have *not* entered into a genuinely exclusive supply contract,

22  because Nukem has retained the right to sell 100 kg of $B^{11}F_3$ to third parties such as Praxair in each

23  contract year.  That is its right under the contract now in effect, and the same right exists in the

24  proposed two-year supply contract denominated "exclusive."  At worst Praxair will lose the ability

25  to buy a small amount of $B^{11}F_3$ from Nukem – an amount that could not possibly threaten the

26

27  [56]  *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962).

28  [57]  Plaintiff's Opening Br. at 2.

1  "existence of its business life as a competitor in the [relevant] market." *Foremost Int'l Tours,* 379

2  F. Supp. at 97.

3      In addition, plaintiff has fundamentally misrepresented its reliance on Nukem for the

4  supply of $B^{11}F_3$. Plaintiff's papers tell a nearly unequivocal story of a world where Nukem is the

5  only viable supplier of $B^{11}F_3$. For example, plaintiff states: "Given Nukem's dominance in the

6  supply of $B^{11}F_3$ worldwide, it is far from clear that an alternative, reliable and adequate supply of

7  that gas can be secured."[58] In reality, it is indisputable that Boron Products also sells "qualified"

8  $B^{11}F_3$; that Praxair (as wells as ATMI) purchases $B^{11}F_3$ from Boron Products; and that Boron

9  Products has uncommitted *production* well in excess of Praxair's needs and uncommitted

10 *capacity* far in excess of Praxair's needs. The exact quantity of $B^{11}F_3$ that Praxair purchases

11 from Boron Products is not yet known because Praxair refused to waive its customer-

12 confidentiality agreement with Boron Products, but the bottom line is clear enough: Boron

13 Products has the largest Boron isotope enrichment facility in the world and can easily supply

14 Praxair's needs.

15      Remarkably, *one will search Praxair's papers in vain for so much as a footnote that*

16 *mentions Boron Products.* Plaintiff's self-serving and distorted portrayal of the available supply

17 of $B^{11}F_3$ comes dangerously close to constituting a Rule 11 violation.

18      Plaintiff's fallback argument that "even if Praxair could find an alternative long term

19 supplier of $B^{11}F_3$" – such as the conspicuously unmentioned Boron Products – "Praxair still

20 finds itself in a perilous competitive posture due to the chokehold that ATMI has placed on the

21 supply of *qualified* $B^{11}F_3$,"[59] is meritless. First, the premise is false: Boron Products' $B^{11}F_3$ *is*

22 *qualified* with the vast majority of ATMI customers. It is qualified because ATMI undertook the

23 time and effort to get it qualified. Note also plaintiff's statement that "more than ninety-eight

24 percent" of its customers either currently are, or previously were, ATMI customers.[60]

25 Consequently, the vast majority of Praxair's current and potential customers – including those

26
27
28

[58] *Id.* at 3; *see also id.* at 7, 12-13.
[59] *Id.* at 7-8 (emphasis in original).
[60] *Id.* at 6 ("More than ninety-eight percent of Praxair's customers had previously used ATMI's SDS.").

1    who ATMI might conceivably exploit were it able to foreclose competition – have previously

2    "qualified" $B^{11}F_3$ sourced from Boron Products.[61]

3          Second, even if one assumes, for the sake of argument, that none of Praxair's customers

4    are currently "qualified" on $B^{11}F_3$ supplied by Boron Products, Praxair's ability to purchase

5    $B^{11}F_3$ from Nukem is not materially different today than it ever has been.  One wonders how

6    Praxair has possibly been surviving.  Regardless, nothing is preventing Praxair from continuing

7    to purchase 100 kg per year of Nukem $B^{11}F_3$ while it supplements that with Boron Products

8    $B^{11}F_3$ and works to qualify Boron Products $B^{11}F_3$ with the odd customer that has not already

9    qualified that product.  It is completely offensive to antitrust policy that Praxair thinks it deserves

10   a free pass from establishing and qualifying a $B^{11}F_3$ supply chain.  Whether it takes three months,

11   six months, or nine months to qualify a gas supplier,[62] doing so is a basic requirement of this

12   business.  ATMI met this requirement and Praxair can meet it too – if it must.  But the reality is

13   that Praxair probably does not need to do so, because it can free ride on ATMI's path-breaking

14   efforts to qualify both Nukem and Boron Products.

15         In short, plaintiff's request that this Court enjoin an "exclusive" supply contract that does

16   not exist reflects a monumental distortion of the relevant facts and relies heavily on a self-

17   serving failure to acknowledge that $B^{11}F_3$ is readily available from Boron Products.  Under these

18   circumstances, plaintiff cannot demonstrate imminent, irreparable injury or likelihood of success

19   on the merits.  There are simply no credible facts indicating that the contemplated ATMI-Nukem

20   supply contract – which is comparable in all important respects to ATMI-Nukem supply

21   contracts dating back to 2005 – will foreclose plaintiff from the supply of $B^{11}F_3$ and force Praxair

22   "out of the relevant market *in toto*."[63]

23         This moots much of the substantive analysis of exclusive dealing.  If this case goes

24   forward, ATMI will demonstrate that Praxair's market and monopoly power allegations are false,

25   and it will demonstrate the substantial procompetitive benefits of its "take or pay" relationship

26   [61]   Fricke Decl. ¶ 11.

27   [62]   *See supra* note 19.

      [63]   Plaintiff's Opening Br. at 12.

28

1    with Nukem.  Ultimately, no law – sounding in antitrust or otherwise – supports the theory that

2    Praxair has a legal right to free ride on the investments ATMI made to create a supply chain that

3    could support a sub-atmospheric gas delivery business and demand gas from a supplier that

4    ATMI developed from scratch.  But today, the issue is simply whether an injunction should

5    issue.  On that, Praxair has failed to show probable success on the merits, or even "close

6    questions."

7        Moreover, the balance of hardships overwhelmingly tips in favor of ATMI.  In essence,

8    Praxair is asking this Court to enjoin ATMI from continuing forward with a lawful,

9    procompetitive supply contract that (a) helps ensure that ATMI and its customers have a reliable

10   supply of $B^{11}F_3$, and (b) fosters ATMI's and Nukem's joint investment in efforts to further

11   enhance the quality of the $B^{11}F_3$ being produced.  Without the security of the output guarantees

12   provided by the contemplated supply contract, these procompetitive investments in product

13   innovation are put at risk.  By contrast, declining to grant the requested injunction relief leaves

14   Praxair in fundamentally the same competitive position – with respect to the amount of $B^{11}F_3$

15   available to Praxair from Nukem – that it has been for years.  The supply contract being

16   negotiated by ATMI does not meaningfully change the competitive landscape vis-à-vis Praxair,

17   let alone completely foreclose Praxair from any relevant market.

18       **B.    Plaintiff's Request for this Court to Enjoin ATMI from Lawfully Pursuing
            its Judicial Rights in Europe is a Meritless Attempt to End-Run a Proper**

19       **European Judicial Proceeding**

20       Praxair would have this Court nullify a Belgian court's preliminary injunction, even

21   though it admits that "there is no doubt that ATMI has every right to seek relief in other

22   jurisdictions to protect whatever intellectual property rights it may claim to have there."[64]  The

23   contradiction is self-evident and damning.  The present preliminary injunction motion is a blatant

24   exercise in forum shopping – an American company appealing to an American court to end-run

25   the judicial proceedings presently ongoing between the parties in Europe, in the country where

26   Praxair fills its UpTime cylinders, and concerning European patent rights.  It is *exactly* what the

27   _____
     [64]   Plaintiff's Opening Br. at 22.

28

1  authorities Praxair cites prohibit:  re-litigating a pending case in a more favorable "home" forum.

2  It is legally and factually baseless and should be firmly rebuked.

3             1.        **Praxair's Description of the Belgian Court Proceedings and ATMI's**
                        **Actions is Wildly Misleading**
4

5        Praxair would have this Court believe that the Belgian court is attempting to ban

6  commercial speech in the United States without any nexus to unlawful conduct in Europe and

7  without any legal justification – and that "ATMI is using [the] Belgian preliminary order to

8  restrain commerce and affect speech in the United States in a way that would never be permitted

9  by a United States court."[65]  This is all false.

10       As set forth above,  the relevant facts in this matter are beyond dispute:

11       ▪   ATMI has presumptively valid European patent rights enforceable in
             certain European countries, including Belgium;
12       ▪   Praxair has major manufacturing facilities in Belgium that produce the
             allegedly infringing product.  In fact, the Belgian Court of Appeal
13           specifically found:  "Filling 'UpTime®' gas cylinders with BF3 gas takes
             place exclusively for the entire Praxair group and all its customers
14           worldwide from the high technology installation in Oevel [Belgium];"
15       ▪   ATMI commenced patent litigation against Praxair in Belgium for
             infringing ATMI's European patent rights by, *inter alia*, filling infringing
16           gas cylinders in Belgium and then shipping the infringing product
             worldwide;
17       ▪   The Belgian district and appellate courts have concluded that ATMI has
             satisfied the requirements under Belgian law for issuance of a preliminary
18           injunction.  The Belgian Court of Appeal found that in light of Praxair's
             "continued patent infringements as presented here," ATMI "runs the risk
19           of losing, over time, a considerable share of its clientele since it may lose
             the exclusive character of its patent and its credibility among the public.
20           A mere compensation in the form of financial damages is not able to fully
             repair that prejudice;"
21
         ▪   The preliminary relief granted by the Belgian courts includes an injunction
22           against (a) the sale and distribution of UpTime cylinders by Praxair into
             any European country where ATMI has validated is European patent, and
23           (b) certain marketing practices, including internet marketing accessible in
             such countries.  The latter relief was based on a finding that "[i]n the case
24           of violation of a prohibition on publicity via Internet sites, the offense is
             not only being carried out at the place where the database is located but
25           also at the place where the challenged publicity is being seen by the
             internet-consumer, for instance in Belgium…;"
26
         ▪   The Belgian courts have held that Praxair has violated the publicity
27  ────────────────
    [65]   *Id.*
28

1    injunction by putting forth advertising or marketing that reached into
2    Belgium and, on September 27, 2007, assessed penalties against Praxair in
     Europe; and

3    ▪  Praxair has been represented by European counsel at all relevant times and
        has strenuously litigated the propriety of the Belgian court preliminary
4       injunction before five Belgian courts – the issuing district court, two
        appellate courts (including the Supreme Court of Belgium), and two
5       separate penalties courts.  All of the decisions to date, rendered after full
        briefing and oral argument, have found that preliminary injunctive relief
6       against Praxair is proper.  Moreover, the Belgian courts have repeatedly
        set out their findings of fact and law – including analyses of the balance of
7       hardships and the irreparability of the harm threatened by Praxair's
        continued infringement of ATMI's European patent rights – in well
8       reasoned, written decisions.[66]

9        The Belgian tribunals are appropriately adjudicating matters properly before them:

10   patent rights under European-issued patents; preliminary injunctive relief relating to those rights;

11   a party's violation of the court's orders and authority; and corresponding penalties assessed

12   against Belgian assets.  At all times, the Belgian courts have been careful not to enjoin Praxair's

13   sale and distribution of UpTime cylinders in the United States, even cylinders filled in Belgium

14   in violation of ATMI's Belgian patent.  In this respect the Belgian courts have demonstrated

15   great jurisdictional restraint; from ATMI's perspective, significantly *more* restraint than is

16   required.  Praxair's complaint is simply that the Belgian courts have drawn a jurisdictional line,

17   and not allowed Praxair to market to European customers either in Europe *or from afar*.  There is

18   nothing wrong with that.  Neither the First Amendment nor jurisdictional principles demand the

19   kind of jurisdictional "gap" that Praxair's arguments would create, whereby one could evade an

20   absolutely ordinary injunction against marketing infringing products simply by lobbing in one's

21   marketing missiles from another country.  U.S. courts do not allow that, *see*, *e.g.*, *Baden Sports,*

22   *Inc., v. Kabushiki Kaisha Molten*, 2007 WL 2790777, at *3 (W.D. Wash. 2007) (issuing a

23   permanent injunction regulating advertisement via a website hosted in Japan of a Japanese

24   product infringing a U.S. patent), and European courts need not allow it either.

25       Praxair ignores these salient facts and paints a muddled picture of American free speech

26   rights under attack by the way the Belgian court's preliminary equitable relief "is being

27   ---
     [66]  *See supra* Section II.D; Vandermeulen Decl. ¶¶ 2-17, Exhs. A-F.
28

1   brandished and overextended by ATMI,"[67] and in particular by ATMI's "attempt[s] to enforce

2   the purported advertising ban *in the United States.*"[68]  But what has ATMI done "*in the United*

3   *States*"?  Exactly one thing:  ATMI's 2007 Form 10K contains a statement to the effect that the

4   scope of the injunction is worldwide.  Praxair does nothing to show how this statement *in a 10K*

5   filing – hardly a marketing document – causes it any harm.  Everything else about which Praxair

6   complains concerns positions ATMI has taken in the Belgian courts in the course of the ongoing

7   litigation.  The relief Praxair seeks makes this clear, as it requests this Court to enjoin ATMI

8   from (1) "attempting improperly to enforce a Belgian court's preliminary equitable relief so as to

9   have any effect outside of the European nations in which ATMI has registered patent rights"; and

10  (2) "seizing Praxair assets or seeking further penalty order from the Belgian court without prior

11  approval of this Court."[69]  Thus, what Praxair is asking this Court to do is remarkable:  issue an

12  injunction that would tie ATMI's hands in the Belgian proceedings, forcefully halting ATMI

13  from seeking relief against activities that, regardless of their country of origin, infringe ATMI's

14  European patent rights.  Praxair is not entitled to this unprecedented, extraordinary remedy.

15          **2.      There is No Legal Basis for the Type of "Anti-Suit Injunction" that**
16                    **Praxair Seeks**

17          Federal courts only have Article III jurisdiction with respect to "actual controversies,"

18  which, among other things (such as ripeness), requires that the plaintiff's interest is in "obtaining

19  compensation for, or preventing, the violation of a legally protected right."  *Vermont Agency of*

20  *Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772 (2000).  It is therefore incumbent

21  on the plaintiff to identify the legally-protected interest that it seeks to vindicate, tying whatever

22  injury it claims to be suffering to some invasion (or threatened invasion) of an interest protected

23  by common law, statute, or the Constitution.  *Raines v. Byrd*, 521 U.S. 811, 819 (1997) ("The

24  alleged injury must be legally and judicially cognizable.").

25          The legal argument that Praxair makes in support of its attack on the publicity injunction

26  ───────────────
    [67]   Plaintiff's Opening Br. at 21 (emphasis added).
27  [68]   *Id*. at 20-21.
    [69]   *Id*. at 1.
28

1   is nearly indecipherable.  It is difficult to find any distinct legal interest or cause of action that

2   might form the basis for judicial intervention, or even jurisdiction.  First Amendment and

3   antitrust themes are tossed about, but with no regard for elementary principles that would appear

4   to eviscerate any claim against the conduct of foreign litigation.[70]  At bottom, however, Praxair

5   seems to be seeking a variant of the "anti-suit injunctions" that were at issue in *Microsoft Corp.*

6   *v. Lindows.com, Inc.*, 319 F. Supp. 2d 1219 (W.D. Wash. 2004) and *Yahoo! Inc. v. La Ligue*

7   *Contre Le Racisme et l'Antsemitisme* case, 169 F. Supp. 2d 1181 (N.D. Cal. 2001), *rev'd,* 433

8   F.3d 1199 (9th Cir. 2006) (en banc).  The variation, however, is fundamental.  While the "anti-

9   suit injunction" doctrine exists and provides jurisdiction to prevent international forum-shopping,

10  Praxair seeks to use it *in aid of forum-shopping*.

11          An "anti-suit injunction" is a specific expression of the maxim that courts always have

12  jurisdiction to protect their jurisdiction.  *See E. & J. Gallo Winery v. Andina Licores S.A.*, 446

13  F.3d 984, 992-93 (9th Cir. 2006) (tracing the doctrine to a jurisdictional struggle between

14  common law and ecclesiastical courts).  The basic rule is that a federal district court with

15  jurisdiction over the parties has the power to enjoin them from proceeding with an identical

16  action in a foreign jurisdiction if "'the first action is dispositive of the action to be enjoined.'"

17  *Id., quoting Sun World, Inc. v. Lizarazu Olivarria,* 804 F. Supp. 1264, 1267 (E.D. Cal. 1992).

18  "Anti-suit injunctions" are typically granted where one party to an existing litigation tries to open

19  a "second front" in a more favorable forum, *e.g., Seattle Totems Hockey Club, Inc. v. Nat'l*

20  *Hockey League,* 652 F.2d 852 (9th Cir. 1981) (enjoining pursuit of parallel Canadian

21  proceeding), or where the first-filed litigation seeks to evade a forum selection clause, *e.g.,*

22  *Gallo,* 446 F.3d at 995 (enjoining Ecuadorian litigation when parties selected California forum

23  and law to govern their contractual relationship).  Outside these facts, "anti-suit injunctions" are

---

24  [70]   For example, every law student knows that "the constitutional guarantee of free speech is a guarantee
25         only against abridgment *by government, federal or state*."  *Hudgens v. NLRB*, 424 U.S. 507, 513
           (1976) (emphasis added).  So where is the "state action" that might confer jurisdiction over a
26         Constitutional claim in this case?  Likewise, it is clear that the antitrust laws do not protect
           competitors from the effects of judicial action that results from litigation.  *See, e.g., Sanders v. Brown*,
27         504 F.3d 903, 914 (9th Cir. 2007).  What cognizable legal interest does Praxair have under U.S.
           antitrust law to be free of foreign patent litigation?  It is all a jumbled mess that does not serve the
           Court.

28

1   rare.  Indeed, they are always rare because of the international comity interests at stake whenever

2   one nation's court is asked to interfere with another sovereign's legal proceedings.  *Id.* at 991*;*

3   *see also Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 17 (1st Cir.

4   2004) ("We deem international comity an important integer in the decisional calculus…"); *Laker*

5   *Airways Ltd. v. Sabena Belgian World Airlines,* 731 F.2d 909, 927 (D.C. Cir. 1984) (anti-suit

6   injunctions should only be granted "in the most compelling circumstances").

7           The threshold requirements for granting an anti-suit injunction are that "the parties and

8   the issues are the same, and [that] the first action is dispositive of the action to be enjoined."

9   *Gallo*, 446 F.3d at 991 (internal quotes omitted); *see also Stein Assoc., Inc. v. Heat and Control,*

10  *Inc.,* 748 F. 2d 653, 658 (Fed. Cir. 1984) ("The district court has the discretionary power to

11  enjoin a party from pursuing litigation before a foreign tribunal but can exercise that power only

12  if the parties and issues are the same, and resolution of the domestic action will dispose of the

13  foreign action."); *Lindows.com,* 319 F. Supp. 2d at 1222 ("An [anti-suit] injunction is appropriate

14  only in cases where the parties are the same, the issues are the same, and resolution of the U.S.

15  action will be dispositive of the action to be enjoined.").  In other words, courts will not consider

16  enjoining foreign suits in the absence of a parallel action between the same parties over the same

17  claim.  *See Gallo*, 446 F. 3d at 991; *Goss Int'l Corp. v. Man Roland Druckmaschinen*

18  *Aktiengesellschaft,* 491 F.3d 355, 366 (8th Cir. 2007) (declining to intervene in foreign litigation

19  where the plaintiff sought to litigate in Japan a cause of action solely available in Japan);

20  *Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc.,* 412 F.2d 577, 579 (1st Cir. 1969)

21  (vacating an international anti-suit injunction "where the subject matter of the foreign suit is a

22  separate, independent foreign patent right"); *Sperry Rand Corp. v. Sunbeam Corp.,* 285 F.2d 542,

23  545 (7th Cir. 1960) (vacating the injunction because disposition of the cause pending in the

24  district court would not dispose of the German case or other threatened cases in foreign courts).

25          Plaintiff's motion for a preliminary injunction plainly fails to meet these requirements.

26  The parties here are not engaged in the "same" issues in two proceedings, and resolution of

27  Praxair's claims in this case will not be "dispositive" in the slightest of ATMI's suit in Europe.

28  Foreign intellectual property rights are by their nature distinct, and are inappropriate candidates

1    for anti-suit injunctions.  The Federal Circuit made this clear in *Stein*, affirming a district court's

2    denial of a preliminary injunction seeking to halt a foreign patent proceeding in Great Britain:

> 3    Here, the issues are not the same, one action involving United
> 4    States patents and the other involving British patents. Further,
>      resolution of the domestic action will not dispose of the British
> 5    action.  Only a British court, applying British law, can determine
>      validity and infringement of British patents. British law being
> 6    different from our own, and British and United States courts being
>      independent of each other, resolution of the question of whether
> 7    the United States patents are valid could have no binding effect on
>      the British court's decision. * * *  The district court properly
> 8    exercised its discretion in denying Stein's motion for preliminary
> 9    injunction.

10    *Stein,* 748 F. 2d at 658 (internal citations omitted); *see also Canadian Filters,* 412 F.2d at 579;

11    *Lindows.com*, 319 F. Supp. 2d at 1222 (denying request for anti-suit injunction because the

12    "weight of authority on the subject supports a finding that a trademark dispute is not the 'same'

13    for purposes of an anti-suit injunction").  In Belgium, ATMI is seeking to enforce rights under

14    European patent law regarding European patents.  That litigation is sure to continue no matter

15    what this Court rules with respect to this motion.  Under *Stein*, an anti-suit injunction is not

16    appropriate here.

17         Furthermore, Praxair is seeking to enjoin *the first action*, litigated for more than a year in

18    what is indisputably a proper court to adjudicate European patent rights, not a new parallel

19    litigation that somehow threatens this Court's jurisdiction.  This is the opposite of the paradigm

20    "anti-injunction suit," with Praxair suing not to preserve U.S. court jurisdiction, but to have this

21    Court take the unprecedented step of directly and specifically intervening in a foreign litigation

22    by enjoining one of the parties thereto from exercising its rights.  There is no authority or

23    jurisdictional basis for a U.S. court to assume this "gatekeeping" role over a litigant in foreign

24    litigation.  Praxair cites to no authority – and ATMI is aware of none – approving such a

25    fantastical injunction.

26         Having a U.S. court micro-manage a foreign judicial proceeding would be exceedingly

27    dismissive of the standards of international comity and judicial sovereignty governing this area.

28    A European court is more than able – and is clearly in the best position – to determine whether

1    European intellectual property law is being violated, and to hold corporations doing business in

2    Europe accountable to its authority.  European courts can also address the limits of their

3    jurisdiction to enjoin the marketing of infringing products far more effectively than a U.S.

4    District Court can and, at the very least, deserve a full opportunity to do so.  The real issue, of

5    course, is that Praxair has failed to convince the Belgian courts that the origins or intended scope

6    of its marketing efforts matter when, in fact, those efforts have significant effects in Europe.

7    That is why Praxair is now turning in desperation to a United States court.  There is no legal or

8    jurisdictional basis for the requested relief, which should in any event be denied under comity

9    principles.

10          **3.      A U.S. District Court Has Neither Jurisdiction Nor Authority to
                      Regulate Foreign Litigation on the Ground that a Party is Seeking or
11                    Obtaining Relief "Repugnant" to U.S. Interests or Policy**

12          Praxair cites to the Restatement (Third) of Foreign Relations Law of the United States

13   and *Yahoo! Inc. v. La Ligue Contre Le Racisme et l'Antsemitisme* case, 169 F. Supp. 2d 1181

14   (N.D. Cal. 2001) for its principal assertion that this Court may enjoin ATMI's actions in foreign

15   litigation that are "repugnant to the public policy of the United States."[71]  This is another wholly

16   specious contention.  The Restatement and the *Yahoo!* decision concern the recognition and

17   enforcement of foreign judgments and orders *in the United States courts.*[72]  ATMI has made no

18   attempts to enforce any of the Belgian court orders in the United States, and Praxair's motion for

19   a preliminary injunction specifically does not request an order from this Court declaring the

20   Belgian injunction "unenforceable" in the United States.  Thus, neither the Restatement nor the

21   *Yahoo!* decision are on point.[73]  Consequently, Praxair may not borrow the principles of the

22

23   [71]   Plaintiff's Opening Br. at 23.

     [72]   Section 482 of the Restatement states that a U.S. court "may not recognize a judgment of the court of
24          a foreign state" if the foreign court lacked jurisdiction or an impartial judicial system, and "need not
            recognize a judgment of the court of a foreign state" under six other enumerated conditions.
25          Similarly, in *Yahoo!,* the district court addressed only the very narrow question of whether a French
            court injunction based on a French anti-hate crime ordinance was recognizable and *enforceable in the*
26          *United States*.  *See* 169 F. Supp 2d at 1194 ("Yahoo! seeks a declaration from this Court that the First
            Amendment precludes enforcement within the United States of a French order…").

27   [73]   It is also very doubtful that Judge Fogel's analysis in *Yahoo!* is good law.  His decision was reversed
            by the Ninth Circuit, first by a panel and then by the Court sitting *en banc*.  *Yahoo!*, 399 F.3d 1010.
28          Praxair contends that reversal was "on other grounds," but that is not so clear.  The six judges who

1    Restatement or *Yahoo!* (be it "repugnancy to United States public policy" or anything else), and

2    apply them to a completely distinct request for an affirmative injunction.

3         The analysis can and should stop here.  But in addition, nothing the Belgian courts have

4    done is "repugnant to United States policy" in the least.  Praxair suggests that the Belgian courts

5    have offended First Amendment interests, likening this case to *Yahoo!*  But *Yahoo!* concerned

6    *content-based regulation* of what, regrettably, must be regarded as *political* speech.  Judge Fogel

7    found that the French order at issue in that case:

8         prohibits the sale or display of items based on their association
         with a particular political organization and bans the display of
9         websites based on the authors' viewpoint with respect to the
         Holocaust and anti-Semitism.  *A United States court*
10        *constitutionally could not make such an order.*  The First
         Amendment does not permit the government to engage in
11        viewpoint-based regulation of speech absent a compelling
         government interest, such as averting a clear and present danger of
12        imminent violence.

13

14   *Id.* at 1189 (emphasis added).

15        Here, *commercial speech* is at issue, and the European court's injunction is *content-*

16   *neutral*.  This has been recognized in numerous cases concerning injunctions to protect intellectual

17   property rights.  *See, e.g., San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,*

18   483 U.S. 522, 536 (1987) (injunction prohibiting use of the word "Olympic" was content neutral

19   and valid because Congress had granted the United States Olympic Committee's a trademark-like

20   property right over the term); *DVD Copy Control Association, Inc. v. Bunner*, 31 Cal. 4th 864,

21   877-78 (Cal. 2003) (affirming injunction against distribution of software code that "cracked"

22   digital rights management software where "the trial court issued the injunction to protect

23   [plaintiff's] statutorily created property interest in information – and not to suppress the content of

24   Bunner's communications"); *see generally,* 3 ROGER M. MILGRIM, MILGRIN ON TRADE SECRETS §

25   14.01[2][a], at 14-26 n.15 (2d ed. 2000) ("there is a long line of authority upholding content-

26   formed the majority all had severe reservations about the policy implications of Yahoo!'s request for
     declaratory relief.  Three expressed their reservations as a matter of ripeness, *id.* at 1211-1224, and
27   three as a matter of abstention and personal jurisdiction, *id.* at 1225-1228.  This makes for a
     complicated decision, but the bottom line is that the district court's analysis failed to carry the court.

28

1  neutral injunctions to protect intellectual property and that such injunctive relief is not an

2  impermissible prior restraint").

3      Indeed, the Belgian injunction tracks exactly those remedies that United States courts can

4  – and in fact do – regularly grant:  it prohibits the marketing of products that violate intellectual

5  property rights.  *See, e.g., Eli Lilly & Co. v. Medtronic, Inc.,* 735 F. Supp. 652, 662 (E.D. Pa.

6  1990) (First Amendment defense rejected where infringer violated permanent injunction that

7  prohibited "any ... activity which would have as its natural or intended purpose the sale of" the

8  infringing device, including using clinical data in "marketing [or] promoting" the device); *3D*

9  *Sys. Inc. v. Aarotech Lab. Inc.,* 160 F.3d 1373, 1379 (Fed. Cir. 1998) (finding that the mailing of

10  eight letters describing the products for sale and quoting prices was "an offer for sale" that could

11  constitute patent infringement under 35 U.S.C. § 271(a) (1994))[74]; *see also Baden Sports*, 2007

12  WL 2790777, at *3 (enjoining marketing from foreign website).[75]  There is no meaningful

13  disparity between the judicial policies of the two countries on this.  As a result, neither U.S.

14  policy interests generally nor First Amendment interests specifically are implicated by a foreign

15  preliminary injunction like the one issued by the Belgian court here.

16          **4.      Praxair Has Waited Too Long to Now Seek Injunctive Relief**

17      Finally, we note briefly that Praxair's request for injunctive relief fails for yet an

18  additional, independent reason:  plaintiff's delay in seeking an injunction.  It is well-established

19  that where the alleged grievance is long-standing, the extraordinary relief of a preliminary

20  injunction is improper as a matter of law.  *See*, *e.g.*, *Oakland Tribune, Inc. v. Chronicle Pub. Co.*

21  *Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (affirming district court's determination that waiting

---

22  [74]  We do not suggest that marketing alone constitutes patent infringement in the United States under

23      35 U.S.C. § 271(a) or otherwise.  Under *3D Systems,* it takes more than marketing to establish direct
        infringement.  The point is simply that U.S. courts, like their counterparts in Europe, are called upon

24      to police the line at which marketing efforts contribute to patent infringement and in appropriate
        circumstances can regulate that which might be though of as "speech."

25  [75]  Praxair attempts to confuse the issue by arguing that it is marketing a product that "cannot infringe
        any American patent."  Plaintiff's Opening Br. at 22.  Once again, this argument is nothing more than

26      a sleight-of-hand.  The fact that U.S. courts have ruled against U.S. patents held by ATMI and Praxair
        is irrelevant.  The United States litigations dealt solely with the parties' U.S. patents.  By contrast, the

27      Belgian court orders address the violation of a completely separate – and independently valid and
        enforceable – set of European patent rights held by ATMI.

28

1   nine months after filing the original complaint to file a preliminary injunction motion

2   demonstrated lack of irreparable harm; "Plaintiff's long delay before seeking a preliminary

3   injunction implies a lack of urgency and irreparable harm.").  Here, the European court

4   injunction at issue has been in effect since October 26, 2006 – over 16 months – and ATMI

5   sought penalties relating to violation of the injunction beginning shortly thereafter.  The

6   injunction – and penalties relating to it – have been extensively litigated in Europe since that

7   time.  Consequently, preliminary injunctive relief on this issue is unwarranted.

8   **V.       CONCLUSION**

9           For all of the foregoing reasons, ATMI respectfully asks the Court to deny plaintiff's

10  request for injunctive relief.

11

12  Dated:  March 19, 2008                          Respectfully Submitted,

13                                                  LATHAM & WATKINS LLP
                                                        Daniel M. Wall
14                                                      Timothy L. O'Mara
                                                        Sadik Huseny
15

16
                                                    By _____ /s/ Timothy L. O'Mara _____
17                                                      Timothy L. O'Mara
                                                        Attorneys for Defendants
18                                                      ATMI, INC. and ADVANCED
                                                        TECHNOLOGY MATERIALS, INC.
19
    SF\648610
20

21

22

23

24

25

26

27

28