1   LATHAM & WATKINS LLP
        Daniel M. Wall (Bar No. 102580)
2       Timothy L. O'Mara (Bar No. 212731)
        Sadik Huseny (Bar No. 224659)
3   505 Montgomery Street, Suite 2000
    San Francisco, California  94111-6538
4   Telephone: (415) 391-0600
    Facsimile: (415) 395-8095
5   Email:  Dan.Wall@lw.com
    Email:  Tim.OMara@lw.com
6   Email:  Sadik.Huseny@lw.com

7   Attorneys for Defendants
    ATMI, INC. and ADVANCED TECHNOLOGY
8   MATERIALS, INC.

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                       SAN JOSE DIVISION

12

13  PRAXAIR, INC.,                      CASE NO. C 08-00869 JW (HRL)

14                                      **DECLARATION OF BRUNO**
                    Plaintiff,          **VANDERMEULEN IN SUPPORT OF**
15                                      **DEFENDANTS ATMI, INC.'S AND**
        v.                              **ADVANCED TECHNOLOGY MATERIALS,**
16                                      **INC.'S MEMORANDUM OF POINTS AND**
                                        **AUTHORITIES IN OPPOSITION TO**
17  ATMI, INC. and ADVANCED             **PLAINTIFF'S MOTION FOR**
    TECHNOLOGY MATERIALS, INC.,         **PRELIMINARY INJUNCTION**
18
                                        Date:     April 21, 2008
19                  Defendants.         Time:     9:00 AM
                                        Place:    Courtroom 8, 4th Floor
20                                      Judge:    The Honorable James Ware

21  I, Bruno Vandermeulen, declare as follows:

22          1.      I am an attorney licensed to practice law in Belgium and have been a

23  member of the Brussels bar since 1990.  I hold a law degree from the Catholic University of

24  Louvain (1988) and a LL.M degree from the University of Georgia (1989).  I am a partner at the

25  law firm of Bird & Bird where I am the head of the intellectual property department of the

26  Brussels office.  Bird & Bird is an international law firm having offices in nine countries with

27  over 600 attorneys.

28          2.      I represent Advanced Technology Materials Inc. ("ATMI") in a series of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEC. OF BRUNO VANDERMEULEN ISO DEFS'
OPPOSITION TO MOTION FOR P.I.
CASE NO. C 08-00869 JW (HRL)



1 cases in Belgium between ATMI and Praxair Inc., Praxair NV, Praxair Production NV and/or

2 Praxair Holding NV concerning patent infringement by these Praxair entities.

3         3.      ATMI holds EPO Patent No. 1 000 291 B1, granted on September 28,

4 2005 (a copy of which is attached as <u>Exhibit A</u>), which relates to mechanical sub-atmospheric

5 delivery systems. This patent has been validated in and is effective in Belgium, as indicated in

6 the electronic records from the Belgium Patent Office attached as <u>Exhibit B</u>.

7         4.      ATMI commenced preliminary injunction proceedings in the Court of

8 First Instance in Antwerp, Belgium against the Praxair entities' infringing activities by a

9 Summons dated September 19, 2006. ATMI requested that the court enjoin, *inter alia,* the

10 manufacture and sale of Praxair's infringing UpTime products being filled in Belgium. The four

11 defendants in this action were Praxair Holding NV (a Belgian company), Praxair NV (a Belgian

12 company), Praxair Production NV (a Belgian company) and Praxair Inc. (a U.S. company). In

13 their defense in this and subsequent related proceedings, the Praxair defendants – represented by

14 counsel – never challenged the jurisdiction of the Belgian court.

15         5.      By Order dated October 26, 2006, the Court of First Instance granted

16 ATMI a preliminary injunction whereby all four aforementioned defendants were ordered,

17 "pending an intervening decision on the merits, to stop publishing and distributing information

18 and/or advertising which present the litigious "UpTime" cylinders as a replacement product for

19 the claimant's competing product" and were enjoined "from making publicity for this product in

20 any way, subject to a fine for non-performance of 100,000.00 EURO per violation established."

21 This Order of October 26, 2006 was served on the Praxair entities starting on October 31, 2006.

22 A copy of the Order of October 26, 2006 is attached as <u>Exhibit C</u> along with the bailiff's original

23 translation thereof, and a corrected translation.

24         6.      By writ of November 24, 2006, Praxair Holding NV, Praxair NV and

25 Praxair Inc. (collectively, the "Praxair group") commenced summary proceedings before the

26 Court of First Instance in Antwerp to revoke the October 26, 2006 preliminary injunction for

27 alleged changed circumstances (as stated in the summons, the Belgian company Praxair

28 Production NV had in the meantime been absorbed by Praxair NV and was therefore no longer

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEC. OF BRUNO VANDERMEULEN ISO DEFS'
OPPOSITION TO MOTION FOR P.I.
CASE NO. C 08-00869 JW (HRL)

1  mentioned in the court papers.) A copy of the writ is attached as <u>Exhibit D</u> along with a bailiff's

2  translation thereof. Praxair Inc. identified itself in this writ and in its subsequent court papers as

3  "a company duly organized and existing under the laws of the State of Connecticut, USA, whose

4  registered office is situated at 39 Old Ridgebury Road, 06810-5113 Danbury, Connecticut,

5  USA."

6          7.       The Court of First Instance in Antwerp denied the Praxair group's request

7  to revoke the October 26, 2006 preliminary injunction in an Order dated January 4, 2007. No

8  appeal was filed against this decision.

9          8.       The Praxair group also appealed the preliminary injunction of October 26,

10  2006 to the Court of Appeal in Antwerp by appeal writ of November 21, 2006.

11          9.       The Court of Appeal in Antwerp, by Order of April 25, 2007, affirmed the

12  October 26, 2006 preliminary injunction, and granted on cross appeal an additional preliminary

13  injunction against the Praxair group "from further manufacturing or having manufactured, gas

14  cylinders with the "UpTime®" system or with the same characteristics, or from offering them,

15  bringing them into circulation, using them, transporting them or filling them to the extent that

16  they relate to acts concerning delivery and use in one of the countries designated in the patent,

17  subject to a penalty of EUR 45.000, per established infringement as of the day of the service of

18  the present decision and this until a final decision on the merits shall be issued." A copy of the

19  Order of April 25, 2007 is attached as <u>Exhibit E</u>, along with the bailiff's translation thereof.

20          10.      The Praxair group appealed the April 25, 2007 Order to the Court of

21  Cassation (the highest court in Belgium) by writ of July 26, 2007. In that writ, the legal

22  arguments to have the April 25, 2007 Order revoked and remanded were limited to the appellate

23  court's reasoning for awarding the injunction in the cross appeal, and did not address, nor have

24  bearing on, either the injunction of October 2006, or the affirmance of the October 2006

25  injunction by the Court of Appeal.

26          11.      By writ of August 27, 2007, the Praxair group commenced another

27  summary proceeding before the Court of First Instance in Antwerp to have the preliminary

28  injunction of the April 25, 2007 Order cancelled due to another set of allegedly changed

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

2

DEC. OF BRUNO VANDERMEULEN ISO DEFS'
OPPOSITION TO MOTION FOR P.I.
CASE NO. C 08-00869 JW (HRL)



1    circumstances.  In an opinion dated October 11, 2007, the Court of First Instance again denied

2    the Praxair group's challenge and upheld the order of April 25, 2007.  The Praxair group has

3    appealed this decision.

4         12.    In early November, 2006, a Belgian bailiff recorded multiple violations of

5    the preliminary injunction displayed at the www.praxair.com and www.praxair.be websites and

6    ATMI claimed 600,000 Euros in penalties for such violations.  On November 20, 2006, Praxair

7    NV and Praxair Inc. commenced an action before the Court of First Instance in Turnhout

8    (Belgium) to oppose ATMI's claim for those penalties.  By bringing this action, Praxair Inc.

9    subjected itself to the jurisdiction of the Belgian courts.

10         13.    By Order dated September 27, 2007, the Court of First Instance in

11    Turnhout rejected most of Praxair's challenges against ATMI's claim for payment of penalties,

12    and awarded 200,000 Euros in penalties against Praxair NV and 200,000 Euros in penalties

13    against Praxair Inc.  A copy of the Order is attached as Exhibit F along with the bailiff's

14    translation thereof.

15         14.    Praxair NV and Praxair Inc. started a second action on December 14, 2007

16    in the Court of First Instance in Antwerp to oppose ATMI's claim for collection of a further

17    1,200,000 Euros in penalties for additional violations of the preliminary injunction of October

18    26, 2006.  In doing so, Praxair Inc. again subjected itself to the jurisdiction of the Belgian courts.

19    A hearing in this action was originally scheduled for February 14, 2008 but was adjourned by the

20    court to September 18, 2008.

21         15.    The order of September 27, 2007 became final vis-à-vis Praxair NV who

22    then paid to ATMI the 200,000 Euro penalty plus interest and costs on March 10, 2008.

23         16.    The trial on the merits before the Court of First Instance in Antwerp is

24    currently scheduled for September 5 and September 9, 2008.

25

26

27

28



1    17.    I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.

3

4  Executed on March 19, 2008 in Brussels, Belgium.

5                                                           /s

6                                            Bruno Vandermeulen

7

8

9

10  SF\647925.3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DEC. OF BRUNO VANDERMEULEN ISO DEFS'
OPPOSITION TO MOTION FOR P.I.
CASE NO. C 08-00869 JW (HRL)

# EXHIBIT A



(19)

Europäisches Patentamt

European Patent Office

Office européen des brevets



(11)    **EP 1 000 291 B1**

(12)    **EUROPEAN PATENT SPECIFICATION**

(45) Date of publication and mention
of the grant of the patent:
**28.09.2005  Bulletin 2005/39**

(21) Application number: **99920081.9**

(22) Date of filing: **28.04.1999**

(51) Int Cl.7: **F17C 7/04**, F17C 9/02

(86) International application number:
**PCT/US1999/009137**

(87) International publication number:
**WO 1999/056057 (04.11.1999 Gazette 1999/44)**

(54) **FLUID STORAGE AND DISPENSING SYSTEM**

LAGERUNGS UND VERTEILUNGSSYSTEM FÜR AUSSIGKEITEN

SYSTEME DE STOCKAGE DE FLUIDE ET DE DISTRIBUTION DE GAZ

(84) Designated Contracting States:
**AT BE CH CY DE DK ES FI FR GB GR IE IT LI LU
MC NL PT SE**
Designated Extension States:
**AL LT LV MK RO SI**

(30) Priority: **28.04.1998  US 67393**

(43) Date of publication of application:
**17.05.2000  Bulletin 2000/20**

(73) Proprietor: **ADVANCED TECHNOLOGY
MATERIALS, INC.**
**Danbury, CT 06810 (US)**

(72) Inventors:
• **WANG, Luping**
  **Brookfield, CT 06804 (US)**

• **TOM, Glenn**
  **New Milford, CT 06776 (US)**

(74) Representative: Avery, Stephen John et al
**Hoffmann Eitle,**
**Patent- und Rechtsanwälte,**
**Arabellastrasse 4**
**81925 München (DE)**

(56) References cited:
US-A- 2 502 588      US-A- 2 553 486
US-A- 2 707 484      US-A- 5 233 837
US-A- 5 409 526      US-A- 5 518 528
US-A- 5 673 562      US-A- 5 685 159

EP 1 000 291 B1

Note: Within nine months from the publication of the mention of the grant of the European patent, any person may give
notice to the European Patent Office of opposition to the European patent granted. Notice of opposition shall be filed in
a written reasoned statement. It shall not be deemed to have been filed until the opposition fee has been paid. (Art.
99(1) European Patent Convention).

Printed by Jouve, 75001 PARIS (FR)

**EP 1 000 291 B1**

**Description**

[0001]    This invention relates to a semiconductor manufacturing fluid storage and dispensing device and to a method of manufacturing a semiconductor product, and is applicable to a fluid storage and gas dispensing system which may be utilized to store high pressure liquid or other fluid, for dispensing of gas from the system in the manufacture of semiconductor devices and materials.

[0002]    In a wide variety of industrial processes and applications, there is a need for a reliable source of process fluid(s).

[0003]    Such process and application areas include semiconductor manufacturing, ion implantation, manufacture of flat panel displays, medical intervention and therapy, water treatment, emergency breathing equipment, welding operations, space-based delivery of liquids and gases, etc.

[0004]    U.S. Patent 4,744,221 issued May 17, 1988 to Karl O. Knollmueller discloses a method of storing and subsequently delivering arsine, by contacting arsine at a temperature of from about -30°C to about +30°C with a zeolite of pore size in the range of from about 5 to about 15 Angstroms to adsorb arsine on the zeolite. The arsine is subsequently dispensed by heating the zeolite to an elevated temperature of up to about 175°C for sufficient time to release the arsine from the zeolite material.

[0005]    The method disclosed in the Knollmueller patent is disadvantageous in that it requires the provision of heating means for the zeolite material, to heat the zeolite to sufficient temperature to desorb the previously sorbed arsine from the zeolite in the desired quantity.

[0006]    The use of a heating jacket or other means exterior to the vessel holding the arsine-bearing zeolite is problematic in that the vessel typically has a significant heat capacity, and therefore introduces a significant lag time to the dispensing operation. Further, heating of arsine causes it to decompose, resulting in the formation of hydrogen gas, which introduces an explosive hazard into the process system. Additionally, such thermally-mediated decomposition of arsine effects substantial increase in gas pressure in the process system, which may be extremely disadvantageous from the standpoint of system life and operating efficiency, as well as safety concerns.

[0007]    The provision of interiorly disposed heating coil or other heating elements in the zeolite bed itself is problematic since it is difficult with such means to uniformly heat the zeolite bed to achieve the desired uniformity of arsine gas release.

[0008]    The use of heated carrier gas streams passed through the bed of zeolite in its containment vessel may overcome the foregoing deficiencies, but the temperatures necessary to achieve the heated carrier gas desorption of arsine may be undesirably high or otherwise unsuitable for the end use of the arsine gas, so that cooling or other treatment is subsequently required to condition the dispensed gas for ultimate use.

[0009]    U.S. Patent 5,518,528 issued May 21, 1996 in the names of Glenn M. Tom and James V. McManus, describes a gas storage and dispensing system, for the storage and dispensing of gases, which overcomes the above-discussed disadvantages of the gas supply process disclosed in the Knollmueller patent. The gas storage and dispensing system of the Tom et al. patent comprises an adsorption-desorption apparatus, for storage and dispensing of a gas, e.g., a hydride gas, halide gas, organometallic Group V compound, etc. The gas storage and dispensing vessel of the Tom et al. patent reduces the pressure of stored sorbate gases by reversibly adsorbing them onto a carrier sorbent medium such as a zeolite or activated carbon material.

[0010]    More specifically, such storage and dispensing system comprises: a storage and dispensing vessel constructed and arranged for holding a solid-phase physical sorbent medium, and for selectively flowing gas into and out of said vessel; a solid-phase physical sorbent medium disposed in said storage and dispensing vessel at an interior gas pressure; a sorbate gas physically adsorbed on the solid-phase physical sorbent medium; a dispensing assembly coupled in gas flow communication with the storage and dispensing vessel, and constructed and arranged to provide, exteriorly of the storage and dispensing vessel, a pressure below said interior pressure, to effect desorption of sorbate gas from the solid-phase physical sorbent medium, and gas flow of desorbed gas through the dispensing assembly; wherein the solid-phase physical sorbent medium is devoid of trace components such as water, metals, and oxidic transition metal species (e.g., oxides, sulfites and/or nitrates) which would otherwise decompose the sorbate gas in the storage and dispensing vessel.

[0011]    By the elimination of such trace components from the solid-phase physical sorbent medium, the decomposition of the sorbate gas after 1 year at 25°C and interior pressure conditions is maintained at extremely low levels, e.g., so that not more than 1-5% by weight of the sorbate gas is decomposed.

[0012]    The storage and dispensing vessel of the Tom et al. patent thus embodies a substantial advance in the art, relative to the prior art use of high pressure gas cylinders. Conventional high pressure gas cylinders are susceptible to leakage from damaged or malfunctioning regulator assemblies, as well as to rupture or other unwanted bulk release of gas from the cylinder if internal decomposition of the gas leads to rapid increasing interior gas pressure in the cylinder.

[0013]    There is therefore a need in the art to provide improved fluid storage and delivery systems for selective dispensing of gases that overcome the various deficiencies described above.

EP 1 000 291 B1

[0014]    Relative to the state of the art and the invention as described more fully hereinafter, pertinent art includes the following references: U.S. Patent 3,590,860 to Stenner (a manually adjustable regulator valve for a liquid propane cartridge, including a regulator diaphragm and actuating spring assembly); U.S. Patent 4,836,242 to Coffre et al. (a pressure reducer for supplying electronic grade gas, including a bellows and inlet valve, with a solid particles filter disposed between the bellows and a low pressure outlet); U.S. Patent 5,230,359 to Ollivier (a diaphragm-based pressure regulator for a high pressure gas cylinder, wherein a valve is positioned in the regulator for adjustably throttling the flow of pressurized fluid); U.S. Patent 3,699,998 to Baranowski, Jr. (a calibratable pressure regulator within leaf spring fasteners are utilized to retain the regulator components in position); U.S. Patent 3,791,412 to Mays (a pressure reducing valve for high pressure gas containers, including a pair of valve elements for dispensing low pressure throttled fluid); U.S. Patent 3,972,346 to Wormser (pressure regulator featuring a U-ring seal poppet assembly); U.S. Patent 4,793,379 to Eidsmore (button-operated valve for main shut-off and flow control of a pressurized gas cylinder, using magnetic actuation of valve components); U.S. Patent 2,615,287 to Senesky (a gas pressure regulator including diaphragm and diaphragm-clamping member elements); U.S. Patent 4,173,986 to Martin (pressurized gas flow control valve including pressure regulator and responsive poppet valve structure); U.S. Patent 3,388,962 to Baumann et al. (pressurized gas fuel metering device including sintered metal pellet flow element); U.S. Patent 1,679,826 to Jenkins (fluid pressure regulator for high pressure container, utilizing diaphragm element and gas filtering means comprising a felt strip); U.S. Patent 2,354,283 to St. Clair (fluid pressure regulator for liquefied petroleum gas tanks, comprising pressure actuated diaphragm with flow restrictor structure to minimize vibration); U.S. Patent 5,566,713 to Lhomer et al. (gas flow control dispensing assembly including piston-type pressure regulator and block reducer/regulator means); U.S. Patent 5,645,192 to Amidzich (valve assembly for relieving excess gas pressure in a container, comprising sealing ring/spring assembly); U.S. Patent 5,678,602 to Cannet et al. (gas control and dispensing assembly for a pressurized gas tank, including reducer and regulator means with indexed flowrneter valve); U.S. Patent 2,793,504 to Webster (valve for pressurized fluid container including pressure reducer and regulator and spring bias closure means); U.S. Patent 1,659,263 to Harris (regulator for pressurized gas cylinder including a diaphragm and anti-friction washer between diaphragm and annular seat of regulator); U.S. Patent 2,047,339 to Thomas (liquefied petroleum gas storage apparatus including flow control unit and leakage prevention valve); and U.S. Patent 3,994,674 to Baumann et al. (detachable burner assembly for container of pressurized liquefied combustible gas, including a regulator valve assembly).

[0015]    European patent 0 792 671 describes a bulk delivery system for ultra-high purity gases, including a container sealed by a lid and holding electronics specialty gas in a liquefied form. The container is provided with an internal heat exchanger and an upper portion of the container above the gas-liquid interface of the liquefied gas. Vapor deriving from the liquefied gas exits the container and flows through a conduit having pressure reduction means and a flow control valve therein.

[0016]    French Patent No. 1,575,424, considered as closest prior art, describes a pressure reducer apparatus for dispensing liquefied petroleum gases (butane or propane) maintained in a bottle. The gas is dispensed from an outlet after passing through a first pressure reduction stage to a second stage which relies on a controllable Venturi valve. The Venturi valve is controlled by a spring-biased diaphragm to regulate the pressure of gas leaving the outlet to a substantially constant level in excess of atmospheric pressure.

[0017]    It is accordingly an object of the present invention to provide an improved fluid storage and dispensing system for the selective dispensing of gases, which overcomes the aforementioned deficiencies of prior practice.

[0018]    It is another object of the invention to provide an improved fluid storage and dispensing system for the selective dispensing of gases, characterized by significant advantages in cost, ease of use, and performance.

[0019]    Other objects and advantages of the invention will be more fully apparent from the ensuing disclosure and appended claims.

[0020]    According to a first aspect of the invention, there is provided a semiconductor manufacturing fluid storage and dispensing device comprising: a fluid storage and dispensing vessel defining an interior volume for holding a pressurized fluid and having an outlet port; and a valve mounted in the interior volume of said vessel in communication with said port, characterized by: said valve being held closed to prevent fluid from being dispensed from said vessel through said port until said valve receives gas at sub-atmospheric pressure from outside of said vessel, and opening in response to the receipt of said subatmospheric pressure gas; and said subatmospheric pressure gas having no more than a predetermined magnitude.

[0021]    According to a second aspect of the invention, there is provided a method of manufacturing a semiconductor product utilizing a semiconductor process fluid contained in a pressurized vessel having an interior volume containing said fluid, characterized in that: said fluid is confined in said interior volume by a pressure regulator in said interior volume in a fluid flow path closed by said pressure regulator to fluid flow downstream of said pressure regulator, selectively dispensing the confined fluid by opening the fluid flow path through and downstream from said pressure regulator, discharging fluid at a rate determined by the fluid pressure regulator, and conducting said fluid to a semiconductor manufacturing facility, said dispensing step comprising supplying gas to said pressure regulator at or below a specified

3

EP 1 000 291 B1

sub-atmospheric pressure, said pressure regulator being set to regulate the pressure of the fluid being dispensed to said sub-atmospheric pressure.

[0022]    For a better understanding of the invention and to show how the same may be carried into effect, reference will now be made, by way of example, to the accompanying drawings, in which:

Figure 1 is a schematic cross-sectional elevation view of a fluid storage and dispensing system according to one embodiment of the present invention;

Figure 2 is a schematic representation of a semiconductor manufacturing facility utilizing a fluid dispensed from a storage and dispensing system of the type shown in Figure 1, in accordance with a further embodiment of the invention;

Figure 3 is a schematic cross-sectional elevation view of a fluid storage and dispensing system according to another embodiment of the present invention;

Figure 4 is a perspective view of the valve head assembly of the Figure 3 fluid storage and dispensing system ;

Figure 5 is an elevation view of the diffuser unit employed in the Figure 3 fluid storage and dispensing system ;

Figure 6 is a partially broken away view of the regulator of the Figure 3 fluid storage and dispensing system ; and

Figure 7 is a sectional elevation view of an upper section of the fluid storage and dispensing vessel of the Figure 3 fluid storage and dispensing system.

[0023]    The following describes a fluid storage and gas dispensing system which comprises a storage and dispensing vessel constructed and arranged for holding a liquid whose vapor constitutes the fluid to be dispensed. The fluid is contained in the storage and dispensing vessel, e.g., at a pressure at which the fluid is in a liquid state. The storage and dispensing vessel includes an outlet port and is equipped with a dispensing assembly coupled to the outlet port, which may for example comprise a valve head assembly including a dispensing valve and an outlet for selective discharge of gas deriving from the liquid in the vessel.

[0024]    A fluid pressure regulator is associated with the outlet port and may constitute part of a pressure regulator/ phase separator assembly associated with the outlet port, e.g., at the neck of the vessel, to retain fluid in the vessel and, when the fluid is in liquid form, to prevent liquid from leaking to the dispensing valve and outlet. The pressure regulator and the optionally included phase separator are arranged to lie in the flow path of fluid dispensed from the vessel through the outlet port. The pressure regulator and the optionally included phase separator are disposed interiorly of the vessel to minimize the possibility of impact and environmental exposure in use, and to minimize the leak path of the contained fluid from the vessel. Since the pressure regulator and optionally included phase separator are interiorly disposed, the vessel may utilize a single weld or seam at the outlet port, to seal the vessel.

[0025]    The phase separator may suitably comprise a porous membrane which is permeable to vapor or gas deriving from the liquid, but is not permeable to the liquid, and the phase separator is preferably disposed in a protective mode upstream of the pressure regulator so that when the contained fluid in the vessel is a liquid, the liquid is prevented from entering and interfering with the function of the pressure regulator in maintaining the liquid in the vessel, and preventing egress of liquid from the vessel.

[0026]    The regulator is a flow control device, which can be set at a predetermined subatmospheric pressure level, to dispense gas or vapor from the cylinder at such pressure level.

[0027]    The fluid storage and dispensing vessel may be formed in the manner of a conventional high pressure gas cylinder, with an elongate main body portion having a neck of reduced cross-sectional area relative to the main body cross-section of the vessel. The vessel may in such conformation be amenable to conventional manufacture wherein the vessel is cleaned and then installed with a valve head assembly including a valve (manual or automatic) and associated pressure and flow control elements, in a manifold arrangement.

[0028]    Although liquid is preferred as the contained fluid medium in the use of the fluid storage and gas dispensing system of the invention, it is also possible that high-pressure gas may be utilized as the fluid medium to be stored and selectively dispensed.

[0029]    The storage and dispensing vessel may be readily filled by setting the fluid pressure regulator at a suitably low pressure level so that the gas or vapor is at a pressure below the pressure regulator set point, using a conventional pressure regulator including a poppet element which may be biased with a biasing element such as a spring biasing element to a closed position, and which responds to pressure above the set point pressure by remaining closed, but which responds to pressure below the set point pressure by opening and allowing fluid flow therethrough.

EP 1 000 291 B1

**[0030]**  Accordingly, the fill operation may be carried out to load the vessel with fluid to be stored and subsequently dispensed, by establishing an interior pressure level in the vessel at which the poppet element of the pressure regulator disengages from its seat, thereby allowing gas to flow into the vessel, in reverse flow fashion to the dispensing mode of the system. In this manner, the vessel may be fabricated with only one port, which thus functions to permit egress of gas from the vessel for dispensing, as well as permitting filling of the vessel with the fluid in the first instance, through the single port.

**[0031]**  Alternatively, the vessel could be configured with dual fluid flow ports, which can accommodate separate fill and dispensing lines. For example, the dispensing port may be located at the neck of the vessel and be associated with a conventional valve head assembly, while the fill port may be provided at another location on the vessel structure.

**[0032]**  The vessel of the invention may be utilized for storage and dispensing of any suitable fluids, such as for example hydride fluids (e.g., arsine, phosphine, stibine, silane, etc.) and acid gases (e.g., hydrogen fluoride, hydrogen chloride, chlorine, boron trichloride, boron trifluoride, halogenated silanes and disilanes, etc.) for use in semiconductor manufacturing operations.

**[0033]**  In use, a dispensing valve may be provided as part of the dispensing assembly associated with the port of the vessel, and such valve may be opened, manually or automatically, to permit gas to flow through the porous membrane or phase separator element, when present, and through the regulator for discharge of the gas from the fluid storage and dispensing system, and subsequent flow to a downstream process system, such as an ion implantation apparatus, chemical vapor deposition chamber, semiconductor equipment cleaning station, etc.

**[0034]**  The vessel may further contain a physical adsorbent material having adsorbed thereon a gas at an internal pressure in the vessel of from about 50 psig to about 5000 psig (3.5-351.5 kg/cm$^2$), and a gas dispensing assembly coupled with the vessel and selectively operable to dispense gas from the vessel.

**[0035]**  In an additional aspect, the semiconductor manufacturing system may comprise a semiconductor manufacturing apparatus utilizing a gas, and a source of said gas, wherein such source comprises a vessel containing a physical adsorbent material having adsorbed thereon a gas at an internal pressure in the vessel of from about 50 psig to about 5000 psig (3.5-351.5 kg/cm$^2$), and a gas dispensing assembly coupled with the vessel and selectively operable to dispense gas from the vessel.

**[0036]**  A still further aspect relates to a method for storage and dispensing of a fluid, comprising:

containing the fluid in an at least partially adsorbed state at a pressure in the range of from about 50 psig to about 5000 psig (3.5-351.5 kgtcm$^2$); and
selectively dispensing the fluid by desorbing same from the adsorbed state and releasing same from containment.

**[0037]**  Another aspect relates to a fluid storage and dispensing system, comprising:

a fluid storage and dispensing vessel enclosing an interior volume of less than about 50 liters and having an inlet opening larger than 1 inch (2.54 cm) NGT;
a fluid dispensing assembly arranged for selectively dispensing fluid from the vessel; and
a fluid pressure regulator in the interior volume of the vessel, arranged to maintain a predetermined pressure therein.

**[0038]**  The vessel may have an internal volume less than about 20 liters, and most preferably less than about 10 liters, e.g., in the range of from about 1 to about 10 liters. Such vessel may be configured and dimensionally sized and shaped as hereinafter more fully described. The vessel preferably has a pressure capability, i.e., a continuous service pressure level that can be accommodated without adverse effect (rupture of the vessel or leakage of fluid therefrom), of up to at least about 1000 pounds per square inch (70.3 kg/cm$^2$), and more preferably up to about 5000 pounds per square inch (351.5 kg/cm$^2$). The vessel may be arranged to selectively dispense to a downstream gas-consuming facility, e.g., a semiconductor manufacturing facility.

**[0039]**  In another aspect, the fluid storage and dispensing vessel may comprise a 2.0-2.25 liter DOT 3AA 2015 cylinder with a 1.5 inch (3.81 cm) NGT opening with a 1½-11½ NGT thread (3.81 cm - 4.528 threads per cm), a 4.187 to 4.25 inch (10.63-10.80 cm) outer diameter, a nominal wall thickness of 0.094 to 0.125 inch (0.239-0.318 cm), and a length of 12.75 to 13.75 inches (32.39-34.93 cm).

**[0040]**  The fluid storage and dispensing assembly may comprise a vessel with an interior volume less than 50 liters and a >1 inch NGT neck opening, a dispensing assembly coupled to the neck opening, a regulator coupled to the dispensing assembly and disposed in the interior volume of the vessel.

**[0041]**  The present invention is based in part on the discovery that a fluid storage and dispensing system, of a type presenting an alternative to the fluid storage and dispensing system of Tom et al. U.S. Patent 5,518,528, may be easily fabricated by disposing a fluid pressure regulator between a confined liquid volume and a gas dispensing assembly including a gas flow control element such as a gas flow shut-off valve, mass flow controller, or the like.

[0042]    Ancillary to this discovery is the finding that the fluid pressure regulator may be advantageously interiorly disposed in the fluid storage and dispensing vessel, so that it is protected by the vessel, e.g., cylinder casing or housing, from impact, environmental exposure and damage.

[0043]    The fluid pressure regulator may be of any suitable type, e.g., the SR4 series set pressure regulator commercially available from Integrated Flow Systems, Inc. The fluid pressure regulator may be of a poppet valve type, comprising a poppet element that is biased to a seat structure to prevent flow at a pressure above a set point value.

[0044]    The set point may be a "native" or fixed set point device, or the device may comprise a variable set point (adjustable) device. Preferably, the fluid pressure regulator is a variable, adjustable device as regards its set point pressure. The fluid pressure regulator may by way of example be set to an appropriate level, e.g., 700 Torr, to provide flow of dispensed fluid from the storage and dispensing vessel at such set point pressure level when the dispensing assembly associated with the fluid flow port of the vessel is opened to flow, such as by opening of a flow control valve of the dispensing assembly.

[0045]    The fluid medium in the fluid storage and dispensing vessel may be any suitable fluid medium at any appropriate fluid storage conditions, e.g., a high pressure gas or alternatively a liquid, at the set point pressure determined by the fluid pressure regulator, as the source of the gas to be dispensed. Thus, the gas source in the system may be a high pressure gas or a liquefied gas.

[0046]    Optionally and desirably, a phase separator is utilized to prevent liquid leakage across the regulator valve seat when the gas source is a high pressure liquid. The phase separator may be of any suitable form, but preferably comprises a porous membrane that is permeable to gas or vapor of the contained liquid, but is impermeable to the liquid phase. Suitable materials for such phase separator permeable membrane include various polymeric material films of appropriate porosity and permeability characteristics, and so-called "breathable" fabrics such as those commercially manufactured by W.L. Gore & Associates, Inc. (Elkton, MD) under the trademarks "Gore-Tex," "Activent," "DryLoft," and "Gore Windstopper."

[0047]    The pressure regulator and the phase separator may be utilized in combination with one another in an assembly interiorly disposed in the fluid storage and dispensing vessel.

[0048]    The fluid utilized in the fluid storage and dispensing vessel may comprise any suitable fluid, such as for example a hydride fluid for semiconductor manufacturing operations. Examples of hydride fluids of such type include arsine, phosphine, stibine, silane, chlorosilane, and diborane. Other fluids useful in semiconductor manufacturing operations may be employed, including acid gases such as hydrogen fluoride, boron trichloride, boron trifluoride, hydrogen chloride, halogenated silanes (e.g., $SiF_4$) and disilanes (e.g., $Si_2F_6$), etc., having utility in semiconductor manufacturing operations as halide etchants, cleaning agents, source reagents, etc.

[0049]    The fluid storage and dispensing vessel may be readily constructed utilizing conventional fluid pressure regulator devices. In relation to the sorbent-based gas storage and dispensing system described in U.S. Patent 5,518,528, the fluid storage and dispensing vessel provides a significantly greater fluid storage capacity, when the fluid is in the liquid phase.

[0050]    By way of example, for a sorbent-based gas storage and dispensing system of the type shown and described in U.S. Patent 5,158,528, using a "JY" cylinder as the storage and dispensing vessel, and containing a physical sorbent material having sorptive affinity for the gas to be dispensed, typically delivers, in the case of arsine gas, on the order of about 0.5 kilogram of gas.

[0051]    In the corresponding vessel of the fluid storage and gas dispensing system, one liter of liquid arsine can be stored and 1.8 kilograms of arsine gas can be dispensed therefrom.

[0052]    The fluid storage and dispensing system permits high purity dispensing of the fluid, free of potential contaminants or impurities characteristically present in sorbent materials utilized in sorbent-based storage and dispensing systems of the prior art.

[0053]    Further, the fluid storage and dispensing system affords a high level of safety in the deployment of fluids, in that the storage and dispensing vessel may be fabricated with an interiorly disposed pressure regulator and optional phase separator, and the seam associated with the fluid flow port of the vessel will constitute the only leak path in the otherwise seamless vessel construction. Further, in the case of a conventional fluid cylinder, because of the relative small size of the cylinder neck in contrast to the cross section of the body of the vessel, a minimal leak path for ingress or egress of gas is provided, which can be easily rendered leak-tight, by brazing, welding, adhesively sealing with a highly fluid impermeable sealant, etc.

[0054]    Additionally, as mentioned, it is feasible to construct the fluid storage and dispensing vessel with only a single fluid flow port. If the fluid pressure regulator is set at a suitable pressure level, e.g., 700 Torr, then the vessel may be lowered in temperature to the point that the gas vapor pressure (of the fluid to be dispensed) is below the regulator set point. Under these conditions the poppet element of the regulator will disengage from its seat and allow gas to flow into the storage vessel from an exterior source.

[0055]    Referring now to the drawings, Figure 1 is a schematic cross-sectional, elevation view of a liquid storage and gas dispensing system 10 according to one embodiment of the present invention.

EP 1 000 291 B1

**[0056]**   The fluid storage and gas dispensing system 10 includes a storage and dispensing vessel 12 including a cylindrical side wall 14, a bottom floor 16 and an upper neck portion 18, defining an enclosed interior volume 15 holding the liquid 17. Liquid 17 may comprise any suitable liquid such as a liquid hydride for use in semiconductor manufacturing operations. Illustrative hydrides include arsine, phosphine, stibine, silane, diborane, etc. The liquid 17 is maintained under sufficient pressure in vessel 12 so as to remain in a liquid phase.

**[0057]**   Disposed in the upper neck portion 18 of the vessel 12 is a valve head assembly comprising valve 20 communicating with valve outlet 22, from which vapor is dispensed from the vessel in the direction indicated by arrow A.

**[0058]**   The valve 20 is shown with an associated actuator 24, which may be of any suitable type (electrical, pneumatic, etc.) as desired in the given end use application of the invention. Alternatively, the valve 20 may be manually actuated, or provided with other flow control means.

**[0059]**   The valve 20 is joined in gas flow communication with the pressure regulator 26, which is of a conventional type employing a poppet element which may for example be spring biased in a closed condition and wherein the poppet is subject to displacement when the pressure differential across the poppet element exceeds a certain level. The pressure regulator 26 may for example be set to a subatmospheric, atmospheric or superatmospheric pressure value, e.g., 700 Torr. The specific pressure level is chosen with respect to the liquid or other fluid contained in the vessel, as appropriate to the storage and dispensing operation.

**[0060]**   Coupled with the pressure regulator 26 is a phase separator 28 including a membrane element 30, which is permeable to gas or vapor deriving from the liquid 17, but is impermeable to the liquid itself.

**[0061]**   The vapor/gas-permeable, liquid-impermeable membrane may be formed of any suitable material that transmits only the gas or vapor from the liquid but precludes liquid flow therethrough. The membrane may in practice be formed of a wide variety of potentially useful materials, including, for example, polypropylene, polyvinylidene fluoride, polytetrafluoroethylene, polyfluoroacetate, silicone, and surface-treated glass fabrics. One preferred useful material comprises polyvinylidene fluoride "breathable" fabrics such as those commercially marketed under the trademark "Gore-Tex®" (Gore-tex Corporation). Other commercially available materials for use as membrane phase separator materials include Noryl film (General Electric Company, Pittsfield, MA).

**[0062]**   In use of the liquid storage and gas dispensing system of Figure 1, the liquid is stored at a predetermined pressure ensuring its liquidity. For this purpose, the pressure regulator 26 is set at a predetermined level ensuring the appropriate interior pressure in the interior volume 15 of the vessel. The liquid-impermeable, gas/vapor-permeable membrane 30 ensures that no liquid will flow into the gas regulator 26, even if the vessel is tilted from the vertical attitude shown in Figure 1 while remaining generally upright.

**[0063]**   When it is desired to dispense gas from the vessel 12, the valve actuator 24 is actuated to open valve 20, thereby permitting gas or vapor deriving from the liquid to flow through the permeable membrane 30, the pressure regulator 26 and the valve 20, for egress from the valve head dispensing assembly through outlet 22.

**[0064]**   The opening of the valve 20 effects a reduction of the pressure on the discharge side of the permeable membrane 30 and causes permeation of vapor deriving from the liquid through the membrane, for discharge. At the same time, the fluid pressure regulator will maintain the pressure of the gas being dispensed at the set point pressure level.

**[0065]**   The vessel 12 in the Figure 1 embodiment may as shown be equipped with a separate fill port 42 (in relation to the fluid flow port at the neck of the vessel), and such separate fill port may be coupled to a source of liquid for filling of the vessel.

**[0066]**   Alternatively, the vessel may simply be provided with one neck opening, with the pressure regulator set at an appropriate temperature level for filling. In the filling operation, the vessel may be chilled, as by placement of the vessel in a cryostat or coolant bath, to reduce the temperature of the vessel below the point of the predetermined pressure established by the pressure regulator. The fluid pressure regulator then will have a gas pressure in the interior volume 15 of the vessel which is below the set point of the regulator, thereby allowing the poppet element of the pressure regulator to disengage from its seat and allow ingress of fluid to the vessel, for subsequent storage of the liquid therein.

**[0067]**   Figure 2 is a schematic representation of a semiconductor manufacturing system utilizing a fluid storage and dispensing system 110. The fluid storage and dispensing system 110 includes a generally cylindrical vessel 112 constructed generally along the lines of vessel 12 in Figure 1. The vessel holds liquid at a predetermined pressure. The valve head assembly comprises a valve 120 with an actuator 124 being arranged to selectively actuate the valve and effect discharge of gas from the vessel in line 142.

**[0068]**   The valve actuator 124 is controlled by central processor unit 210, which may comprise a computer or microprocessor control apparatus, coupled in controlling relationship with the valve actuator 124 by means of signal transmission line 212.

**[0069]**   The central processor unit 210 may be constructed and arranged to actuate the valve according to a cycle time program. Alternatively, the central processor unit 210 may monitor a process condition in the semiconductor manufacturing facility 200 by means of process condition signal transmission line 216 which conveys a signal indicative of a given process condition to the central processor unit, causing the unit to responsively actuate the valve actuator 124 to a corresponding extent, to modulate the gas flow in line 142 in proportion to the needs of the semiconductor

manufacturing facility.

[0070]   The central processor unit 210 may also receive a signal correlative of the temperature of the vessel in signal transmission line 214, which may be joined to a thermal sensor or embedded thermocouple associated with vessel 112, to compensate the flow of fluid in line 142 in relation to the temperature of vessel 112.

[0071]   The semiconductor manufacturing facility 200 may comprise any suitable arrangement of semiconductor process equipment for the production of semiconductor materials or devices, or products containing such materials or devices.

[0072]   For example, the semiconductor manufacturing facility 200 may comprise an ion implantation system, lithotracks, chemical vapor deposition reactor and associated reagent supply and vaporization equipment (including liquid delivery equipment, bubblers, etc.), etch unit, cleaning apparatus, etc.

[0073]   In one particular embodiment of the present invention, a liquid hydride fluid is maintained under pressure in vessel 112 and gas derived therefrom is selectively dispensed in line 142 to the semiconductor manufacturing facility 200 comprising an ion implantation chamber. The dispensed gas, together with suitable carrier and/or diluent gas(es), is subjected to ionization, and the resulting ion species are implanted in a substrate such as a semiconductor device precursor structure or subassembly.

[0074]   The semiconductor manufacturing facility 200 subsequent to use of the dispensed gas, discharges an effluent gas stream in line 202 which may be flowed to an effluent gas treatment system 204, for treatment and discharge of final purified effluent in line 206.

[0075]   It will be recognized that the semiconductor manufacturing facility may be widely varied and configured, as for example to employ a multiplicity of process gases which may be dispensed from corresponding individual fluid storage and dispensing vessels constructed and operated in accordance with the present invention.

[0076]   It will also be recognized that the fluid storage and dispensing apparatus provides a highly effective and readily fabricated means for high capacity storage and delivery of fluids such as arsine, which are able to be liquefied under pressure without undue effort or expense.

[0077]   Further, by interiorly disposing a fluid pressure regulator in the interior volume of a fluid storage and dispensing vessel, the vessel may be fabricated with only a single seam at its neck portion as a potential leakage path for ingress or egress of fluid species. Accordingly, the vessel may be readily fabricated, and in use, the interiorly disposed gas pressure regulator is protected from impact as well as environmental exposure, which could otherwise deleteriously affect the structural integrity or operation of the vessel, as well as constituting an additional potential leak path for the storage and dispensing vessel.

[0078]   While the approach of the system described in connection with Figures 1 is generally satisfactory, it is possible that under long-term storage conditions of the fluid vessel, condensation of liquid on the downstream side of the membrane can occur. For example, if the vessel is reposed on its side and the liquid volume extends above the height of the permeable phase-separator membrane in such position, then a small potential gradient is present and is equal to the gravitational potential associated with such liquid "head." In order to equilibrate this liquid head potential, liquid will condense on the valve side of the membrane until the respective liquid levels on the opposing sides of the membrane have equalized.

[0079]   Additionally, for gas storage and dispensing vessels of the high pressure cylinder type, such as are conventionally employed for boron trifluoride ($BF_3$), the gas storage capacity of the system is usually determined and limited by the cylinder pressures. The pressures that would be necessary for liquefaction of the gas in such instances may be prohibitive.

[0080]   Further to the above, the gas cylinder vessels conventionally used for compressed gas service typically utilize valve inlets, as measured by National Gas Taper (NGT) standards, of ¾ inch (1.905 cm) NGT, ½ inch (1.27 cm) NGT, and smaller. In order to usefully exploit the "regulator in a bottle" approach, larger cylinder inlets are required than are currently conventionally available. The Compressed Gas Association's (CGA's) largest recommended compressed gas cylinder inlet is a 1.5 inch (3.81 cm) NGT - 11½ tpi (4.528 threads per cm) (threads per inch) opening having a minimum diameter of 1.79 inch (4.55 cm). Openings larger than ¾ inch (1.905 cm) NGT are typically designed for applications in which high flows and larger cylinders (> 50 liters internal volume) are required. The inventors are not aware of any cylinders with volumes of less than 50 liters that have openings larger than 1 inch (2.54 cm) NGT, and it is very unlikely that any openings larger than 1 inch (2.54 cm) NGT have been employed for cylinders with volumes of less than 20 liters.

[0081]   In order to commercially enable the "regulator in a bottle" approach, it is necessary to provide a cylinder that satisfies United States Department of Transportation (USDOT) packaging standards, has a larger inlet opening than is conventionally available, and can withstand pressures in the range of from about 1000 to about 5000 pounds per square inch (70.3-351.5 kg/cm²) (psi). No such vessel has been proposed or fabricated by the prior art, and none has been commercially available.

[0082]   In the fluid storage and dispensing system including a fluid storage and dispensing vessel featuring a fluid flow port, with a fluid dispensing assembly coupled in fluid flow communication with the port, the regulator that is

EP 1 000 291 B1

associated with the port may suitably comprise a double stage regulator, to resolve the phase separation issue described hereinabove.

[0083]    As mentioned, if the storage and dispensing vessel utilizes a single stage regulator in combination with a phase-separator unit, the vessel if reposed on its side may contain sufficient liquid so that the liquid volume extends above the height of the permeable phase-separator membrane. Under such condition, liquid will condense on the valve side of the membrane until the respective liquid levels on the opposing sides of the membrane have equalized.

[0084]    The use of a double stage regulator obviates such shortcoming. If liquid from the bulk interior volume of the vessel moves between the first and second stage of the double stage regulator, the pressure-sensitive element of the high-pressure stage of the double stage regulator (the high-pressure stage being the stage of the regulator in initial fluid flow communication with the liquid in the vessel, and the low-pressure stage being the stage of the regulator in subsequent fluid flow communication to the first stage) will be forced to a closed position. Typically, the pressure-sensitive element of the respective regulator stages is a poppet valve. As the high-pressure stage is forced closed and the pressure in the interstage region (between the high-pressure stage and the low-pressure stage) rises, such increased interstage pressure will have little impact on the final pressure of the fluid discharged from the second stage.

[0085]    The pressure set point for the high-pressure stage of the two-stage regulator can be set to any suitable pressure level above the pressure of the final stage (low-pressure stage) of the dual stage regulator. By such arrangement, the liquid condensation issue of the single stage regulator arrangement is resolved, without impact on the overall operation of the fluid storage and dispensing system, including the fill operation (fluid charging) of such system.

[0086]    Accordingly, the storage and dispensing system utilizing a dual stage regulator may be configured as generally shown in Figure 1, described hereinabove, but wherein the pressure regulator 26 is a dual stage regulator rather than a single stage regulator. The double-stage fluid pressure regulator thereby is associated with the port of the vessel, and is arranged to maintain a predetermined pressure in the interior volume of the vessel.

[0087]    Moreover, the fluid storage and dispensing system may comprise a vessel containing a physical adsorbent material with sorptive affinity for a gas, e.g., a gas selected from the group consisting of hydride gases, halide gases and organometallic compound gases. A gas of such type (i.e., one for which the physical adsorbent material has a sorptive affinity) is contained in the vessel at an internal vessel pressure of from about 50 to about 5000 pounds per square inch (3.5-351.5 $kg/cm^2$) gauge (psig). Preferably, from about 5 to about 40% of such gas is present in a free (unadsorbed) state and from about 60 to about 95% of such gas is present in an adsorbed state on the physical sorbent material.

[0088]    The vessel in which the adsorbent material is contained may be constructed and arranged with a dispensing assembly or other discharge means, as described in U.S. Patent 5,528,518, issued May 21, 1996 in the names of Glenn M. Tom and James V. McManus, the disclosure of which hereby is incorporated herein by reference in its entirety. The vessel may alternatively be constructed as shown in Figure I hereof, but wherein the liquid 17 is replaced by a bed of physical adsorbent material sorptively retaining a gas species which also is present in the interstices of the physical adsorbent bed as well as in the head space in the interior volume of the vessel.

[0089]    Although the prior art has disclosed sorbent-based gas storage and dispensing systems of the type referred described in U.S. Patent 5,528,518 as having utility for gas storage and dispensing at pressures above atmospheric pressure, e.g., U.S. Patent 5,704,967 issued January 6, 1998 to Glenn M. Tom et al. (which describes superatmospheric pressure "below about 1200 torr"), the prior art has not contemplated that such sorbent-based gas storage and delivery systems could be usefully employed as a gas source at significantly higher pressures, e.g., above about 50 psig (3.5 $kg/cm^2$), and more preferably above about 100 psig (7.0 $kg/cm^2$). The reason for this circumstances is that on initial consideration, it would appear that the occlusion of volume by the physical mass of the sorbent material would be disadvantageous, creating a "lost volume" which would reduce the net amount of the gas which could be stored in the vessel.

[0090]    Against this circumstance, it has been surprisingly and unexpectedly discovered that deployment of a sorbent-based gas storage and dispensing system utlizing high pressure storage conditions in the interior volume of the vessel provides a striking improvement in the storage capacity of the vessel containing the sorbent. By filling the cylinder with a solid phase physical adsorbent material, preferably in a divided form, as described in the aforementioned Tom et al. U.S. Patent 5,518,528, adsorbable gas can be stored in the cylinder in a physical state akin to a liquid phase, with a greatly enhanced gas storage capacity as compared to conventional high pressure gas cylinders.

[0091]    Such unexpected enhancement of gas storage capacity is illustratively shown by the data in Table I below, in which the storage capacity of $BF_3$ is compared in an adsorbent-filled gas cylinder and in a conventional gas cylinder at room temperature (20°C). The adsorption capacity of $BF_3$ in Table I is determined using a computer model having a predictive reliability of $\pm$ 20%, for a gas storage and dispensing vessel of 2.2 liters internal volume (equivalent to a commercially available "JY" cylinder), with the adsorbent being a bead activated carbon sorbent material of the type disclosed in Tom et al. U.S. Patent 5,704,965, the disclosure of which hereby is incorporated herein by reference in its entirety.

EP 1 000 291 B1

Table I

| Pressure | Adsorbent Filled Cylinder | | | High Pressure Cylinder | | |
|---|---|---|---|---|---|---|
| (psig) | Adsorbed BF3 | Free BF3 | Total | Adsorbed BF3 | Free BF3 | Total |
| | (g) | (g) | (g) | (g) | (g) | (g) |
| 0 | 220 | 3 | 223 | 0 | 6 | 6 |
| 100 | 569 | 24 | 593 | 0 | 48 | 46 |
| 500 | 836 | 109 | 945 | 0 | 218 | 218 |
| 800 | 889 | 173 | 1062 | 0 | 346 | 346 |
| 1000 | 906 | 215 | 1121 | 0 | 430 | 430 |
| 1500 | 925 | 321 | 1246 | 0 | 642 | 642 |

As shown by the data in Table I, the total amount of boron trifluoride contained in the cylinder filled with adsorbent is consistently greater than the amount of boron trifluoride contained in the conventional (adsorbent-free) gas cylinder. For example, at 100 psig (7.0 kg/cm$^2$), the total amount of boron trifluoride contained in the cylinder filled with adsorbent is 12.35 times greater than the amount of boron trifluoride contained in the conventional (adsorbent-free) gas cylinder. At 1500 psig (105.5 kg/cm$^2$), the total amount of boron trifluoride contained in the cylinder filled with adsorbent is 1.94 times greater than the amount of boron trifluoride contained in the conventional (adsorbent-free) gas cylinder.

[0092]    According to another aspect, the fluid storage and dispensing system including a fluid storage and dispensing vessel with a fluid flow port, a fluid dispensing assembly in fluid flow communication with the port, and a fluid pressure regulator associated with the port, may be configured with the following features:

(i) an internal volume of less than about 50 liters, more preferably less than about 20 liters, and most preferably less than about 10 liters, e.g., in the range of from about l to about 10 liters; and

(ii) an inlet opening larger than 1 inch (2.54 cm) NGT.

[0093]    Such vessel preferably has a pressure capability, i.e., a continuous service pressure level that can be accommodated without adverse effect (rupture of the vessel or leakage of fluid therefrom), of up to at least about 1000 pounds per square inch (70.3 kg/cm$^2$) and more preferably up to about 5000 pounds per square inch (351.5 kg/cm$^2$).

[0094]    In one embodiment, such vessel may be of 2.0 liters internal volume with a 1.5 inch (3.81 cm) NGT cylinder valve inlet, so that the inlet opening is sufficiently large to fit a regulator device such as an IFS set point regulator.

[0095]    For the "regulator in a bottle" configuration, an inlet opening of such character (> 1 inch (2.54 cm) NGT) is necessary, since (1) the diameter of a regulator such as the IFS set point regulator is typically greater than 1.5 inch (3.81 cm) and less than 1.6 inch (4.064 cm), which requires an opening on the order of 1.5 inch (3.81 cm) NGT in order for the regulator to fit inside the cylinder, and (2) an NGT opening is the only accepted and USDOT approved cylinder inlet for applications involving the storage and delivery of gases such as BF$_3$, AsH$_3$, F$_2$, PH$_3$, SiH$_4$, etc. Any other type of cylinder valve inlet such as an externally threaded connection or a straight thread is not currently accepted as a legally permissible connection by the USDOT for such gases.

[0096]    In the manufacture of vessels of such type with a >1 inch (2.54 cm) NGT inlet opening, the process fabrication steps typically include:

(1) cold pressing a metal disk into a cylindrical cup;
(2) forming the cylinder neck by hot metal spinning; and
(3) fabricating the cylinder opening in the neck of the vessel utilizing either a manual or an automated machining process.

[0097]    A specific embodiment of the vessel of such type comprises a 2.0-2.25 liter DOT 3AA 2015 cylinder with a 1.5 inch (3.81 cm) NGT opening with a 1½- 11½ NGT thread (3.81 cm-4.528 threads per cm) with the vessel having a 4.187 to 4.25 inch (10.63-10.80 cm) outer diameter, a nominal wall thickness of 0.094 to 0.125 inch (0.239-0.318 cm), a nominal neck outer diameter of 2.5 inches (6.35 cm), a maximum neck inner diameter of 1.5 inches (3.81 em) as spun, and a length of 12.75 to 13.75 inches (32.39-34.93 cm). Such a vessel is suitable for use with boron trifluoride as the gas species being stored in and dispensed from the vessel.

[0098]    Figure 3 is a schematic cross-sectional elevation view of a fluid storage and dispensing system 300 according

EP 1 000 291 B1

to an illustrative embodiment of the present invention. The system 300 includes a fluid storage and dispensing vessel 302 of generally cylindrical form, with cylindrical side wall 304 closed at its lower end by floor member 306. At the upper end of the vessel is a neck 308 including a cylindrical collar 310 defining and circumscribing a top opening of the vessel. The vessel wall, floor member and neck thereby enclose an interior volume 328 as shown.

**[0099]**    At the neck of the vessel, a threaded plug 312 of the valve head assembly 314 is threadably engaged with the interior threaded opening of the collar 310. The valve head assembly 314 includes a central fluid flow passage 320 joined in fluid flow communication with a central working volume cavity in the valve head assembly. The central working volume cavity is in turn joined to outlet 324, which may be exteriorly threaded or otherwise constructed for attachment of a connector and associated piping, conduit, etc. thereto.

**[0100]**    Disposed in the central working volume cavity is a valve element 322 that is joined to a hand wheel 326 in the embodiment shown, but may alternatively be joined to an automatic valve actuator or other controller or actuating means.

**[0101]**    The valve head assembly 314 also features in the valve block a vent flow passage 316 joined to an over-pressure relief valve 318 and communicating with the interior volume 328 of the vessel, for relief of gross over-pressure conditions in the vessel.

**[0102]**    The central fluid flow passage 320 in the valve head assembly 314 is joined at its lower end to a connector flow tube 330, to which in turn is joined to the regulator 332. The regulator is set to maintain a selected pressure of the fluid discharged from the vessel. At the lower end of the regulator is joined a tubular fitting 336 which in turn is joined, e.g., by butt welding, to a diffuser unit 334 having a diffuser end cap 331 at its lower extremity. The diffuser unit may be formed of stainless steel, with the diffuser wall being formed of a sintered stainless steel such as 316L stainless steel. The diffuser unit has a wall porosity that permits removal of all particles greater than a predetermined diameter, e.g., greater than 0.003 micrometers at 30 standard liters per minute flow rate of gas from the system. Filter diffuser units of such type are commercially available from Millipore Corporation (Bedford, MA) under the trademark WAFER-GARD.

**[0103]**    In use, a suitable fluid reagent is contained in the interior volume 328 of the vessel 302, e.g., a high pressure gas or a liquefied gas, or alternatively a sorbable gas sorptively retained on a physical sorbent having sorptive affinity for the gas, wherein the interior volume contains a bed of suitable solid-phase physical sorbent material. The fluid pressure regulator 332 is set to a selected set point to provide flow of dispensed fluid when the valve in the valve head assembly 314 is opened, with the fluid flowing through the diffuser unit 334, fitting 336, regulator 332, connector flow tube 330, central fluid flow passage 320 in the valve head assembly 314, the central working volume cavity, and outlet 324. The valve head assembly may be joined to other piping, conduits, flow controllers, monitoring means, etc. as may be desirable or required in a given end use application of the invention.

**[0104]**    Figure 4 is a perspective view of the valve head assembly 314 of the Figure 3 fluid storage and dispensing system. In Figure 4, wherein corresponding elements are correspondingly numbered to Figure 3, the plug 312 is shown as being provided with threading 313 complementary to threading on the inner surface of the collar 310, whereby the plug of the valve head assembly and the vessel may be complementarily mated with one another in a leak-tight fashion.

**[0105]**    Figure 5 is an elevation view of the diffuser unit 334 employed in the Figure 3 fluid storage and dispensing system 300. The diffuser unit 334 as shown has a tubular fitting portion that is threaded with threading 337, for matable engagement with the housing of the regulator 332 shown in Figure 3.

**[0106]**    Figure 6 is a partially broken away view of the regulator 332 of the Figure 3 fluid storage and dispensing system 300. The regulator 332 as illustrated has a lower fluid inlet 333, to which the tubular fitting of the diffuser unit is threadably joined. The regulator 332 at its upper end is provided with a fluid outlet 335 that is joined to connector flow tube 330 as shown in Figure 3. The regulator may be a single stage regulator or a multiple stage regulator. As mentioned, a double stage regulator has the advantage that it overcomes the fluid condensation problems attendant the use of membrane phase separators, relative to overturning or tilting of the vessel, and the vessel may employ a single or multiple stage regulator, without such a membrane phase separator unit, and with or without the particulate-filtering diffuser unit, as may be desired in a given end-use application of the present invention.

**[0107]**    Figure 7 is a sectional elevation view of an upper section of the fluid storage and dispensing vessel 302 of the Figure 3 fluid storage and dispensing system 300. The illustrated portion of the vessel 302 includes the cylindrical wall 304, neck 308 and collar 310. The interior surface of the collar is threaded with threading 309 that is complementary to the threading 313 on the plug 312 of the valve head assembly 314 (see Figure 4). The vessel may be formed of a stainless steel material or other ferrous metal alloy, or other metal or non-metal material of construction, fabricated as described hereinabove, and providing the> 1 inch (2.54 cm) NGT neck opening and appropriate NGT threading.

**[0108]**    The various features and aspects illustratively disclosed herein may be utilized separately or in various per-mutations or combinations with one another, to provide a fluid storage and dispensing system constituting a useful source fluid apparatus for specific usage requirements.

**[0109]**    Thus, while the invention has been illustratively described herein with reference to specific elements, features and embodiments, it will be recognized that the invention is not thus limited in structure or operation, but that the

**EP 1 000 291 B1**

invention is to be broadly construed consistent with the disclosure herein, as comprehending variations, modifications and embodiments as will readily suggest themselves to those of ordinary skill in the art.

[0110]    The fluid storage and dispensing system of the invention may be industrially employed to advantage in the manufacturing of semiconductor devices, in which gases are required for various unit operations, such as etching, chemical vapor deposition, ion implantation, etc. Many of such gases are hazardous and/or expensive, and the gas supply vessels must be leak-tight, and highly reliable in dispensing source gases with precision, as well as preferably having a high storage capacity, since space constraints in semiconductor manufacturing facilities are very stringent. The storage and dispensing system of the present invention is highly efficient for such applications and in meeting such criteria.

**Claims**

1.   A semiconductor manufacturing fluid storage and dispensing device (10, 110, 300) comprising:

a fluid storage and dispensing vessel (12, 112, 302) defining an interior volume (22, 133, 324) for holding a pressurized fluid and having an outlet port; and
a valve (26, 332) mounted in the interior volume (15, 328) of said vessel in communication with said port, **characterized by**:

said valve (26, 332) being held closed to prevent fluid from being dispensed from said vessel (12,112,302) through said port until said valve receives gas at sub-atmospheric pressure from outside of said vessel, and opening in response to the receipt of said subatmospheric pressure gas; and
said subatmospheric gas pressure having no more than a predetermined magnitude.

2.   A device as in Claim 1 in which said valve has means for sensing the pressure in the gas downstream thereof and means for opening said valve when the pressure sensed is at or below a pre-set level, and closing said valve when the pressure sensed is above said pre-set level, so as to regulate the pressure of said downstream gas and protect against unwanted escape of said gas.

3.   A device as in Claim 1, wherein said valve comprises part of a pressure regulator (26, 332) for regulating the pressure of the gas dispensed from said vessel.

4.   A device as in Claim 3 **characterized in that** said regulator determines the rate at which said fluid is dispensed.

5.   A device according to any preceding claim, wherein the vessel contains a fluid selected from the group consisting of hydride gases, halide gases and gaseous organometallics.

6.   A device according to any one of Claims 1 to 4, wherein the vessel contains a fluid selected from the group consisting of arsine, phosphine, stibine, diborane, hydrogen fluoride, boron trichloride, boron trifluoride, hydrogen chloride, halogenated silanes and disilanes.

7.   A device according to any preceding claim, wherein the vessel is coupled in selective fluid flow communication with a semiconductor manufacturing facility.

8.   A device according to Claim 1, wherein the valve (28, 332) includes a housing defining a chamber in fluid flow communication with said port, and a pressure-sensing assembly located within the chamber, wherein the pressure sensing assembly is operatively connected to the valve and is adapted to move in response to the fluid pressure in the chamber so as to cause the valve to open or close.

9.   A device according to Claim 1, wherein a portion (17) of the fluid contained in the vessel is liquefied, and including a phase separator device (28) preventing egress of said liquid from said vessel.

10.   A device according to Claim 1, wherein the vessel contains a fluid for semiconductor manufacturing processes selected from the group consisting of fluids for ion implantation and chemical vapor deposition.

11.   A device according to Claim 1, wherein the vessel contains a fluid selected from the group consisting of phospine, silane, arsine, and $BF_3$, and is adapted for dispensing fluid for chemical vapor deposition semiconductor manu-

EP 1 000 291 B1

facturing processes.

12. A device according to Claim 1, wherein the vessel contains a fluid selected from the group consisting of phosphine and arsine, and is adapted for dispensing fluid for chemical vapor deposition semiconductor manufacturing processes.

13. A device according to Claim 1, wherein the vessel contains a fluid selected from the group consisting of phosphine, arsine, and BF$_3$, and is adapted for dispensing fluid for ion manufacturing processes.

14. A method of manufacturing a semiconductor product utilizing a semiconductor process fluid contained in a pressurized vessel (12, 112, 324) having an interior volume (15, 328) containing said fluid,
    **characterized in that**
    said fluid is confined in said interior volume by a pressure regulator (26, 332) in said interior volume in a fluid flow path (334, 336, 332, 330, 320) closed by said pressure regulator to fluid flow downstream of said pressure regulator,
    selectively dispensing the confined fluid by opening the fluid flow path through and downstream from said pressure regulator, discharging fluid at a rate determined by the fluid pressure regulator, and
    conducting said fluid to a semiconductor manufacturing facility (200)
    said dispensing step comprising supplying gas to said pressure regulator at or below a specified sub-atmospheric pressure, said pressure regulator being set to regulate the pressure of the fluid being dispensed to said sub-atmospheric pressure.

15. A method according to Claim 14, wherein said fluid is used in the process of ion implantation or chemical vapor deposition.

16. A method according to Claim 14, wherein said fluid is selected from the group consisting of liquefied hydride gases, liquefied acid gases, arsine, phosphine, stibine, silane, diborane, hydrogen chloride, halogenated silanes and disilanes.

17. A method according to Claim 14, wherein said dispensing step includes applying gas with sub-atmospheric pressure to the outlet of said pressure regulator from outside said vessel to alternatively open and close a valve therein to dispense said fluid from said vessel.

**Patentansprüche**

1. Fluidspeicher- und ausgabevorrichtung (10, 110, 300) für die Halbleiterherstellung mit:

    einem Fluidspeicher- und ausgabebehälter (12, 112, 302), der ein Innenvolumen (22, 133, 324) bestimmt zum Halten eines unter Druck stehenden Fluides und einen Auslassanschluss besitzt, und

    einem Ventil (26, 332), das in dem Innenvolumen (15, 328) des Behälters befestigt ist und in Verbindung mit dem Anschluss steht, **gekennzeichnet durch**

    das Ventil (26, 332), das so lange geschlossen gehalten ist, um das Ausgeben von Fluid aus dem Behälter (12, 112, 302) **durch** den Anschluss zu verhindern, bis das Ventil ein Gas bei subatmosphärischem Druck von außerhalb des Behälters erhält, und auf den Erhalt des Gases bei subatmosphärischem Druck hin öffnet; und

    wobei der subatmosphärische Gasdruck nicht höher als ein vorbestimmter Wert ist.

2. Vorrichtung nach Anspruch 1, bei der das Ventil ein Mittel zum Erfassen des Druckes in dem Gas stromabwärts desselben und ein Mittel zum Öffnen des Ventils, wenn der erfasste Druck bei oder unterhalb eines voreingestellten Pegels ist, und zum Schließen des Ventils besitzt, wenn der erfasste Druck oberhalb des voreingestellten Pegels ist, um so den Druck des stromabwärtigen Gases zu regulieren und einen Schutz gegenüber einem ungewollten Gasaustritt vorzusehen.

3. Vorrichtung nach Anspruch 1, bei der das Ventil einen Teil eines Druckreglers (26, 332) aufweist zum Regulieren

**EP 1 000 291 B1**

des Druckes des aus dem Behälter ausgegebenen Gases.

4. Vorrichtung nach Anspruch 3, **dadurch gekennzeichnet, dass** der Regler die Geschwindigkeit bestimmt, mit der das Fluid ausgegeben wird.

5. Vorrichtung nach einem der vorhergehenden Ansprüche, bei der der Behälter ein Fluid enthält, welches aus der Gruppe bestehend aus Hydridgasen, Halogenidgasen und gasförmigen Organo-Metallen ausgewählt ist.

6. Vorrichtung nach einem der Ansprüche 1 bis 4, bei der der Behälter ein Fluid enthlt, das aus der Gruppe bestehend aus Arsin, Phosphin, Stibin, Diboran, Wasserstofffluorid, Bortrichlorid, Bortrifluorid, Wasserstoffchlorid, halogenierten Silanen und Disilanen ausgewählt ist.

7. Vorrichtung nach einem der vorhergehenden Ansprüche, bei der der Behälter mit einer Halbleiterherstellungseinrichtung selektiv auf fluide Weise gekoppelt ist.

8. Vorrichtung nach Anspruch 1, bei der das Ventil (28, 332) ein Gehäuse, das eine Kammer bestimmt, die auf fluide Weise mit dem Anschluss verbunden ist, und eine Druckerfassungseinheit umfasst, die sich innerhalb der Kammer befindet, wobei die Druckerfassungseinheit betriebsmäßig mit dem Ventil verbunden ist und dafür angepasst ist, auf den Fluiddruck in der Kammer hin sich derart zu bewegen, um das Öffnen oder Schließen des Ventils zu bewirken.

9. Vorrichtung nach Anspruch 1, bei der ein Abschnitt (17) des in dem Behälter enthaltenen Fluids verflüssigt ist, und die eine Phasentrennvorrichtung (28) umfasst, die den Austritt der Flüssigkeit aus dem Behälter verhindert.

10. Vorrichtung nach Anspruch 1, bei der der Behälter ein Fluid für Halbleiterherstellungsprozesse enthält, das ausgewählt ist aus der Gruppe bestehend aus Fluiden für die Ionenimplantation und die chemische Gasphasenabscheidung.

11. Vorrichtung nach Anspruch 1, bei der der Behälter ein Fluid enthält, das ausgewählt ist aus der Gruppe bestehend aus Phosphin, Silan, Arsin und $BF_3$ und angepasst ist zum Ausgeben von Fluid für die chemische Gasphasenabscheidung bei Halbleiterherstellungsprozessen.

12. Vorrichtung nach Anspruch 1, bei der der Behälter ein Fluid enthält, das ausgewählt ist aus der Gruppe bestehend aus Phosphin und Arsin und angepasst ist zum Ausgeben von Fluid für die chemische Gasphasenabscheidung bei Halbleiterherstellungsprozessen.

13. Vorrichtung nach Anspruch 1, bei der der Behälter ein Fluid enthält, das ausgewählt ist aus der Gruppe bestehend aus Phosphin, Arsin und $BF_3$ und angepasst ist zum Ausgeben von Fluid für Ionen-Herstellungsprozesse.

14. Verfahren zum Herstellen eines Halbleiterproduktes unter Verwendung eines Halbleiterprozessfluids, das in einem unter Druck stehendem Behälter (12, 112, 324) mit einem Innenvolumen (15, 328), das das Fluid enthält, enthalten ist,
    **dadurch gekennzeichnet, dass**
    das Fluid in dem Innenvolumen eingedämmt ist durch einen Druckregler (28, 332) in dem Innenvolumen in einer Fluidflussbahn (334, 336, 332, 330, 320), die durch den Druckregler für einen Fluidfluss stromabwärts von dem Druckregler geschlossen ist,
    selektives Ausgeben des eingedämmten Fluids durch Öffnen der Fluidflussbahn durch den Druckregler hindurch und stromabwärts von demselben, Auslassen des Fluids mit einer Geschwindigkeit, die durch den Fluiddruckregler bestimmt ist, und
    Leiten des Fluid zu einer Halbleiterherstellungseinrichtung (200),
    wobei der Ausgabeschritt das Zuführen von Gas zu dem Druckregler bei oder unterhalb eines spezifizierten subatmosphärischen Druckes aufweist, und wobei der Druckregler so eingestellt ist, dass der Druck des ausgegebenen Fluids auf den subatmosphärischen Druck reguliert ist.

15. Verfahren nach Anspruch 14, bei dem das Fluid bei dem Prozess der Ionenimplantation oder der chemischen Gasphasenabscheidung verwendet wird.

16. Verfahren nach Anspruch 14, bei dem das Fluid ausgewählt ist aus der Gruppe bestehend aus verflüssigten Was-

**EP 1 000 291 B1**

serstoffgasen, verflüssigten sauren Gasen, Arsin, Phosphin, Stibin, Silan, Dioboran, Wasserstoffchlorid, halogenierten Silanen und Disilanen.

17. Verfahren nach Anspruch 14, bei dem der Ausgabeschritt das Beaufschlagen des Auslasses des Druckreglers mit Gas bei subatmosphärischen Druck von außerhalb des Behälters umfasst, um wechselweise ein Ventil darin zu öffnen und zu schließen, um so das Fluid aus dem Behälter auszugeben.

**Revendications**

1. Dispositif de stockage et de distribution de fluide de fabrication de semi-conducteurs (10, 110, 300) comprenant :

une cuve de stockage et de distribution de fluide (12, 112, 302) définissant un volume intérieur (22, 133, 324) pour contenir un fluide pressurisé et possédant un orifice de sortie ; et
une vanne (26, 332) montée dans le volume intérieur (15, 328) de ladite cuve en communication avec ledit orifice, **caractérisé par** :

ladite vanne (26, 332) étant maintenue fermée pour empêcher le fluide d'être distribué depuis ladite cuve (12, 112, 302) par le biais dudit orifice jusqu'à ce que ladite vanne reçoive un gaz à une pression subatmosphérique depuis l'extérieur de ladite cuve, et s'ouvrant en réponse à la réception dudit gaz à une pression sub-atmosphérique ; et
ladite pression de gaz sub-atmosphérique ne dépassant pas une grandeur prédéterminée.

2. Dispositif selon la revendication 1 dans lequel ladite vanne possède un moyen pour détecter la pression dans le gaz en aval de celle-ci et un moyen pour ouvrir ladite vanne quand la pression détectée est égale ou inférieure à un niveau prédéfini et fermer ladite vanne quand la pression détectée est supérieure audit niveau prédéfini, de manière à réguler la pression dudit gaz en aval et protéger contre une fuite non souhaitée dudit gaz.

3. Dispositif selon la revendication 1 dans lequel ladite vanne comprend une partie d'un régulateur de pression (26, 332) pour réguler la pression du gaz distribué depuis ladite cuve.

4. Dispositif selon la revendication 3 **caractérisé en ce que** ledit régulateur détermine la vitesse à laquelle ledit fluide est distribué.

5. Dispositif selon l'une quelconque des revendications précédentes dans lequel la cuve contient un fluide choisi dans le groupe constitué par les hydrures gazeux, les halogénures gazeux et les organométalliques gazeux.

6. Dispositif selon l'une quelconque des revendications 1 à 4 dans lequel la cuve contient un fluide choisi dans le groupe constitué par l'arsine, la phosphine, la stibine, le diborane, le fluorure d'hydrogène, le trichlorure de bore, le trifluorure de bore, le chlorure d'hydrogène et les silanes et disilanes halogénés.

7. Dispositif selon l'une quelconque des revendications précédentes dans lequel la cuve est couplée en communication fluide sélective avec une installation de fabrication de semi-conducteurs.

8. Dispositif selon la revendication 1 dans lequel la vanne (26, 332) comporte un logement définissant une chambre en communication fluide avec ledit orifice, et un ensemble de détection de pression situé à l'intérieur de la chambre, l'ensemble de détection de pression étant fonctionnellement relié à la vanne et étant adapté pour se déplacer en réponse à la pression du fluide dans la chambre de manière à amener la vanne à s'ouvrir ou se fermer.

9. Dispositif selon la revendication 1 dans lequel une partie (17) du fluide contenu dans la cuve est liquéfié, et comportant un dispositif séparateur de phases (28) empêchant la sortie dudit liquide de ladite cuve.

10. Dispositif selon la revendication 1 dans lequel la cuve contient un fluide pour procédés de fabrication de semi-conducteurs choisi dans le groupe constitué par les fluides pour implantation ionique et dépôt chimique en phase vapeur.

11. Dispositif selon la revendication 1 dans lequel la cuve contient un fluide choisi dans le groupe constitué par la phosphine, le silane, l'araine et $BF_3$, et est adaptée pour distribuer un fluide pour des procédés de fabrication de

**EP 1 000 291 B1**

semi-conducteurs par dépôt chimique en phase vapeur.

12. Dispositif selon la revendication 1 dans lequel la cuve contient un fluide choisi dans le groupe constitué par la phosphine et l'arsine, et est adaptée pour distribuer un fluide pour des procédés de fabrication de semi-conducteurs par dépôt chimique en phase vapeur.

13. Dispositif selon la revendication 1 dans lequel la cuve contient un fluide choisi dans le groupe constitué par la phosphine, l'arsine et BF$_3$, et est adaptée pour distribuer un fluide pour des procédés de fabrication ioniques.

14. Procédé de fabrication d'un produit semi-conducteur utilisant un fluide de procédé semi-conducteur contenu dans une cuve pressurisée (12, 112, 324) possédant un volume intérieur (15, 328) contenant ledit fluide, **caractérisé en ce que** :

ledit fluide est confiné dans ledit volume intérieur par un régulateur de pression (26, 332) dans ledit volume intérieur dans un passage d'écoulement fluide (334, 336, 332, 330, 320) fermé par ledit régulateur de pression vers un écoulement fluide en aval dudit régulateur de pression,
distribuant sélectivement le fluide confiné en ouvrant le passage d'écoulement fluide par le biais et en aval dudit régulateur de pression, déchargeant du fluide à une vitesse déterminée par le régulateur de pression du fluide, et
amenant ledit fluide à une installation de fabrication de semi-conducteurs (200),
ladite étape de distribution comprenant la fourniture d'un gaz audit régulateur de pression à ou en-dessous d'une pression sub-atmosphérique spécifiée, ledit régulateur de pression étant réglé pour réguler la pression du fluide distribué à ladite pression sub-atmosphérique.

15. Procédé selon la revendication 14 dans lequel ledit fluide est utilisé dans le procédé d'implantation ionique ou de dépôt chimique en phase vapeur.

16. Procédé selon la revendication 14 dans lequel ledit fluide est choisi dans le groupe constitué par les hydrures gazeux liquéfiés, les acides gazeux liquéfiés, l'arsine, la phosphine, la stibine, le silane, le diborane, le chlorure d'hydrogène et les silanes et disilanes halogénés.

17. Procédé selon la revendication 14 dans lequel ladite étape de distribution comporte l'application d'un gaz à une pression sub-atmosphérique à la sortie dudit régulateur de pression depuis l'extérieur de ladite cuve pour ouvrir et fermer alternativement une vanne à l'intérieur de celle-ci afin de distribuer ledit fluide depuis ladite cuve.

EP 1 000 291 B1



FIG.1

EP 1 000 291 B1



FIG.2

EP 1 000 291 B1



FIG.3

EP 1 000 291 B1



FIG.4

FIG.5



FIG.6

EP 1 000 291 B1



FIG.7

# EXHIBIT B

Uitvindingsoctrooien



---

**Document 2 op 2**

| | |
|---|---|
| **Soort:** | PCT |
| **Publicatienummer:** | **1000291** |
| **Publicatiedatum:** | 28.09.2005 |
| **Voorlopig nummer:** | 999200819 |
| **Datum indiening van de aanvraag:** | 28.04.1999 |
| **Internationale classificaties:** | F17C 7/04 F17C 9/02 |
| **Titel:** | FLUIDUMOPLSAG- EN VERDEERLSYSTEEM |
| **Uitvinder:** | WANG, Luping;TOM, Glenn; |
| **Voorrang:** | 19980428 US 67393 |
| **Houders:** | ADVANCED TECHNOLOGY MATERIALS, INC.; 7 Commerce Drive,Danbury CT 06810 |
| **Land houders:** | US |
| **Vertegenwoordigers:** | ARNOLD & SIEDSMA;D'HALLEWEYN N.V.T.G.;Meir 24;2000 Antwerpen |
| **Nummers PCT:** | WO 1999/056057 US1999009137 |
| **Verleningsdatum:** | 28.09.2005 |
| **Oppositiedatum:** | 12.04.2006 |
| **Omschrijving classificaties:** | Vessels for containing or storing compressed, liquefied, or solidified gases; Fixed-capacity gas-holders; Filling vessels with, or discharging from vessels, compressed, liquefied, or solidified gases |
| **Vertaaldatum B1:** | 22.12.2005 |
| **Compta:** | Dernière annuité payée / Laatste betaalde jaartaks / |

Letzte bezahlte Jahresgebühr : 26/04/2007

Nota : De informatie betreffende octrooien en certificaten die voorkomen in deze rubriek hebben enkel een officieus karakter. De Dienst voor de intellectuelle Eigendom garandeert niet de juistheid ervan. Zij zullen niet tegen de Dienst voor de intellectuelle Eigendom kunnen worden gebruikt. De informaties moeten worden gebruikt als een eerste oriëntatie vooral wanneer het doel van de opzoeking het volbrengen van administratieve acties is (betaling van taksen, notificatie van een statuutswijziging, het verval - dat kan geannuleerd worden mits de aanvaarding van een laattijdige betaling of mits een restauratie -, ...). Indien een officieel karakter gewenst is, moet schriftelijk een attest aangevraagd worden. Dit is onderworpen aan de betaling van een vergoeding van 12 euro per octrooi.



# EXHIBIT C

Marc BEERTEN LIC. JUR. - Martine VERGAUWEN - Willy MERTENS - Roger VANDENHENDE - Jan DE BELDER

| | | GERECHTSDEURWAARDERS | |
|---|---|---|---|
| Balansstraat | 117 | | |
| 2018 | ANTWERPEN 1 | | |
| ☏ | 03 259 59 00 | | |
| Fax | 03 259 59 01 | Johan BOCKLANDT L.J. | |
| e-mail: | bdmv@bdmv.net | Bart GEETS L.J. | |
| website : | www.bdmv.net | Alain VAN DER STEICHEL L.J. | |
| Kantooruren : | van 9 uur tot 16 uur | kandgerechtsdeurwaarder | |



**06/5939 SVK**

*Te vermelden bij iedere betaling of briefwisseling*

ORIGINEEL

# BETEKENING VAN BESCHIKKING

Het jaar tweeduizend en zes, op éénendertig oktober.-


OP VERZOEK VAN :

de vennootschap naar Amerikaans recht **ADVANCED TECHNOLOGY MATERIALS INC.**, waarvan de vennootschapszetel gevestigd is te Danbury CT 06810 (Verenigde Staten van Amerika), Commerce Drive 7,
- die ten behoeve van deze procedure keuze van woonplaats maakt ten kantore van gerechtsdeurwaarder Marc Beerten, die kantoor houdt te 2018 Antwerpen, Balansstraat 117,

- hebbens als raadslieden Meester Bruno Vandermeulen en Meester Ruben Peeters, advocaten te Brussel, met kantoor te 1040 Brussel, Oudergemlaan 22-28,  (tel. 02/282.6000; e-mail Bruno.Vandermeulen@twobirds.com resp. Ruben.Peeters@twobirds.com ; ref. ADVTM.0002)

- verzoekende partij, ten deze woonplaats kiezend op het kantoor van ondergetekende Gerechtsdeurwaarder.


Heb ik, ondergetekende, Marc Beerten, Gerechtsdeurwaarder met standplaats te Antwerpen, die kantoor houdt te 2018 Antwerpen 1, Balansstraat 117,


BETEKEND en met ieder afschrift van onderhavig exploot, een voor gelijkluidend verklaard afschrift gelaten aan:

1. de **N.V. PRAXAIR HOLDING**, ingeschreven in de Kruispuntbank van Ondernemingen onder het ondernemingsnummer 0437.603.028, waarvan de vennootschapszetel gevestigd is te 2900 Schoten, Metropoolstraat 17,

- aldaar de betekening doende en er afschrift van dit exploot latende, sprekende tot :


zo verklaard, die het origineel            heeft getekend voor ontvangst van het afschrift,

*gezien het exploot niet kon worden betekend overeenkomstig de art. 33 tot 35 van het Gerechtelijk Wetboek, heb ik aan het voormeld adres van de geadresseerde een afschrift ervan achtergelaten overeenkomstig art. 38 § 1 van zelfde Wetboek om           uur met melding dat ik hem een brief zal zenden in een per post aangetekende omslag, om gebeurlijk nog een eensluidend afschrift van dit exploot op mijn kantoor te komen afhalen;*

Blz. 1

Marc BEERTEN LIC. JUR. - Martine VERGAUWEN - Willy MERTENS - Roger VANDENHENDE - Jan DE BELDER

Balansstraat          117                    GERECHTSDEURWAARDERS
2018        ANTWERPEN 1
℡                      03 259 59 00
Fax                    03 259 59 01          Johan BOCKLANDT L.J.
e-mail :      bdmv@bdmv.net                  Bart GEETS L.J.
website :     www.bdmv.net                   Alain VAN DER STEICHEL L.J.
Kantooruren :  van 9 uur tot 16 uur          kand. gerechtsdeurwaarder

06/5939 SVK
Te vermelden bij iedere
betaling of briefwisseling



2. de **N.V. PRAXAIR**, ingeschreven in de Kruispuntbank van Ondernemingen onder het ondernemingsnummer 0438.719.221, waarvan de vennootschapszetel gevestigd is te 2250 Olen, Lammerdries 29,

- aldaar de betekening doende en er afschrift van dit exploot latende, sprekende tot :

### - BIJ AFZONDERLIJK EXPLOOT -

zo verklaard, die het origineel                    heeft getekend voor ontvangst van het afschrift,

*gezien het exploot niet kon worden betekend overeenkomstig de art. 33 tot 35 van het Gerechtelijk Wetboek, heb ik aan het voormeld adres van de geadresseerde een afschrift ervan achtergelaten overeenkomstig art. 38 § 1 van zelfde Wetboek om                    uur met melding dat ik hem een brief zal zenden in een per post aangetekende omslag, om gebeurlijk nog een eensluidend afschrift van dit exploot op mijn kantoor te komen afhalen;*

3. de vennootschap naar het recht van de staat Connecticut (Verenigde Staten van Amerika) **PRAXAIR INC.**, waarvan de vennootschapszetel gevestigd is te Danbury Connecticut 06810-5113 (Verenigde Staten van Amerika), 39 Old Ridgebury Road,

Aangezien zij in België geen gekende vennootschapszetel, bedrijfszetel of gekozen woonplaats heeft;

Dat haar zetel gevestigd is in de Verenigde Staten van Amerika;

Gelet op de Conventie van Den Haag van 15 november 1965;

Dienvolgens heb ik twee afschriften van onderhavig exploot, (alsmede de stukken erin vermeld), samen met een vertaling in het Engels en de voorgeschreven formulieren, onder aangetekende omslag met de luchtpost en met kennisgeving van ontvangst, heden afgegeven op het postkantoor te Antwerpen, toegezonden aan :

Process Forwarding International
633 Yesler Way
Seattle, WA 98104
USA

met verzoek de afgifte aan geadresseerde te doen bewerkstelligen overeenkomstig art. 5) a., van de bepalingen van voornoemde Conventie.

Tevens heb ik, overeenkomstig art. 40 van het Belgisch Gerechtelijk Wetboek, een afschrift van onderhavig exploot, (alsmede de stukken erin vermeld), met een vertaling in het Engels, toegezonden aan geadresseerde aan haar hiervoor vermeld adres,

Blz. 2

KBC 402-5501611-59          BjB 645-1008245-62          ING 320-0917406-50          000-0089340-03

Marc BEERTEN LIC. JUR. · Martine VERGAUWEN · Willy MERTENS · Roger VANDENHENDE · Jan DE BELDER

Balansstraat          117
2018          ANTWERPEN 1
℃          03 259 59 00
Fax          03 259 59 01
e-mail:          bdmv@bdmv.net
website :          www.bdmv.net
Kantooruren :     van 9 uur tot 16 uur

GERECHTSDEURWAARDERS



Johan BOCKLANDT l.j.
Bart GEETS l.j.
Alain VAN DER STEICHEL l.j.
kand. gerechtsdeurwaarder

06/5939 SVK
*Te vermelden bij iedere betaling of briefwisseling*

a) onder aangetekende omslag met de luchtpost en met kennisgeving van ontvangst,

b) onder aangetekende omslag met de gewone post en met kennisgeving van ontvangst,

heden afgegeven op het Postkantoor te Antwerpen.

Bovendien heb ik per fax (nr. +001.203.837.2515), alsook per e-mail (jim_breedlove@praxiar.com) een afschrift van onderhavig exploot, (alsmede de stukken erin vermeld), met een vertaling in het Engels, toegezonden aan haar Vice President, General Counsel & Secretary (*vertaald : "Vice-Voorzitter, Hoofd Bedrijfsjurist & Secretaris*), de heer James T. Breedlove.

De bewijzen van aantekening van deze zendingen heb ik aan het origineel van onderhavig exploot gehecht;

- van de uitgifte in uitvoerbare vorm van een beschikking gewezen tussen partijen op zesentwintig oktober tweeduizend en zes door de Voorzitter van de Rechtbank van Eerste Aanleg te Antwerpen, zetelend in kort geding.

Doende deze betekening tot kennisgeving en leiding van de betekende partijen, tot zulke doeleinden als naar recht en onder alle voorbehoud.


WAARVAN AKTE . - Datum van het exploot.
Afschrift(en) zo nodig afgegeven onder gesloten omslag, conform artikel 44 van het Gerechtelijk Wetboek.


KOSTEN : duizend vijfentwintig euro elf cent,
eventueel te vermeerderen met de kosten van aangetekende zendingen en/of taxipost zoals vermeld op het origineel.  Fiscale zegels worden in voorkomend geval aangebracht op het origineel.


De Gerechtsdeurwaarder

Blz. 3

Marc BEERTEN LIC. JUR. · Martine VERGAUWEN · Willy MERTENS · Roger VANDENHENDE · Jan DE BELDER

Balansstraat          117
2018          ANTWERPEN 1                GERECHTSDEURWAARDERS
℘
Fax                03 259 59 00
e-mail:              03 259 59 01          Johan BOCKLANDT L.J.
website :          bdmv@bdmv.net          Bart GEETS L.J.
Kantooruren :     www.bdmv.net          Alain VAN DER STEICHEL L.J.
              van 9 uur tot 16 uur          kand. gerechtsdeurwaarder



06/5939 SVK
*Te vermelden bij iedere betaling of briefwisseling*

| | |
|---|---:|
| Vast Recht | 107,01 |
| Afschriften | 85,60 |
| Geschriften | 154,55 |
| Opzoekingen | 10,97 |
| Vacatie Artikel 38 | 9,65 |
| Rollen Vertaling | 168,60 |
| Fax | 10,00 |
| Verplaatsing | 8,57 |
| Port buitenland | 45,00 |

------------------------------------------

| | |
|---|---:|
| Totaal rechten | 599,95 |

| | |
|---|---:|
| Zegels | 30,00 |
| Registratie | 25,00 |
| Vertaling | 272,25 |
| Uitreiking USA | 97,91 |

------------------------------------------

| | |
|---|---:|
| Totaal uitschotten | 425,16 |

| | |
|---|---:|
| TOTAAL | € 1.025,11 |

| | |
|---|---:|
| Port | 4,82 |
| Taxi-post | |

------------------------------------------

ALGEMEEN TOTAAL : € 1.029,93
==================================

Blz. 4

KBC 402-5501611-59          BjB 645-1008245-62          ING 320-0917406-50          000-0089340-03

**Marc BEERTEN** Lic. jur.- **Martine VERGAUWEN** - **Willy MERTENS** - **Roger VANDENHENDE** - **Jan DE BELDER**
JUDICIAL OFFICERS & BAILIFFS

Balansstraat 117
2018    ANTWERP 1 (Belgium)
Tel. (03) 259.59.00          e-mail: bdmv@bdmv.net
Fax  (03) 259.59.00          website: www.bdmv.net
Office hours: 9 a.m. - 4 p.m.

Johan BOCKLANDT, Lic.iur.
Bart GEETS, Lic.iur.
Alain VAN DER STEICHEL, Lic.iur.
Trainee Judicial Officers & Bailiffs

Ref.:  06/5939 SVK

*Please quote in all exchange of
mail and with all payments.*

KBC 402-5501611-59  BJB 645-1008245-262  Deutsche Bank 610-4035000-85  BBL 320-0917406-50  PCR 000-0089340-03

## SERVICE & NOTIFICATION OF A COURT ORDER

This thirty-first day of October of the year two thousand
and six.-

AT THE REQUEST OF:

the firm of ADVANCED TECHNOLOGY MATERIALS INC., a company
organized and existing under the laws of the United States
of America, with registered office at 7 Commerce Drive,
Danbury, CT 06810 (United States of America);

- electing domicile, for the purposes of these proceedings,
at the office of Mr. Marc Beerten, Judicial Officer &
Bailiff at B-2018 Antwerp 1, Balansstraat 117;

- represented by counsel: Messrs. Bruno Vandermeulen and
Ruben Peeters, attorneys-at-law at the Brussels bar, with
law offices at B-1040 Brussels, Oudergemlaan 22-28 (tel.
02/282.60.00; e-mail: Bruno.Vandermeulen@twobirds.com and/or
Ruben.Peeters@twobirds.com - ref. ADVTM.0002);

- Party at whose request this service is effected, electing
domicile, for the purposes of these proceedings, at the
office of the undersigned Judicial Officer & Bailiff;

I the undersigned, Marc Beerten, Judicial Officer & Bailiff
at Antwerp, with office in B-2018 Antwerp 1, Balansstraat
117,

HAVE SERVED upon:

1. the firm of PRAXAIR HOLDING N.V., a limited liability
company organized and existing under Belgian law, corporate
registration no. 0437.603.028, with registered office at B-
2900 Schoten (Belgium), Metropoolstraat 17;

**Marc BEERTEN** Lic. jur.- **Martine VERGAUWEN** – **Willy MERTENS** – **Roger VANDENHENDE** – **Jan DE BELDER**
JUDICIAL OFFICERS & BAILIFFS

Balansstraat 117
2018     ANTWERP 1 (Belgium)                    Johan BOCKLANDT, Lic.iur.
Tel. (03) 259.59.00          e-mail: bdmv@bdmv.net      Bart GEETS, Lic.iur.
Fax  (03) 259.59.01          website: www.bdmv.net      Alain VAN DER STEICHEL, Lic.iur.
Office hours: 9 a.m. - 4 p.m.                          Trainee Judicial Officers & Bailiffs
KBC 402-5501611-59  BJB 645-1008245-262  Deutsche Bank 610-4035000-85  BBL 320-0917406-50  PCR 000-0089340-03

Ref.:   06/5939 SVK

*Please quote in all exchange of
mail and with all payments.*

                                                                  page 2

being on the premises and speaking with:


who accepted-declined to sign the original of my writ in
acknowledgement of receipt of a copy; /*read*

> *Whereas the writ could not be served pursuant to sections 33, 34 and 35 of the
> Belgian Judicial Code, the copy was left at the summoned party's place of
> residence, at 17 45 a.m./p.m., in a sealed envelope, pursuant to section 38 § 1
> of the Judicial Code. Furthermore a notice shall be sent by registered mail
> advising the recipient of the possibility to collect a copy at my office.*


2. the firm of <u>PRAXAIR N.V.</u>, a limited liability company
organized and existing under Belgian law, corporate regis-
tration no. 0438.719.221, with registered office at B-2550
Olen (Belgium), Lammerdries 29;

being on the premises and speaking with:

**Marc BEERTEN** Lic. jur.- **Martine VERGAUWEN** - **Willy MERTENS** - Roger **VANDENHENDE** - Jan **DE BELDER**
JUDICIAL OFFICERS & BAILIFFS

Balansstraat 117
2018    ANTWERP 1 (Belgium)
Tel. (03) 259.59.00          e-mail: bdmv@bdmv.net
Fax  (03) 259.59.01          website: www.bdmv.net
Office hours: 9 a.m. - 4 p.m.
KBC 402-5501611-59  BJB 645-1008245-262  Deutsche Bank 610-4035000-85  BBL 320-0917406-50  PCR 000-0089340-03

Johan BOCKLANDT, Lic.iur.
Bart GEETS, Lic.iur.
Alain VAN DER STEICHEL, Lic.iur.
Trainee Judicial Officers & Bailiffs

Ref.: 06/5939 SVK

*Please quote in all exchange of mail and with all payments.*

page 3

### - BY SEPARATE PROCESS -

who accepted-declined to sign the original of my writ in
acknowledgement of receipt of a copy;

*Whereas the writ could not be served pursuant to sections 33, 34 and 35 of the
Belgian Judicial Code, the copy was left at the summoned party's place of
residence, at      a.m./p.m., in a sealed envelope, pursuant to section 38 § 1
of the Judicial Code. Furthermore a notice shall be sent by registered mail
advising the recipient of the possibility to collect a copy at my office.*

4. the firm of PRAXAIR INC., a company organized and
existing under the laws of the State of Connecticut (United
States of America), with registered office at 39 Old
Ridgebury Road, Danbury, Connecticut 06810-5113 (United
States of America);

*Whereas the said party has no known registered office, place
of residence or elected domicile in Belgium;*

*Whereas the served and notified party is established in the
United States of America;*

*In view of the Convention of The Hague of November 15, 1965;*

*Therefore I have sent two copies of this process (and of the
documents referred to therein, if any) together with a
translation into English, said documents being accompanied
by the required official forms, under a sealed envelope, by
registered air mail with acknowledgement of receipt, entrust-
ed this day at the Antwerp Post Office, to:*

*PROCESS FORWARDING INTERNATIONAL
633 Yesler Way
Seattle, WA 98104
UNITED STATES OF AMERICA*

*with request to effect the service of the aforementioned
documents to the addressee, in due observance of section 5),
subpar. a, of the provisions of the aforementioned Conven-
tion.*

**Marc BEERTEN** Lic. jur.- **Martine VERGAUWEN** - **Willy MERTENS** - **Roger VANDENHENDE** - **Jan DE BELDER**
JUDICIAL OFFICERS & BAILIFFS

Balansstraat 117
2018    ANTWERP 1 (Belgium)
Tel. (03) 259.59.00          e-mail: bdmv@bdmv.net
Fax (03) 259.59.01          website: www.bdmv.net
Office hours: 9 a.m. - 4 p.m.

Johan BOCKLANDT, Lic.iur.
Bart GEETS, Lic.iur.
Alain VAN DER STEICHEL, Lic.iur.
Trainee Judicial Officers & Bailiffs

Ref.:  06/5939 SVK

*Please quote in all exchange of
mail and with all payments.*

KBC 402-5501611-59  BJB 645-1008245-262  Deutsche Bank 610-4035000-85  BBL 320-0917406-50  PCR 000-0089340-03

page 4

*I have also sent, in application of section 40 of the
Belgian Judicial Code, a copy of this process (and of the
documents referred to in same, if any), together with a
translation into English, directly to the served & notified
party's address, as indicated above,*

*a) under a sealed envelope, by registered air mail with
acknowledgement of receipt;*

*b) under a sealed envelope, by registered surface mail with
acknowledgement of receipt;*

*the service being effected today at the Antwerp Post Office;*

*In addition, I have also forwarded by fax (fax no.
+001.203.837.2515) and by e-mail (jim_breedlove@praxair.com)
a copy of this process (and of the documents referred to in
same, if any), together with a translation into English, to
the served and notified party's Vice-President, General
Counsel & Secretary, Mr. James T. Breedlove.*

*The receipts of these dispatches by registered mail were
attached to the master copy of my writ.*

*- together with each copy of this process, a certified true
copy of the enforceable transcript of a Court Order issued
between the parties by the Presiding Magistrate of the Court
of First Instance of the judicial district of Antwerp (Bel-
gium), ruling in summary (référé) proceedings, on October
twenty-sixth  of the year two thousand and six;*

*Effecting this service for the notified party's guidance and
information, for all lawful purposes and under all proper
reservations.*

IN WITNESS WHEREOF *this writ was drawn up.- Date as above.*

*Copies were issued, if need be, under sealed envelopes, in
conformity with section 44 of the Belgian Judicial Code.*

**Marc BEERTEN** Lic. jur.- **Martine VERGAUWEN - Willy MERTENS - Roger VANDENHENDE - Jan DE BELDER**
JUDICIAL OFFICERS & BAILIFFS

Balansstraat 117
2018    ANTWERP 1 (Belgium)
Tel. (03) 259.59.00          e-mail: bdmv@bdmv.net
Fax (03) 259.59.01          website: www.bdmv.net
Office hours: 9 a.m. - 4 p.m.

Johan BOCKLANDT, Lic.iur.
Bart GEETS, Lic.iur.
Alain VAN DER STEICHEL, Lic.iur.
Trainee Judicial Officers & Bailiffs

Ref.:   06/6939 SVK

*Please quote in all exchange of mail and with all payments.*

KBC 402-5501611-59  BjB 645-1008245-262  Deutsche Bank 610-4035000-85  BBL 320-0917406-50  PCR 000-0089340-03

page 5

COSTS: 1.025,11 EUR,
to which may be added the costs of registered mail, as
specified in the master copy. Revenue stamps were affixed on
the master copy of this process, if applicable.

                    The Judicial Officer & Bailiff,
                    (signed) Marc BEERTEN

Certified true translation,
The sworn Translator,

Voor eensluidende vertaling
de beëdigd vertaler
Pour traduction conforme
le traducteur assermenté
F.E. SMET

**Voor eensluidend afschrift**
*de Gerechtsdeurwaarder.*

First/page
initialled

19,95 EUR

IN no.  6400/06/sh

Nine pages

# I, ALBERT II,

## KING OF THE BELGIANS,

LET ALL MY SUBJECTS, PRESENT AND TO COME, KNOW :

second page
initialled

General Calendar no. 06-794-A   Page 1/8   Folio no. 5228
Repertory no. 06/2333

| Submitted on: | Delivered to: | Delivered to: |
|---|---|---|
| EXEMPT of registration | Application reference: | Application reference: |
| The Sr. Inspector, signed: | CD no.:<br>RD no.<br>Fee:          Date: | CD no.:<br>RD no.<br>Fee:          Date: |

## COURT ORDER

issued at the ANTWERP Law Court this TWENTY- SIXTH DAY OF OCTOBER OF THE YEAR TWO THOUSAND AND SIX, in the public hearing held in SUMMARY PROCEEDINGS at the Court of First Instance of the Judicial District of ANTWERP,

On the bench :

L. Lambrechts,                          Judge, acting President,
W. Mignolet,                    Assistant Clerk of the Court.

In the matter of:   General Calendar ARK 06/794/C

the firm of ADVANCED TECHNOLOGY MATERIALS INC., a company organized and existing under the laws of the United States of America, with registered office at 7 Commerce Drive, Danbury, CT 06810 (United States of America);

CLAIMANT,
- electing domicile, for the purposes of these proceedings, at the office of Mr. Marc Beerten, Judicial Officer & Bailiff at B-2018 Antwerp 1, Balansstraat 117,
- represented by counsel: Messrs. B. Vandermeulen and R. Peeters, attorneys-at-law, with offices at B-1040 Brussels, Oudergemlaan 22-28;

versus:

1. the firm of PRAXAIR HOLDING N.V., a limited liability company organized and existing under Belgian law, corporate registration no. 0437.603.028, with registered office at B-2900 Schoten (Belgium), Metropoolstraat 17;

Folio no. 5229
third page
initialled

General Calendar no. 06-794-C   Page 2/8

2. the firm of PRAXAIR PRODUCTION N.V., a limited liability company organized and existing under Belgian law, corporate registration no. 0439.211.248, with registered office at B-2070 Zwijndrecht (Belgium), Scheldedijk 58;

3. the firm of PRAXAIR N.V., a limited liability company organized and existing under Belgian law, corporate registration no. 0438.719.221, with registered office at B-2550 Olen (Belgium), Lammerdries 29;

4. the firm of PRAXAIR INC., a company organized and existing under the laws of the State of Connecticut (United States of America), with registered office at 39 Old Ridgebury Road, Danbury, Connecticut 06810-5113 (United States of America);

DEFENDANTS,
- represented by counsel: Mr. G. Glas, attorney-at-law, with office at B-1150 Brussels, Tervurenlaan 268 A;

* * *

In view of the documents submitted in this matter, duly inventoried and included in the file of the proceedings, and in particular the originating summons whereby these proceedings were initiated, served on September 19, 2006 as far as the first, second and third defendants are concerned and on September 20, 2006 as far as the fourth defendant is concerned;

In view of the provisions of sections 2, 30, 34, 36, 37 and 41 of the Law of June 15, 1935 ruling the use of national languages in court proceedings;

Having heard the arguments and pleadings of counsels for the parties, presented in the Dutch language.

* * *

I. Subject-matter of the claim:

The claimant's claim aims at obtaining a court order:

Folio no. 5230
fourth page
initialled

General Calendar no. 06-794-C    Page 3/8

- enjoining the defendants, by way of provisional measure, from infringing upon the clamant's European patent # EP 1000 291 BI by manufacturing, having manufactured, keeping in stock, offering for sale, distributing or selling, using, filling or importing gas cylinders currently marketed as "Up Time" or any other gas cylinder with comparable characteristics, on pain of having to pay a penalty of 45,000.00 euros for each gas cylinder held, handled or disposed of in breach of the aforesaid injunction, until such time as a final decision on the merits shall be rendered;

- ordering the defendants, by way of provisional measure, to cease and desist from publishing and distributing any and all information and/or advertising material, in whatever form and by whatever means, containing or including reference to and/or pictures, descriptions or particulars of the contentious gas cylinders or promoting in any way the sale thereof, on pain of having to pay a penalty of 100,000.00 euros per day or part thereof in which this injunction is breached;

- ruling that the injunction as applied for shall be null and void if the claimant fails to institute within one month reckoning from the issuance of the relevant Court Order a lawsuit in the main claim on account of a patent infringement against European patent # EP 1000 291 BI.

II. Factual elements:

The claimant is a supplier of materials and equipment to the semiconductor industry and in particular of gaseous substances which are sold in a cylinder patented under the trade mark VAC. The claimant holds the European patent # EP 1000 291 BI.

The defendants are Belgian companies while the fourth defendant is the American parent company engaged in the business, among other things, of selling industrial gases.

The defendant companies also use the "Up Time" patended gas cylinder for the sale and delivery to the semiconductor industry of the product they provide (i.e. BF3 gas), an activity in which they are in direct competition with the claimant.

The claimant asserts having recently come into possession of compelling evidence that the defendants are currently fill-

Folio no. 5231
fifth page
initialled

General Calendar no. <u>06-794-C</u>   Page 4/8

ing gas cylinders in Belgium and offering said units for
sale under the trade name of "Up Time", an activity which
*prima facie* constitutes a infringement on the claimant's
patent rights; for the said reason, the claimant is compell-
ed to request, by means of a motion in summary proceedings,
a provisional Court Order, enjoining the defendants to
refrain from any further infringing activitities.

<u>III. Assessment of the claim</u>:

<u>1. Motion for an injunction against the manufacture, keeping
in stock, offering for sale, using, filling or importing "Up
Time" gas cylinders</u>

Section 584 of the Belgian Judicial Code provides that the
Presiding Magistrate is empowered, in all issues in which in
his view time is of the essence, to issue provisional orders
in all matters save such as, according to law and statute,
are not with the judiciary's remit.

As a condition precedent to the claim being declared
admissible, the matter and the measures applied for must be
urgently required.

The burden of proof on the subject of the urgency lies with
the claimant (Liège, March 5, 1991, *J.T.* 1991).

The criteria when it comes to assess the urgent nature of
the claim shall be more stringent the more the measure
applied for is perceived to anticipate on the decision
ultimately to be entered on the merits (anticipatory
measure).

The measure applied for: an injunction against further
infringements upon the European patent # EP 1000 291 BI by
distributing or selling "Up Time" patended gas cylinders
pending a decision on the merits, and specifically regarding
the issue of whether such distribution and sale constitutes
a patent infringement, implies a full (*prima facie*) assess-
ment of the existence of a valid patent or lack thereof and
the infringement upon such patent throuygh the distribution
and sale of the "Up Time" patended gas cylinders, and conse-
quently the most stringent criteria shall apply when
weighing whether the requirement for urgency is met.

This reasoning applies even more so now that the ruling ul-
timately to be entered may have a significant impact on the

Folio no. 5232
sixth page
initialled

General Calendar no. 06-794-C    Page 5/8

future sales, both national and international, for gases
used in the semiconductor industry given that there appear
to be only two players on the market for the gas in ques-
tion, to wit the current litigating parties, and that
filling for all cylinders shipped worldwide is carried out,
as far as the defendanst are concerned, at Oevel.
Granting the claimant in the main claim's motion would be
tantamount to placing the claimant in a quasi-monopoly
position, a situation which would endure as long as no
decision regarding the merits of the main claim is given.

Taking into account the adjustments which would be necessary
in order to ensure compatibilty between the equipment for
the manufacture of semiconductors and the gas cylinders used
in same and the even more farreaching safety procedures that
would have to be devised and implemented for the processing
of this highly toxic gas, the situation that would be
created if the measure were to be granted would, for all
intents and purposes, be irreversible.

Such state of affairs could only be countenanced in the
context of merely provisional measures, ordered to address
a situation that requires expedient and prompt action and on
condition that less radical measures would be manifestly
insufficient to remedy a tort where time is of the essence
and when there is no reasonably dispute regarding the legal
status (Beernaert S., Algemeen principes van het civiel kort
geding, *R.W.* 2001-2002, no. 22, page 1346).

These conditions are not satisfied in the case at hand.

The urgent nature of the claim as pleaded by the claimant
boils down to the fact that due to the alleged patent right
infringements on the part of companies of the Praxair group,
the claimant suffers continually increasing damage and
losses which will be difficult to offset by a financial
compensation, not only because of the loss of revenue
incurred but also and more importantly on account of the
possible erosion of the intrinsic value of its patent
rights.

First and foremost, it seems most unlikely that the claim-
ant, being the direct and only competitor of the defendants
when it comes to the distribution and sale of the subject
gases, should have failed to keep abreast of developments in
its segment of the market and keep a weary eye on its com-
petitor's activities and thus should not have become aware

Folio no. 5233
seventh page
initialled

General Calendar no. <u>06-794-C</u>    Page 6/8

before July 2006 of the fact that the contentious gas cylinders were being filled in Belgium and shipped worldwide from this country.

It is not disputed that the "Up Time" gas cylinders are being distributed by the defendants since 2003, that the defendants advertised the product and the services they provide in this respect, that they took part in trade fairs..., while each cylinder bears an inscription (certificate) stating the venue where the unit was filled.

A decision whereby the measure applied for would be denied would carry the consequence that, should the Court ruling on the main claim find that the cylinders as used constitute an infringement upon the claimant's patent rights, the defendants would be placed in a position to capture or otherwise gain some of claimant's market share without being entitled to such windfall, an injury that may be remedied by awarding proper and suitable damages.

The defendants are part of a well-known and solvent international group pursuing a wide range of activities.

It cannot be contended that there is in all fairness no reasonable dispute or that there could there be a reasonable dispute regarding the parties' legal status, to wit that the "Up Time" gas cylinders distributed and sold by the defendants infringe upon the gas cylinder in use with the claimant and protected under European patent # EP 1000 291 BI.

The defendants' argument propounds that it is only by dint of an artifice that was recently resorted to (the unlawful amending of the claimant's patent recitals) that the claimant was able to offer an interpretation of its patent pending that would allow said party to include the "Up Time" gas cylinders.

Suffices in this regard to refer to the proceedings instituted and maintained between the litigaging parties in the United States of America, the decision rendered on January 25, 2006 by the Korean Patent Office, the appeals proceedings against the patent in the context of which serious and compelling *prima facie* arguments submitted regarding the merits of the complaint, the Court Order issued upon third-party opposition by the Antwerp Judge of Seizures on September 6, 2006.

The measure applied for by the claimant in the main claim

Folio no. 5234
eighth page
initialled

General Calendar no. 06-794-C    Page 7/8

therefore, having regard to the attending circumstances, is too drastic and cannot qualify as a merely conservative measure for security purposes.

### 2. The motion for an injunction against advertising with respect to the gas cylinders

On the other hand, the parties do not dispute that a patent was granted to the claimant upon the latter's application to the European Patent Office and that the opposition proceedings pursued against this patent do not as such impinge on the validity of the patent.
The German judge ruling in summary proceedings on August 1, 2006 acknowledged and affirmed the claimant's patent rights, a decision against which appeal was lodged.

Under the cicumstances as described, it is appropriate that the defendants be ordered to refrain, until a decision regardings the merits of the case is given, from all further action aimed at capturing a sustantial part of the claimant's market share.

FOR THE REASONS SET FORTH ABOVE:

I the undersigned, L. Lambrechts, Judge and acting Presiding Magistrate of the Court of First Instance of the Judicial District of Antwerp, sitting in summary (référé) proceedings, with the assistance of W. Mignolet, Assistant Registrar, ruling in duly contested proceedings;

Hereby declare the claim to be admissible and founded on the merits to the extent specified hereafter;

Hereby order that each of the litigating parties, pending a decision on the merits of the main claim, shall cease and desist from publishing and distributing any and all information and/or advertising material, in whatever form and by whatever means, containing or including reference to and/or pictures, descriptions or particulars of the contentious "Up Time" gas cylinders or promoting in any way the sale thereof, on pain of having to pay a penalty of 100,000.00 euros per day or part thereof in which this injunction is breached;

Folio no. 5234bis
ninth page
initialled

General Calendar no. <u>06-794-C</u>   Page 8/8

Hereby rule that the injunction as applied for shall be null and void if the claimant fails to institute within one month reckoning from the issuance of the relevant Court Order a lawsuit in the main on account of a patent infringement against European patent # EP 1000 291 BI.

Dismiss all furter motions for lack of jurisdiction

Hold each of the parties for its own procedural costs and expenses.

Signed: W. Mignolet                    Signed: L. Lambrechts

tenth and last page
(initialled)

" In consequence, I hereby order all Judicial Officers &
Bailiffs who may receive a request to that effect to execute
this (appeals) judgment, court order, injunction or instrum-
ent;

" All Procurators general and all Public Prosecutors at
the courts of first instance to see to it that it is
enforced and all commanders and all officers of the police and
armed forces to lend their assistance whenever they receive
a lawful request for that purpose.

" In witness whereof this (appeals) judgment, court
order, injunction or instrument was signed and sealed with
the seal of the (Appellate) Court or Public Official. "

Certified authentic copy, delivered at the request of Mr. M.
Beerten, Judicial Officer & Bailiff, on behalf of the
claimant.

                    The Clerk of the Court,
                    Signed: R. Aerts


     Official seal of the
   COURT OF FIRST INSTANCE
        at ANTWERP

Registry of the Court of 1st Instance at Antwerp
Date: Oct.31, 2006
Volume: Exp. Fees no. ...24409....
..7.. pages x 2.85 EUR = ............
Fees paid: EUR    ....19.95 .....
The Clerk of the Court,
Signed: M. Van Eylen


            Certified true copy,
            The Judicial Officer & Bailiff
            (signed) Marc Beerten




Certified true translation,
The sworn Translator,

*Voor eensluidende vertaling*
*de beëdigd vertaler*
*Pour traduction conforme*
*le traducteur assermenté*
*F.E. SMET*

                                    **Voor eensluidend afschrift,**
                                    **de Gerechtsdeurwaarder,**

eerste blad

19,95 EURO

In Nr.6400/06/sh

negen bladen

WIJ, ALBERT II, KONING DER BELGEN,

AAN ALLEN, DIE NU ZIJN EN HIERNA WEZEN ZULLEN

DOEN TE WETEN :

| aangeboden op:<br><br>Niet te registreren<br><br>de e.a. inspecteur, | afgeleverd aan:<br><br><br><br>referentie bestelling:<br>CD nummer:<br>RD nummer:<br>bedrag:        datum: | afgeleverd aan:<br><br><br><br>referentie bestelling:<br>CD nummer:<br>RD nummer:<br>bedrag:        datum: |

**BESCHIKKING** gewezen en uitgesproken in het gerechtsgebouw te Antwerpen, op **ZESENTWINTIG OKTOBER TWEEDUIZEND EN ZES**
in openbare zitting van **KORT GEDING** van de rechtbank van eerste aanleg van het gerechtelijk arrondissement Antwerpen, al waar zetelden:
L. Lambrechts, rechter, dd. Voorzitter
W. Mignolet, adjunct-griffier.

In zake : ARK nr. 06/794/C

**ADVANCED TECHNOLOGY MATERIALS INC.,**
vennootschap naar Amerikaans recht, met zetel te Danbury CT 06810 (VSA),
Commerce Drive 7,

**EISENDE PARTIJ**
- woonplaats keuze doende bij meester Marc Beerten, gerechtsdeurwaarder te 2018 Antwerpen, Balansstraat 117,
- verschijnend bij meester B. Vandermeulen en R. Peeters, advocaten, kantoorhoudende te 1040 Brussel, Oudergemlaan 22-28,

**TEGEN :**

**1. NV PRAXAIR HOLDING,**
met KBO-nummer 0437 603 028, met zetel te 2900 Schoten, Metropoolstraat 17,

**2. NV PRAXAIR PRODUCTION,**
met KBO-nummer 0439 211 248, met zetel te 2070 Zwijndrecht, Scheldedijk 58,

### 3. NV PRAXAIR,

met KBO-nummer 0438 719 221, met zetel te 2250 Olen, Lammerdries 29,

### 4. PRAXAIR INC.,

vennootschap naar recht van de staat Connecticut (VSA), met zetel te Danbury Connecticut 06810-5113 (VSA), 39 Old Ridgebury Road,

**VERWERENDE PARTIJ**
- verschijnend bij meester G. Glas, advocaat, kantoorhoudende te 1150 Brussel, Tervurenlaan 268 A,,

*** 

Gezien de stukken van het dossier van de rechtspleging zoals zij voorkomen op de inventaris ervan, ondermeer de inleidende dagvaarding dd° 19 september 2006 opzichtens eerste, tweede en derde verwerende partij en dd° 20 september opzichtens vierde verwerende partij.

Gelet op de artikelen 2, 30, 34, 36, 37 en 41 der wet van 15 juni 1935.

Gehoord partijen in hun middelen en besluiten, ontwikkeld in de Nederlandse taal.

*** 

### I. Voorwerp van de vordering

De vordering van eisende partij strekt ertoe
- verwerende partijen bij wijze van voorlopige maatregel te horen verbieden inbreuk te plegen op haar Europees octrooi EP 1000 291 BI door gascilinders die gekend staan onder de naam "UpTime", of gascilinders met dezelfde kenmerken te vervaardigen, te laten vervaardigen, in voorraad te houden, aan te bieden, in het verkeer te brengen, te gebruiken , te vullen of in te voeren, op straffe van een dwangsom van 45.000,00 EUR per individuele gascilinder waarmee één van de voorgaande verbodsbepalingen wordt geschonden, en dit totdat een beslissing ten gronde zal zijn tussengekomen.

- verwerende partijen voorlopig te horen veroordelen tot stopzetting van het uitgeven en verspreiden van informatie en/of publicitaire dragers die een aanwijzing, afbeelding en/of beschrijving inhouden van de litigieuze gascilinders, of om op enigerlei wijze reclame te maken voor deze producten, onder verbeurte van een dwangsom van 100.000,00 EUR per dag of deel van een dag dat het verbod wordt geschonden.

- te horen bevelen dat het gevraagde verbod zal ophouden uitwerking te hebben indien eisende partij binnen de maand na tussenkomst van de gevraagde beschikking geen vordering ten gronde wegens octrooi-inbreuk m.b.t. EP 1 000 291 B1 heeft ingesteld.

## II. Feiten:

Eisende partij is leverancier van materialen en systemen aan de halfgeleiderindustrie; meerbepaald gas dat aangeboden wordt in een geoctrooieerde cilinder onder de merknaam VAC. Zij is titularis van het Europees octrooi nr. EP 1 000 291 B1.

Verwerende partijen zijn Belgische vennootschappen en vierde verwerende partij de Amerikaanse moedervennootschap die zich onder meer bezig houden met verkoop van industriële gassen.

Voor de door hen verkochte gassen aan de halfgeleiderindustrie (BF3 gas), waar zij een rechtstreekse concurrent van eisende partij zijn, gebruiken deze vennootschappen een eveneens geoctrooieerde gascilinder "Up Time".

Eisende partij stelt sinds kort over de nodige bewijzen te beschikken dat verwerende partijen in België gascilinders vult en commercialiseert onder de naam Up Time die prima facie inbreuk plegen op haar octrooirechten., reden waarom zij middels vordering in kortgeding de dringende en voorlopige stopzetting vordert van deze namaak.

## III. Beoordeling:

1. Vraag tot verbod van vervaardigen, laten vervaardigen, in voorraad houden, aanbieden, in het verkeer brengen gebruiken, vullen of invoeren van gascilinders Up Time

Artikel 584 Ger. W. stelt dat de voorzitter, in gevallen die hij spoedeisend acht, bij voorraad uitspraak doet in alle zaken, behalve die welke de wet aan de gerechtelijke macht onttrekt.

Voorwaarde opdat de vordering gegrond verklaard zou kunnen worden is het bestaan van urgentie.

De bewijslast terzake berust bij eisende partij.(Luik, 5 maart 1991, *J.T.* 1991, 456)

Urgentie dient strenger beoordeeld te worden naar mate de vordering meer vooruitloopt op een te verwachten bodembeslissing (anticiperende maatregel).

De gevorderde maatregel; verbod inbreuk te plegen op het Europees octrooi EP 1 000 291 B1 door het commercialiseren van gascilinders "Up Time" in afwachting van een beslissing ten gronde of deze commercialisering een inbreuk op het octrooi impliceert houdt een volledige (prima facie) beoordeling in van het al dan niet bestaan van een geldig octrooi en van de inbreuk op dit octrooi door verwerende partijen door de commercialisering van de gascilinder "Up Time", zodat in casu de urgentievoorwaarde met de nodige gestrengheid dient beoordeelt te worden.

Dit geldt des te meer nu deze beoordeling de markt van gassen voor de halfgeleiderindustrie zowel nationaal als internationaal sterk kan beïnvloeden doordat er voor bewust gas blijkbaar slechts twee spelers op de markt zijn (huidige procespartijen) en alle vulling van cilinders voor de hele wereld, wat verwerende partijen betreft, in Oevel gebeurt.
Toekenning van de door eisende partij in hoofdorde gevraagde maatregel zou het toekennen betekenen aan eisende partij van een quasi monopoliepositie, in afwachting van een beslissing ten gronde .

Gezien de noodzakelijke aanpassingen aan de installaties voor fabricatie van halfgeleiders aan de gebruikte gascilinder en meer nog de verregaande veiligheidsprocedures die gepaard gaan met het gebruik van het uiterst giftig gas, zou de toestand die geschapen wordt door toekenning van de gevraagde maatregel, in realiteit zo goed als onomkeerbaar zijn.

Rolnummer: 06-794-C                         blad 5/7                    folio nummer: 5232

Dit is enkel aanvaardbaar in het kader van voorlopige maatregelen wanneer er duidelijk urgentie is, wanneer minder ingrijpende maatregelen onvoldoende zijn om de uiterst dringende situatie te verhelpen en er redelijkerwijze geen betwisting bestaat over de rechtssituatie. (Beernaert S., Algemene principes van het civiel kort geding, *R.W.* 2001-2002,nr. 22 p.1346)

Deze voorwaarden zijn in casu niet vervuld.

De door eisende partij ingeroepen urgentie bestaat hierin dat zij door de beweerde octrooiinbreuken van Praxair een alsmaar groeiend nadeel lijdt dat moeilijk louter financieel kan gecompenseerd worden, omdat ze niet alleen winst moet derven, maar vooral ontwaarding van haar octrooirechten dreigt te leiden.

Vooreerst kan niet aangenomen worden dat eisende partij, rechtstreeks en enig concurrent van verwerende partijen wat betreft de commercialisering van bewust gas, deze niet met argusogen gevolgd heeft en niet langer dan sedert juli 2006 op de hoogte is dat de gewraakte cilinders in België gevuld en van hieruit verhandeld worden.

Er wordt niet ontkend dat de Up Time cilinders door verwerende partijen verhandeld worden sedert 2003, dat verwerende partijen reclame rond het product voerden, zich manifesteerden op vakbeurzen..., terwijl elke cilinder via het opschrift (certificaat), melding maakte van de plaats van vulling.

Het niet toestaan van de gevraagde maatregel kan tot gevolg hebben dat verwerende partijen, mocht ten gronde vastgesteld worden dat de door hen gebezigde cilinder inbreuk vormt op de octrooirechten van eisende partij, ten onrechte marktaandeel van eisende partij afsnoepen, wat gecompenseerd kan worden mits schadevergoeding.
Verwerende partijen maken deel uit van een solide internationale groep met diverse activiteiten.

Er kan niet gesteld worden dat er redelijkerwijze geen betwisting bestaat, kan bestaan over de rechtssituatie van partijen; dit is, dat de door verwerende partijen gecommercialiseerde Up Time cilinder een inbreuk vormt op de cilinder gebruikt door eisende partij die beschermd is onder octrooi nr. EP 1 000 291 B1.

Stelling van verwerende partijen is dat slechts via een recente kunstgreep (een onrechtmatige amendering van haar octrooiconclusies) eisende partij argumenten aanbrengt om haar octrooi zo te interpreteren dat ook de gascilinder Up Time hier onder zou vallen.

Het volstaat ten deze te verwijzen naar de in Amerika tussen partijen gevoerde procedure, de beslissing van 25 januari 2006 van het Koreaanse octrooibureau, de oppositieprocedure tegen het octrooi waar prima facie een ernstige argumentatie ten gronde voorligt, de beschikking na derden verzet gewezen door de beslagrechter te Antwerpen dd; 6 september 2006.

De door eisende partij in hoofdzaak gevraagde maatregel is, gezien de omstandigheden te ingrijpend en vormt geen beveiligingsmaatregel.

2. Vraag tot verbod van het voeren van publiciteit voor de gascilinders.

Partijen betwisten anderzijds niet dat er een octrooi bestaat in hoofde van eisende partij hetwelk verleend werd na onderzoek door het Europees Octrooibureau en dat de tegen dit octrooi gevoerde oppositieprocedure op zich de geldigheid van het octrooi niet aantast.
De Duitse rechter in kortgeding heeft per 1 augustus ll. de octrooirechten van eisende partij erkend, beslissing waartegen echter beroep is ingesteld.

Het past in deze omstandigheden in afwachting van het resultaat van een procedure ten gronde, de belangen van partijen bij urgentie veilig te stellen mits hun rechten zoveel mogelijk intact te laten

Er is daarom reden om verwerende partijen, onder verbeurte van een dwangsom, te verbieden, in afwachting van een beslissing te gronde, agressief op te treden teneinde verder marktaandeel van eisende partij in te palmen.


OM DEZE REDENEN

Wij, L. Lambrechts, rechter dd. Voorzitter der Rechtbank van eerste aanleg, zitting houdende te Antwerpen, zetelend in kort geding, bijgestaan door W. Mignolet, adjunct-griffier, uitspraak doende op tegenspraak.

Verklaren de vordering ontvankelijk en in de volgende mate gegrond,

Veroordelen elk der gedaagden, in afwachting dat een beslissing ten gronde zal zijn tussen gekomen, tot stopzetting van het uitgeven en verspreiden van informatie en/of publicitaire dragers die litigieuze cilinders "Up Time" voorstellen als vervangproduct van het concurrerend product van eisende partij en legt verwerende partijen verbod op op enigerlei wijze reclame te voeren voor dit product onder verbeurte van een dwangsom van 100.000,00 EUR per vastgestelde overtreding.

Zeggen voor recht dat het gevraagde verbod zal ophouden uitwerking te hebben indien eisende partij binnen de maand na tussenkomst van huidige beschikking geen vordering ten gronde wegens octrooi-inbreuk m.b.t. EP 1 000 291 B1 heeft ingesteld.

Wijzen de vordering voor het overige af bij gebrek aan rechtsmacht.

Veroordelen ieder der partij tot de door haar gemaakte kosten.

W. Mignolet                                                    L. Lambrechts

9e en laatste blad

"Lasten en bevelen dat alle daartoe gevorderde gerechtsdeurwaarders
"dit arrest, dit vonnis, deze beschikking, dit bevel of deze akte ten
"uitvoer zullen leggen;

"Dat Onze procureurs-generaal en Onze procureurs des Konings bij de
"rechtbanken van eerste aanleg daaraan de hand zullen houden en dat
"alle bevelhebbers en officieren van de openbare macht daartoe de
"sterke hand zullen bieden wanneer dit wettelijk van hen gevorderd
"wordt;

"Ten blijke waarvan dit arrest, dit vonnis, deze beschikking, dit
"bevel of deze akte is ondertekend en gezegeld met het zegel van het
"hof, de rechtbank of de notaris."

Voor eensluidende eerste grosse

afgeleverd aan:  eisende partij

ten verzoeke van: M. Beerten, gerechtsdeurwaarder

De Griffier,

R. AERTS

(Zegel van de
rechtbank)

Griffie R.E.A. Antwerpen

Datum : 31.10. 2006

Boekdeel : U.R. nr. : 24409

.7.....blz :....2.85.  €

Betaalde rechten : 19.95 €

De Griffier,

Voor eensluidend afschrift,
de Gerechtsdeurwaarder

Van Eylen M.

**INJUNCTION** pronounced at the Court House in Antwerp on **TWENTY-SIXTH of OCTOBER TWO THOUSAND AND SIX**, at the public **SUMMARY PROCEEDINGS** hearing of the court of first instance of the judicial district of Antwerp, where were sitting:

L.Lambrechts, judge, dd. President
W.Mignolet, adjunct-registrar

---

**In the case: ARK no. 06/794/C**

**ADVANCED TECHNOLOGY MATERIALS INC.,**
company under American law, with registered offices in  Danburry CT 06810 (USA), Commerce drive 7,

**CLAIMANT**
- electing domicile at the chambers of Mr. Marc Beerten, Judicial Officer in 2018 Antwerp, Balansstraat 117,
 -represented by Messrs. B.Vandermeulen and R.Peeters, Attorneys-at-Law with chambers in 1040 Brussels, Oudergemlaan 22-28

**VERSUS:**

**1. NV PRAXAIR HOLDING,**
with CBE number 0437 603 028, with registered offices in 2900 Schoten, Metropoolstraat 17,

**2. NV PRAXAIR PRODUCTION,**
with CBE number 0439 211 248, with registered offices in 2070 Zwijndrecht, Scheldedijk 58,

1

**3. NV PRAXAIR,**
with CBE number 0438 719 221, with registered offices in 2250 Olen, Lammerdries 29,

**4. PRAXAIR INC.,**
company under the law of the State of Connecticut (USA), with registered offices in Danbury Connecticut 06810-5113 (USA), on Old Ridgebury Road 39,

**DEFENDANTS**
-represented by Mr. G. Glas, Attorney-at-Law, with chambers in 1150 Brussels, Tervurenlaan 268 A;

*** 

Considering the documents in the file of the proceedings as listed in its inventory, amongst others the introductory summons dd° 19th September 2006 against the first, second and third defendants and dd° 20th September against the fourth defendant.

Considering articles 2, 30, 34, 36, 37 and 41 of the Act of 15th June 1935.

Having heard the arguments and statements of defence of the parties in the Dutch language.

*** 

**I. Object of the claim**

The claimant's claim seeks:
- to hear the defendants enjoined, by means of interim measure, from violating its European patent EP 1 000 291 B1 by manufacturing, having manufactured, having in stock, offering, bringing into circulation, using, filling, or importing, gas cylinders known as "UpTime", or any other gas cylinder with the same characteristics, subject to a penalty for non-performance of 45,000.00 EURO per individual gas cylinder which violates one of the aforementioned injunctions, and this until a decision on the merits has intervened.

-to hear the defendants provisionally ordered, subject to a fine for non-performance of 100.000,00 EURO per day or part of a day that the injunction is violated, to stop publishing and distributing any information and/or advertising which contains a sign, picture, and/or description of the litigious gas cylinders, or to publicize these products in any way;

-to hear the court rule that the injunction sought will expire if the claimant has not filed a suit on the merits on grounds of a patent infringement in relation to EP 1 000 291 B1, within one month from the intervening decision having been made;

## II. Facts:

The claimant is a supplier of materials and systems to the semiconductor industry; more specifically gas which is sold in a patented cylinder under the trade mark VAC. They are the holder of European patent no. EP 1 000 291 B1.

The defendants are Belgian companies and the fourth defendant is the American parent company which is amongst others involved in the sale of industrial gasses.

For the gasses sold by them to the semiconductor industry (BF3 gas), in which they are a direct competitor of the claimant, these companies use an "UpTime" gas cylinder, which has also been patented.

Claimant argues that, of late, they have obtained the necessary evidence to demonstrate that the defendants fill and commercialize gas cylinders in Belgium under the brand name UpTime which prima facie infringe their patent rights, reason why they seek the urgent and preliminary cessation of this counterfeiting in summary proceedings.

## III. Judgment:

1. Request for an injunction on the manufacturing, having manufactured, stocking, offering, bringing into circulation, filling, or importing of UpTime gas cylinders

3

Art. 584 of the Judicial Code stipulates that the president pronounces a provisional judgment in all cases he deems urgent, except in those which are withdrawn from the judiciary by law.

Urgency is a prerequisite to have the claim pronounced well founded.

The burden of proof rests on the claimant. (Liège, 5th March 1991, *J.T.* 1991, 456)

The more the claim anticipates an expected decision on the merits, the more stringently the urgency must be assessed (anticipative measure).

The measure sought; an injunction on the violation of European patent EP 1 000 291 B1 through the commercialization of "UpTime" gas cylinders pending a decision on the merits on whether this commercialization constitutes a patent violation, implies a complete (prima facie) assessment of the existence or non-existence of a valid patent and of the violation of this patent by the defendants through the commercialization of the "UpTime", gas cylinder so that in the present case the urgency condition must be assessed with the necessary stringency.

This reasoning is all the more warranted as this judgment may strongly influence the gas market for the semiconductor industry both nationally and internationally, as for said gas there only seem to be two players on the market (present parties to the proceedings) and all the filling of cylinders for the entire world, as far as the defendants are concerned, takes place in Oevel.
Acceding to the claimant's principal claim would mean granting the claimant a quasi-monopoly position, pending a decision on the merits.

Considering the necessary adjustments to the installations for the production of semiconductors to the gas cylinder used, and moreover the far-reaching safety procedures involved in the use of the highly toxic gas, would, in reality, make the situation which would be created by acceding to the measure sought, almost irreversible.

4

This is only acceptable within the framework of interim measures where urgency is clearly of the issue, when less radical measures are insufficient to remedy the extremely urgent situation and when there is no reasonable contestation about the legal circumstances. (Beernaert S., Algemene principes van het civiel kort geding [General principles of civil summary proceedings], *R.W.* 2001-2002, no. 22 p. 1346)

These requirements are not fulfilled in casu.

The urgency invoked by the claimant consists in the fact that they are suffering ever-increasing losses due to the alleged patent infringements from Praxair, which can hardly only be compensated financially, as they are not only forced to incur a loss of profit, but, as this may especially lead to a devaluation of their patent.

First of all, it cannot be accepted that the claimant, the direct and only competitor of defendants as far as the commercialization of the gas in question is concerned, has not followed them with Argus' eyes and has only become aware of the fact that the contested cylinders are being in filled in Belgium and distributed from here since July 2006.

It is not disputed that the UpTime cylinders have been commercialized by the defendants since 2003, that the defendants advertised the product, that they were present at trade fairs…, while each cylinder via the inscription (certificate), mentioned the place of filling.

Not acceding to the measure sought may, if a decision on the merits would establish that the cylinders constitute an infringement on the claimant's patent, result in the defendant wrongfully stealing market share from the claimant, which can be compensated by damages.
Defendants are part of a solid international group with diverse activities.

It can not be claimed that there is no or that there can be no reasonable dispute about the legal circumstances of the parties; i.e., that the UpTime cylinders commercialized by the defendants, constitute an infringement on the cylinder used by the claimant which is protected by patent no. EP 1 000 291 B1.

It is the position of the defendants that it is through a recent trick (an illegitimate amendment to its patent claims) that the claimant submits arguments to interpret its patent in such a way that also the UpTime gas cylinder are included.

In this regard it is sufficient to refer to the proceedings conducted between parties in the United States, the decision of the Korean patent office of 25th January 2006, the opposition proceedings against the patent in which prima facie a serious argumentation on the merits is submitted, the ruling dd. 6th September 2006 by the Distraint Judge in Antwerp rendered after third-party opposition proceedings.

The measure sought by the claimant in the principal claim is, given the circumstances, too radical and does not constitute a safety measure.

2. Request for an injunction on the advertising of the gas cylinders.

On the other hand, parties do not dispute the existence of the claimant's patent which was granted after an examination by the European Patent Office and that the opposition proceedings against this patent do not affect the validity of the patent as such.
On 1st August last, the German judge ruling in summary proceedings did recognize the claimant's patent, however, this judgment is being appealed.

Pending the outcome of proceedings on the merits, it is appropriate to safeguard the interests of the parties as a matter of urgency, while leaving their rights as intact as possible.

Therefore, there is reason to prohibit the defendants, under penalty of a fine for non-performance, pending a decision on the merits, from acting in an aggressive manner in order to grab a further market share from the claimant.

FOR THESE REASONS

We, L. Lambrechts, Judge dd. President of the Court of First Instance, sitting in Antwerp, in summary proceedings, assisted by W. Mignolet, deputy-registrar, ruling after both parties have been heard.

6

Pronounce the claim admissible and well founded to the following extent,

Order each one of the defendants, pending an intervening decision on the merits, to stop publishing and distributing information and/or advertising which present the litigious "UpTime" cylinders as a replacement product for the claimant's competing product and enjoin the defendants from making publicity for this product in any way, subject to a fine for non-performance of 100,000.00 EURO per violation established.

Rule in law that the injunction sought will no longer be effective if the claimant, within a month from the intervening present ruling, has not filed an action on the merits for patent infringement in relation to EP 1 000 291 B1.

Dismiss the remainder for lack of jurisdiction.

Order each party to bear their own procedural costs.

W. Mignolet                                          L. Lambrechts

Certified a true translation from Dutch into English,
Luc VANPARIJS, Sworn Translator at the Court of
First Instance, Leuven (Belgium)
Linden, 14th March 2008

Luc VANPARIJS
Sworn Translator
Kortrijkstraat 154
3210 LINDEN

7

# EXHIBIT D

24/11 '06 17:51 FAX +32 3 2160587 _____ JENNES-BEHAEGHEL-DE NEEF                    ☑002



**F. JENNES, J. BEHAEGHEL, P. DE NEEF**
**GERECHTSDEURWAARDERS BV.-BVBA**
**Amerikalei 15 – 2000 ANTWERPEN**
Kantoor open van 9 tot 12 uur & van 14 tot 17 uur
E-MAIL : studie@gdwjdb.be - KBO Nr. 0.443.756.489

Tel.      03 / 238.39.66
Fax.     03 / 216.05.87
KBC    403-3049311-92
PCR :   000-1093961-92
KBC Nederland: 063.31.41.429



blad 1

23/11/08 eb

*DEMANDE* AUX FINS DE SIGNIFICATION OU DE NOTIFICATION A L'ETRANGER D'UN ACTE
JUDICIAIRE OU EXTRAJUDICIAIRE

**REQUEST** FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS

A06-04410

Referentie:

JDB-90126

*Convention relative à la signification et à la notification à l'étranger des*
*actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée*
*à La Haye le 15 novembre 1965,*
Convention on the service abroad of judicial and extrajudicial documents in
civil or commercial matters, signed at The Hague, the 15th November 1965,

*Identité et adresse du requérant*        **Identity and address of the applicant**
*Adresse de l'autorité destinataire*       **Adress of receiving authority**

**Peter DE NEEF**                          **PROCESS FORWARDING INTERNATIONAL**
**a bailiff**                              **910 5ᵗʰ Avenue**
**Amerikalei 15**                          **SEATTLE WA 98104**
**2000   ANTWERP**                         **USA**
**BELGIUM**

*Le requérant soussigné a l'honneur de faire parvenir - en double exemplaire à*
*l'autorité destinataire les documents ci-dessous énumérés, en la priant*
*conformément à l'article 5 de la Convention précitée, d'en faire remettre sans*
*retard un exemplaire au destinataire, à savoir (identité et adresse)*
The undersigned applicant has the honour to transmit - in duplicate - the
documents listed below and, in conformity with article 5 of the above-
mentioned Convention, requests prompt service of one copy thereof on the
adressee, i.e. (Identity and adresse)
ADVANCED TECHNOLOGY MATERIALS INC., 06810 Danbury, Connecticut, USA. Commerce
Drive 7, .

a) *selon les formes légales (article 5, alinéa premier, lettre a)* 
a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of
article 5 of the Convention*

b) ~~selon la forme particulière suivante (article 5, alinéa premier, lettre b)~~* b) ~~in~~
~~accordance with the following particular method (sub-paragraph (b) of the first~~
~~paragraph of article 5)~~*

c) le cas échéant, par remise simple (article 5, alinéa premier, lettre b)*
c) ~~by delivery to the adressee, if he accepts it voluntarily (second paragraph of~~
~~article 5)~~*

*Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un*
*exemplaire de l'actre - et de ses annexes * avec l'attestation figurant au*
*verso.*
The authority is requeates to return or to have returned to the applicant a
copy of the documents - and of the annexes * - with a certificate as provided
on the reverse side.

List of documents
Writ of Summons

                          Done at Antwerp the 24ᵗʰ of November 2006

                          signature and/or stamp

        * Delete if inappropriat

blad 2

## ELEMENTS ESSENTIELS DE L'ACTE

## SUMMARY OF THE DOCUMENT TO BE SERVED

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires et extrajudicaires en matière civile ou commerciale, signée à La Haye, le 15 novembre 1965*
*Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters, signed at the Hague, the 15th november 1965.*

**(article 5, alinea 4)**
**(article 5, fourth paragraph)**

**Nom et adresse de l'autorité requérante**
**Name and address of the requesting authority**

**Peter DE NEEF, a bailiff, Amerikalei 15, 2000 Antwerp, Belgium,**

**Identité des parties\***
**Particulars of the parties**

**PRAXAIR HOLDING N.V. and others // ADVANCED TECHNOLOGY MATERIALS Inc.,**
**06810 Danbury, Connecticut, USA, Commerce Drive 7,**

### ACTE JUDICIAIRE\*\*
### JUDICIAL DOCUMENT \*\*

*Nature et objet de l'acte*
**Nature and purpose of the document**
**Writ of Summons,**

*Nature et objet de l'instance, le cas échéant, le montant du litige :*
**Nature and purpose of the proceedings and, where appropriate, the amount in dispute :**

*Date et lieu de la comparution\*\* :*
**Date and place for entering appearance\*\* :**
**the 30th of November 2006**

*Juridiction qui a rendu le décision\*\**
**Court which has given judgment\*\* :**
**Court of First Instance at Antwerp,**

*Date de la decision\*\*:*
**Date of judgment\*\* :**
**22/11/2006**

*Indication des délais figurant dans l'acte\*\**
**Time limits stated in the document\*\* :**

### ACTE EXTRAJUDICIAIRE\*\* EXTRAJUDICIAL DOCUMENT\*\*

*Nature et objet de l'acte :*
**Nature and purpose of the document :**

*Indication des délais figurant dans l'acte\*\**
**Time limits stated in the document\*\* :**

\* *S'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte*
\* If appropriate, identity and address of the person interested in the transmission of the document

\*\* *Rayer les mensions inutiles*
\*\* Delete if inappropriate

blad 3

## ATTESTATION

### CERTIFICATE

*L'autorité soussigné a l'honneur d'attester conformément à l'article 6 de ladite Convention.*
The undersigned authority has the honour to certify, in conformity with article 6 of the Convention

1) *Que la demande a été éxécuté*
1) That the document has been served*
   *le (date)*
   .........................................................................
   the (date)
   .........................................................................
-  *à (localité, rue, numéro)*
   .........................................................................
-  at (place, street, number)
   .........................................................................

- *dans une des formes suivantes prévues à l'article 5 :*
- in one of the following methods authorised by article 5 :
*a) selon les formes légales (article 5, alinée premier, lettre a)*
a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of
article 5 of the Convention*
*b) selon la forme particulière suivante* :*
.........................................................................
b) in accordance with the following particular method* :
.........................................................................
*c) par remise simple **
c) by delivery to the adressee, who accepted it voluntarily*

*Les documents mentionnés dans la demande ont été remis à :*
The documents referred to in the request have been delivered to :
-  *(identité et qualité de la personne)*
   .........................................................................
-  - (identity and description of person)
   .........................................................................
-  *-liens de parenté, de subordination ou autres, avec le destinaire de l'acte*
   .........................................................................
- relationship to the adressee (family, business or other)
.........................................................................

2) *Que la demande n'a pas été exécutée, en raison des faits suivants*
2) That the document has not been served, by reason of the following acts*:
.........................................................................
.........................................................................
.........................................................................

*Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de
payer ou de rembourser les frais dont le détail figure au mémoire ci-joint*
 In conformity with the second paragraph of article 12 of the Convention, the applicant
is requested to pay or reimburse the expenses detailed in the attache statement

*Annexes*
Annexes

*Pièces renvoyées*
Documents returned

                                        *Fait à*              , *le*
                                        Done at              , the

                                        *signature et/ou cachet*
                                        signature and/or stamp

*Le cas échéant, les documents justificatifs de l'éxécution*
n approchiate cases, documents establishing the service

*Rayer les mentions inutiles*
* Delete if inappropriate



**F. JENNES, J. BEHAEGHEL, P. DE NEEF**
**GERECHTSDEURWAARDERS BV.-BVBA**
Amerikalei 15 – 2000 ANTWERPEN
Kantoor open van 9 tot 12 uur & van 14 tot 17 uur
E-MAIL : studie@edwidb.be - KBO Nr. 0.443.756.489

| | |
|---|---|
| Tel. | 03 / 238.39.66 |
| Fax. | 03 / 216.05.87 |
| KBC | 403-3049311-92 |
| PCR : | 000-1093961-92 |

KBC Nederland: 063.31.41.429



23/11/06 eb

blad 1

# DAGVAARDING IN KORT GEDING

A06-04410

Referentie:

JDB-90126

Het jaar tweeduizend en zes, op vier en twintig november,

OP VERZOEK VAN :

1. De naamloze vennootschap **PRAXAIR HOLDING**, met maatschappelijke zetel aan de Metropoolstraat nr. 17 te 2900 Schoten, met ondernemingsnummer 0437.603.028,

2. De naamloze vennootschap **PRAXAIR**, met maatschappelijke zetel aan de Lammerdries 29, te 2250 Olen, met ondernemingsnummer 0438.719.221, in eigen naam en tevens in haar hoedanigheid van rechtsopvolgster van NV Praxair Production, destijds met maatschappelijk zetel te 2070 Zwijndrecht, Scheldedijk 58 en ondernemingsnummer 0439 211 248, van dewelke NV Praxair alle rechten en verplichtingen heeft overgenomen ingevolge fusie door overneming van het volledig actief en passief vermogen bij beslissingen van de buitengewone algemene vergaderingen van NV Praxair Production resp. van NV Praxair beide van 31 augustus 2006; en

3. De vennootschap naar het recht van de staat Connecticut (USA) **PRAXAIR Inc.** met maatschappelijke zetel aan Old Ridgebury Road, 39, te 06810-5113 Danbury, Connecticut (V.S.A),

Allen vertegenwoordigd door Meester **Geert GLAS**, advocaat te Brussel en kantoor houdende te 1150 Brussel, Tervurenlaan 268A, en Meester **Filip VAN ELSEN**, advocaat te Antwerpen en kantoor houdende te 2600 Antwerpen, Uitbreidingstraat 80;

**MOTIVERING:**

1.    Overwegende dat de Heer Voorzitter van de Rechtbank van Eerste Aanleg te Antwerpen, zetelend in kort geding, bij beschikking van 26 oktober 2006 inzake ARK nr. 06/794/C, de voorlopige maatregelen zoals door gedaagde bij dagvaarding in kortgeding van 19 september 2006 gevorderd op basis van haar Europees Octrooi EP 1 000 291 B1, deels heeft toegekend;

Dat de Heer Voorzitter de vordering van gedaagde om verzoeksters een verbod op te leggen tot het vervaardigen, laten vervaardigen, in voorraad houden, aanbieden, in het verkeer brengen, gebruiken, vullen of invoeren van UpTime gascilinders, afwees omdat de voorwaarden vervat in artikel 584 Ger. W. voor de toekenning van de aldus gevorderde maatregel niet zijn vervuld;

Dat de heer Voorzitter met name (onder meer) oordeelde dat er redelijkerwijze betwisting bestaat over de rechtssituatie van partijen, meer bepaald of de door gedaagden gecommercialiseerde UpTime cilinder een inbreuk vormt op het octrooi nr. EP 1 000 291 van gedaagde;

blad 2

2.      Overwegende dat het de Heer Voorzitter, niettegenstaande deze betwisting, wel gepast voorkwam om verzoeksters *"te veroordelen tot stopzetting van het uitgeven en verspreiden van informatie en/of publicitaire dragers die litigieuze cilinders "Up Time" voorstellen als vervangproduct van het concurrerend product van eisende partij, en appellanten een verbod op te leggen om op enigerlei wijze reclame te voeren voor dit product onder verbeurte van een dwangsom van EUR 100,000.00 per vastgestelde overtreding";*

Dat het motiverend gedeelte van de beschikking duidelijk aantoont dat de Heer Voorzitter aldus wou voorkomen dat verzoeksters, in afwachting van het resultaat van een procedure ten gronde, agressief zouden optreden teneinde verder marktaandeel van gedaagde in te palmen;

3.      Overwegende dat de rechtspositie van de partijen in de Duitse procedure kennelijk door de Heer Voorzitter van groot belang werd geacht voor het opleggen van deze voorlopige maatregel;

Dat de Heer Voorzitter deze maatregelen inderdaad verantwoorde door *expressis verbis* te wijzen naar "de Duitse rechter in kort geding", die "per 1 augustus ll. de octrooirechten van eisende partij had erkend";

Dat de Heer Voorzitter het daarom wenselijk vond om, middels de opgelegde maatregelen de belangen van partijen veilig te stellen;

4.      Overwegende dat zich precies in de procedure voor de Duitse Rechtbank recent een zeer belangrijke ontwikkeling heeft voorgedaan die een veel preciser en meer waarheidsgetrouw licht werpen op de door gedaagde ingeroepen octrooirechten;

Dat inderdaad het Landgericht te Dusseldorf in een vonnis uitgesproken op 9 november 2006 heeft besloten om de vordering van gedaagde om (onder meer) derde verzoekster te veroordelen wegens inbreuk op conclusie 1 van EP 1 000 21 B1 formeel op te schorten tot het EPO zich zal hebben uitgesproken in de tegen dit octrooi van gedaagde lopende oppositieprocedure, omdat het met name omdat er een grote waarschijnlijkheid bestaat dat de betreffende conclusie 1 geen stand zal houden (zie stuk nr. 1);

Dat het Landgericht in Düsseldorf als volgt besloot:

*"Die Verhandlung wird, soweit die Klage auf eine Verletzung des Patentanspruchs 1 gestützt ist [Klageantrag zu I.1.a und darauf rückbezogene Klageanträge zu I.2. und II.]. bis zur Entscheidung der Einspruchsabteilung des Europäischen Patentamtes über den Einspruch gegen das Klagepatent [EP 1 000 291]."*

[Eigen vertaling:]

*"De behandeling van de zaak wordt opgeschort, in zoverre de rechtsvordering op een schending van octrooiconclusie 1 gesteund is [vordering tot klacht I.1.a en vorderingen tot klacht I.2. en II. die daarop betrekking hebben], tot de beslissing [is uitgesproken] van de oppositieafdeling van het Europees Octrooibureau betreffende het verzet tegen het octrooi waarop de rechtsvordering is gesteund (EP 1 000 291)."*

blad 3

En deze beslissing als volgt motiveerde:

> *"Nach Ansicht der Kammer besteht eine hohe Warscheinlichkeit, dass das europäische Klagepatent im Umfang des Patentanspruhs 1 in der erteilten Fassung im anhängigen Einspruchsverfahren widerrufen wird, weil sein Gegenstand über den Inhalt der Anmeldung in der ursprünglich eingerichten Fassung hinausgeht, Art. 100 c) i.V.m. Art. 83 EPÜ. Die von der Kammer im Urteil vom 1.8.2006 (4a O 455/05) insoweit vertretene Auffassung wird nicht mehr aufrecht erhalten."*

[Eigen vertaling:]

> *"Volgens de kamer [van het Landgericht] bestaat een grote waarschijnlijkheid dat conclusie 1 van het Europese octrooi, waarop de rechtsvordering gesteund is in de aanhangige verzetsprocedure, wordt herroepen, omdat het voorwerp ervan verder reikt dan de inhoud van de aanmelding in de oorspronkelijk ingediende versie, art. 100 c) juncto art. 83 EPÜ. Het door de kamer [van het Landgericht] in haar vonnis van 1.8.2006 in dit opzicht vertolkte standpunt wordt niet langer gehandhaafd."*

Dat de Duitse rechtbank het aldus aangewezen vond om de oppositieprocedure voor het Europees Octrooibureau af te wachten vooraleer aan dit octrooi enigerlei verregaande conclusies te verbinden, en aldus de eerder op 1 augustus 2006 uitgesproken voorlopige maatregelen expliciet teniet deed;

Dat het Landgericht eveneens, doch in een afzonderlijk vonnis gewezen op 9 november 2006, oordeelde dat derde verzoekster zich <u>niet</u> schuldig maakt aan een inbreuk op conclusie 14 van het ingeroepen octrooi (zie stuk nr. 2);

5.    Overwegende dat de uitspraken van 9 november 2006 aantonen dat thans ook de Duitse rechter zich op het standpunt stelt dat er gewichtige redenen zijn om de geldigheid van het ingeroepen octrooi van gedaagde te betwisten;

Dat aldus de schijn van rechten van gedaagde nu zeker niet langer voldoende vaststaat (Cass., 31 januari 1997, Arr. Cass., 1997, 140 n° 56);

Dat ook de juridische argumentatie en strategie van gedaagde staat of valt met het welslagen van haar juridische stappen in Duitsland, zodat er geen twijfel over bestaat dat deze evolutie een belangrijk nieuw licht werpt op het geschil;

Dat ook de door gedaagde ingeleide procedure in kort geding volledig was gebaseerd op een (vermeende) inbreuk op dezelfde conclusie 1 van hetzelfde octrooi EP 1 000 291 B1, zoals op 9 november 2006 nu door het Duitse Landgericht op zijn minst tijdelijk aan de kant geschoven;

6.    Overwegende dat overweging 16 van de Verordening (EG) nr. 44/2001 van de Raad van 22 december 2000 betreffende de rechterlijke bevoegdheid, de erkenning en de tenuitvoerlegging van beslissingen in burgerlijke en handelszaken (EEX-Verordening) bepaalt *"dat het op grond van het wederzijds vertrouwen in de rechtsbedeling gewettigd is de in een lidstaat gegeven beslissingen van rechtswege te erkennen zonder dat daarvoor, behoudens bij betwisting, nog een procedure moet worden gevolgd"*;

Dat de Voorzitter in kort geding, in de beschikking van 26 oktober 2006, in de geest van voormelde overweging 16 van de EEX-Verordening, de beslissing van de Duitse kortgedingrechter van 1 augustus 2006 uitdrukkelijk in overweging heeft genomen bij het (gedeeltelijk) toekennen van de door gedaagde geëiste voorlopige maatregelen;

blad 4

Dat de Voorzitter het aldus vermag, in zijn oordeel over de (verdere) opportuniteit van de opgelegde en vérstrekkende voorlopige maatregelen, zich naar de inmiddels op 9 november 2006 door het Landgericht te Düsseldorf gevelde vonnissen, te richten;

Dat, ingevolge deze recente vonnissen van het Landgericht van Düsseldorf van 9 november 2006, de omstandigheden derwijze fundamenteel gewijzigd zijn, dat de voorlopige maatregel zoals bevolen door de beschikking van 26 oktober 2006 achterhaald is zodat, bij wijze van nieuwe voorlopige maatregel, het hierna gevorderde zich opdringt;

7.    Overwegende dat de bij onderhavige dagvaarding gevorderde maatregel hoogdringend is, gelet op enerzijds het uiterst recent karakter van de uitspraken van het Landgericht in Düsseldorf en anderzijds het grote en acute risico dat gedaagde, door een abusievelijke en foutieve interpretatie van de beschikking van 26 oktober 2006, deze beschikking zal aangrijpen om lastens verzoeksters dwangsommen op te vorderen die de activiteiten van verzoeksters dreigen te verlammen;

Aangezien bij beschikking verleend op verzoekschrift door de Voorzitter van de rechtbank van eerste aanleg van Antwerpen, op twee en twintig november tweeduizend en zes, verzoekende partijen gemachtigd werden om hiernagedaagde te dagvaarden tegen de hiernavermelde zitting, en van welke verzoekschrift en beschikking kopie aan huidig exploot wordt gehecht,

Ik ondergetekende (Frans JENNES)  *lee,*    Peter DE NEEF·
Gerechtsdeurwaarder met standplaats te Antwerpen,
er kantoorhoudende Amerikalei 15

HEB  GEDAGVAARD:

de vennootschap naar Amerikaans Recht  **ADVANCED TECHNOLOGY MATERIALS INC;**
waarvan de zetel gevestigd is te 06810 Danbury, Connecticut, V.S.A., Commercre Drive 7,

- *doende deze betekening zoals hierna vermeld*

Om te verschijnen voor de **VOORZITTER VAN DE RECHTBANK VAN EERSTE AANLEG VAN ANTWERPEN**, zetelend **IN KORT GEDING** die zetelt in het gewoon lokaal der zittingen in het Gerechtsgebouw van Antwerpen, zaal F1, Bolivarplaats 20 te Antwerpen, om negen uur dertig in de voormiddag, op **DONDERDAG DERTIG NOVEMBER TWEEDUIZEND EN ZES**

ten einde :

**OM DEZE REDENEN,**

De beschikking van de Voorzitter van de Rechtbank van Eerste Aanleg te Antwerpen van 26 oktober 2006 inzake ARK 06/794/C te zien en te horen intrekken;

Gedaagde zich te zien en te horen veroordelen tot alle kosten van het geding, met inbegrip van de wettelijke rechtsplegingsvergoeding;

blad 5

De tussen te komen beschikking uitvoerbaar te horen verklaren bij voorraad, niettegenstaande elke voorziening, zonder borgstelling en met uitsluiting van het vermogen tot kantonnement,

En opdat de geadresseerde hiervan niet onwetend zou zijn, doch aangezien hij gedomicilieerd is in de Verenigde Staten van Amerika en aangezien mij van hem geen verblijfplaats noch gekozen woonplaats in België bekend is, zo heb ik ondergetekende en meergemelde gerechtsdeurwaarder,

> *krachtens het Internationaal Verdrag inzake de betekening en de kennisgeving in het buitenland van gerechtelijke en buitengerechtelijke stukken in burgerlijke zaken en in handelszaken, gesloten te 's-Gravenhage op 15 november 1965 (goedgekeurd bij wet van 24 januari 1970 - Belgisch Staatsblad 9 februari 1971), ten aanzien van de Verenigde Staten van Amerika in werking getreden op 10 februari 1969,*

overgemaakt, onder aangetekende omslag, heden afgegeven op het postkantoor te ANTWERPEN,

1°    een behoorlijk in het Engels ingevulde aanvraag, overeenstemmend met het als bijlage aan dit Verdrag toegevoegd modelformulier,

2°    twee kopieën van onderhavig exploot (alsmede van de stukken erin vermeld), elke kopie van het exploot vergezeld
     a) van een formulier, opgesteld in het Engels, dat aard en onderwerp van het gerechtelijk stuk weergeeft,
     b) van een vertaling in het Engels,

3°    het alles vergezeld van de som van $ US 95,

aan volgende door de Verenigde Staten van Amerika aangewezen firma, alléén bevoegd om te handelen in naam van de centrale Autoriteit, m.n.

**Process Forwarding International**
**910 5th Avenue**
**SEATTLE, WA 98104**
**USA**

deze laatste verzoekende

1°    één exemplaar van dit exploot, vermelde sub 2° supra, vergezeld van het formulier dat aard en onderwerp van het gerechtelijk stuk weergeeft en van de vertaling, te doen betekenen aan

ADVANCED TECHNOLOGY MATERIALS Inc.
Commerce Drive 7
06810 DANBURY
CONNECTICUT, V.S.A.

**met inachtneming van de vormen, in de wetgeving van de aangezochte Staat voorgeschreven voor de betekening of de kennisgeving van stukken, die in dat land zijn opgemaakt en bestemd zijn voor zich aldaar bevindende personen, m.n. BIJ TOEPASSING VAN ARTIKEL 5, LID 1, LITT. A VAN OPGEMELD VERDRAG,**

blad 6

2°    mij het andere exemplaar te retourneren, vergezeld van de verklaring voorzien bij artikel 6 van dit Verdrag, behelzende dat aan de aanvraag uitvoering is gegeven, vermeldende tevens de vorm waarin, de plaats waar en het tijdstip waarop dit is geschied, alsmede de persoon aan wie het stuk is afgegeven of, in voorkomend geval, de omstandigheden vermeldend die de uitvoering van de aanvraag hebben belet.

| | |
|---|---|
| VR | 107,01 |
| KOP | 42,80 |
| VACB | 9,65 |
| RINL | 6,01 |
| ROLG | 60,69 |
| RS | 8,57 |
| | ------ |
| | 234,73 |
| UINL | 4,96 |
| ZEG | 20,00 |
| REG | 25,00 |
| PLZ | 3,70 |
| ROLZ | 69,50 |
| PORT | 32,00 |
| | ------ |
| | 155,16 |
| | ------ |
| | 389,89 |
| UVRT | 448,31 |
| | ------ |
| | 838,20 |

En aangezien artikel 10 van voorschreven Verdrag onverlet laat de bevoegdheid gerechtelijke stukken rechtstreeks over de post toe te zenden aan zich in het buitenland bevindende personen, tenzij de Staat van bestemming zich hiertegen verzet - quod non -zo heb ik tevens een kopie van onderhavig exploot (alsmede van de stukken erin vermeld), vergezeld van een formulier dat aard en onderwerp van het stuk weergeeft, en van een vertaling in het Engels, onder aangetekende omslag met bericht van ontvangst, verzonden naar het adres van de belanghebbende, mijn exploot doende op voorschreven postkantoor.

En de ontvangstbewijzen van deze aangetekende zendingen heb ik aan het origineel van onderhavig exploot gehecht.

Waarvan akte, datum als boven;

Kost : achthonderd acht en dertig euro twintig cent,

rolrecht inbegrepen, en eventueel te vermeerderen met de kosten van aangetekende zending(en) zijnde 4,82 EUR per afwezige partij,

14,25  EUR

UIT nr 610

zesende bladen

WIJ, ALBERT II, KONING DER BELGEN,

AAN ALLEN, DIE NU ZIJN EN HIERNA WEZEN ZULLEN
DOEN TE WETEN :

eerste blad

*824*

ARV  06/5931/B                    VERKORTING TERMIJN DAGVAARDEN

- B E S C H I K K I N G -

Wij, F.Van de Merckt, Ondervoorzitter dd. Voorzitter van de rechtbank van eerste aanleg zitting houdend te Antwerpen, bijgestaan door C. Croon , Griffier.

Gelet op de artikelen 2 en 41 van de wet van 15 juni 1935 op het gebruik der talen in gerechtszaken.

Gezien het hieraangehecht verzoekschrift, ingediend op 22 november 2006 door Mr. G. Glas, advokaat te Brussel, en door Meester F. Van Elsen, advokaat te Antwerpen, handelend voor de verzoekende partijen en de redenen erin aangehaald.

Recht sprekend na behandeling en beraad in raadkamer.

Gelet op de artikelen 55.3°, 708 en 1035 van het Gerechtelijk Wetboek.

MACHTIGEN de verzoekende partijen de in het verzoekschrift aangehaalde verwerende partij te dagvaarden voor de Voorzitter van de Rechtbank van eerste aanleg te Antwerpen, zetelende in kortgeding, voor de zitting van 30 november 2006, mits de dagvaarding te betekenen ten laatste op 24 november 2006 voor 20 uur.

Leggen verzoekende partijen de verplichting op de tekst van de dagvaarding aan verwerende partij en aan haar raadsman in België ter kennis te brengen  per e-mail of per fax op datum van het exploot en een kopie van deze mail of fax aan de dagvaarding te hechten.

Gegeven te Antwerpen, in raadkamer, op tweeentwintig november tweeduizend en zes, te 11.25 uur.

De Griffier.                                    De dd. Voorzitter,

C. Croon.                                       F. Van de Merckt.



24/11 '06 17:55 FAX +32 3 2160587    JENNES-BEHAEGHEL-DE NEEF    @013



GEZIEN
Antwerpen  22. 11. 2006
De Griffier

SzGS    06| 5931|3

**VERZOEKSCHRIFT TOT VERKORTING DAGVAARDINGSTERMIJN
KORT GEDING (ARTIKEL 708 GER.W.)**

Aan de Voorzitter
van de Rechtbank van Eerste Aanleg
te Antwerpen

Geven U met eerbied te kennen,

1.    De naamloze vennootschap **Praxair Holding NV**, met maatschappelijke zetel aan de
      Metropoolstraat 17 te 2900 Schoten, met ondernemingsnummer 0437.603.028,

2.    De naamloze vennootschap **Praxair NV**, met maatschappelijke zetel aan de Lammerdries 29 te 2250
      Olen, met ondernemingsnummer 0438.719.221, in eigen naam en tevens in haar hoedanigheid van
      rechtsopvolgster van NV Praxair Production, destijds met maatschappelijk zetel te 2070 Zwijndrecht,
      Scheldedijk 58 en ondernemingsnummer 0439 211 248, van dewelke NV Praxair alle rechten en
      verplichtingen heeft overgenomen ingevolge fusie door overneming van het volledig actief en
      passief vermogen bij beslissingen van de buitengewone algemene vergaderingen van NV Praxair
      Production resp. van NV Praxair beide van 31 augustus 2006; en

3.    De vennootschap naar het recht van de staat Connecticut (V.S.A.) **Praxair Inc.**, met
      maatschappelijke zetel aan Old Ridgebury Road, 39, te 06810-5113 Danbury, Connecticut (V.S.A.),

Alle vertegenwoordigd door Meester **Geert Glas**, advocaat te Brussel en kantoor houdende te 1150 Brussel,
Tervurenlaan 268A, en Meester **Filip Van Elsen**, advocaat te Antwerpen en kantoor houdende te 2600
Antwerpen, Uitbreidingstraat 80;

Dat verzoeksters het voornemen hebben om bij hoogdringendheid een dagvaarding in kort geding uit te
brengen voor de Voorzitter van de Rechtbank van Eerste Aanleg te Antwerpen, zetelend in kort geding,
tegen:

de vennootschap naar Amerikaans recht **Advanced Technology Materials Inc.**, met zetel aan de Commerce
Drive nr. 7, te 06810 Danbury, Connecticut, V.S.A.,

strekkende tot intrekking van een beschikking in kort geding, op tegenspraak gewezen door de Voorzitter
van de Rechtbank van Eerste Aanleg te Antwerpen in kort geding op 26 oktober 2006 (ARK 06/794/C) op
dagvaarding van voormelde vennootschap Advanced Technology Materials Inc. (ATMI) waarbij
verzoeksters, in afwachting van een beslissing ten gronde omtrent beweerde octrooirechten van ATMI,
verbod werd opgelegd tot *"het uitgeven en verspreiden van informatie en/of publicitaire dragers die
litigieuze cilinders "UpTime" voorstellen als vervangproduct van het concurrerend product van (ATMI) en
(...) op enigerlei wijze reclame te voeren voor dit product onder verbeurte van een dwangsom van
100 000,00 EUR per vastgestelde overtreding"*;

3 e blad


Dat de beweerde octrooirechten die door ATMI werden ingeroepen om voormelde voorlopige maatregel te bekomen met de beschikking van 26 oktober 2006, grotendeels gesteund waren op een, voor ATMI gunstige, beslissing van de Duitse kortgedingrechter van 1 augustus 2006;

Dat deze Duitse beslissing in kort geding van 1 augustus 2006 echter recent werd rechtgezet door twee uitspraken van het Landgericht van Düsseldorf geveld op 9 november 2006, waarin geoordeeld werd dat een hoge waarschijnlijkheid bestaat dat conclusie 1 van het litigieuze (door ATMI ingeroepen) octrooi EP 1 000 291 B1 in zijn huidige draagwijdte niet heelhuids door de in Duitsland hangende oppositieprocedure zal geraken, resp. dat Praxair Inc. zich niet schuldig maakt aan een inbreuk op conclusie 14 van het ingeroepen octrooi;

Dat de recente uitspraken van het Landgericht van Düsseldorf van 9 november 2006, de omstandigheden die gekend waren ten tijde van de beschikking van 26 oktober 2006, derwijze fundamenteel gewijzigd hebben, dat de voorlopige maatregel zoals bevolen door de beschikking van 26 oktober 2006 achterhaald is, zodat bij wijze van nieuwe voorlopige maatregel, de beschikking van 26 oktober 2006 dient ingetrokken;

Dat zulks des te meer hoogdringend is, nu ATMI op abusievelijke en malafide wijze de beschikking van 26 oktober 2006 ten onrechte interpreteert en toepast als een volledig reclameverbod, en in dit verband op onrechtmatige, tergende en roekeloze wijze dwangsommen opvordert; dat deze onrechtmatige handelwijze van ATMI de activiteiten van verzoeksters dreigt te verlammen;

Dat het derhalve dringend gewenst voorkomt, verzoeksters te machtigen om met verkorting van dagvaardingstermijn een nieuwe procedure in kort geding tegen ATMI in te leiden, volgens ontwerp neergelegd samen met onderhavig verzoekschrift, mits inachtneming van een dagvaardingstermijn van minstens twee vrije dagen;

Dat, zo niet, ten aanzien van ATMI die haar zetel heeft in de Verenigde Staten van Amerika, een dagvaardingstermijn van 2 plus 80 dagen zou in acht dienen genomen;



24/11 '06 17:56 FAX +32 3 2160587    JENNES-BEHAEGHEL-DE NEEF    @015

**REDENEN WAAROM,**

**HET DE VOORZITTER VAN DE RECHTBANK VAN EERSTE AANLEG TE ANTWERPEN BEHAGE**

Verzoeksters te machtigen, bij toepassing van artikel 708 en 1036 Ger.W., om een dagvaarding in kort geding uit te brengen voor de zitting van de Voorzitter van de Rechtbank van Eerste Aanleg te Antwerpen, zetelend in kort geding, op donderdag 30 november 2006, met verkorting van dagvaardingstermijn, mits inachtneming van een dagvaardingstermijn van minstens twee dagen, tegen:

de vennootschap naar Amerikaans recht **Advanced Technology Materials Inc.**, met zetel aan de Commerce Drive nr. 7, te 06810 Danbury, Connecticut, V.S.A.,

mits de dagvaarding ook per elektronische post of per telefax wordt ter kennis gebracht van deze vennootschap en van de Belgische raadslieden van deze vennootschap.

Kosten als naar recht.

Met de meeste eerbied

Antwerpen, 22 november 2006

Voor verzoeksters,
Hun raadslieden,

**Filip Van Elsen**
Advocaat te Antwerpen

JAN VAN CELST,
advocaat te Antwerpen
loco Geert Glas
Advocaat te Brussel

Bijlage: Inventaris der stukken

5 e blad

24/11 '06 17:56 FAX +32 3 2160587 _____ JENNES-BEHAEGHEL-DE NEEF                     ☒016

## INVENTARIS DER STUKKEN

1. Beschikking gewezen op 26 oktober 2006 door de Voorzitter van de Rechtbank van Eerste Aanleg te Antwerpen, zetelend in kort geding inzake ARK 06/794/C

2. Ontwerp dagvaarding in kort geding uit te brengen door verzoeksters tegen Advanced Technology Materials Inc.

"Lasten en bevelen dat alle daartoe gevorderde gerechtsdeurwaarders
"dit arrest, dit vonnis, deze beschikking, dit bevel of deze akte ten
"uitvoer zullen leggen;

"Dat Onze procureurs-generaal en Onze procureurs des Konings bij de
"rechtbanken van eerste aanleg daaraan de hand zullen houden en dat
"alle bevelhebbers en officieren van de openbare macht daartoe de
"sterke hand zullen bieden wanneer dit wettelijk van hen gevorderd
"wordt;

"Ten blijke waarvan dit arrest, dit vonnis, deze beschikking, dit
"bevel of deze akte is ondertekend en gezegeld met het zegel van het
"hof, de rechtbank of de notaris."

*Voor eensluidende eerste grosse*

*afgeleverd aan :* /mr G. Glas

*ten verzoeke van :* verkopende partij

*De Griffier,*

C. Croqu
(Zegel van de rechtbank)

Griffie R.E.A. Antwerpen

Datum :....22..11. 2006

Boekdeel : U.R. nr. :...363̶=3

.5... blz. X 2.85 EUR

Betaalde rechten :..14,25..

De Griffier

*Voor eensluidend afschrift* *. . .* en laatste blad
*De gerechtsdeurwaarder*

CERTIFIED TRANSLATION.-

**F. JENNES, J. BEHAEGHEL, P. DE NEEF**
**GERECHTSDEURWAARDERS – B.V. – B.V.B.A.**
**JUDICIAL OFFICERS**
15 Amerikalei – 2000 ANTWERP
The office is open from 9 am to 12 noon & from 2 pm to 5 pm
E-MAIL: studie@gdwjdb.be - Crossroads Bank for Companies No. 0.443.756.489

Tel. : 03 238.39.66  -  Fax : 03 216.05.87
A/C : KBC : 403-3049311-92  -  PCR : 000-1093961-92  - KBC The Netherlands: 063.31.41.429

[in the left margin: 22.11.2006-eb * A06-04410 * Reference **JDB-90126**]

## WRIT OF SUMMONS IN SUMMARY PROCEEDINGS

On the twenty-fourth day of November in the year two thousand and six,

AT THE REQUEST OF:

1.    **PRAXAIR HOLDING**, a public limited company whose registered office is situated at 17 Metropoolstraat, 2900 Schoten, whose company number is 0437.603.028,

2.    **PRAXAIR**, a public limited company whose registered office is situated at 29 Lammerdries, 2250 Olen, whose company number is 0438.719.221, on its own behalf and also in its capacity as legal successor to NV Praxair Production, having its registered office at the time at 2070 Zwijndrecht, 58 Scheldedijk, and whose company number is 0439 211 248, all the rights and obligations whereof are assumed by NV Praxair as a result of the merger by take-over of all the assets and liabilities of the said company by decisions of the extraordinary general meeting of NV Praxair Production, respectively of NV Praxair, both of them of 31August 2006; and

3.    **PRAXAIR Inc.**, a company duly organized and existing under the laws of the State of Connecticut, USA, whose registered office is situated at 39 Old Ridgebury Road, 06810-5113 Danbury, Connecticut, USA.

All of them represented by **Geert GLAS** LLM, a lawyer at Brussels, having his office at 1150 Brussels, 268A Tervurenlaan, and **Filip VAN ELSEN** LLM a lawyer at Antwerp, having his office at 2600 Antwerp, 80 Uitbreidingstraat;

MOTIVATION:

1.    Whereas by his decision dated 26 October 2006 in the matter of General List Summary Proceedings ARK No. 06/794/C,  the President of the Antwerp Court of First Instance, sitting in summary proceedings, partly granted the provisional measures as claimed by the defendant by writ of summons in summary proceedings of 19 September 2006 on the basis of its European Patent EP 1 000 291 B1;

1

Whereas the President dismissed the defendant's claim to forbid the plaintiffs to manufacture UpTime gas cylinders, have the same manufactured, keep the same in stock, offer the same, bring the same onto the market, use, fill or import the same, because the terms and conditions contained in section 584 of the Judicial Code for the granting of such measure claim have not been met;

Whereas the President was in particular *(inter alia)* of the opinion that reasonably there is a dispute regarding the parties' legal position, more in particular whether the UpTime cylinder commercialized by the defendants constitutes an infringement of defendant's patent no. EP 1 000 291;

2.    Whereas in spite of such dispute, in the opinion of the President it was appropriate indeed *"to order the plaintiffs to stop the publication and distribution of information and/or advertising carriers presenting the litigious "Up Time" cylinders as a replacement product of the plaintiff's competing product, and to forbid the appellants to conduct an advertising campaign in any way whatsoever for the said product on forfeiture of an incremental penalty payment of EUR 100,000.00 for each infringement found"*;

Whereas the motivating part of the decision clearly shows that by doing so the President tried to prevent the plaintiffs, while waiting for the result of the proceedings on the merits, from acting aggressively in order to pull in further market share of the defendant;

3.    Whereas the parties' legal position in the German proceedings was apparently deemed by the President to be of great importance for the imposition of this provisional measure;

Whereas the President did justify such measures by referring *expressis verbis* to the "German judge in summary proceedings" who "had recognized the plaintiff's patent rights as at 1 August last";

Whereas the President found it therefore advisable to safeguard the parties' interests by means of the measures imposed;

4.    Whereas recently and precisely in the proceedings of the German Court a very important development occurred shedding a far more precise and truthful light on the patent rights invoked by the defendant;

That in a judgment pronounced on 9 November 2006, the Düsseldorf Landgericht did decide to formally suspend the defendant's claim to (inter alia) convict the third plaintiff of the infringement of conclusion 1 of EP 1 000 21 B1 until the European Patent Office will have given its views in the ongoing opposition proceedings against the defendant's patent, and this in particular because there is a great probability that the conclusion 1 concerned will not hold (see document no. 1);

Whereas the Düsseldorf Landgericht concluded as follows:

*"Die Verhandlung wird, soweit die Klage auf eine Verletzung des Patentanspruchs 1 gestützt ist [Klageantrag zu I.1.a und darauf rückbezogene Klageanträge zu I.2 und II.], bis zur Entscheidung der Einspruchsabteilung des Europäischen Patentamtes über den Einspruch gegen das Klagepatent [EP 1 000 291]."*

2

[Own translation]
*"The hearing of the case is suspended insofar as the action is based on the infringement of patent conclusion 1 [claim for complaint I.1.a and claim for complaint I.2 and II referring thereto] until the decision of the opposition department of the European Patent Office regarding the opposition against the patent on which the action is based* [has been pronounced]."

And motivated the said decision as follows:

*"Nach Ansicht der Kammer besteht eine hohe Warscheinlichkeit, dass das europäische Klagepatent im Umfang des Patentanspruhs 1 in der erteilten Fassung im anhängigen Einspruchsverfahren widerrufen wird, weil sein Gegenstand über den Inhalt der Anmeldung in der ursprünglich eingerichteten Fassung hinausgeht, Art. 100 c) i.V.m. Art. 83 EPÜ. Die von der Kammer im Urteil vom 1.8.2006 (4a O 455/05) insoweit vertretene Auffassung wird nicht mehr aufrecht erhalten."*

[Own translation]

*"According to the Division* [of the Landgericht] *there is a great probability that conclusion 1 of the European patent on which the action is based, will be revoked in the pending opposition proceedings because the subject thereof reaches further than the contents of the announcement in the version initially filed, art. 100 c) juncto art. 83 EPÜ. The point of view expressed by the Division* [of the Landgericht] *in its judgment of 1 August 2006 in this respect, is no longer held."*

Whereas the German Court therefore found it advisable to await the opposition proceedings before the European Patent Office before attaching any kind of far-reaching conclusions to this patent, and therefore explicitly cancelled the provisional measures pronounced prior thereto on 1 August 2006.

Whereas the Landgericht also, but in a separate judgment given on 9 November 2006, ruled that the third plaintiff is <u>not</u> guilty of an infringement of conclusion 14 of the patent invoked (see document no. 2);

5.      Whereas the judgments given on 9 November 2006 show that the German judge currently also takes the view that there are serious reasons to contest the validity of the defendant's patent invoked;

Whereas therefore the appearance of the defendant's rights is certainly no longer an established fact (Cass., 31 January 1997, Arr. Cass., 1997, 140 no. 56);

Whereas also the defendant's legal arguments and strategy stands or falls with the success of its legal steps in Germany, and so it is beyond any doubt that this evolutions sheds an important new light on the dispute;

Whereas the summary proceedings initiated by the defendant were entirely based on an (alleged) infringement of the same conclusion 1 of the same patent EP 1 000 291 B1 as on 9 November 2006, now set aside by the German Landgericht at least temporarily;

3

24/11 '06 17:58 FAX +32 3 2160587    JENNES-BEHAEGHEL-DE NEEF    ☑021

6.    Whereas whereas 16 of Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters provides that: *"mutual trust in the administration of justice in the Community justifies judgments given in a Member State being recognised automatically without the need for any procedure except in cases of dispute.";*

Whereas in his resolution dated 26 October 2006, in the lines of whereas 16 of the EEX Regulation, the President in summary proceedings explicitly took the decision of the German judge in summary proceedings of 1 August 2006 into consideration when (partly) granting the provisional measures claimed by the defendant;

Whereas, therefore, the President may follow the judgments given by the Düsseldorf Landgericht in the meantime on 9 November 2006, in his judgment about the (further) opportunity of the imposed and granted provisional measures;

Whereas as a result of the recent judgments of the Düsseldorf Landgericht of 9 November 2006, the circumstances have so fundamentally changed that the provisional measure as ordered by the decision of 26 October is superseded, and so the claim hereinafter urges itself by way of a new provisional measure;

7.    Whereas the measure claimed by this writ of summons is highly urgent, having regard on the one hand to the extremely recent character of the judgments given by the Düsseldorf Landgericht, and on the other to the great and acute risk that by an abusive and wrong interpretation of the decision of 26 October 2006, the defendant will seize the said decision to claim incremental penalty payments which threaten to paralyze the plaintiffs' activities;

Whereas by a decision given by the President of the Antwerp Court of First Instance on a petition on the twenty-second of November two thousand and six, the plaintiffs were authorized to summon the defendant hereinafter mentioned to appear at the hearing hereinafter mentioned, and of which petition and decision a copy is attached to this writ;

I, the undersigned, Peter DE NEEF,
a Judicial Officer with residence at Antwerp,
having my office there at 15 Amerikalei

SUMMONED:

**ADVANCED TECHNOLOGY MATERIALS INC.**, a company duly organized and existing under the laws of America,
 whose registered office is situated at 06810 Danbury, Connecticut, USA, 7 Commerce Drive,

- *effecting service of this writ as hereinafter mentioned*.

To appear before the: **PRESIDENT OF THE ANTWERP COURT OF FIRST INSTANCE**, sitting **IN SUMMARY PROCEEDINGS** in its usual courtroom, in the Antwerp Courthouse, Room F1, 20 Bolivarplaats, Antwerp, at the hour of nine thirty in the forenoon on **THURSDAY THE THIRTIETH DAY OF NOVEMBER TWO THOUSAND AND SIX**

4

in order:

FOR THESE REASONS,

To hear and see the decision of the President of the Antwerp Court of First Instance of 26 October 2006 in the matter of Cause List of Summary Proceedings ARK 06/794/C be revoked;

That the defendant should hear and see itself be ordered to pay the costs of the proceedings, including the legal administration of justice fee;

To hear that the judgment to be given is declared enforceable by anticipation, notwithstanding any recourse, without security and without it being possible to pay the amount due, after the judgment has been given, to the Deposit and Consignment Office or into the hands of a judicial officer,

And in order that the addressee should be cognizant hereof, but whereas the addressee is domiciled in the United States of America and since no residence or elected domicile in Belgium of the addressee are known to me, so,

> pursuant to the International Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, concluded at The Hague on 15 November 1965 (ratified by the Act of 24 January 1970 – Belgian Official Gazette "Belgisch Staatsblad – Moniteur belge" of 9 February 1971), which took effect with regard to the United States of America on 10 February 1969,

I, the undersigned and aforesaid judicial officer, have sent in a registered envelope, delivered at the ANTWERP post office on the date hereof,

1)     an application form duly filled out in English in conformity with the model form attached to the said Convention;
2)     two copies of this writ (as well as of the documents therein mentioned), each copy of the writ accompanied
       a) by a form indicating the nature and subject of the judicial
          document, drawn up in English,
       b) by a translation into English
3)     all this accompanied by the amount of US$ 95,

to the following company designated by the United States of America, the only company that is competent to act on behalf of the Central Authority, viz.:

**Process Forwarding International**
**910 5th Avenue**
**SEATTLE, WA 98104**
**USA**

requesting the aforesaid company:

1)     to have one copy of this writ, mentioned sub 2 supra, accompanied by the form

indicating the nature and subject of the judicial document and of its translation, served on:

ADVANCED TECHNOLOGY MATERIALS INC.
7 Commerce Drive
06810 DANBURY
CONNECTICUT, USA

**with due observance of the forms prescribed by the laws of the State called on for the service or notification of documents, drawn up in such country and to be intended for persons being there, in particular IN PURSUANCE OF ARTICLE 5/SECTION 1/LITT. A OF THE AFORESAID CONVENTION,**

2)    to return the other copy to me, accompanied by the statement provided for by Article 6 of the said Convention, saying that the request has been met, also indicating the form wherein, the place where and the time at which this was done, as well as the person to whom the document was delivered, or should the case arise, mentioning the circumstances owing to which the request could not be met.

And whereas article 10 of the aforesaid Convention does not forbid to send judicial documents directly by post to persons being abroad, so, unless the State of destination opposes such sending – *quod non* – I have also sent a copy of this writ (as well of the documents therein mentioned) accompanied by the form indicating the nature and subject of the judicial document,  and by a translation into English, in a registered envelope with acknowledgment of receipt, to the address of the party interested, delivering my writ at the aforesaid post office.

And I have attached the receipts of this registered mail to the original of this writ;

Whereof record, date as above;

Costs: EIGHT HUNDRED AND THIRTY-EIGHT EUROS AND TWENTY CENTS

including the administration of justice fee, and which costs may be increased by the registered mail postage, *i.e.* EUR 4.82 per absent party;

[signed] Peter DE NEEF

CERTIFIED TRUE TRANSLATION FROM DUTCH INTO ENGLISH

6

24/11 '06 17:59 FAX +32 3 2160587    JENNES-BEHAEGHEL-DE NEEF    @024

CERTIFIED TRANSLATION.-

14.25 EUROS                          OUT No. 610

                                     Seven sheets




WE, ALBERT II, KING OF THE BELGIANS,

BRING TO THE NOTICE OF ALL THOSE NOW AND LATER BEING:




                                     First sheet
                                     [initialled]

General List of Judgments ARV 06/5931/B

## SHORTENING OF TERM FOR SUMMONING

## D E C I S I O N:

I, F. Van de Merckt, Vice-President, acting President of the Antwerp Court of First Instance, assisted by C. Croon, Clerk of the Court.

Having regard to sections 2 and 41 of the Use of Languages in Lawsuits Act of 15 June 1935.

Having regard to the petition attached hereto, filed by G. Glas LLM, a lawyer at Brussels, and by F. Van Elsen LLM, a lawyer at Antwerp, acting on behalf of the plaintiffs, on 22 November 2006, and the reasons set forth therein.

Administering justice after hearing and taking the matter into consideration in Chambers.

Having regard to sections 55,3°, 708 and 1035 of the Judicial Code.

AUTHORIZE the plaintiffs to summon the defendant mentioned in the petition to appear before the President of the Antwerp Court of First Instance, sitting in summary proceedings, at the hearing of 30 November 2006, provided that the writ of summons is served on 24 November 2006 before 08 pm at the latest.

Impose the obligation on the plaintiffs to communicate the text of the writ of summons to the defendant and its counsel in Belgium by e-mail or by fax on the date of the writ and to attach a copy of the said e-mail or fax to the writ of summons.

Given at Antwerp, in Chambers, on the twenty-second of November two thousand and six, at the hour of 11.25 am.

The Clerk of the Court,                          The acting President,
[signature]                                       [signature]
C. Croon                                          F. Van de Merckt

8

SEEN
Antwerp, 22 November 2006
The Clerk of the Court
[signature]

## PETITION TO SHORTEN THE TERM FOR SUMMONING
## SUMMARY PROCEEDINGS (SECTION 798 OF THE JUDICIAL CODE)

**To the President
of the Antwerp Court of First Instance**

1. **Praxair Holding NV,** a public limited company whose registered office is situated at 17 Metropoolstraat, 2900 Schoten, whose company number is 0437.603.028,

2. **Praxair NV,** a public limited company whose registered office is situated at 29 Lammerdries, 2250 Olen, whose company number is 0438.719.221, on its own behalf and also in its capacity as legal successor to NV Praxair Production, having his registered office at the time at 2070 Zwijndrecht, 58 Scheldedijk, and whose company number is 0439 211 248, all the rights and obligations whereof are assumed by NV Praxair as a result of the merger by take-over of all the assets and liabilities of the said company by decisions of the extraordinary general meeting of NV Praxair Production, respectively of NV Praxair, both of them of 31August 2006; and

3. **PRAXAIR Inc.,** a company duly organized and existing under the laws of the State of Connecticut, USA, whose registered office is situated at 39 Old Ridgebury Road, 06810-5113 Danbury, Connecticut, USA.

All of them represented by **Geert GLAS LLM,** a lawyer at Brussels, having his office at 1150 Brussels, 268A Tervurenlaan, and **Filip VAN ELSEN LLM,** a lawyer at Antwerp, having his office at 2600 Antwerp, 80 Uitbreidingstraat;

**Respectfully inform**

That the petitioners intend to issue a writ of summons in summary proceedings by high urgency to appear before the President of the Antwerp Court of First Instance, sitting in summary proceedings, against:

**Advanced Technology Materials Inc.,** a company duly organized and existing under the laws of America, whose registered office is situated at 7 Commerce Drive, 06810 Danbury, Connecticut, USA.

for the purpose of revoking a decision in summary proceedings, given in a defended action by the President of the Antwerp Court of First Instance in summary proceedings on 26 October 2006 (General List of Summary Proceedings ARK 06/794/C) on a writ of summons from the

9

Advanced Technology Materials Inc. (ATMI), the aforesaid company, whereby pending a decision on the merits regarding ATMI's alleged patent rights, the prohibition was imposed on the plaintiffs *"to publish and distribute information and/or advertising carriers presenting the litigious "Up Time" cylinders as a replacement product of the competing product of (ATMI), and (...) to conduct an advertising campaign in any way whatsoever for the said product on forfeiture of an incremental penalty payment of EUR 100,000.00 for each infringement found";*

That the alleged patent rights invoked by ATMI to obtain the aforesaid provisional measure with the decision of 26 October 2006, were largely based on a decision of German judge in summary proceedings of 1 August 2006, which was favourable for ATMI;

That the said German decision given in summary proceedings on 1 August 2006 was, however, rectified by two judgments of the Düsseldorf Landgericht given on 9 November 2006, wherein it was judged that there is a high probability that conclusion 1 of the litigious patent EP 1 000 291 B1 (invoked by ATMI) will not get unscathed in its current scope through the opposition proceedings pending in Germany, respectively that Praxair is not guilty of an infringement of conclusion 14 of the invoked patent;

That the recent judgments given by the Düsseldorf Landgericht on 9 November 2006 so fundamentally changed the situations known at the time of the decision of 26 October 2006 that the provisional measure ordered by the decision of 26 October 2006 is superseded, and so the decision of 26 October 2006 must be revoked by way of a new provisional measure;

That all this is all the more highly urgent since ATMI interprets the decision of 26 October 2006 without any reason in an abusive and *mala fide* way and applies the same as a total advertising ban, and claims incremental penalty amounts in this respect in an unlawful, vexatious and reckless way; that this unlawful conduct of ATMI threatens to paralyze the plaintiffs' activities;

That therefore it appears to be urgently advisable to authorize the plaintiffs to initiate new summary proceedings against ATMI, with a shortening of the term for summoning, in accordance with the draft filed with this petition, with due observance of a term for summoning of at least two days;

That, if not, a term for summoning of 2 plus 80 days should be observed with respect to ATMI whose registered office is situated in the United States of America;


**THEREFORE,**

**IT MAY PLEASE YOUR HONOUR, THE PRESIDENT OF THE ANTWERP COURT OF FIRST INSTANCE**

To authorize the plaintiffs under sections 708 and 1036 of the Judiciary Code to issue a summons in summary proceedings to appear at ~~the~~ a hearing of the President of the Antwerp Court of First Instance sitting in summary proceedings, ~~on Thursday 30 November 2006~~, with a shortening of the term for summoning, provided that a term for summoning of least two days is observed, against:

**Advanced Technology Materials Inc.**, a company duly organized and existing under the laws of America, whose registered office is situated at 7 Commerce Drive, 06810 Danbury, Connecticut, USA.

provided that the writ of summons is communicated by electronic mail or fax to the said company or the Belgian counsels of the said company.

Costs to be determined by the Court.

Yours respectfully

Antwerp, 22 November 2006


For an on behalf of the plaintiffs
Their counsels

[signature]                          [signature]
Filip Van Elsen                      Jan Van Celst
A lawyer at Antwerp                  A lawyer at Antwerp

                                     *Loco* Geert Glas
                                     A lawyer at Brussels

Enclosures: Inventory of documents.



11

## INVENTORY OF DOCUMENTS

1.  Decision given on 26 October 2006 by the President of the Antwerp Court of First Instance, sitting in summary proceedings in the matter of General List of Summary Proceedings ARK 06/794/C

2.  Draft of writ of summons in summary proceedings to be issued by the plaintiffs against Advanced Technology Materials Inc.

12

Charge and order all judicial officers demanded to do so to enforce this judgment, decision, order or writ;

Our Attorneys General and Our Public Prosecutors to the Courts of First Instance to enforce rules and all commanders and officers of the public authorities to support law and order when they are legally demanded to do so.

In witness whereof this judgment, decision, order or writ has been signed and sealed with the seal of the Court of Appeal, the Court or the Notary Public.


First certified true executory copy
issued to: G. Glas LLM
at the request of: the informing party


The Clerk of the Court
[signature]
C. Croon

Court seal

[seal: ANTWERP COURT OF FIRST INSTANCE

Office of the Clerk of the Antwerp Court of First Instance
Date: 22 November 2006
Volume: U.R. No. 26303
5 pages x EUR 2.85
Fee paid: 14.25
The Deputy Clerk of the Court
[signature]
[illegible]

Seventh and last sheet


CERTIFIED TRUE TRANSLATION FROM DUTCH

13

# EXHIBIT E

eerste blad

# WIJ, ALBERT II,
## KONING DER BELGEN,

Aan allen die nu zijn en hierna wezen zullen, doen te weten:

NO

.......e Blad          015690

**Nummer:** 1781

**Rep. nr.:** 2007/3232

---

**Zitting van:**

**25 APRIL 2007**

**EINDARREST**

---

**Het HOF VAN BEROEP, zitting houdend te ANTWERPEN, ACHTSTE KAMER, recht doende in burgerlijke zaken, heeft volgend arrest gewezen:**

**Inzake : 2006/RK/407**

1. **NV PRAXAIR HOLDING**,
   met maatschappelijke zetel te 2900 Schoten, Metropoolstraat 17, ondernemingsnummer 0437.603.028;

2. **NV PRAXAIR**, met maatschappelijke zetel te 2250 Olen, Lammerdries 29, ondernemingsnummer 0438.719.221, in eigen naam en tevens in haar hoedanigheid van rechtsopvolgster van de NV PRAXAIR PRODUCTION, destijds met maatschappelijke zetel te 2070 Zwijndrecht, Scheldedijk 58, ondernemingsnummer 0439.211.248, van dewelke nv Praxair alle rechten en verplichtingen heeft overgenomen ingevolge fusie door overneming van het volledig actief en passief vermogen, bij beslissingen van de buitengewone algemene vergaderingen van nv Praxair Production resp. nv Praxair, beide van 31 augustus 2006;

3. **PRAXAIR Inc.**, vennootschap naar het recht van de staat Connecticut (USA), met maatschappelijke zetel aan Old Ridgebury Road 39 te 06810-5113 Danbury, Connecticut, USA;

   APPELLANTEN
   tegen de beschikking van de Voorzitter van de rechtbank van eerste aanleg te Antwerpen, zetelend in kort geding, d.d. 26 oktober 2006

ffSchmitV = FOD economie

2006/RK/407

vertegenwoordigd door mr. Geert Glas, advocaat te 1150 Brussel, Tervurenlaan 268A, en mr. Filip Van Elsen, advocaat te 2600 Antwerpen, Uitbreidingstraat 80;

TEGEN :

**ADVANCED TECHNOLOGY MATERIALS INC.**, vennootschap naar Amerikaans recht, met zetel aan de Commerce Drive nr. 7 te Danbury CT 06810, USA, met *woonstkeuze* op het kantoor van o.m. gerechtsdeurwaarder Marc Beerten, Balansstraat 117 te 2018 Antwerpen;

GEÏNTIMEERDE

vertegenwoordigd door mr. Bruno Vandermeulen en mr. Ruben Peeters, advocaten te 1040 Brussel, Oudergemlaan 22-28;

*****

Gelet op de door de wet vereiste processtukken in behoorlijke vorm overgelegd, waaronder de bestreden beschikking, op 26 oktober 2006 op tegenspraak tussen de partijen uitgesproken door de voorzitter van de rechtbank van eerste aanleg te Antwerpen, betekening op 31 oktober 2006, en waartegen tijdig en geldig naar de vorm hoger beroep werd ingesteld bij verzoekschrift neergelegd ter griffie van dit Hof op 21 november 2006.

Gelet op het incidenteel beroep.

2006/RK/407

De oorspronkelijke vordering gaat uit van ADVANCES TECHNO-LOGY MATERIALS Inc., vennootschap naar het recht van de staat Connecticut (USA), (verder ATMI) en strekt ertoe (1) PRAXAIR HOL-DING nv, (2) PRAXAIR PRODUCTION nv, (3) PRAXAIR nv en (4) PRAXAIR Inc., vennootschap naar het recht van de staat Connecticut (USA) (verder PRAXAIR), bij wijze van voorlopige maatregel:

➤ elk te horen verbieden inbreuk te plegen op het Europees octrooi EP 1 000 291 B1 van ATMI, door gascilinders die gekend staan onder de naam "UpTime®", of gascilinders met dezelfde kenmerken te vervaardigen, te laten vervaardigen, in voorraad te houden, aan te bieden, in het verkeer te brengen, te gebruiken, te vervullen, of in te voeren, op straffe van dwangsom van 45 000,- EUR per individuele gascilinder waarmee één van de voorgaande verbodsbepalingen wordt geschonden, en dit tot dat een beslissing ten gronde zal zijn tussengekomen;

➤ elk te horen veroordelen tot stopzetting van het uitgeven en verspreiden van informatie en/of publicitaire dragers die een aanwijzing, afbeelding en/of beschrijving inhouden van de litigieuze gascilinders, of om op enigerlei wijze reclame te maken voor deze producten, onder verbeurte van een dwangsom van 100 000,- EUR per dag of deel van de dag dat het verbod wordt geschonden;

➤ te bevelen dat het gevraagde verbod zal ophouden uitwerking te hebben indien ATMI binnen de maand na tussenkomst van de gevraagde beschikking geen vordering ten gronde wegens octrooi inbreuk met betrekking tot EP 1 000291 B1 heeft ingesteld.

2.-

De eerste rechter heeft de vordering ontvankelijk en gegrond verklaard in die mate:

➤ PRAXAIR wordt veroordeeld, in afwachting dat een beslissing ten gronde zal zijn tussengekomen, tot stopzetting van het uitgeven

2006/RK/407

en verspreiden van informatie en/of publicitaire dragers die liti-
gieuze cilinders "UpTime®" voorstellen als een vervangproduct
van het concurrerend product van ATMI en legt hen verbod op op
enigerlei wijze reclame te voeren voor dit product onder verbeurte
van een dwangsom van 100 000,-EUR per vastgestelde over-
treding,

➢ voor recht wordt gezegd dat het verbod zal ophouden uitwerking
te hebben indien eisende partij binnen de maand na tussenkomst
van huidige beschikking geen vordering wegens octrooi-inbreuk
met betrekking tot EP 1 000 291 B1 heeft ingesteld.

De eerste rechter overweegt in essentie:

a. OMTRENT DE URGENTIE MET BETREKKING TOT HET OPLEGGEN VAN EEN
VERBOD TOT COMMERCIALISERING:

➢ het toekennen van de in hoofddorde gevraagde maatregel tot het
opleggen van het verbod inbreuk te plegen op het Europees
octrooi EP 1 000 291 B1 van ATMI, door het commercialiseren
van gascilinders die gekend staan onder de naam "UpTime®" zou
het toekennen van een quasi monopoliepositie in afwachting van
een beslissing ten gronde inhouden,

➢ de ingeroepen urgentie bestaat erin dat ATMI door de beweerde
octrooi-inbreuken van PRAXAIR een alsmaar groeiend nadeel
lijdt dat moeilijk louter financieel kan gecompenseerd worden
omdat ze niet alleen winst moet derven, maar vooral ontwaarding
van haar octrooirechten dreigt te lijden,

➢ het niet ontkend is dat de "UpTime®" cilinders door PRAXAIR
verhandeld worden sedert 2003, PRAXAIR reclame rond het pro-
duct voerden en zich manifesteerden op vakbeurzen,

➢ het mogelijks ten onrechte afgesnoept marktaandeel kan worden
gecompenseerd mits schadevergoeding,

➢ de gevraagde maatregel is gezien de omstandigheden te in-
grijpend en vormt geen beveiligingsmaatregel meer.

2006/RK/407

b. OMTRENT HET VERBOD TOT HET VOEREN VAN PUBLICITEIT VOOR DE GASCILINDERS:

➢ de partijen betwisten niet dat er een octrooi bestaat in hoofde van ATMI, verleend na onderzoek door het Europees Octrooibureau en dat de gevoerde verzetprocedure op zich de geldigheid van het octrooi niet aantast,

➢ in afwachting van het resultaat van een procedure ten gronde, teneinde de belangen van partijen bij urgentie veilig te stellen, is er reden om PRAXAIR, onder verbeurte van een dwangsom, wel te verbieden agressief op te treden teneinde verder marktaandeel van ATMI in te palmen.

3.-

Het hoger beroep strekt ertoe de bestreden beschikking te bevestigen in de mate dat zij de vordering met betrekking tot het opleggen van het verbod inbreuk te plegen op het Europees octrooi EP 1 000 291 B1 van ATMI, door het commercialiseren van gascilinders afgewezen heeft als ongegrond, voor het overige deze beschikking te niet te doen daar waar appellanten veroordeeld zijn tot stopzetting van het uitgeven en verspreiden van informatie en/of publicitaire dragers die litigieuze cilinders "UpTime®" voorstellen als vervangproduct van het concurrerend product van ATMI en hen verbod opgelegd wordt op enigerlei wijze reclame te voeren voor dit product onder verbeurte van een dwangsom van 100 000,- EUR per vastgestelde overtreding.

Appellanten, PRAXAIR, laten als grief tegen deze beschikking gelden dat ze een tegenstrijdigheid in de motieven bevat door enerzijds het verbod tot commercialisering af te wijzen wegens het manifest gebrek aan urgentie en de onvoldoende waarschijnlijkheid van de ingeroepen rechten, en anderzijds het verbod tot reclame toe te kennen alhoewel in strijd met de voorwaarden van artikel 584 Gerechtelijk Wetboek.

2006/RK/407

...7....e Blad

PRAXAIR werpt op dat ATMI in werkelijkheid reeds langer kennis had van hun activiteiten in België sinds december 2003 en ATMI zelfs geen schijn van recht heeft gezien de octrooi de voorwerp uit-maakt van een oppositieprocedure rekening gehouden met de ernst van de ingeroepen rechten.

4.-

De geïntimeerde, ATMI, vordert bij wijze van incidenteel beroep de beschikking gedeeltelijk te hervormen wat betreft de weigering tot het opleggen van het voorlopig verbod tegen het plegen van octrooi-inbreuken inzake de commercialisering van de gascilinders.

Zij herneemt verder haar oorspronkelijke hoofdeis.

Ondergeschikt vraagt zij de maatregel slechts toe te kennen voor zover ze betrekking heeft op handelingen die de levering en het ge-bruik van de verboden gascilinders beogen in één van de aange-duide landen van het EP 1 000 291 B1 octrooi.

Uiterst ondergeschikt vraagt ze de maatregel toe te kennen voor zover ze betrekking heeft op de gascilinders die gevuld zijn met een ander gas dan BF3 en de verboden handelingen met betrekking tot BF3 gascilinders te beperken tot het verdelen en het leveren aan klanten die nog niet beleverd werden op datum van 17 augustus 2006.

| FEITEN |
| --- |

5.-

De omstandigheden en de doelstellingen van het geschil zijn in de bestreden beschikking uiteengezet zodat het Hof hiernaar verwijst en het volstaat te herhalen zoals volgt.

...8...e Blad    015696    paginaz7 van 30

ATMI omschrijft zich als een hooggespecialiseerd bedrijf met ver-koop- en onderzoekscentra in de Verenigde Staten van Amerika, Europa en Azië. Zij is een van de leidinggevende leveranciers van materialen en systemen aan de halfgeleiderindustrie dankzij haar "Safe Delivery Systems (SDS)" (Veilige toedieningsystemen). In de jaren 1990 had zij dit subatmosferische gasverdeelsysteem "SDS" ontwikkeld dat een veilig en succesvol alternatief bleek te zijn voor de hoge-druksystemen die tot dan toe bestonden. Zij bezit een Eu-ropees octrooi op deze hoge druk gascilinder die enkel opent en gas doorlaat indien de buiten-atmosfeer absoluut veilig is.

PRAXAIR groep is een Amerikaanse multinationale onderneming die meer dan 35 jaar actief is in België. PRAXAIR heeft de activiteiten van Union Carbide overgenomen en vervaardigt en levert een ruim gamma van gasproducten via haar Belgische dochterondernemin-gen. De activiteiten van PRAXAIR beperken zich niet tot de loutere verkoop van industriële gassen maar zij zijn eveneens bekend om-wille van de ontwikkeling van technologie met betrekking tot het vloeibaar maken van lucht bij extreem lage temperaturen.

In de tweede helft van de jaren 1990 ontwikkelde PRAXAIR, in samenwerking met UOP LLC, een eigen opslag en verdelings-systeem voor speciale gassen dat gecommercialiseerd wordt onder de benaming "UpTime®". Door deze ontwikkeling van een eigen ver-deel- en opslagsysteem voor gassen werd ATMI geconfronteerd met een nieuwe concurrent op de markt van BF3 gas.

Deze "UpTime®" gascilinder werd voor het eerst aan het Amerikaans publiek voorgesteld op de SEMICON WEST vakbeurs in juli 2003.

ATMI verwijt PRAXAIR deze cilinder voor industriële gassen aan de halfgeleiderindustrie te hebben nagemaakt en via een agressieve

2006/RK/407

reclame haar "UpTime®" cilinder als een direct vervangproduct aan te prijzen.

PRAXAIR daarentegen stelt dat slechts nadat de ontwikkeling, op een volledig onafhankelijke wijze, van haar revolutionaire "UpTime®" gascilinder ter ore kwam van ATMI, deze zelf een mechanisch systeem ontwierp onder de naam "VAC" waarvoor op 28 september 2005 het Europees octrooi EP 1 000 291 B1 afgeleverd werd, dat nochtans van latere datum bleek te zijn dan de octrooiaanvragen ingediend door PRAXAIR.

Op 10 augustus 2006 legde de beslagrechter te Antwerpen verbod op aan PRAXAIR de van namaak verdachte gascilinders uit handen te geven tegen verbeurte van een dwangsom. Na derdenverzet werd dit verbod gedeeltelijk opgeheven bij beschikking van 6 september 2006 wat betreft het uit handen geven van de van namaak verdachte gascilinders. Deze beschikking werd bevestigd bij arrest van dit Hof van 20 december 2006 (3e kamer).

---

BEOORDELING

---

6.-

Aan de hand van de uiteenzetting der partijen en de neergelegde stukken overweegt het Hof als volgt.

De beide partijen zijn concurrenten in het beleveren van hoogtoxische gassen aan bedrijven die halfgeleiders vervaardigen.

ATMI is titularis van een Europees octrooi nr. EP 1 000 291 B1 dat op 28 september 2005 haar werd verleend voor een *Fluïdumopslag- en verdeelsysteem* (Fluid Storage and Dispensing System) en dat een

*10...e Blad* 015698 pagina 9 van 30

prioriteitsdatum draagt van 28 april 1998, zoals opgeëist in de PCT aanvraag WO 1999/056056, op basis van de Amerikaanse prioriteits-aanvraag ingediend op 28 april 1989.

Momenteel loopt er een oppositieprocedure tegen dit octrooi voor het Europees Octrooibureau te München (E.O.B.), doch partijen gaan akkoord dat dit geen afbreuk doet aan de geldigheid van het octrooi.

7.-
PRAXAIR is evenwel van oordeel dat de geldigheid van de inge-roepen octrooirechten op diverse gronden voor ernstige betwisting vatbaar is, waaronder het gebrek aan nieuwheid en uitvinderwerk-zaamheid alsmede wegens ontoelaatbare uitbreiding van de hoofdrevindicatie van het octrooi. Deze betwisting zou de Ameri-kaanse rechter en het Koreaanse Octrooibureau ertoe aangezet hebben de desbetreffende octrooien van ATMI nietig te verklaren. In dit verband zou het Landgericht te Düsseldorf in de aldaar hangende bodemprocedure bij vonnis van 9 november 2006 besloten hebben de procedure op te schorten gelet op de grote waarschijnlijkheid dat het octrooi van ATMI zal worden herroepen in het kader van de oppositieprocedure.

8.-
Voor PRAXAIR biedt de "UpTime®" gascilinder het voordeel van een driemaal hogere opslagcapaciteit en van de compatibiliteit met ver-schillende gassen. Dit is vooral te wijten aan het feit dat het systeem mechanisch van aard is, terwijl de gangbare modellen voor de aan-drijving gebruik maken van een absorberende spons. Deze "Up Time®" gascilinder werd trouwens voor het eerst aan het publiek voorgesteld op de SEMICON WEST beurs te San Francisco in juli 2003.

2006/RK/407

Het vullen van de "UpTime®" gascilinders met BF3 gas gebeurt exclusief voor de volledige PRAXAIR groep en al haar klanten wereldwijd vanuit een in 2003 in gebruik genomen hoogtechnologische installatie te Oevel. Reeds bij de voorstelling in juli 2003 zou PRAXAIR er geen geheim van gemaakt hebben dat deze producten vanuit haar vestiging te Oevel gevuld en verdeeld werden.

Voordien had ATMI de markt van de subatmosferische verdeel- en opslagsystemen in handen dankzij haar in 1990 ontwikkeld "SDS" systeem. Het nadeel zou zijn geweest dat deze slechts voor bepaalde gassen kon worden gebruikt en ze een eerder beperkte opslagcapaciteit hadden. Slechts achteraf nadat ATMI weet zou hebben gehad van de ontwikkeling van een revolutionaire "UpTime®" gascilinder, zou ATMI een mechanisch "VAC" systeem gaan ontwikkelen zijn dat het voorwerp uitmaakt van het Europees octrooi EP 1 000 291 B1.

PRAXAIR benadrukt dat dit Europees octrooi betrekking heeft op het recentelijk ontwikkeld mechanisch "VAC" systeem en niet slaat op het bestaande "SDS" systeem. De eigenheid van het "VAC" systeem zou erin bestaan dat het controle mechanisme een klep is die zich binnenin de gascilinder bevindt, zodat de klep beschermd wordt tegen externe klappen die haar zouden kunnen beschadigen of ontregelen. Doch voor PRAXAIR is het "VAC" systeem van recentere datum dan het door PRAXAIR ontworpen "UpTime®" systeem.

9.-
Daarnaast werpt PRAXAIR op dat in de belangenafweging rekening dient gehouden met het feit dat bij het veranderen van gasleverancier een specifiek kwalificatieproces dient doorlopen te worden van normaal zes tot twaalf maanden, wat een zeer significante investering zowel in tijd als in geld betekent. Onder verwijzing naar het kosten- en tijdsintensieve kwalificatieproces voor leveranciers van

2006/RK/407

gascilinders is het duidelijk dat de klanten, ingeval van toekenning van de gevorderde maatregelen, in geen geval opnieuw deze intensieve testprocedure zullen wensen te doorlopen. Dit komt volgens PRAXAIR in de praktijk er op neer dat de rechten van partijen op een definitieve en onherroepelijke wijze aangetast zullen worden.

10.-

ATMI van haar kant bevestigt twee systemen ontwikkeld en gecommercialiseerd te hebben. Enerzijds werd het "SDS" systeem ontwikkeld, waardoor het gas wordt opgeslagen in de cilinder aan subatmosferische druk door middel van een bijzonder chemisch proces waardoor het gas uit de cilinder moest gezogen worden, en anderzijds, op vraag van de halfgeleider fabrikanten, het "VAC" systeem dat in een veilige opslag van gas moest voorzien door in een hoge druk gascilinder een of twee gesloten kleppen te voorzien die enkel openen wanneer de gepaste aanzuiging (onderdruk) aanwezig is aan de cilinderuitgang (dual port valve).

11.-

Het is de tweede innovatie, het "VAC" systeem, waarvoor het Europees octrooi voor *Fluïdumopslag- en verdeelsysteem* (Fluid Storage and Dispensing System) werd toegekend dat thans ter betwisting staat. De eigenheid van het systeem behelst een klep die zich binnenin de gascilinder bevindt en het feit dat de klep alleen opent wanneer een gas onder druk, die niet hoger is dan een bepaalde subatmosferische druk, van buiten uit het vat wordt toegediend. Het belang van de uitvinding heeft dus betrekking op het veiligheidssysteem.

ATMI betwist ten stelligste dat de "UpTime®" gascilinder waarvan PRAXAIR de octrooirechten in Amerika over gekocht heeft van U.O.P. over dezelfde specificiteit beschikt als haar "VAC" systeem.

2006/RK/407

Aangezien in het "UpTime®" systeem de klep buiten de cilinder ge-legen is en niet over een 'dual port valve' beschikt (zie hoger).

Het "VAC" systeem zou al in het jaar 2000 op de markt gelanceerd geweest zijn voor er sprake was van het "UpTime®" systeem. Slechts in de zomer van 2006 zou PRAXAIR publieke verklaringen afgelegd hebben waarbij zij voor het eerst in een persbericht mee-gedeeld hebben dat de "UpTime®" gascilinders in Oevel gevuld en verhandeld werden. In de procedure met betrekking het beslag inzake namaak en het daaropvolgende derdenverzet is bovendien komen vast te staan dat de Amerikaanse moedermaatschappij de gascilinders in België levert voor vulling en zij een coördinerende rol vervult in de marketing- en verkoopactiviteiten van deze gascilinders.

Inmiddels is ATMI op 24 november 2006 overgegaan tot dagvaarding ten gronde voor de rechtbank van eerste aanleg te Antwerpen wegens octrooi-inbreuk.

OMTRENT DE URGENTIE MET BETREKKING TOT HET OPLEGGEN VAN EEN VERBOD TOT COMMERCIALISERING:

12.-

De voorzitter van de rechtbank van eerste aanleg doet, krachtens artikel 584, eerste lid, van het Gerechtelijk Wetboek, in de gevallen die hij spoedeisend acht, bij voorraad uitspraak in alle zaken, be-halve die welke de wet aan de rechterlijke macht onttrekt.

De hoogdringendheid wordt doorgaans erkend telkens wanneer een onmiddellijke beslissing wenselijk is om schade van een bepaalde omvang, dan wel ernstige ongemakken te voorkomen en men derhalve zijn toevlucht kan nemen tot het kort geding wanneer de gewone rechtspleging niet bij machte is het geschil tijdig op te lossen

015702

*14...e Blad*

2006/RK/407

(zie ook Cass., 11 mei 1990, RC905B4, R.W., 1990-1991, 987).

Deze grondvereiste van urgentie bestaat wanneer de gevorderde maatregelen objectief nuttig zijn voor de beslechting van het geschil en wegens de omstandigheden eigen aan de zaak, spoedeisend zijn, wat wil zeggen dat wanneer ze uitgesteld worden ze ofwel geen nut meer hebben ofwel niet meer kunnen plaatsvinden (E. Krings, Het kort geding naar Belgisch recht, T.P.R., 1991, 1068). Aan deze eis van spoedeisendheid moet dan ook worden voldaan zowel op het tijdstip van de inleiding als van de uitspraak.

13.-

Het urgente karakter van de gevorderde maatregelen blijkt in de eerste plaats reeds uit de juridische bescherming die aan intellectuele rechten wordt toebedeeld. De stopzetting van een octrooi-inbreuk is dan ook alleen uit de aard van de zaak in beginsel als spoedeisend te beschouwen. Trouwens mag blijken uit de internationale erkenning dat de beteugeling van inbreuken op intellectuele rechten slechts efficiënt kan zijn wanneer deze snel en met voorlopige maatregelen kunnen worden afgedwongen (zie ook artikel 9 van de EG richtlijn 2004/48/EC van 29 april 2004 betreffende de maatregelen en procedures om de handhaving van intellectuele eigendomsrechten te waarborgen, BL L 57, 30 april 2004, blz.45-86).

14.-

Wat PRAXAIR verwijt is dat de ingeroepen urgentie te wijten zou zijn aan het gedrag van ATMI zelf. Door eigen handelen of nalaten te handelen wordt ATMI geacht zelf verantwoordelijk te zijn voor de schade ter vermijding waarvan zij thans de voorlopige maatregelen vordert (zie ook Antwerpen, 7 december 2004, N.J.W., 2005, 770).

PRAXAIR stelt dat ATMI in werkelijkheid reeds lange tijd op de hoogte was van haar desbetreffende activiteiten in Oevel. De verwijzing

2006/RK/407

naar het perscommuniqué in juli 2003 toont volgens hen genoeg-zaam de kennis door ATMI aan van het commercialiseren van de "UpTime®" gascilinders. Bovendien werd op één van de meest voor-aanstaande vakbeurzen in de halfgeleiderindustrie, de SEMICON WEST beurs te San Francisco (USA) in juli 2003, de "UpTime®" gascilinder vertoond en aan het publiek voorgesteld. Ter gelegen-heid van deze beurs zou PRAXAIR er geen geheim van gemaakt hebben dat de "UpTime®" gascilinders in België (Oevel) voor de Europese markt gevuld worden. De lancering van het nieuw vul-centrum in Oevel heeft bovendien in de vakpers van die periode ruimschoots de nodige weerklank gekregen als zenuwcentrum voor de wereldwijde belevering van "UpTime®" gascilinders. Daarom zou ATMI minstens sinds het begin van 2005 op de hoogte moeten ge-weest zijn van de activiteiten van PRAXAIR mede gezien de octrooi-betwistingen die in Duitsland aanhangig gemaakt werden, zodat niet kan aangenomen dat ATMI slechts via een persbericht van 10 juli 2006 voor het eerst het bestaan vernam van het feit dat de gewraak-te cilinders in België gevuld en verhandeld werden.

15.-

Samen met ATMI moet het Hof echter vaststellen dat het aanneme-lijk gemaakt wordt dat zij eerst de resultaten van een oppositie-procedure afgewacht heeft alvorens voorlopige maatregelen te nemen. Het is nochtans begrijpelijk door het persisterend en aan-houdend karakter van de octrooi-inbreuken dat ATMI zich niettemin vooralsnog verplicht zag de rechter in kort geding te vatten.

16.-

De belangenafweging heeft niets met urgentievoorwaarden te maken. Tot het afwegen van belangen of de respectievelijke rechten van par-tijen, zal slechts worden overgegaan nadat de vordering door de rech-ter in kort geding als urgent bevonden werd (zie ook P. Taelman, Het kort geding, P & B, 1997, nr.2, blz. 204).

2006/RK/407

In de belangenafweging wordt het nadeel dat een partij zal ondergaan bij het behoud van de situatie vergeleken met het nadeel dat de wederpartij lijdt in de veronderstelling dat de eis wordt toegekend. In de context van voorgehouden aanhoudende octrooi-inbreuken is echter de verwijzing naar de leer die een belangenafweging voorstaat in kort geding niet nuttig, wanneer de houder van het octrooi de bescherming van de rechter inroept om de miskenning van zijn ogenschijnlijke rechten tegen te gaan.

ATMI onderstreept terecht dat zij anders het risico loopt op termijn een aanzienlijk deel van haar cliënteel te verliezen doordat het exclusief karakter van haar octrooi en haar geloofwaardigheid bij het publiek dreigt verloren te gaan. Een loutere vergoeding onder de vorm van een geldelijke schadeloosstelling is niet van die aard om de schade volledig te herstellen (zie ook Brussel, 19 augustus 1994, Pas., 1994, II, 108). Het toegekend publiciteitsverbod is immers onvoldoende en kan niet volstaan om haar belangen veilig te stellen.

Bijgevolg is aan de voorwaarde van spoedeisendheid van de gevraagde maatregelen voldaan.

OMTRENT HET VOORLOPIG KARAKTER VAN DE MAATREGEL

17.-

De bepaling van artikel 1039 Gerechtelijk wetboek dat de beschikkingen in kort geding geen nadeel mogen toebrengen aan de zaak zelf, houdt slecht in dat de rechter ten gronde geenszins gebonden is door wat de rechter in kort geding beslist heeft. Het is voldoende dat de ingeroepen rechten waarschijnlijk genoeg zijn om een voorlopige maatregel te staven, zonder rechtsregels te betrekken die de bevolen maatregel in redelijkheid niet zouden kunnen schragen (zie ook Cass.,

2006/RK/407

5 mei 2000, RW, 2000-2001, 589).

De rechter in kort geding kan derhalve zijn beslissing steunen op een voorlopige beoordeling van de grond van de zaak.

18.-

Het betekent dat de rechter in kort geding de gevraagde maatregel slechts kan toestaan, indien er een schijn van rechten is, die het nemen van een beslissing verantwoordt. De rechter in kort geding die bij het onderzoek van de ogenschijnlijke rechten van partijen rechts-regels betrekt die de voorlopige maatregel die hij beveelt niet redelijk kunnen schragen, overschrijdt de grenzen van zijn bevoegdheid (zie ook Cass., 6 juni 2003, T.B.H., 2004/3, 258 met noot J. Verlinden, Beoordeling van de rechten van partijen en belangenafweging in kort geding).

Bovendien mag de rechter in kort geding geen maatregelen bevelen waardoor de rechten van de partijen op een definitieve en onherroepe-lijke wijze worden aangetast, doch slechts enkel maatregelen tot be-waring van recht, indien het bestaan van een recht voldoende waar-schijnlijk is om het nemen van een beslissing te verantwoorden. Dit houdt in dat de rechter in kort geding geen definitieve wijziging aan de rechtspositie van partijen mag aanbrengen en dus juridisch geen nadeel mag toebrengen aan de grond van de zaak. Dit belet niet dat de naleving van de beschikking definitieve, feitelijk onherstelbare ge-volgen kan teweegbrengen. Daarvoor is er evenmin vereist dat de rechten die ingeroepen worden een onbetwistbaar karakter zouden hebben. Het is voldoende dat de rechter in kort geding zijn onderzoek beperkt tot een onderzoek naar ogenschijnlijke rechten van partijen.

19.-

PRAXAIR houdt voor dat het Europees octrooi EP 1 000 291 B1 het gevolg is van een ogenschijnlijk onrechtmatig verkregen erkenning,

2006/RK/407

zodat de geldigheid van het ingeroepen octrooirecht naar haar oordeel geenszins bewezen is.

Met verwijzing naar artikel 52 van het Europees Octrooiverdrag van 5 oktober 1973 (verder EOV) en artikel 2 van de Belgische Octrooiwet (verder Octrooiwet) dient voor PRAXAIR elk ingeroepen octrooi, wil het geldig zijn, te voldoen aan de vereisten van nieuwheid en uitvinderwerkzaamheid. Ingevolge de miskenning van deze geldigheidsvereisten maakt het octrooi van ATMI thans het voorwerp uit van een oppositieprocedure bij het Europees Octrooibureau (E.O.B.).

Dat deze oppositieprocedure niet onbesuisd of lichtzinnig aangetekend is, mag volgens PRAXAIR blijken uit het feit dat ze gebaseerd is op niet minder dan negen oudere octrooien die geen deel uitmaakten van het dossier van de onderzoeker van het E.O.B.. Gezien de ernst ervan zou de rechter in kort geding 'prima facie' (op eerste gezicht) mogen vast te stellen dat de tegen het ATMI octrooi opgeworpen geldigheidsbezwaren bestaan die dermate ernstig lijken dat ATMI geen blijk geeft van het bestaan van voldoende manifeste ogenschijnlijke rechten.

20.-
ATMI daarentegen stelt dat de geldigheid van het Europees octrooi op eerste gezicht mag aangenomen worden gelet op het voorafgaandelijk onderzoek door het E.O.B.. Nagegaan moet worden of deze rechtstitel waarop wordt gesteund voldoende ernstig is om in aanmerking te komen voor rechtsbescherming, zonder dat de voorgebrachte rechtstitel onbetwistbaar of onbetwist hoeft te zijn (zie ook Antwerpen, 25 juni 1990, Ing. Cons. , 1991, 249).

2006/RK/407

21.-

De omstandigheid dat ATMI over een Europees octrooi beschikt, brengt inderdaad met zich mee dat het door ATMI ingeroepen recht op eerste gezicht niet voor een redelijke betwisting vatbaar is. Een Europees octrooi biedt immers, gezien de aard van de verlening-procedure, normaler wijze op zich voldoende waarborgen om een voorlopige maatregel te rechtvaardigen.

De beoordeling van de middelen van PRAXAIR die strekken tot het bewijs van de ongeldigheid van de octrooirechten vergt bovendien in voorliggend geval een zeer diepgaand technisch onderzoek van de octrooiaanvrage die een 'prima facie' (op eerste gezicht) beoordeling overstijgt. De vermoedelijke slaagkansen van de oppositieprocedure kunnen niet worden ingeschat op grond van een oppervlakkig onder-zoek, zoals die binnen het bestek van een kort geding vereist is (zie ook Brussel, 15 juni 2004, I.R. D.I., 2005, 67).

Derhalve is er voldoende schijn van recht aanwezig om een voorlopige maatregel te doen opleggen.

OMTRENT DE OPPOSITIEPROCEDURE VOOR HET EUROPEES OCTROOI-BUREAU

22.-

Om haar stelling kracht bij de zetten verwijst PRAXAIR naar het om-standig octrooitechnisch verslag van Ir. P. Van Varenberg van het bureau M.F.J. Bockstael te Antwerpen waaruit een gebrek aan nieuwheid en een gebrek aan inventiviteit blijkt.

Tevens doet PRAXAIR beroep op het precedentengehalte van voor-gaande beslissingen. Een beslissing van het Koreaanse Octrooi-bureau van 25 januari 2006 wordt bijgebracht, alsmede een vonnis

2006/RK/407

van het U.S. District Court, southern district of New York van 14 april 2006 en een vonnis van het Landgericht Düsseldorf in de bodem-procedure van 9 november 2006.

Deze laatste beslissing oordeelde met betrekking tot de geldigheid van conclusie 1 van het octrooi EP 1 000 291 B1 dat er een grote waarschijnlijkheid bestaat dat conclusie 1 van het Europees Octrooi, waarop de rechtsvordering gesteund is in de aanhangige verzets-procedure, herroepen wordt, omdat het voorwerp ervan verder reikt dan de inhoud van de aanmelding in de oorspronkelijke versie (art. 100, c) juncto art. 83 EOV).

23.-
ATMI wordt namelijk verweten de oorspronkelijke aanvraag WO 99/56057 ontoelaatbaar te hebben verruimd door in de conclusie 1 van het octrooi EP 1 000 291 B1 bij wijze van amendering tijdens de verleningprocedure het gebruik van een "klep" (valve) te hebben doen invoegen in plaats van een "drukregelaar" (fluid pressure regu-lator), wat een miskenning uitmaakt van artikel 83 EOV.

24.-
De conclusie 1 vereist inderdaad dat de "klep" gesloten wordt ge-houden om te vermijden dat fluïdum verdeeld wordt vanuit het vat doorheen de poort tot op het ogenblik dat de klep gas bij subatmos-ferische druk ontvangt van buiten het vat, en opent in antwoord op het ontvangen van gas bij subatmosferische druk, en welke sub-atmosferische druk niet hoger is dan een vooraf bepaalde waarde.

Een beschrijving die volgens ATMI de vakman doet begrijpen dat de klep een drukregelende functie heeft. Wanneer de druk stroom-afwaarts van de klep stijgt na het openen van de klep in antwoord op het ontvangen van subatmosferische druk, de klep weer sluit, zodat de druk evolueert naar het punt van de vooraf ingestelde waarde. De

2006/RK/407

klep neemt met name uiteindelijk een evenwichtspositie in. De vak-
man begrijpt dat dit de elementair regelende functie van de klep (20)
is.

25.-

Reeds in de oorspronkelijk octrooiaanvrage is er op bladzijde 8 noch-
tans sprake: (zoals vrij vertaald) *"de regelaar is een toevoercontrole
inrichting dat ingesteld kan worden op een vooraf bepaald
drukniveau om gas of damp uit de cilinder te verdelen bij een derge-
lijk drukniveau"*. Aldus lag het nooit in de bedoeling van ATMI om de
uitvinding te beperken tot een bepaald type van drukregelaar.
Bovendien verduidelijkt de octrooiaanvrage dat de klep (20) in een
gasstroomverbinding staat met de drukregelaar (26), welke van een
conventioneel type is dat gebruik maakt van een schotelelement dat
bijvoorbeeld met een veer in een gesloten stand wordt gehouden, en
waarbij de schotel verplaatst wordt wanneer het drukverschil over het
schotelelement een bepaald niveau overschrijdt.

Derhalve is de omschrijving van de klep niet manifest en ondubbel-
zinnig strijdig te noemen met de bovengenoemde bepaling van de
regelaar zoals voorkomend in de octrooiaanvrage, zoals PRAXAIR
wilt doen geloven.

26.-

Het vonnis van het U.S. District Court, southern district of New York
van 14 april 2006 betreft het Amerikaans octrooi 6,101,816 en
6,343,467 van ATMI en is bijgevolg irrelevant voor de beoordeling
van dit geschil. Het komt tot het besluit dat deze patenten geen
nieuwheid bevatten en slechts een beschrijving geven van een com-
binatie van elementen die, op het ogenblik van de uitvinding, gekend
waren door de vakman. Doch het U.S District Court spreekt zich
enkel uit over het U.S patent 6,101,816 en US patent 6,3343,476,
die beiden vreemd zijn aan huidig geschil.

2006/RK/407

De beslissing van het Koreaanse Octrooibureau van 25 januari 2006, waartegen ATMI hoger beroep heeft ingesteld en waarvan slechts een vrije vertaling naar het Engels wordt bijgebracht, is evenmin bruikbaar om de beoordeling van het E.O.B. in twijfel te trekken.

27.-

Het vonnis van het Landgericht Düsseldorf daarentegen heeft in de bodemprocedure van 9 november 2006 op grond van twijfels wel beslist om de procedure op te schorten tot na uitspraak door E.O.B.. Doch deze beslissing laat het verbod om de aangevochten "Up Time®" gascilinders nog verder in Duistland te vervaardigen en ver- handelen, opgelegd bij beschikking van 1 augustus 2006 in kortge- ding, onverkort laten bestaan.

28.-

Het Oberlandesgericht oordeelde dienaangaande bij arrest van 14 december 2006: (zoals vrij vertaald) *"het enkel feit dat het Landge- richt (Düsseldorf) in de bodemprocedure de vraag omtrent de gel- digheid van het litigieuze octrooi in de bodemprocedure anders be- oordeelt dan in kort geding, het beroepen vonnis niet manifest onjuist doet voorkomen"*. Zowel in het beroepen vonnis als beslissing tot schorsing in de bodemprocedure bevatten beoordelingen van de vraag naar onrechtmatige verruiming. Zonder nader onderzoek kan niet gezegd worden welk van deze tegengestelde beoordelingen de juiste is. Dit dient gereserveerd te worden voor een mondeling debat voor de senaat. Er dus geen reden om een voorlopige schorsing van de uitvoerbaarheid te bevelen.

29.-

Het arrest van het Hof van beroep te Antwerpen (3[de] kamer) van 20 december 2006 in de procedure met betrekking het beslag inzake namaak is ten onrechte volgens PRAXAIR met het gezag van gewijs- de bekleed.

2006/RK/407

Dit arrest heeft namelijk beslist dat binnen het marginale toetsings-recht van de beslagrechter (in hoger beroep) dient vastgesteld dat er wel ernstige betwisting is met betrekking tot de inbreuk door NV PRAXAIR HOLDING en NV PRAXAIR op het door ATMI ingeroepen octrooi. Dat 'prima facie' (op eerste zicht) blijkt dat de inbreuk geens-zins met voldoende zekerheid is aangetoond. Dat uit de voorgebrachte objectieve gegevens immers blijkt dat de "UpTime®" gascilinders er-voor zorgen dat het gasdebiet continu hetzelfde niveau aanhoudt, zonder in de cilinder zelf de druk van het gas te regelen, terwijl de "VAC" cilinders van ATMI middels een drukregelaar binnenin de cilin-der constant dezelfde druk garanderen. Om deze redenen alleen is de intrekking en de opheffing van de aanvullende maatregelen (nota: arti-kel 1481, $2^{de}$ lid Ger.W.), zoals door de eerste rechter in de bestreden beschikking terecht geoordeeld, verantwoord.

De beslagrechter oordeelde in de bestreden beschikking van 6 sep-tember 2006 dat door ATMI niet aanvaardbaar aangetoond was dat zij in afwachting van een oplossing van de betwisting over de grond van de zaak, ernstig nadeel zal ondervinden zo er voorlopig geen verbod geldt in de zin van artikel 1481, $2^{de}$ lid Gerechtelijk wetboek.

30.-
Het gezag van rechterlijk gewijsde behelst dat de rechter, zelfs wan-neer de oorzaak en het voorwerp van de rechtsvordering waarover definitief uitspraak werd gedaan en die van een latere rechtsvordering tussen dezelfde partijen niet gelijk zijn, een aanspraak waarvan de grond onverenigbaar is met de vroeger geoordeelde zaak, niet kan aannemen (zie ook Cass., 20 februari 1975, R.W., 1974-1975, 2594). Met andere woorden dient onderzocht te worden of de nieuwe aan-spraak kan worden ingewilligd zonder het voordeel van de vorige be-slissing ongedaan te maken.

**31.-**

Het gezag van gewijsde geldt derhalve enkel tussen dezelfde partijen in dezelfde hoedanigheid en strekt zich niet verder uit dan tot hetgeen het voorwerp van de beslissing uitmaakt.

Ten aanzien van geïntimeerde sub 3, PRAXAIR Inc., vennootschap naar het recht van de staat Connecticut (USA), die vreemd was in de vorige procedure en die verantwoordelijk wordt geacht voor het vullen van de gascilinders in Oevel, geldt dit middel niet.

Daarenboven heeft de beslagrechter maar een marginaal toetsings- recht teneinde na te gaan of de beweerde rechten een voldoende graad van zekerheid bezitten opdat zij een ingrijpende beslagmaat- regel kunnen wettigen. Aangenomen wordt dat voor het opleggen van een dergelijke maatregel een afweging dient te gebeuren van de res- pectieve belangen van partijen en dat deze maatregel noodzakelijk is haar rechten te handhaven.

**32.-**

De beslagmaatregel voorzien in artikel 1481, 2$^{de}$ lid Gerechtelijk wet- boek dient er niet enkel toe om de op grond van het 1$^{ste}$ lid gevraagde beschrijving mogelijk te maken, doch kan tevens tot doel hebben de rechten van de houder van een intellectueel recht te beschermen in afwachting van de uitspraak door de bodemrechter. Doch dienen de redenen van opportuniteit van de gevorderde beslagmaatregelen evenwel niet noodzakelijk dezelfde te zijn als het verbod tot octrooi- inbreuk in een kortgeding procedure.

Omtrent de octrooi-inbreuk

**33.-**

PRAXAIR betwist dat de inbreuk voldoende zeker is om dergelijke vergaande maatregelen op te leggen die de octrooihouder op een buitensporige manier zouden bevoordeligen. Indien de conclusies van

2006/RK/407

het Europees octrooi EP 1 000 291 B1 gelezen worden in het licht van de beschrijving en de figuren, dan kan er voor PRAXAIR geen sprake zijn van een inbreuk vermits de "UpTime®" gascilinders geen drukregelaar toepassen die de druk van het gas aan de uitgang van de gascilinders constant moet houden.

34.-

Zowel artikel 69 EOV als artikel 26 van de Octrooiwet bepaalt dat de beschermingsomvang van het Europees octrooi of van de Europese octrooiaanvrage wordt bepaald door de inhoud van de conclusies. Niettemin dienen de beschrijving en de tekeningen tot uitleg van de conclusies. De betwisting tussen partijen handelt over de interpretatie aan de hand van het Protocol inzake de uitleg van artikel 69 (BS, 7 oktober 1977).

35.-

Als dusdanig moeten volgens PRAXAIR ook de beschrijving en de tekeningen worden geraadpleegd om de gebruikte termen in het juiste daglicht te stellen, evenals om de betekenis en de reikwijdte van de in de conclusies opgeëiste uitvinding te verduidelijken. Bij toepassing van dit principe is het voor PRAXAIR duidelijk dat de klep van kenmerk 2 van conclusie 1 van het octrooi EP 1 000 291 B1 dient gelezen te worden als een klep die deel uitmaakt van een drukregelaar voor het regelen van een vaste druk van het gas dat verdeeld wordt vanaf het verdeelvat.

36.-

Voor ATMI daarentegen is de conclusie 1 van het octrooi duidelijk, inbegrepen de term klep, en behoeft zij geen interpretatie. Bovendien dient naar haar oordeel niet de vraag gesteld of het "UpTime®" sys-teem voorzien is van een regelaar voor het regelen van een vaste druk, aangezien de uitvinding geen betrekking heeft op de nauw-keurigheid van de drukregeling. De technische kenmerken van het

..26..e Blad                015714
pagina 25 van 30

"VAC" systeem zijn bovendien niet van die aard, dat zij de octrooi-rechten van ATMI zouden kunnen inkorten

37.-

Onder verwijzing naar de technische illustraties wil PRAXAIR aan-tonen dat in het "UpTime®" systeem geen sprake is van enigerlei drukregeling en dat de klep in de "UpTime®" gascilinders aldus slechts twee standen kent, namelijk volledig open en volledig toe. Voor de technische verduidelijking ervan verwijst PRAXAIR naar het octrooitechnisch verslag van Ir. P. Van Varenberg. De hoeveelheid gas die in de fase met openstaande klep wordt geleverd aan de externe inrichting, wordt bepaald door de instelling van de voornoem-de debietregelaar van die inrichting, die in functie van het gewenste debiet meer of minder kan worden opengezet. Met andere woorden hoe groter het gasdebiet, hoe lager de subatmosferische druk aan de uitgang. Dit heeft voor gevolg dat bij om het even welke stand van de debietregelaar geen enkele regeling van druk gebeurt door de klep. Hieruit blijkt voor PRAXAIR duidelijk dat de beide systemen twee totaal verschillende concepten belichamen, met het name het "Up Time®" systeem gericht op het leveren van een constant debiet en het "VAC" systeem gericht op het leveren van een constante druk.

Derhalve kan slechts besloten worden dat de "UpTime®" gascilin-ders geen gebruik maken van een drukregelaar zoals het vereist is door het ingeroepen Europees octrooi EP 1 000 291 B1. Voor PRAXAIR brengt dit met zich mee dat de "UpTime®" gascilinders geen inbreuk uitmaken op het octrooi zoals de draagwijdte ervan beschreven is in de oorspronkelijke tekst, en minstens door het be-schrijvend gedeelte van het octrooi, die beiden vereisen dat de door het octrooi opgeëiste klep deel uitmaakt van een drukregelaar.

2006/RK/407

**38.-**

ATMI reageert hierop door te stellen dat zelfs in die veeleisende inter-pretatie van PRAXAIR dat de klep deel moet uitmaken van een druk-regelaar, de "UpTime®" gascilinders nog steeds een inbreuk uit-maken. Voor haar is de klep in feite een eenvoudige soort van druk-regelaar. De eenvoudigste vorm van regelen is voor haar het gecon-troleerd openen en sluiten. Dat is precies wat vereist wordt in conclu-sie 1 van het octrooi. Met verwijzing van de Mc Graw-Hill Woorden-boek van wetenschappelijke en technische termen is een drukregelaar immers een open-sluit inrichting gebruikt op de uitlaat van een ge-sloten gas druk systeem, om een systeemdruk binnen een bepaald interval te houden. Daarnaast zou PRAXAIR in haar octrooi U.S. patent 5,937,895 met betrekking tot het "UpTime®" systeem zelf zo-wel de term klep, als regelaar, als drukregelaar door elkaar gebruikt hebben.

**39.-**

De wetenschappelijke waarde van de adviezen bijgebracht door de technische raadslieden van PRAXAIR ter oplossing van dit dispuut om het gebrek aan een drukregelende klep in de "UpTime®" gascilinder aan te tonen, wordt terecht door ATMI betwist gezien ze volledig ge-baseerd zijn op éénzijdige testen door PRAXAIR zelf uitgevoerd. Hun bevindingen worden trouwens ten stelligste tegengesproken door deze van Professor Ir. J. De Schutter, KU Leuven, in zijn verslag van 7 ja-nuari 2007 waar hij concludeert (blz. 40) dat zelfs als de conclusie 1 van het octrooi zou worden geacht beroep te doen op een drukrege-laar (quod non) dan nog de zogeheten 'toedieningsafsluitklep' van het "UpTime®" systeem naar zijn oordeel een drukregelaar is.

**40.-**

Bijgevolg dient vastgesteld dat het bestaan van een octrooi-inbreuk niet genoegzaam wordt weerlegd door PRAXAIR.

2006/RK/407

OMTRENT DE GEVORDERDE MAATREGELEN

41.-

Het komt de rechter in kort geding toe in geval van urgentie de belangen van partijen veilig te stellen, waarbij de rechten van partijen zoveel mogelijk worden gevrijwaard. Hij is verplicht, al naargelang de omstandigheden, enkel de minst ingrijpende en nuttige maatregel op te leggen.

Het feit dat de rechter in kort geding geen definitieve wijziging aan de rechtspositie van partijen mag aanbrengen, houdt niet in dat de bevolen maatregelen geen schade zouden mogen toebrengen aan de verwerende partij. Het bestaan van een ernstige betwisting met betrekking tot de rechten van partijen maakt dat een afweging van de belangen van partijen zich opdringt.

Het nadeel dat PRAXAIR kan lijden bij de toekenning van de maatregelen weegt echter niet op tegenover het voordeel voor ATMI. Hierbij is het niet onbelangrijk dat PRAXAIR bij de lancering van de "Up-Time®" gascilinders haar product gepromoot heeft in vervanging van de ATMI gascilinders die binnen de sector courant in gebruik waren. Recentelijk heeft PRAXAIR nog in een persbericht op 7 oktober 2006 aangekondigd haar productie en de verdeling van haar "UpTime®" gascilinders nog te verhogen. Voor ATMI is het relatief belang van de "VAC" gascilinders in haar activiteiten erg hoog, zeker in vergelijking met het aandeel van de "UpTime®" gascilinders aan de halfgeleiders industrie in het geheel van de internationale groep PRAXAIR. Het feit dat PRAXAIR wereldwijd leverings- en kwaliteitsakkoorden afgesloten heeft met producenten waardoor zij enorme schadeclaims riskeert, kan hierbij niet doorwegen. De penetratie van de "UpTime®" gascilinders in deze beperkte groep van afnemers maakt dat de exclusiviteit van het octrooi EP 1 000 291 B1 riskeert volledig te worden afgekalfd.

2006/RK/407

PRAXAIR toont trouwens aan dat de klantenbinding aan het product zeer hoog is ingevolge het verplicht doorlopen van zeer tijd- en kosten-intensieve kwalificatieprocessen vooraleer BF3 gas kan geleverd worden. Dit heeft voor gevolg dat een verloren klant nog moeilijk te recupereren valt.

42.-

Bijgevolg is het hoger beroep van PRAXAIR ongegrond en dient de opgelegde verplichting tot stopzetting van het uitgeven en verspreiden van informatie en/of publicitaire dragers die de "UpTime®" gas-cilinders voorstellen als een vervangproduct voor het concurrerend product van ATMI tegen verbeurte van een dwangsom behouden te blijven.

Het incidenteel beroep van ATMI is gegrond in die mate dat verbod geldt in die landen waar het Europees octrooi EP 1 000 291 B1 be-scherming biedt en erin staan aangeduid. Artikel 31 EEX Vo (EG 44/2001) belet niet dat een Belgische rechter een voorlopige of be-warende maatregel uitspreekt met een extra territoriale uitwerking in de mate dat hier een aanknooppunt bestaat (zie ook Cass., 3 septem-ber 1999, T.B.H., 2000, 128 met noot M Pertegás Sender).

Aangezien prima facie (op eerste gezicht) vastgesteld wordt dat de octrooi inbreuk voldoende zeker is om de gevorderde maatregelen, zoals in ondergeschikte orde gevorderd, door ATMI op te leggen, zijnde een voorlopig verbod tegen het plegen van octrooi-inbreuken inzake de commercialisering van de gascilinders in de aangeduide landen.

015718

2006/RK/407

.3e...e Blad

## OM DIE REDENEN:
## HET HOF,

Rechtsprekend op tegenspraak;

Gelet op art. 24 van de wet van 15 juni 1935 op het gebruik van talen in gerechtszaken;

Verklaart het hoger beroep toelaatbaar doch ongegrond.

Verklaart het incidenteel beroep toelaatbaar en gedeeltelijk gegrond.

Hervormt de bestreden beschikking en opnieuw wijzende;

Zegt voor recht dat het appellanten verboden is met miskenning van het Europees octrooi EP 1 000 291 B1 met ingang van heden nog verder gascilinders met het "UpTime®" systeem of met dezelfde kenmerken te vervaardigen, te laten vervaardigen, aan te bieden, in het handelsverkeer te brengen, te gebruiken, te vervoeren of te vullen voor zover zij betrekking hebben op handelingen die levering en gebruik betreffen in één der aangeduide landen in het octrooi, op straffe van een dwangsom van 45 000,- EUR per vastgestelde inbreuk vanaf de dag van betekening van huidige beslissing en dit totdat een definitieve uitspraak ten gronde tussengekomen is.

Bevestigt voor het overige de bestreden beschikking.

Verwijst appellanten in de kosten van beide aanleggen, deze tot op heden aan de zijde van geïntimeerde begroot op:

| dagvaardingen eerste aanleg | 1 106,35 EUR |
| rechtsplegingsvergoeding eerste aanleg | 242,94 EUR |
| rechtsplegingsvergoeding hoger beroep | 485,87 EUR. |

015719
pagina 30 van 30

2006/RK/407

.31...e Blad

Aldus gedaan en uitgesproken in openbare terechtzitting van

**VIJFENTWINTIG APRIL TWEEDUIZEND EN ZEVEN**

waar aanwezig waren :

| de heer | P. ADRIAENSEN | dd. Voorzitter |
| mevrouw | M. DOM | Raadsheer |
| de heer | B. BULLYNCK | Raadsheer |
| mevrouw | G. VERSYPT | Griffier |

G. VERSYPT                    B. BULLYNCK

M. DOM                    P. ADRIAENSEN

**tweeëndertigste en laatste blad**

Lasten en bevelen dat alle daartoe gevorderde gerechtsdeurwaarders dit arrest ten uitvoer zullen leggen;
Dat onze procureurs-generaal en onze procureurs des Konings bij de rechtbanken van eerste aanleg daaraan de hand zullen houden en dat alle bevelhebbers en officieren van de openbare macht daartoe de sterke hand zullen bieden wanneer dit wettelijk van hen gevorderd wordt;
Ten blijke waarvan dit arrest is ondertekend en gezegeld met het zegel van het Hof.
Voor gelijkvormige expeditie afgeleverd aan meester B. VANDERMEULEN, advocaat, die optreedt voor geïntimeerde.

Antwerpen, 27 april 2007



Gerda HELSSEN
E.a. adjunct-griffier

HOF VAN BEROEP - ANTWERPEN
burgerlijke griffie

| griffierechten | |
|---|---|
| expeditierecht BUR. nr. 2331 | |
| aantal blz. | tarief (EUR) |
| 30 | 2,85 |
| | |
| totaal (EUR) | 85,50 |

datum : 27 april 2007

G. HELSSEN,
e.a. adjunct-griffier.

Marc BEERTEN LIC. JUR. - Martine VERGAUWEN - Willy MERTENS - Roger VANDENHENDE - Jan DE BELDER

| Balansstraat | 117 | GERECHTSDEURWAARDERS | | 06/5939 GVK |
|---|---|---|---|---|

2018 ANTWERPEN 1
Ø
Fax            03 259 59 00
e-mail:        03 259 59 01
website :      bdmv@bdmv.net
Kantooruren :  www.bdmv.net
               van 9 uur tot 16 uur

Johan BOCKLANDT L.J.
Bart GEETS L.J.
Alain VAN DER STEICHEL L.J.
kand. gerechtsdeurwaarder

06/5939 GVK

*Te vermelden bij iedere betaling of briefwisseling*

ORIGINEEL

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
* 0 6 0 0 0 5 9 3 9 $ 0 0 0 0 9 1 4 1 7 *

⌐ AGTK

# BETEKENING - BEVEL

Het jaar tweeduizend en zeven, op zevenentwintig april voor geadresseerden sub 1 en 2 en op

twee mei                voor geadresseerde sub 3.

## OP VERZOEK VAN :

de vennootschap naar Amerikaans recht **ADVANCED TECHNOLOGY MATERIALS INC.**, waarvan de vennootschapszetel gevestigd is te Danbury CT 06810 (Verenigde Staten van Amerika), Commerce Drive 7,

- hebbens als raadslieden Meester Bruno Vandermeulen en Meester Ruben Peeters, advocaten te Brussel, met kantoor te 1040 Brussel, Oudergemlaan 22-28,  (tel. 02/282.6000; e-mail Bruno.Vandermeulen@twobirds.com  resp.  Ruben.Peeters@twobirds.com  ;  ref. ADVTM.0002)

- verzoekende partij, ten deze woonplaats kiezend op het kantoor van ondergetekende Gerechtsdeurwaarder.

Heb ik, ondergetekende, Alain VAN DER STEICHEL, plaatsvervangend Gerechtsdeurwaarder, handelende in vervanging van Willy MERTENS, Gerechtsdeurwaarder met standplaats te Antwerpen, die kantoor houdt te 2018 Antwerpen 1, Balansstraat 117,

BETEKEND en, met ieder afschrift van onderhavig exploot, een voor gelijkluidend verklaard afschrift gelaten aan:

1. de **N.V. PRAXAIR HOLDING**, ingeschreven in de Kruispuntbank van Ondernemingen onder het ondernemingsnummer 0437.603.028, waarvan de vennootschapszetel gevestigd is te 2900 Schoten, Metropoolstraat 17,

- aldaar de betekening doende en er afschrift van dit exploot latende, sprekende tot : *[handtekening]*

*[handtekening]*

zo verklaard, die het origineel *[handtekening]* heeft getekend voor ontvangst van het afschrift,

Blz.: 1/5

KBC 402-5501611-59      BjB 645-1008245-62      ING 320-0917406-50      ☏ 000-0089340-03

**Marc BEERTEN** LIC. JUR. - **Martine VERGAUWEN** - **Willy MERTENS** - **Roger VANDENHENDE** - **Jan DE BELDER**



GERECHTSDEURWAARDERS

Balansstraat          117
2018      ANTWERPEN 1
Ø            03 259 59 00
Fax           03 259 59 01
e-mail:       bdmv@bdmv.net
website :      www.bdmv.net
Kantooruren :   van 9 uur tot 16 uur

Johan BOCKLANDT L.J.
Bart GEETS L.J.
Alain VAN DER STEICHEL L.J.
kand. gerechtsdeurwaarder

**06/5939 GVK**

*Te vermelden bij iedere betaling of briefwisseling*

*gezien het exploot niet kon worden betekend overeenkomstig de art. 33 tot 35 van het Gerechtelijk Wetboek, heb ik aan het voormeld adres van de geadresseerde een afschrift ervan achtergelaten overeenkomstig art. 38 § 1 van zelfde Wetboek om           uur met melding dat ik hem een brief zal zenden in een per post aangetekende omslag, om gebeurlijk nog een eensluidend afschrift van dit exploot op mijn kantoor te komen afhalen;*

**2. de N.V. PRAXAIR,**
- zowel in eigen neem als in haar hoedanigheid van rechtsopvolgster van de N.V. PRAXAIR PRODUCTION, destijds met vennootschapszetel te 2070 Zwijndrecht, Scheldedijk 58, KBO nr. 0439.211.248 van dewelke de N.V. PRAXAIR alle rechten en verplichtingen heeft overgenomen ingevolge fusie door overneming van het volledig actief en passief vermogen, bij beslissingen van de buitengewone algemene vergaderingen van N.V. Praxair Production resp. N.V. Praxair dd. 31.08.2006;
- ingeschreven in de Kruispuntbank van Ondernemingen onder het ondernemingsnummer 0438.719.221, waarvan de vennootschapszetel gevestigd is te 2900 Schoten, Metropoolstraat 17,

- aldaar de betekening doende en er afschrift van dit exploot latende, sprekende tot :

*de heer peeters Franck, haar aangesteld*

zo verklaard, die het origineel *niet* heeft getekend voor ontvangst van het afschrift,

*gezien het exploot niet kon worden betekend overeenkomstig de art. 33 tot 35 van het Gerechtelijk Wetboek, heb ik aan het voormeld adres van de geadresseerde een afschrift ervan achtergelaten overeenkomstig art. 38 § 1 van zelfde Wetboek om           uur met melding dat ik hem een brief zal zenden in een per post aangetekende omslag, om gebeurlijk nog een eensluidend afschrift van dit exploot op mijn kantoor te komen afhalen;*

3. de vennootschap naar het recht van de staat Connecticut (Verenigde Staten van Amerika) **PRAXAIR INC.,** waarvan de vennootschapszetel gevestigd is te Danbury Connecticut 06810-5113 (Verenigde Staten van Amerika), 39 Old Ridgebury Road,

Aangezien zij in België geen gekende vennootschapszetel, bedrijfszetel of gekozen woonplaats heeft;

Dat haar zetel gevestigd is in de Verenigde Staten van Amerika;

Gelet op de Conventie van Den Haag van 15 november 1965;

Dienvolgens heb ik twee afschriften van onderhavig exploot, (alsmede de stukken erin vermeld), samen met een vertaling in het Engels en de voorgeschreven formulieren, onder aangetekende omslag met de luchtpost en met kennisgeving van ontvangst, heden afgegeven op het postkantoor te Antwerpen, toegezonden aan :

Blz.: 2/5

Marc BEERTEN LIC. JUR. - Martine VERGAUWEN - Willy MERTENS - Roger VANDENHERDE - Jan DE BELDER

| Balansstraat | 117 | GERECHTSDEURWAARDERS | | 06/5939 GVK |
| --- | --- | --- | --- | --- |

Balansstraat          117
2018                ANTWERPEN 1
∅                        03 259 59 00
Fax                      03 259 59 01
e-mail:              bdmv@bdmv.net
website :            www.bdmv.net
Kantooruren :    van 9 uur tot 16 uur

GERECHTSDEURWAARDERS



Johan BOCKLANDT L.J.
Bart GEETS L.J.
Alain VAN DER STEICHEL L.J.
kand. gerechtsdeurwaarder

**06/5939 GVK**

*Te vermelden bij iedere
betaling of briefwisseling*

PROCESS FORWARDING INTERNATIONAL
633 Yesler Way
Seattle, WA 98104
USA

met verzoek de afgifte aan geadresseerde te doen bewerkstelligen overeenkomstig art. 5) a., van de bepalingen van voornoemde Conventie.

Tevens heb ik, overeenkomstig art. 40 van het Belgisch Gerechtelijk Wetboek, een afschrift van onderhavig exploot, (alsmede de stukken erin vermeld), met een vertaling in het Engels, toegezonden aan geadresseerde aan haar hiervoor vermeld adres,
a) onder aangetekende omslag met de luchtpost en met kennisgeving van ontvangst,
b) onder aangetekende omslag met de gewone post en met kennisgeving van ontvangst,
heden afgegeven op het Postkantoor te Antwerpen.

Bovendien heb ik per fax (nr. +001.203.837.2515), alsook per e-mail (jim_breedlove@praxiar.com) een afschrift van onderhavig exploot, (alsmede de stukken erin vermeld), met een vertaling in het Engels, toegezonden aan haar Vice President, General Counsel & Secretary (*vertaald : "Vice-Voorzitter, Hoofd Bedrijfsjurist & Secretaris*), de heer James T. Breedlove.

De bewijzen van deze zendingen heb ik aan het origineel van onderhavig exploot gehecht;

- van de uitgifte in uitvoerbare vorm van een arrest gewezen tussen partijen op vijfentwintig april tweeduizend en zeven door de   ACHTSTE KAMER van het HOF VAN BEROEP te ANTWERPEN, rechtdoende in burgerlijke zaken.

Doende deze betekening tot kennisgeving en leiding van de betekende partijen, tot zulke doeleinden als naar recht en onder alle voorbehoud.

En krachtens hogerbetekend arrest, heb ik terzelfdertijd aan voornoemde betekenden BEVEL gedaan om onmiddellijk aan mij, gerechtsdeurwaarder, houder van de stukken en belast met de inning, tegen ontvangstbewijs, **TE BETALEN** :

1. de kosten begroot in het arrest,
   - dagvaardingen eerste aanleg :                                          1.106,35 €
   - rechtsplegingsvergoeding eerste aanleg :                         242,94 €
   - rechtsplegingsvergoeding hoger beroep :                         485,87 €

Blz.: 3/5

Marc BEERTEN Lic. Jur. - Martine VERGAUWEN - Willy MERTENS - Roger VANDENHENDE - Jan DE BELDER

| | | GERECHTSDEURWAARDERS | | |
|---|---|---|---|---|
| Balansstraat | 117 | | | **06/5939 GVK** |
| 2018 | ANTWERPEN 1 | | | |
| ⌀ | 03 259 59 00 |  | Johan BOCKLANDT l.j. | *Te vermelden bij iedere* |
| Fax | 03 259 59 01 | | Bart GEETS l.j. | *betaling of briefwisseling* |
| e-mail: | bdmv@bdmv.net | | Alain VAN DER STEICHEL l.j. | |
| website : | www.bdmv.net | | kand. gerechtsdeurwaarder | |
| Kantooruren : | van 9 uur tot 16 uur | | | |

2. de kosten van uitgifte van het arrest :                                    85,50 €

3. de kosten van onderhavig exploot, onderaan vermeld.

Onverminderd alle andere welkdanige rechten van verzoekende partij en zonder enige schadelijke erkentenis,

<u>Onder aftrek van de sommen die zullen bewezen worden geldig op afkorting zijn betaald.</u>

Aan de betekende partijen verklarende dat, bij gebreke aan onderhavig bevel tot betaling te voldoen, zij daartoe zullen worden gedwongen o.m. na verloop van de door de wet bepaalde termijn, zijnde ÉÉN DAG VRIJ, door het uitvoerend beslag op hun meubelen, roerende goederen en koopwaren, zonder nadeel aan alle andere middelen tot tenuitvoerlegging.

<u>WAARVAN AKTE</u> . -

Afschrift(en) zo nodig afgegeven onder gesloten omslag, conform artikel 44 van het Gerechtelijk Wetboek.

<u>KOSTEN</u> : negenhonderd en drie euro en dertig cent, eventueel te vermeerderen met de kosten van vertaling, rollen vertaling en kosten van uitreiking in Amerika zoals vermeld op het origineel.

De Gerechtsdeurwaarder,

Blz.: 4/5

**Marc** BEERTEN L.IC. JUR.  –  **Martine** VERGAUWEN  –  **Willy** MERTENS  –  **Roger** VANDENHERDE  –  **Jan** DE BELDER

| | |
|---|---|
| Balansstraat        117 | GERECHTSDEURWAARDERS |
| 2018                    ANTWERPEN 1 | |
| Ø | |
| Fax                    03 259 59 00 | |
| e-mail:                03 259 59 01 | Johan BOCKLANDT L.J. |
| website :              bdmv@bdmv.net | Bart GEETS L.J. |
| Kantooruren :          www.bdmv.net | Alain VAN DER STEICHEL L.J. |
| van 9 uur tot 16 uur | kand. gerechtsdeurwaarder |



**06/5939 GVK**

*Te vermelden bij iedere betaling of briefwisseling*

| | |
|---|---:|
| Vast Recht | 108,52 |
| Afschriften | 108,50 |
| Geschriften | 575,70 |
| Opzoekingen | 22,10 |
| Vacatie Artikel 38 | 9,79 |
| Verplaatsing | 8,69 |
| Port buitenland | 45,00 |
| --------------------------------------------- | |
| Totaal rechten | 878,30 |
| | |
| Registratie | 25,00 |
| | |
| TOTAAL | 903,30 |
| | |
| Port | 9,64 |
| Vertaling | 95,00 |
| Rollen vertaling | 250,80 |
| Uitreiking VSA | 92,16 |
| --------------------------------------------- | |

ALGEMEEN TOTAAL : 1.341,26 €
==============

*Vertaling arrest :*

KBC 402-5501611-59        BjB 645-1008245-62        ING 320-0917406-50        000-0089340-03

**Marc BEERTEN** Lic.Jur.  -  **Martine VERGAUWEN** -  **Willy MERTENS**  -  **Roger VANDENHENDE**  -  **Jan DE BELDER**
**PROCESS-SERVERS**

Balansstraat 117
B- 2018 ANTWERP 1
Phone        (03) 259.59.00
Fax           (03) 259.59.01
e-mail        bdmv@bdmv.net
Website      www.bdmv.net
Office hours 9 a.m. - 4 p.m.

Johan BOCKLANDT,  L.J.,
Bart GEETS, L.J.
Alain VAN DER STEICHEL, L.J.
Cand. Process-Servers

06/5939 GVK

*Please quote*

---

<u>TRANSLATION</u>

# SERVICE - ORDER TO PAY
=========================

The year two thousand and seven, this twenty-seventh day of April concerning the addressee sub 1 and 2, and this second day of May concerning the addressee sub 3.

At the request of :
------------------------

The company under American law **ADVANCED TECHNOLOGY MATERIALS INC.**, with registered office at 7 Commerce Drive, Danbury, CT 06810 (United States of America),

- its counsels being <u>Maître Bruno Vandermeulen and Maître Ruben Peeters</u>, lawyers at Brussels, practising at 22-28 Oudergemlaan, 1040 Brussels (phone 02/282.6000 ; e-mail <u>Bruno.Vandermeulen@twobirds.com</u>, resp. <u>Ruben.Peeters@twobirds.com</u> ; ref. : ADVTM.0002)

- Plaintiff, for the purpose hereof having its address for service at the office of the undersigned Process-Server.

I the undersigned, **Alain VAN DER STEICHEL**, Substitute Process-Server acting in replacement of **Willy MERTENS**, Process-Server in residence in Antwerp, practising at 117 Balansstraat, 2018 Antwerp 1,

1

**HAVE SERVED UPON** and with each copy of this writ, left a certified true copy with :

1.    **N.V. PRAXAIR HOLDING**, entered in the Crossroads Bank of Enterprises under enterprise no. 0437.603.028, with registered office established at 17 Metropoolstraat, 2900 Schoten,

where effecting the service and leaving a copy of this writ, speaking to :

so declared, who has            signed the original for receipt of the copy.

*And since the writ could not be served in accordance with sections 33 to 35 of the Judicial Code, I have left a copy thereof at the aforesaid address of the addressee in accordance with section 38 § 1 of the same Code, at                 , indicating that I will send a notice under registered cover to the addressee, inviting the latter to collect another certified copy of this writ at my office.*

2.    **N.V. PRAXAIR,**
- both in its own name and in its capacity of successor of N.V. PRAXAIR PRODUCTION, at the time having its registered office at 58 Scheldedijk, 2070 Zwijndrecht, Crossroads Bank of Enterprises no. 0439.211.248, N.V. PRAXAIR having taken over all its rights and obligations by merger through the taking-over of all of the assets and liabilities decided by the extraordinary general meetings of N.V. Praxair Production, resp. N.V. Praxair on August 31, 2006,
- entered in the Crossroads Bank of Enterprises under enterprise no. 0438.719.221, with registered office established at 17 Metropoolstraat, 2900 Schoten,

where effecting the service and leaving a copy of this writ, speaking to :

so declared, who has            signed the original for receipt of the copy.

*And since the writ could not be served in accordance with sections 33 to 35 of the Judicial Code, I have left a copy thereof at the aforesaid address of the addressee in accordance with section 38 § 1 of the same Code, at                 , indicating that I will send a notice under registered cover to the addressee,*

2

*inviting the latter to collect another certified copy of this writ at my office.*

3.      The company under the law of the State of Connecticut (United States of America) **PRAXAIR INC.**, with registered office established at 39 Old Ridgebury Road, Danbury, Connecticut 06810-5113 (United States of America).

Whereas it has no registered office, no principal place of business and no address for service known in Belgium ;

Whereas it is established in the United States of America ;

Considering the Convention of The Hague dated November 15, 1965 ;

Therefore I have sent two copies of this writ (and of the documents mentioned in it) with an English translation and the prescribed forms under registered cover with notice of receipt card, all this handed today at the Antwerp Post Office, by airmail to :

PROCESS FORWARDING INTERNATIONAL
910 5th avenue
SEATTLE, WA 98104
U.S.A.

with the request to have a copy delivered to the addressee in accordance with the provisions of article 5) a. of the said Convention.

Furthermore and in pursuance of section 40 of the Judicial Code, I have sent two copies of this writ (and of the documents mentioned in it) with an English translation to the addressee at its above-mentioned address,

a)      one under registered cover, with notice of receipt card, by airmail,

b)      one under registered cover, with notice of receipt card, by regular mail,

all this handed today at the Antwerp Post Office.

3

Furthermore, I have sent, by fax (no. +001.203.837.2515), as well as by e-mail (jim_breedlove@praxiar.com) a copy of this writ (and of the documents mentioned in it) with an English translation to its Vice-President, General Counsel & Secretary, Mr James T. Breedlove.

I have annexed the receipts of registration of these covers and the transmission reports to the original of this writ.

- of the authenticated copy in enforceable form of a decision on appeal given between parties on the twenty-fifth day of April two thousand and seven, by the EIGHTH DIVISION of the ANTWERP COURT OF APPEAL, doing justice in civil matters.

Effecting the service for information and guidance of the served, for all legal purposes and without prejudice.

And under the decision on appeal served hereinabove, I have, by this same writ, ORDERED the afore-named served **TO PAY** immediately to me, Process-Server, holder of the documents and in charge of collecting, against receipt :

1. costs taxed in the decision on appeal
   - writs of summons first instance
   - compensation for proceedings first instance
   - compensation for proceedings appeal

   1,106.35 EUR
   242.94 EUR
   485.87 EUR

2. the cost of the authenticated copy of the decision on appeal

   85.50 EUR

3. costs of this writ, as mentioned below.

Without prejudice of all other rights of the plaintiff and without any prejudicial acknowledgment.

Less the amounts shown to have been validly paid on account.

Declaring to the served that should they fail to comply with the order to pay,

4

they will be forced to do so, among other things after expiry of the legally fixed period of time, being ONE CLEAR DAY, by the execution of their furniture, personal property and merchandise, subject to all other means of execution.

WHEREOF RECORD.

Copy (copies) delivered, if necessary in a closed envelope in pursuance of section 44 of the Judicial Code.

Cost : nine hundred and three euros and thirty cents, to be increased by costs of translation, copies translation and costs of delivery in America, if any, as mentioned in the original.

The Process-Server,
signed : Alain VAN DER STEICHEL

---

CERTIFIED TRUE TRANSLATION
**Anne CLEEREN**, sworn translator to the Court of First Instance in Antwerp.




5

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

Number:
Rep. No.: 2007/3232

**Hearing of:**
**25 APRIL 2007**

**FINAL JUDGEMENT**

The COURT OF APPEAL, having session in ANTWERP
EIGHTH CHAMBER, ruling in civil cases, has rendered
the following judgement:

**Concerning the case: 2006/RK/407**

1. **NV PRAXAIR HOLDING**
   with its registered office at 2900 Schoten, Metropoolstraat 17, company registration number 0437.603.028
2. **NV PRAXAIR**
   with its registered office at 2250 Olen, Lammerdries 29, company registration number 0438.719.221, in its own name and in its capacity as legal successor of NV PRAXAIR PRODUCTION, which at that time had its registered office at 2070 Zwijndrecht, Scheldedijk 58, company registration number 0439.211.248, in respect of which nv Praxair has assumed all rights and duties consequent to a merger by means of a takeover of the entire assets and liabilities, by means of decisions of the extraordinary general meetings of nv Praxair Production and nv Praxair, both held on 31 August 2006;

3. **PRAXAIR Inc.,** a company under the laws of the state of Connecticut (USA), with its registered office at 39 Old Ridgebury Road, 06810-5113, Danbury, Connecticut, USA;

   APPELLANTS
   against the decision of the President of the Court of first instance in Antwerp, having session in urgency proceedings on 26 October 2006

   Represented by Mr. Geert Glas, attorney-at-law, practising at 1150 Brussels, Tervurenlaan 268A, and Mr. Filip Van Elsen, attorney-at-law, practising at 2600 Antwerp, Uitbreidingstraat 80;

VERSUS:

**ADVANCED TECHNOLOGY MATERIALS INC;**
a company under American law, with its registered office at 7 Commerce Drive, Danbury CT 06810, USA, electing domicile at, among other places, the office of the court bailiff Marc Beerten, Balansstraat 117, 2018 Antwerp;

   DEFENDANT
   Represented by Mr. Bruno Vandermeulen and Mr. Ruben Peeters, attorneys-at-law, practising at 1040 Brussels, Oudergemlaan 22-28;

Case 5:08-cv-00869-JW    Document 30-6    Filed 03/19/2008    Page 45 of 63

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

Given that the procedural documents as required by law have been properly submitted, including the appealed decision pronounced - after having heard the parties - by the president of the court of the first instance at Antwerp on 26 October 2006, served on 31 October 2006, and against which a timely and valid appeal, according to the required form, was filed with the Registrar of this Court on 21 November 2006.

Given the incidental appeal.

The original claim was instituted by ADVANCES TECHNOLOGY MATERIALS Inc., a company under the laws of the state of Connecticut (USA), (referred to hereinafter as: ATMI) and was aimed at, by means of a provisional measure, in respect of (1) PRAXAIR HOLDING nv, (2) PRAXAIR PRODUCTION nv, (3) PRAXAIR nv and (4) PRAXAIR Inc., a company according to the laws of the state of Connecticut (USA) (referred to hereinafter as PRAXAIR)

➢ hearing each of them enjoined, by means of preliminary measure, from infringing the European patent EP 1 000 291 B1 by manufacturing, having manufactured, having in stock, offering, bringing into circulation, using, filling, or importing for these purposes, gas-cylinders known as "UpTime", or any other gas-cylinder with the same characteristics, subject to a penalty of forty five thousand Euro (45.000,- Euro) per individual gas-cylinder which one of the aforementioned injunctions is violated with, and this until a decision on the merits has been rendered.

➢ hearing each of them provisionally ordered, subject to a penalty of one hundred thousand Euro (100.000,- Euro) per day or part of a day that the injunction is violated, to stop publishing and spreading information and/or advertising carriers that contain an indication, picture, and/or description of the litigious gas-cylinders, or to make publicity for these products in any other way;

➢ to rule that the requested Court Order will expire if claimant, within one month after the grant of the requested decision, has not filed suit on the merits for patent infringement relating to EP 1 000 291 B1;

2.-

The first judge declared the claim admissible and founded, such that:

➢ PRAXAIR is ordered, awaiting a decision on the merits, to stop publishing and spreading information and/or advertising carriers that represent the litigious "UpTime" cylinders as a replacement product for the competing product of ATMI and enjoined from making publicity for this product in any way, subject to a penalty of 100.000,00 Euros per established violation.

➢ it was ruled that the requested injunction will no longer be effective if claimant, within a month after the present order, has not filed an action for patent infringement in relation to EP 1 000 291 B1.

The first judge considered in essence:

a. CONCERNING THE URGENCY WITH RESPECT TO THE IMPOSITION OF AN INJUNCTION AGAINST COMMERCIALISATION :

* the granting of the measure requested in the main order for the imposition of the injunction against committing an infringement of the European patent EP 1 000 291 B1 of ATMI, by means of the commercialisation of gas cylinders that are known under the name "UpTime®" would amount to the grant of a quasi monopoly position until the judgement on the merits,

Case 5:08-cv-00869-JW    Document 30-6    Filed 03/19/2008    Page 46 of 63

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

* the urgency invoked is based on the fact that ATMI, due to the alleged patent infringements of PRAXAIR, suffers from an ever-increasing disadvantage which is difficult to be merely financially compensated, since it is not only forced to lose profits but above all it is threatened with the devaluation of ATMI's patent rights,

* it is not disputed that the "UpTime®" cylinders have been marketed by PRAXAIR since 2003, that they have made publicity for the product and have shown it at trade fairs,

* that the possibly unjustified stolen market share can be compensated by means of a compensation for damage suffered,

* the requested measure is viewed as to much intervening in the circumstances and no longer constitutes a protective measure.

b. CONCERNING THE INJUNCTION AGAINST MAKING PUBLICITY FOR THE GAS CYLINDERS:

* the parties do not dispute that ATMI owns a patent, granted after a examination by the European Patent Office and that the opposition proceedings as such do not impinge on the validity of the patent,

* awaiting a result of an action on the merits, in order to safeguard the interests of the parties urgently, there is good reason indeed to enjoin PRAXAIR, subject to a penalty, from acting aggressively in order to steal additional market share from ATMI.

3.-

The appeal is intended to confirm the appealed decision to the extent that it dismisses as unfounded the claim for the imposition of the injunction from infringing the European patent EP 1 000 291 B1 of ATMI by means of the commercialisation of gas cylinders, for the rest to nullify this decision in respect of which the appellants are enjoined from issuing and distributing information and/or information carriers that present the disputed cylinders "UpTime®" as a replacement product for the competing product of ATMI and impose an injunction from making any form of publicity for this product subject to a penalty of EUR 100,000.00 for each established violation.

The appellants, PRAXAIR, present as grievance against this decision that it contains conflicting elements in it reasoning by, on the one hand, refusing the injunction against commercialisation due to the evident lack of urgency and insufficient probability of the invoked rights, and on the other hand allowing the injunction against advertising although this conflicts with the stipulations of Article 584 of the Belgian Legal Code.

PRAXAIR raises the argument that ATMI in fact already knew of their activities in Belgium since December 2003 and ATMI has not seen any aspect of law to make the patent the subject of an opposition proceedings taking into account the gravity of the invoked rights.

4.-

The defendant, ATMI, demands by means of an incidental appeal the partial modification of the ruling in respect of the refusal to impose the preliminary injunction against committing patent infringements concerning the commercialisation of the gas cylinders.

ATMI furthermore reiterates its original main claim.

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

In subsidiary order, it requests that the measure be applied only to the extent that it refers to activities aimed at the delivery and the use of the forbidden gas cylinders in one of the countries indicated in the European patent EP 1 000 291 B1.

In most subsidiary order, it requests that the measure be applied only to the extent that it refers to gas cylinders that are filled with a gas other than BF3 and to limit the forbidden activities concerning BF3 gas cylinders to distributing and supplying customers that had not yet been served before 17 August 2006.

**FACTS**

5.-
The circumstances and the objectives of the dispute have been set out in the appealed decision so that the Court refers to what follows here below. It suffices to repeat as follows.

ATMI describes itself as a highly specialised company with sales and research centres in the United States of America, Europe and Asia. It is one of the top suppliers of materials and systems to the semi-conductor industry thanks to its "Safe Delivery Systems (SDS)". In the 1990s, it developed this sub-atmospheric gas delivery system "SDS" that proved to be a safe and successful alternative to the high-pressure systems existing up to then. ATMI owns a European patent on this high-pressure gas cylinder that opens and allows gas to pass through only if the outside atmosphere is absolutely safe.

PRAXAIR group is an American multinational corporation that has been active for more than 35 years in Belgium. PRAXAIR took over the activities of Union Carbide and processes and delivers a wide range of gas products via its Belgian subsidiary companies. The activities of PRAXAIR are not limited to merely selling industrial gasses but are also well known due to the development of the technology of liquidising air at extremely low temperatures.

In the second half of the 1990s, PRAXAIR developed, in collaboration with UOP LLC, its own storage and dispensing system for special gasses that was commercialised under the name "UpTime®". Due to this development of an own storage and dispensing system of gasses, ATMI was confronted with a new competitor in the market of BF3 gas.

This "UpTime®" gas cylinder was presented to the American public for the first time at the SEMICON WEST trade fair in July 2003.

ATMI accuses PRAXAIR of having copied this cylinder for industrial gasses for the semiconductor industry and, via aggressive advertising, of offering its "UpTime®" Cylinder as a direct replacement product.

PRAXAIR, on the other hand, states that it was only after the fully independent development of its revolutionary "UpTime®" cylinder was brought to the attention of ATMI that the latter company itself designed a mechanical system under the name "VAC," for which the European patent EP 1 000 291 B1 was granted on 28 September 2005, this date, however, turning out to be later than the date of the patent applications filed by PRAXAIR.

On 10 August 2006, the judge of seizures imposed an injunction against PRAXAIR from disposing of gas cylinders suspected of infringement, subject to payment of a penalty. After third party opposition proceedings, this injunction was partially lifted according to the decision

of 6 September 2006, as far as disposing of gas cylinders alleged to be copies was concerned. This decision was confirmed by judgement of this Court of 20 December 2006 (3rd chamber).

**JUDGEMENT**

6.-

Based on the presentation of the parties and the documents submitted, the Court deliberates as follows.

Both parties are competitors in the delivery of highly toxic gasses to companies that manufacture semi-conductors.

ATMI is holder of the European patent EP 1 000 291 B1 that was granted on 28 September 2005 for a Fluid Storage and Dispensing System and that carries a priority date of 28 April 1998, as claimed in the PCT application WO 1999/056056, based on the American priority application filed on 28 April 1989.

Currently, opposition proceedings are pending concerning this patent before the European Patent Office (EPO) in Munich. Despite this, the parties agree that these proceedings do not affect the validity of the patent.

7.-

PRAXAIR is also of the opinion that the validity of the asserted patent rights is subject to serious contestation on a number of grounds, including the lack of novelty and inventive step as well as the inadmissible extension of the main claim of the patent. This dispute would have encouraged the American court and Korean Patent Office to declare the relevant patents of ATMI null and void. In this context, the State Court of Düsseldorf in the pending action with the judgment of 9 November 2006 would have decided to suspend the action given the serious possibility that the ATMI patent might be revoked in the opposition proceedings.

8.-

For PRAXAIR, the "UpTime®" gas cylinder offers the advantage of tripling the storage capacity and of the compatibility with various gasses. This is mainly due to the fact that the system is of a mechanical nature, while the conventional models make use of an absorbing sponge for the drive. Incidentally, this "UpTime®" gas cylinder was furthermore first presented to the public at the SEMICON WEST trade fair in San Francisco in July 2003.

Filling "UpTime®" gas cylinders with BF3 gas takes place exclusively for the entire PRAXAIR group and all its customers worldwide from the high technology installation in Oevel that was inaugurated in 2003. Already at the presentation in July 2003, PRAXAIR would have made no secret about the fact that these products were filled and distributed from its plant in Oevel.

Previously, ATMI had the market of the sub-atmospheric dispensing and storage system in its possession due to its "SDS" system developed in 1990. The disadvantage of this would be that it could be used only for a limited number of gasses and that they would have a limited storage capacity. Only later on, after ATMI would have learned about the development of a revolutionary "UpTime®" gas cylinder, the company would have started developing the mechanical "VAC" system that is the subject of the European patent EP 1 000 291 B1.

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

PRAXAIR emphasizes that this European patent relates to the recently developed mechanical "VAC" system and does not concern the existing "SDS" system. The special feature of the "VAC" system is the fact that the control mechanism is a valve that is located inside the gas cylinder so that the valve is protected against external blows that might damage or dislocate it. Nevertheless, for PRAXAIR, the "VAC" system is of a more recent date than the "UpTime®" system designed by PRAXAIR.

9.-

Apart from that, PRAXAIR submits that in the balance of interests, account must be taken of the fact that when changing gas suppliers, a specific qualification process must be followed that normally takes six to twelve months, and which entails a very high investment of both time and money. Referring to the cost and time-intensive qualification process for suppliers of gas cylinders, it is clear that if the requested measures are granted, the customers will in no way wish to undertake this intensive testing procedure once more. According to PRAXAIR, this would mean in practice that the rights of the parties would be affected in a final and irrevocable manner.

10.-

For its part, ATMI confirms that two systems have been developed and commercialised. On the one hand, the "SDS" system was developed with the result that gas can be stored in the cylinder with sub-atmospheric pressure by means of a special chemical process according to which gas must be sucked out of the cylinder and on the other hand, at the request of the semi-conductor manufacturers, the "VAC" system which had to ensure a safe storage of gas by providing one or two closed valves in a high pressure gas cylinder that opens only when the appropriate suction (vacuum pressure) is present at the cylinder exit (dual port valve).

11.-

It is the second innovation, the "VAC" system, for which the European patent for a Fluid Storage and Dispensing System has been granted, that is now in dispute. The special characteristic of the system comprises a valve that is located inside the gas cylinder and the fact that the valve opens only when a gas under pressure, that is not higher than a certain sub-atmospheric pressure, is applied from the outside of the vessel. The importance of the invention therefore relates to the safety system.

ATMI heavily disputes that the "UpTime®" gas cylinder - for which PRAXAIR acquired the patent rights for the United States from U.O.P. - has the same specific characteristics as its "VAC" system, because in the "UpTime®" system the valve is located outside the cylinder and it does not have a "dual port valve" (see above).

The "VAC" system, would have been launched on the market already in 2000 before there was any mention of the "UpTime®" system. Only in the summer of 2006, PRAXAIR would have made public statements in which for the first time the company stated in a press release that the "UpTime®" gas cylinders were filled and marketed in Oevel. In the descriptive seizure action and the subsequent third party opposition, it moreover has been established that the American parent company supplies the gas cylinders that are filled in Belgium and it plays a coordinating role in the marketing and sales activities of these gas cylinders.

In the meantime, on 24 November 2006, ATMI has served a writ of summons before the court of first instance in Antwerp for patent infringement.

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

## CONCERNING THE URGENCY IN RESPECT OF IMPOSING AN INJUNCTION AGAINST COMMERCIALISATION.

12.-
The President of the Court of the first instance, pursuant to Article 584, Clause 1 of the Belgian Judicial Code, in the cases he considers urgent, renders a provisionally enforceable ruling in all cases, other than those which the Law detracts from the Judiciary.

The urgency is normally recognised each time when an immediate decision is desirable in order to avoid damage of a certain nature or serious hindrance, and therefore it is possible to make use of an urgency action when the normal course of justice does not have the ability to settle the dispute in time (see also Cass. (High Court of Appeal), 11 May 1990, RC905B4, R.W., 1990-1991, 987).

This basic requirement of urgency exists when the measures taken are objectively useful for settling the dispute and, due to the circumstances peculiar to the case, are urgent, i.e. when if they were to be postponed they would no longer be useful or could no longer take place (E. Krings, Het kort geding naar Belgisch recht (The urgency action according to Belgian law), T.P.R., 1991, 1068). This requirement of urgency must be complied with, therefore, both at the time of the introduction, and at the time of the ruling.

13.-
The urgent nature of the claimed measures is apparent in the first place in view of the legal protection that is awarded to intellectual property rights. The cease of a patent infringement is therefore to be considered, in principle, as urgent already on the nature of the case alone. Indeed, there is international recognition that the suppression of violations of intellectual rights can be efficient only if this can be enforced speedily and via provisional measures (see also Article 9 of the EC directive 2004/48/EC of 29 April 2004 concerning the measures and actions to safeguard the maintenance of intellectual property rights, BL L 57, 30 April 2004, pages 45-86).

14.-
What PRAXAIR criticises is that the invoked urgency is in fact due to the conduct of ATMI itself. Due to its own actions or omission to take action, ATMI is deemed to bear itself the responsibility for the damage that it tries now to avoid by claiming provisional measures (see also Antwerp, 7 December 2004, N.J.W., 2005, 770).

PRAXAIR states that in fact ATMI was already aware for a long time of her activities in Oevel. The reference to the press release in July 2003 demonstrates sufficiently, according to PRAXAIR, that ATMI was aware of the "UpTime®" gas cylinders. Furthermore, the "UpTime®" gas cylinder was presented to the public at one of the leading trade fairs for the semiconductor industry, the SEMICON WEST trade fair in San Francisco (USA) in July 2003. At this trade fair, PRAXAIR would have made no secret of the fact that the "UpTime®" gas cylinders were filled in its plant in Belgium (Oevel) for the European market. The launch of the new filling centre in Oevel was, furthermore, widely reported in the trade journals in that period as the nerve centre of the worldwide delivery of "UpTime®" gas cylinders. Therefore, at least since the beginning of 2005, ATMI should have been aware of the activities of PRAXAIR also in view of the patent disputes introduced in Germany, so that it cannot be assumed that ATMI only via the press release of 10 July 2006 heard for the first time that the litigious cylinders were filled and marketed in Belgium.

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

15.-
Together with ATMI, this Court must establish, however, that it can be made plausible that it first awaited the results of opposition proceedings before seeking provisional measures. It is however understandable due to the persistent and incessant nature of patent infringements that ATMI saw itself nevertheless obliged to institute urgency proceedings.

16.-
The balance of interests has nothing to do with urgency conditions. The court will balance the interests or the respective rights of the parties only after the claims have been considered urgent by the court in urgency proceedings (see further P. Taelman, Het kort geding (Urgency proceedings), P&B, 1997, No. 2, page 204).

In the balance of interests, the damage that a party will suffer if the situation is maintained is compared to the damage that the other party would suffer in the assumption that the claim is granted. In the context of continued patent infringements as presented here, a reference to the doctrine that promotes a balance of interests is not useful in urgency proceedings, when the patentee invokes the protection by the court to counter the violation of its apparent rights.

ATMI emphasizes rightly that otherwise it runs the risk of losing, over time, a considerable share of its clientele since it may lose the exclusive character of its patent and its credibility among the public. A mere compensation in the form of financial damages is not able to fully repair that prejudice (see also Brussels, 19 August 1994, pas., 1994, II, 108). Indeed, the publicity injunction that was granted is insufficient and is not able to safeguard ATMI's interests.

Consequently, the condition of urgency of the measures requested is complied with.


**CONCERNING THE PROVISIONAL NATURE OF THE MEASURE**

17.-
The provision of Article 1039 of the Belgian Judicial Code that the decisions in urgency proceedings can not prejudice the case itself, means simply that the judge who decides on the merits is in no way bound by what the judge in urgency proceedings has decided in . It is sufficient that the invoked rights are sufficiently apparent to support a provisional measure, without involving rules of law that could not reasonably support the ordered measure (see also Cass., 5 May 2000, RW 2000-20001, 589)

The judge in urgency proceedings can therefore support his decision on a provisional assessment of the merits of the case.


18.-
This means that the judge in urgency proceedings can grant the requested measure only if there is an appearance of rights that justifies taking such a decision. The judge in urgency proceedings who in the investigation of the apparent rights of the parties involves rules of law that cannot sufficiently support the provisional measure that he orders, exceeds the limits of his authority (see also Cass., 6 June 2003, T.B.H., 2004/3, 258 with a note of J. Verlinden, (Assessment of the rights of parties and balance of interests in urgency proceedings ).

Case 5:08-cv-00869-JW    Document 30-6    Filed 03/19/2008    Page 52 of 63

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

Furthermore, in a summary action, the judge can not order any measures as a consequence of which the rights of the parties are affected in a final and irrevocable manner, but only certain measures to safeguard rights, if the existence of a right is sufficiently likely to justify taking a decision. This entails that a judge ruling in urgency proceedings can not cause a definite change in the legal position of the parties and he can thus legally not cause any prejudice to the merits of the case. This does not prevent that complying with the provisional order may bring about definite, and actually irreparable consequences. For this it is not required either that the invoked rights need to have an undisputable nature. It is sufficient that the judge in urgency proceedings restricts his investigation to an investigation of the apparent rights of the parties.

19.-
PRAXAIR maintains that the European patent EP 1 000 291 B1 is the consequence of an ostensible unlawfully obtained recognition, so that the validity of the invoked patent right is in its opinion not proven in any way.

With reference to Article 52 of the European Patent Convention of 5 October 1973 (referred to hereinafter as the EPC) and Article 2 of the Belgian Patent Act (referred to hereinafter as the Patent Law) for PRAXAIR any invoked patent, in order to be valid, must comply with the requirements of novelty and inventive step. Due to the non-observation of these validity requirements, the ATMI patent is now the subject of opposition proceedings at the European Patent Office (EPO).

That these opposition proceedings are not undertaken rashly or lightly, can be deducted according to PRAXAIR from the fact that it is based on no less than nine prior art patents that were not part of the file before the EPO examiner. Given the seriousness of this, the court could "prima facie" (at first sight) establish that validity objections raised against the ATMI patent exist that are so serious that ATMI does not prove the existence of sufficiently manifestly apparent rights.

20.-
ATMI on the other hand states that the validity of the European patent may at first sight be assumed in view of the preceding examination by the EPO. It must be investigated whether the legal title that it is based on is sufficiently serious to be considered for legal protection, without the presented legal title needing to be indisputable or undisputed (see also Antwerp, 25 June 1990, Ing. Cons., 1991, 249).

21.-
The fact that ATMI has been granted a European patent does indeed mean that the right invoked by ATMI is at first sight not open to reasonable contestation. Because a European patent – given the nature of the proceedings to grant – normally gives sufficient guarantees to justify a provisional measure.

The assessment of PRAXAIR's arguments that aim at proving invalidity of the patent rights requires furthermore in this case an in-depth technical investigation of the patent application, that goes beyond a "prima facie" (at first sight) assessment. The probable chances of success of the opposition proceedings cannot be estimated on the basis of a superficial examination such as required in urgency proceedings (see further Brussels, 15 June 2004, I.R. D.I., 2005, 67).

Therefore there is sufficient appearance of rights to impose a provisional measure.

Case 5:08-cv-00869-JW    Document 30-6    Filed 03/19/2008    Page 53 of 63

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

**CONCERNING THE OPPOSITION PROCEEDINGS BEFORE THE EUROPEAN PATENT OFFICE**

22.-
In order to substantiate its arguments, PRAXAIR refers to the extensive patent technical report of P. Van Varenberg, engineer, of the firm M.F.J. Bockstael of Antwerp which shows a lack of novelty and a lack of inventive step of the patent.

Furthermore, PRAXAIR invokes the precedence value of earlier decisions. A decision by the Korean Patent office of 25 January 2006 is cited as well as a decision of the U.S, District Court, southern district of New York of 14 April 2006 and a ruling of the State Court of Dusseldorf in the action of 9 November 2006.

This latter ruling stated with reference to the validity of Claim 1 of the patent EP 1 000 291 B1 patent that there was a great probability that Claim 1 of the European Patent, on which the legal action was based in the pending opposition procedure, will be revoked because its subject matter reaches beyond the content of the application in the original version (Article 100, c) in conjunction with Article 83 of the European Patent Convention (EPC).

23.-
ATMI is accused in particular of having inadmissibly extended the original application WO 99/56057, by means of an amendment during the prosecution, having inserted the use of a "valve" instead of a "fluid pressure regulator" in Claim 1 of the patent EP 1 000 291 B1, which constitutes a violation of Article 83 EPC.

24.-
Claim 1 requires indeed that the "valve" be kept closed in order to avoid the fluid being dispensed from the vessel through the port until the moment that the valve receives gas at sub-atmospheric pressure from outside the vessel and opens in response to receiving the gas at sub-atmospheric pressure, and which sub-atmospheric pressure is not higher than a pre-set value.

A description which according to ATMI enables the skilled man to understand that the valve has a pressure-regulating function. When the pressure rises downstream from the valve after the valve opens in response to receiving sub-atmospheric pressure, the valve shuts again so that the pressure evolves to the point of the pre-set value. In particular, the valve ultimately adopts a position of balance. The skilled man understands that this is the elementary regulating function of the valve (20).

25.-
Already in the original patent application on page 8, the situation is described (freely translated): *the regulator is a flow control device that can be set to a pre-determined pressure level in order to dispense gas or moisture from the cylinder at such a pressure level"*. Therefore, it was never the intention of ATMI to limit the invention to a certain type of pressure regulator. Furthermore, the patent application makes it clear that the valve (20) is in a gas flow connection to the fluid pressure regulator (26), which is of a conventional type that makes use of a poppet element that, for example, is held in a closed position with a spring, and the poppet moved when the pressure difference across the poppet element exceeds a certain level.

Therefore the description of the valve cannot be considered manifestly and unambiguously incompatible with the aforementioned definition of the regulator as appears in the patent application, as PRAXAIR would like us to believe.

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

**26.-**

The judgment of the U.S, District Court, Southern District of New York of 14 April 2006 refers to the American patents 6,101,816 and 6,343,467 of ATMI and is consequently irrelevant for the assessment of this dispute. It comes to the conclusion that these patents do not comprise any novelty and merely give a description of a combination of elements that, at the moment of the invention, were known to the skilled man. Nevertheless, the U.S. District Court rules only concerning the U.S. patent 6,101,816 and US patent 6,3343,476, which are both outside the current dispute.

The decision of the Korean Patent office of 25 January 2006, against which ATMI has appealed and of which only a free translation into English is presented, can not be used to question the examination by the EPO either.

**27.-**

The judgment of the State Court of Düsseldorf, however, has indeed decided in the main proceedings by judgement of 9 November 2006 to suspend those proceedings because of doubts, until after the decision by the EPO. Nevertheless this decision does not impede on the injunction against further manufacturing and commercialising the litigious "UpTime®" gas cylinders in Germany, imposed by a decision of 1 August 2006 in urgency proceedings.

**28.-**

The Higher State Court (Oberlandesgericht) ruled in this respect in its judgement of 14 December: (freely translated) *"the simple fact that the State Court (of Dusseldorf) in the proceedings on the merits ruled differently concerning the the validity of the litigious patent compared to the judgement in the urgency proceedings , does not make the judgement under appeal to appear manifestly incorrect"*. Both the appealed judgement and the decision in the main proceedings that suspends those proceedings contain assessments about the question of undue broadening. Without a more detailed investigation, it cannot be said which of these conflicting assessments is correct. This must be reserved for a verbal debate before the senate. There is therefore no reason to order the provisional suspension of its enforceability.

**29.-**

The judgement of the Court of Appeal of Antwerp (3rd chamber) of 20 December 2006 in the descriptive seizure action is being erroneously attributed the authority of *res judicata* by PRAXAIR.

More specifically, this judgement ruled that within the limited powers of review of the judge of seizures (in appeal) it should be established that there is indeed a serious dispute concerning the infringement by NV PRAXAIR HOLDING and NV PRAXAIR of the patent invoked by ATMI. That 'prima facie' (at first sight) it is shown that the infringement is not demonstrated with sufficient certainty. That from the objective information presented it indeed appears that the "UpTime®" gas cylinders ensure that the gas flow is maintained continuously at the same level without regulating the pressure in the cylinder itself, while the "VAC" cylinders of ATMI guarantee the same constant pressure by means of a pressure regulator inside the cylinder. For these reasons alone, the revocation and the lifting of the additional measures, (note: Article 1481, Clause 2 of the Belgian Civil Code) as decided correctly by the first judge in the appealed decision, is justified.

The judge of seizures ruled in the appealed decision of 6 September 2006 that it was not demonstrated convincingly by ATMI that awaiting a solution to the dispute on the merits of the

Case 5:08-cv-00869-JW    Document 30-6    Filed 03/19/2008    Page 55 of 63

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

case, it would suffer serious prejudice if there would not be imposed a provisional injunction in the sense of Article 1481, Clause 2 of the Belgian Civil Code.

30.-
The authority of *res judicata* means that a judge, even when the cause and the subject of the legal action for which a final judgment has been rendered and that in a later legal action between the parties are not the same, cannot grant a claim whose cause is incompatible with the earlier case (see further Cass., 20 February 1975 R.W., 1974-1975, 2594). In other words it has to be examined whether the new claim can be granted without reversing the advantage of the earlier ruling.

31.-
The authority of *res judicata* applies therefore only between the same parties acting in the same capacity and does not go beyond the matter that is the subject of the decision.

In respect of the defendant under 3, PRAXAIR Inc., a company organised under the laws of the state of Connecticut (USA), that was not involved in the earlier proceedings and who is considered responsible for filling the gas cylinders in Oevel, this argument does not apply.

Furthermore, the judge of seizures only has a limited power of judicial review in order to establish whether the asserted rights contain a sufficient degree of certainty to be able to justify a radical seizure measure. It is assumed that for imposing such a measure, a balance must be made of the respective interests of the parties, and that this measure is necessary to enforce their rights.

32.-
The seizure measure provided for in Article 1481, Paragraph 2 of the Belgian Judicial Code serves not only to enable the requested description on the basis of the 1st paragraph, but can also have the objective of protecting the rights of the owner of an intellectual property right in anticipation of the ruling of the court. Nevertheless the desirability of the claimed seizure measures do not necessarily have to be the same as those for an injunction against patent infringement via urgency proceedings.

## CONCERNING THE PATENT INFRINGEMENT

33.-
PRAXAIR disputes that the infringement is sufficiently certain to impose such far-reaching measures that favour the patentee in such an excessive manner. If the claims of the European patent EP 1 000 291 B1 are read in the light of the description and the figures, then for PRAXAIR there can be no question of any infringement since the "UpTime®" gas cylinders do not apply a pressure regulator that should maintain the pressure of the gas at the exit of the gas cylinders constant.

34,-
Both Article 69 EPC and Article 26 of the Patent Act stipulate that the extent of protection of the European patent or of the European patent application is determined by the content of the claims. Nonetheless, the description and the drawings serve as an explanation of the claims. The dispute between the parties concerns the interpretation based on the Protocol regarding the interpretation of Article 69 (BS, 7 October 1977).

Case 5:08-cv-00869-JW    Document 30-6    Filed 03/19/2008    Page 56 of 63

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

35.-

As such, it is necessary according to PRAXAIR that also the description and the drawings are consulted in order to place the terms used in their correct context, as well as to clarify the meaning and scope of the invention as claimed in the claims. In applying this principle it is clear to PRAXAIR that the valve of feature 2 of claim 1 of the patent EP 1 000 291 B1 should be read as a <u>valve</u> that is part of a <u>pressure regulator</u> for regulating a <u>constant pressure</u> of the gas that is dispensed from the dispensing vessel.

36.-

For ATMI, on the other hand, claim 1 of the patent is clear, including the term "valve," and it does not require any interpretation. Furthermore, in its opinion, the question whether the "UpTime®" system is equipped with a regulator for regulating a constant pressure does not need to be asked since the invention does not refer to the accuracy of the pressure regulation. The technical characteristics of the "VAC" system are furthermore not of such a nature that they would be able to reduce the patent rights of ATMI.

37.-

With reference to the technical illustrations, PRAXAIR wishes to demonstrate that in the "UpTime®" system there is no question of any pressure regulation and that the valve in the "UpTime®" gas cylinders therefore has only two positions, namely fully open and fully closed. For the technical clarification of this, PRAXAIR refers to the technical report concerning the patent of P. Van Varenberg, engineer. The volume of gas that must be delivered in the phase with the open valve to the external device is determined by the setting of the aforementioned flow regulator of the device that can be opened to a greater or lesser degree in the function of the desired flow. In other words, the greater the gas flow, the lower the sub-atmospheric pressure at the exit. The consequence of this is that whatever position the flow regulator is in, there is no regulation of the pressure by the valve. From this, it is clear for PRAXAIR that the two systems represent two totally different concepts, with the "UpTime®" system focused in particular on delivering a constant flow and the "VAC" system focused on delivering a constant pressure.

Therefore it can only be concluded that the "UpTime®" gas cylinders do not make use of a pressure regulator as required by the European patent EP 1 000 291 B1. For PRAXAIR this means that the "UpTime®" gas cylinders do not infringe the patent to the extent that the scope of it is described in the original text and at least by the descriptive part of the patent, that both demand that the valve required by the patent is part of the pressure regulator.

38.-

ATMI responds to this by stating that even in the very demanding interpretation of PRAXAIR that the valve must form part of the pressure regulator, the "UpTime®" gas cylinders still infringe the patent. For ATMI, the valve is in fact a simple type of pressure regulator. In its opinion, the most simple form of regulation is a controlled opening and closing. This is precisely what is required in claim 1 of the patent. With reference to the Mc Graw-Hill dictionary of scientific and technical terms, a pressure regulator is an open-close device used on the exit of a closed gas pressure system, in order to maintain a system pressure within a certain interval. In addition, PRAXAIR has itself used the terms "valve", "regulator" and "pressure regulator" interchangeably in its U.S. patent 5,937,895 concerning the "UpTime®" system.

39.-

The scientific value of the opinions submitted by PRAXAIR's technical advisors in order to solve the dispute by demonstrating the lack of a pressure regulating valve in the "UpTime®"

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

gas cylinder, is rightly disputed by ATMI since they are based wholly on one-sided tests carried out by PRAXAIR itself. Their findings are, furthermore, strongly contradicted by those of Professor J. De Schutter, Engineer, Catholic University of Louvain, in his report of 7 January 2007 in which he concludes (page 40) that even if claim 1 of the patent were to refer to a pressure regulator (*quod non*) even then the so-called "dispensing check valve" of the "UpTime®" system is, in his opinion, a pressure regulator.

40.-
Consequently it needs to be established that the existence of a patent infringement has not been satisfactorily refuted by PRAXAIR.

## CONCERNING THE REQUESTED MEASURES

41.-
It is within the power of the judge ruling in preliminary injunction proceedings, in case of urgency, to safeguard the interests of the parties, whereby the rights of the parties are as far as possible maintained. He is obliged, depending on the circumstances, only to impose the least radical and useful measures.

The fact that the judge can not in such urgency proceedings bring about any final change to the legal position of the parties does not mean that the ordered measures can not bring about any damage to the defending party. The existence of a serious dispute about the rights of the parties requires a balance of the interests of the parties.

The prejudice that PRAXAIR can suffer with the grant of the measures does not however outweigh the advantage for ATMI. It is not insignificant in this case to remind that PRAXAIR, during the launch of the "UpTime®" gas cylinders, advertised its product as a replacement for the ATMI gas cylinders that were currently in use in the industry. Recently, PRAXAIR in a press release of 7 October 2006 announced that it was increasing still further the production and distribution of its "UpTime®" gas cylinders. For ATMI, the relative importance of the "VAC" gas cylinders in its activities is very high, certainly in comparison to the share of the "UpTime®" gas cylinders in the semi-conductor industry in the entirety of the international group PRAXAIR. The fact that PRAXAIR has concluded worldwide delivery and quality service agreements with producers with the result that there is the risk of enormous claims for damages cannot be decisive in this context. The penetration of the "UpTime®" gas cylinders in this limited group of customers means that the exclusivity of the patent EP 1 000 291 B1 risks to be entirely carved out.

PRAXAIR demonstrates incidentally that the customer binding with such a product is very high as a consequence of the mandatory, extremely time and cost-intensive qualification processes before BF3 gas can be delivered. This has as consequence that a lost customer is difficult to win back in the future.

42.-
Consequently, the appeal of PRAXAIR is unfounded and the ordered injunction against issuing and distributing information and/or publicity carriers that present the "UpTime®" gas cylinders as a replacement product for the competing product of ATMI subject to a penalty, should be upheld.

The incidental appeal of ATMI is founded to the extent that the injunction applies in those countries where the European patent EP 1 000 291 B1 offers protection and which are designated therein. Article 31 EEX Vo (EC 44/2001) does not impede a Belgian court from issuing a provisional or preserving measure with an extra-territorial effect to the extent that a connecting link exists here (see further Cass., 3 September 1999, T.B.H., 2000, 128 with comments by M Pertagás Sender).

Since *prima facie* (at first sight) it is established that the patent infringement is sufficiently certain in order to grant the measures as requested by ATMI in subsidiary order, i.e. a provisional injunction against committing further patent infringements concerning the commercialisation of the gas cylinders in the designated countries.

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

## FOR THESE REASONS:

## THE COURT,

Ruling with both parties represented,

In view of Article 24 of the Act of 15 June 1935 concerning the use of languages in judicial matters,

Declares the appeal admissible but unfounded.

Declares the incidental appeal admissible and partially founded.

Reforms the appealed ruling and now orders anew:

Declares that the appellants are enjoined as of today, for lack of respect of the European patent EP 1 000 291 B1, from further manufacturing or having manufactured, gas cylinders with the "UpTime®" system or with the same characteristics, or from offering them, bringing them into circulation, using them, transporting them or filling them to the extent that they relate to acts concerning delivery and use in one of the countries designated in the patent, subject to a penalty of EUR 45.000,- per established infringement as of the day of the service of the present decision and this until a final decision on the merits shall be issued.

Confirms the appealed decision as far as the rest is concerned.

Orders the appellants to bear the costs of both instances, which at the side of defendant are calculated to date as:

| | |
|---|---|
| Writ of summons first instance | EUR 1 106.35 |
| Judicature compensation first instance | EUR  242.94 |
| Judicature compensation appeal | EUR  485.87 |

So rendered and pronounced at the public hearing of

## THE TWENTY-FIFTH OF APRIL, TWO THOUSAND AND SEVEN

where there were present:

| | |
|---|---|
| Mr.  P. ADRIAENSEN | President |
| Ms. M. DOM | Advisor |
| Mr.      B. BULLYNCK | Advisor |
| Ms. G. VERSYPT | Registrar |

(Signature)        (Signature)
G. VERSYPT        B.BULLYNCK

(Signature)        (Signature)
M. DOM             P. ADRIAENSEN

*English translation of Antwerp appeal judgment of 25 April 2007 Praxair vs. ATMI*

(stamp)
APPEAL COURT Antwerp
Civil Registrar
(illegible)
Pages (illegible)
Paid sum €8.50
Delivered to (illegible)
Antwerp (illegible)
The registrar

MS. G. HELSSEN
Deputy registrar
(signature)

# GRAYDON

# Handelsrapport

**Datum: 27/04/2007**
**Klantnummer: 11626**
**Betreft:**
**438719221**
**PRAXAIR NV**
**METROPOOLSTRAAT 17**
**2900 SCHOTEN**

# Kredietadvies

| Datum | 27-04-2007 |
|---|---|
| | Het berekende kredietmaximum bedraagt : 5.444.000 EUR |
| | Het kredietadvies werd op uw verzoek berekend aan de hand van de door u gekende of ontworpen formule. |
| | Het is slechts een onderdeel van het totale rapport dat moet bijdragen tot het verkrijgen van een globaal beeld over de toestand van een onderneming. |

# Officiële gegevens

| Ondernemingsnummer | 438.719.221 |
|---|---|
| Rechtspersonenregister | RPR ANTWERPEN |
| | Privaatrechtelijke vennootschap |
| BTW-plichtig | Ja |
| Rechtsvorm | Naamloze Vennootschap |
| Telefoonnummer | 03/641.84.50 |
| Telefax | 014/25.05.00 |
| Website-adres | http://www.praxair.com |
| E-mailadres | info_be@praxair.com |
| Oprichtingsdatum | 30-10-1989 |
| RSZ-nummer | 1573972-43 |
| Werkgeverscategorie | 87 |
| | 187 |
| Paritaire comités | 116 |
| | 207 |

## Vestigingen

| Bron | Adres |
|---|---|
| Eigen mededeling | |

PAULUSSTRAAT 50 - 3920 LOMMEL
NIJVERHEIDSSTRAAT 4 - 2260 WESTERLO
SCHELDEDIJK 58 - 2070 ZWIJNDRECHT BURCHT

Bovenstaande lijst van vestigingen werd ons bezorgd door de onderneming zelf en kan ondertussen gewijzigd zijn

## Historiek

| Datum | BBS-nr | |
|---|---|---|
| 27/11/2006 | 20061212/185741 | Verlenging boekjaar tot 31/12/2006 |
| 27/11/2006 | 20061212/185741 | Wijziging afsluitdatum boekjaar van 30/12 naar 31/12 |
| 27/11/2006 | 20061212/185741 | Verplaatsing van zetel naar METROPOOLSTRAAT 17 - 2900 SCHOTEN |
| | 20061212/185741 | Voorheen gevestigd te LAMMERDRIES 29 - 2250 OLEN |
| 31/08/2006 | 20060921/146155 | Kapitaalverhoging van 29.128.733,84 EUR naar 29.612.733,84 EUR |
| 31/08/2006 | 20060921/146155 | Kapitaalverhoging van 28.509.000 EUR naar 29.128.733,84 EUR |
| 31/08/2006 | 20060921/146155 | Fusie door opslorping van NV PRAXAIR PRODUCTION 439.211.248 |
| 31/08/2006 | 20060921/146155 | Fusie door opslorping van NV INDUGAS 419.550.536 |
| 14/09/2001 | 20011010/384 | Omzetting maatschappelijk kapitaal in euro |
| 14/09/2001 | 20011010/384 | Kapitaalverhoging van 28.507.755,35 EUR naar 28.509.000 EUR |
| 18/07/1992 | 19920718/135 | Wijziging benaming in PRAXAIR |
| 6/02/1990 | 19900206/387 | Kapitaalverhoging van 9.293.528,24 EUR naar 28.507.755,35 EUR |
| 6/02/1990 | 19900206/387 | Wijziging benaming in UNION CARBIDE INDUSTRIAL GASES |
| 1/02/1990 | 19900201/220 | Kapitaalverhoging van 8.420.571,20 EUR naar 9.293.528,24 EUR |
| 28/12/1989 | 19891228/240 | Kapitaalverhoging van 30.986,69 EUR naar 8.420.571,20 EUR |
| 28/12/1989 | 19891228/240 | Wijziging benaming in UCAR SPECIALTY GASES Vorige benaming : NEWRECON |
| 4/12/1989 | 19891228/240 | Fusie door opslorping van N.V. UCAR SPECIALTY GASES 412.989.079 |

**Volledige index van alle akten gepubliceerd in Bijlagen Belgisch Staatsblad**

# Bedrijfsleiding

## Voorzitter

KRAMER RANDY
TANGLE CIRCLE LANE 5718
HOUSTON TX 77057

# GRAYDON                    Maatwerkrapport

**Datum: 27/04/2007**
**Klantnummer: 11626**
**Betreft:**
**437603028**
**PRAXAIR HOLDING NV**
**METROPOOLSTRAAT 17**
**2900 SCHOTEN**

## Officiële gegevens

| | |
|---|---|
| **Ondernemingsnummer** | 437.603.028 |
| **Rechtspersonenregister** | RPR ANTWERPEN |
| | Privaatrechtelijke vennootschap |
| **BTW-plichtig** | Neen |
| **Rechtsvorm** | Naamloze Vennootschap |
| **Telefoonnummer** | 014/25.04.11 |
| **Telefax** | 014/22.58.71 |
| **Oprichtingsdatum** | 2-06-1989 |

## Historiek

| Datum | BBS-nr | |
|---|---|---|
| 10/10/2006 | 20061026/164141 | Kapitaalverhoging van 33.915.792,11 EUR naar 37.623.410 EUR |
| 10/10/2006 | 20061026/164141 | Kapitaalverhoging van 24.716.000 EUR naar 33.915.792,11 EUR |
| 6/09/2004 | 20041207/167323 | Verplaatsing van zetel naar METROPOOLSTRAAT 17 - 2900 SCHOTEN |
| 14/09/2001 | 20011010/386 | Omzetting maatschappelijk kapitaal in euro |
| 14/09/2001 | 20011010/386 | Kapitaalverhoging van 24.715.356,26 EUR naar 24.716.000 EUR |
| 29/10/1997 | 19971120/347 | Kapitaalverhoging van 15.756.112,43 EUR naar 24.715.356,26 EUR |
| 28/11/1995 | 19951216/372 | Wijziging afsluitdatum boekjaar van 31/12 naar 30/12 |
| 18/07/1992 | 19920718/130 | Wijziging benaming in PRAXAIR HOLDING |
| 10/07/1992 | 19920710/134 | Verplaatsing van zetel naar LAMMERDRIES 29 - 2250 OLEN |
| 14/12/1990 | 19901214/97 | Verplaatsing van zetel naar LAMMERDRIES 9 - 2250 OLEN |
| | 19901214/97 | Voorheen gevestigd te NIJVERHEIDSSTRAAT 4 - 2260 WESTERLO |
| 29/12/1989 | 19891229/205 | Wijziging benaming in UNION CARBIDE INDUSTRIAL GASES HOLDING |
| | | Vorige benaming : UNION CARBIDE INDUSTRIAL |

# EXHIBIT F

Rolnummer : 06/1848/A-
            07/1070/A
Rep.nummer: 07/8372



# WIJ, ALBERT II, KONING DER BELGEN,

# AAN ALLEN, DIE NU ZIJN EN HIERNA WEZEN ZULLEN,

# DOEN TE WETEN :

Voorste blad

**A.R. 06/1848/A- 07/1070/A**          **van : 27.9.2007**          **rep.** *04 2372*

**BESCHIKKING :** uitgesproken in het gerechtsgebouw " Het Kasteel " te Turnhout, op de zitting van donderdag, **ZEVENENTWINTIG SEPTEMBER TWEEDUIZEND EN ZEVEN** van de heer Beslagrechter in de Rechtbank van Eerste Aanleg van het gerechtelijk arrondissement Turnhout, alwaar zetelden :

**P. PEETERS**, Ondervoorzitter-Beslagrechter
**J. THYS**, Griffier

---

<u>**Inzake : A.R. 06/1848/A**</u>

1. **NV PRAXAIR**, ingeschreven in het handelsregister te Turnhout onder nummer 63395, ondernemingsnummer 0438.719.221, met zetel te 2250 Olen, Lammerdries 29;
2. **PRAXAIR INC.**, vennootschap naar het recht van de staat Connecti-cut ( Verenigde Staten van Amerika), met zetel te 06810-5113 Danbury Connecticut, Old Ridgeury Road 39, Verenigde Staten van Amerika

   - aanlegsters
   - vertegenwoordigd door Mr. F. Van Elzen , loco Mr. Glas advocaat te 2600 ANTWERPEN, Uitbreidingstraat nr. 80;

<u>**Tegen :**</u>

**ADVANCED TECHNOLOGY MATERIALS INC.**, vennootschap naar Amerikaans recht, met zetel te 06810 Danbury, CT, Commerce Drive 7, Verenigde Staten van Amerika, met keuze van woonst op het kantoor van gerechtsdeurwaarder J. De Belder te Antwerpen, Balansstraat 117
   - verweerster
   - vertegenwoordigd door Mrs. B..Vandermeulen en Mr. R..Peeters , advocaten te 1040 BRUSSEL, Oudergemlaan nr. 22 – 28;

<u>**En inzake : A.R. 07/1070/A**</u>

**NV PRAXAIR**, ingeschreven in het handelsregister te Turnhout onder nummer 63395, ondernemingsnummer 0438.719.221, met zetel voor-heen te 2250 Olen, Lammerdries 29, thans te 2900 Schoten, Metropoolstraat 17;

   - aanlegsters
   - vertegenwoordigd door Mr. F. Van Elzen , loco Mr. Glas advocaat te 2600 ANTWERPEN, Uitbreidingstraat nr. 80;

---

**Tegen :**

**ADVANCED TECHNOLOGY MATERIALS INC.**, vennootschap naar Amerikaans recht, met zetel te 06810 Danbury, CT, Commerce Drive 7, Verenigde Staten van Amerika, met keuze van woonst op het kantoor van gerechtsdeurwaarder M. Beerten te Antwerpen, Balansstraat 117

- verweerster
- vertegenwoordigd door Mrs.  B..Vandermeulen en Mr. R..Peeters , advocaten te 1040 BRUSSEL, Oudergemlaan nr. 22 – 28;

Gezien het inleidend exploot van dagvaarding betekend inzake A.R. 06/ 1848/A op 20.11.2006 door gerechtsdeurwaarder F. Jennes te Antwer-pen houdende verzet tegen het bevel voorafgaand uitvoerend beslag op roerende goederen dd. 15.11.2006 tot betaling van beweerdelijk verbeurde dwangsommen tbv. 600.000 EUR meer intresten en kosten;

Gezien het inleidend exploot van dagvaarding betekend inzake A.R. 07/ 1070/A (voorheen 07/3460/A) op 25.5.2007 door gerechtsdeurwaarder F. Jennes te Antwerpen houdende verzet tegen uitvoerend beslag onder derden betekend dd. 11.5.2007 in handen van de NV KBC-Bank, NV  ING België, NV Fortis Bank met aanzegging van het verzetexploot aan de derde beslagenen voornoemd;

Gezien de beschikking van de beslagrechter te Antwerpen in de zaak aldaar gekend onder 07/3460/A waarbij deze zaak werd verwezen naar de beslagrechter te Turnhout, thans gekend onder A.R. 07/1070/A;

Gehoord partijen in de uiteenzetting van hun middelen bij monde van hun respectieve raadslieden;

De zaken gekend onder A.R. 06/1848/A en 07/1070/A zijn samenhangend in de zin van art. 30 Ger.Wetboek en worden dan ook gevoegd.

Partijen zijn leveranciers van industrieel gas dat door hen wordt aangeboden in cilinders, door verweerster onder de naam "VAC" en door aanlegsters onder de naam "Up Time".
Verweerster houdt voor dat hierbij door aanlegsters inbreuk wordt gepleegd op haar Europees octrooi  EP 1000 291 B1.

Bij beschikking in kortgeding van de voorzitter van de rechtbank van eerste aanleg te Antwerpen dd. 26.10.2006 werden aanlegsters veroordeeld  in afwachting van een beslissing te gronde :

*tot stopzetting van het uitgeven en vespreiden van informatie en/of publiicitaire dragers die litigeuze cilinders "Up Time" voorstellen als vervang-  product van het concurrerend product van eisende partij* (thans verweer- ster) *en legt verwerende partijen* (thans aanleggers) *verbod op op enigerlei wijze reclame te voeren voor dit product onder verbeurte van een dwangsom van 100.000 EUR per vastgestelde overtreding.*

Partijen betwisten niet dat de beschikking aan aanlegsters werd betekend op 30.10.2006.

Verweerster stelt dat na genoemde betekening door aanlegsters overtredingen werden begaan op de verbodsbepalingen van de beschikking en dat dwangsommen werden verbeurd door ieder van aanlegsters tbv. 600.000 EUR.
Bevel voorafgaand uitvoerend beslag op roerende goederen werd betekend op 15.11.2006 en uitvoerend beslag onder derden werd betekend op 11.5.2007.

De vordering van aanlegsters inzake A.R. 06/1848/A welke als voorwerp heeft te zeggen voor recht dat geen dwangsommen verbeurd zijn en het bevel dd. 15.11.2006 nietig te verklaren, een schadevergoeding van 100. 000 wegens tergende en roekeloze tenuitvoerlegging, in ondergeschikte orde de dwangsom, voor zover verbeurd, te herleiden tot 100.000 EUR en enkel toe te kennen ten aanlegster sub 2, werd regelmatig gesteld en is ontvankelijk.

De vordering van aanlegster inzake A.R. 07/1070/A welke als voorwerp heeft de opheffing van het uitvoerend beslag onder derden dd. 11.5.2007 en een schadevergoeding van 100.000 EUR wegens tergend en roekeloos beslag, werd regelmatig gesteld en is ontvankelijk.

Verweerster betoogt dat de gevorderde dwangsommen werden verbeurd door aanlegsters vermits zij via internet op hun websites " www.praxair.com" (toebehorend aan Praxair Inc) en "www.praxair.be" ( toebehorend aan NV Praxair) reclame hebben gevoerd voor de gascilinder Up Time, ten bewijze waarvan verweerster verwijst naar drie uittreksels van web-pagina's van ieder der voornoemde websites, welke drie inbreuken ten laste van ieder van beide aanlegsters volgens de mededeling van verweerster in een schrijven dd. 9.11.2006, een eerste maal werden vastgesteld "...vorige week..." en "... deze week een tweede maal... ".
Verweerster refereert naar processen verbaal van vaststelling van plv. gerechtsdeurwaarder A. Van Der Steichel loco gerechtsdeurwaarder W. Mertens te Antwerpen dd. 3 en 9.11.2006.

Aanlegsters betwisten allereerst dat dwangsommen werden verbeurd.
Zij betogen dat in de kwestieuze beschikking slechts een specifieke vorm van reclame werd verboden, met name deze waarbij "Up Time" cilinders werden voorgesteld als vervangproduct voor de producten van verweerster. Zij verwijzen naar de motieven van de beschikking waarin wordt gesteld dat aan aanlegsters moet verboden worden, in afwachting van een beslissing ten gronde, agressief op te treden teneinde verder marktaandeel van verweerster in te palmen. Zij stellen dat dit bevestigd wordt in het dispositief van de beschikking en zij verwijzen ook naar het arrest van het Hof van Beroep Antwerpen dd. 25.4.2007, gewezen in hoger beroep tegen de kwestieuze beschikking, waarin volgens aanlegsters wordt beslist dat enkel de reclame verboden is die de "Up Time" cilinders als vervangproducten van de VAC cilinders van verweerster voorstellen.

In de kwestieuze beschikking is duidelijk iedere reclame verboden voor de "Up Time" cilinders. Het genoemd arrest van het Hof van Beroep heeft het hoger beroep van aanlegsters tegen de kwestieuze beschikking als ongegrond afgewezen en gaat zelfs nog verder : op incidenteel beroep van verweerster is beslist ook iedere productie van de "Up Time" cilinders te verbieden.
Het door aanlegsters voorgehouden standpunt kan dan ook niet worden onderschreven.

Aanlegsters werpen verder op dat in ieder geval de beslissing onduidelijk is en dat er zeker geen sprake kan zijn van een aan hen toerekenbare fout.
Zij stellen dat zij iedere verwijzing naar een vervangproduct onmiddellijk hebben weggelaten.

Dit middel herhaalt in feite het voorgaande en is in tegenspraak met het in de kwestieuze beschikking ondubbelzinnig geformuleerde verbod voor aanlegsters om "op enigerlei wijze reclame te voeren ".

Aanlegsters betogen ook dat na betekening van de beschikking de in- houd van de websites werd aangepast door te vermelden dat de "Up Time" cilinders niet in België verkrijgbaar zijn en dat elke verwijzing naar het Up Time systeem zoals uiteengezet op de website niet bedoeld is voor gebruik op de Belgische markt en/of door huidige of toekomstige Belgische klanten van Praxair, welke wijziging volgens aanlegsters tot gevolg heeft dat geen inbreuk op het verbod is gepleegd.

De door aanlegsters aangebrachte wijziging in de inhoud van de websites neemt echter het wervend karakter niet weg zodat ook na de wijziging de inhoud van de webpagina's nog steeds onder het publiciteitsverbod viel.

Aanlegsters argumenteren verder dat er geen dwangsom kan verbeurd zijn omdat er geen inbreuk in België werd gepleegd vermits de beide hoger voornoemde internet websites centraal beheerd worden vanuit de Verenigde Staten van Amerika en advertenties op het web gelokaliseerd dienen te worden op de plaats waar de relevante database, van waaruit de inhoud van de website wordt bepaald, zich bevindt te weten in casu in de V.S.A te Danbury.

De bedoelde websites kunnen gemakkelijk in België en ongetwijfeld ook in de andere Europese landen waar het octrooi van verweerster beschermd wordt, geconsulteerd worden. Publiciteit via internet sites heeft een grensoverschrijdend karakter; om die reden wordt dikwijls juist be- roep gedaan op deze vorm van publiciteit. Zulks houdt in dat de plaats, waar de database die de basis van de publiciteit vormt, zich bevindt, enkel het vertrekpunt vormt en de consument-internetgebruiker het eind- punt is. Bij inbreuk via internetsites op een publiciteitsverbod wordt dan ook de overtreding begaan niet enkel op de plaats waar de databank zich bevindt maar ook op de plaats waar van de gewraakte publiciteit door de internet-consument kennis wordt genomen, o.m. België.

Aanlegsters stellen ook dat zeker aan NV Praxair, die gevestigd is in België, geen toerekenbare inbreuk op het publiciteitsverbod kan verweten worden omdat de inhoud van de websites centraal vanuit de Verenigde Staten wordt beheerd door Praxair Inc., gevestigd in Amerika.

Het wordt niet betwist, en blijkt trouwens uit de vaststellingen van de gerechtsdeurwaarder, dat de NV Praxair titularis is van de website "www. Praxair.be" Op deze website komt publiciteit voor welke strijdig is met het pubilciteitsverbod opgelegd door de kwestieuze beschikking. De NV Pra-xair is verantwoordelijk voor de op haar website voorkomende informatie en publiciteit.

Aanlegsters argumenteren eveneens dat geen dwangsom kan verbeurd zijn door Praxair Inc., gevestigd in de Verenigde Staten van Amerika, omdat " de beschikking (waarin het verbod werd opgelegd) niet uitvoerbaar is (geen exequatur heeft verkregen) in de Verenigde Staten".

Door genoemde vennootschap werden op het in de kwestieuze beschikking opgelegde verbod, via de internetsite inbreuken gepleegd in België en in de andere Europese landen waar het octrooi van verweerster bescherming geniet.
Voor tenuitvoerlegging van de dwangsom, verbonden aan de overtreding van het verbod, in België is geen exequatur in de Verenigde Staten vereist.

Aanlegsters betogen verder in meest ondergeschikte orde dat geen dwangsommen tbv. 600.000 EUR verbeurd kunnen zijn. Zij stellen dat de 3 webpagina's van elke der beide internetsites telkens slechts één geheel vormen zodat geen 2 x 3 x 100.000 EUR = 600 000 EUR kan verbeurd zijn door ieder van hen. Zij stellen verder dat de informatie op de webpagina's slechts één enkele handeling uitmaken die enkel aan de vennootschap Praxair Inc., gevestigd in de Verenigde Staten, kan aangerekend worden en dat in de kwestieuze beschikking de dwangsom niet verbonden werden aan een inbreuk per tijdseenheid zodat de gevorderde dwangsom in ieder geval dient te worden herleid tot 100.000 EUR.

Verweerster betoogt dat op 3 verschillende webpagina's van elk der beide internetsites verboden publicaties werden gedaan, dat zulks tweemaal werd vastgesteld zodat in hoofde van ieder der aanlegsters 6 overtredingen werden vastgesteld en er door hen ieder 600.000 EUR aan dwangsommen werden verbeurd.

Uit het proces verbaal van de gerechtsdeurwaarder dd. 3.11.2006 blijkt dat op 2 en 3.11.2006 inbreuken vastgesteld werden in hoofde van ieder van beide aanlegsters in de verschillende webpagina's van de respectieve internetsites. De verschillende webpagina's welke de internetsite van NV Praxair vormen, maken één geheel uit zoals de verschillende webpagina's van Praxair Inc. één geheel vormen. Dienvolgens werd door ieder van beide vennootschappen op de twee voornoemde data telkens één inbreuk gepleegd zodat door ieder van hen 2 x 100.000 EUR = 200.000 EUR aan dwangsommen werd verbeurd.
In tegenstelling tot wat aanleggers voorhouden, levert het in stand houden van een website met verboden publiciteit een voortdurende reeks inbreuken op i.p.v. één enkele inbreuk omdat de gevolgen blijven voortduren, zoniet zouden aanlegsters de verboden publiciteit straffeloos kunnen verder voeren door het verbod af te kopen met betaling van een eenmalige som, wat geenszins de bedoeling is van de dwangsom ( K. Wagner, Dwangsom, A.P.R., nr 110 blz. 106).

Gebeurlijke inbreuken na 3.11. 2006 zijn niet relevant in het kader van huidige betwisting vermits in het bevel en beslag geen dwangsommen worden gevorderd welke na laatstgenoemde datum zouden verbeurd zijn.

Vermits dwangsommen werden verbeurd is er geen enkele reden tot schadevergoeding.

**OM DEZE REDENEN,**
en de rechtspleging geschied zijnde in het Nederlands, conform art. 2, 34, 36, 37 en 41 der wet van 15 juni 1935 op het gebruik der talen in gerechtszaken

WIJ, **P. PEETERS**, Ondervoorzitter-beslagrechter,
bijgestaan door :
**J. THYS**, Griffier,

Beschikkende op tegenspraak

Voegen de zaken gekend onder 06/1848/A en 07/1070/A.

Verklaren de vorderingen ontvankelijk en gegrond als volgt met afwijzing van het anders en meer gevorderde als ongegrond.

Zeggen voor recht in de zaak gekend onder 06/1848/A door ieder der aanlegsters dwangsommen werden verbeurd ten belope van 200.000 EUR.

Verklaren het bevel dd. 15.11.2006 geldig voor zover betekend voor 200.000 EUR dwangsommen ten laste van ieder der aanlegsters meer de kosten in het exploot vermeld, en voor het overige ongeldig is.

Verklaren in de zaak 07/1070/A het uitvoerend beslag onder derden ten laste van aanlegster dd. 11.5.2007 geldig voor 200.000 EUR dwangsommen meer de kosten in het exploot vermeld en voor het overige ongeldig.

Veroordelen verweerster tot opheffing van het beslag betekend voor meer dan voornoemde sommen en kosten binnen de 48uur na betekening van deze beschikking en zeggen voor recht dat, bij ontstentenis van vrijwillige uitvoering, deze beschikking zelf geldt als handlichting in die mate.

Verwijzen in de zaak 06/1848/A aanlegsters in de gedingkosten en begroten de kosten tot op heden in hoofde van verweerster op 123,95 EUR (rechtsplegingvergoeding) en van aanlegsters op 257,90 EUR (dagvaarding + rolstelling) + 123,95 EUR (rechtsplegingvergoeding).

Verwijzen in de zaak 07/1070/A aanlegster in de gedingkosten en begroten de kosten tot op heden in hoofde van verweerster op 123,95 EUR (rechtsplegingvergoeding) en van aanlegster op 313,85 EUR (dagvaarding + rolstelling), de rechtsplegingvergoeding niet begroot zijnde bij gebrek aan opgave.

J. THYS                                                                                    P. PEETERS

Rolnummer: 06/1848/A-
07/1070/A
Rep.nr. : 07/8372

*Lasten en bevelen dat alle daartoe gevorderde gerechtsdeurwaarders
dit vonnis ten uitvoer zullen leggen.*
*Dat Onze Procureurs-Generaal en Onze Procureurs des Konings bij de
rechtbanken van eerste aanleg daaraan de hand zullen houden en dat
alle bevelhebbers en officieren van de openbare macht daartoe de
sterke hand zullen bieden wanneer dit wettelijk van hen gevorderd
wordt.  Ten blijke waarvan dit vonnis is ondertekend en gezegeld
met het zegel van deze rechtbank.*

<u>Griffie : Rechtbank van Eerste Aanleg</u>

UOR : 5315       BUR : 7180

6bladzijden x  2,85 Euro
Betaalde rechten: 17.10 Euro

Turnhout,16 oktober 2007

Voor eensluidende uitgifte
afgeleverd aan:

Gdw. M. Beerten

voor:Mr. R. Peeters
voor : Advanced Technology
materials INC

Turnhout,16 oktober 2007

De Griffier,

I.Sterckx

De Griffier,

I.Sterckx

laatste blad

Marc **BEERTEN** LIC. JUR – Martine **VERGAUWEN** – Willy **MERTENS** – Roger **VANDENHENDE** – Jan **DE BELDER**

Balansstraat          117
2018          ANTWERPEN 1
Ø          03 259 59 00
Fax          03 259 59 01
e-mail :          bdmv@bdmv.net
website :          www.bdmv.net
Kantooruren :     van 9 uur tot 16 uur

GERECHTSDEURWAARDERS

Johan BOCKLANDT L.J.
Bart GEETS L.J.
Alain VAN DER STEICHEL L.J.
kand. gerechtsdeurwaarder



ORIGINEEL

2450/07 GVK

*Te vermelden bij iedere betaling of briefwisseling*

┌ AGTK



*070004174$000107104*

# BETEKENING VAN BESCHIKKING

Het jaar tweeduizend en zeven, op eenentwintig december.

OP VERZOEK VAN :

de vennootschap naar Amerikaans recht **ADVANCED TECHNOLOGY MATERIALS INC.**, waarvan de vennootschapszetel gevestigd is te Danbury CT 06810 (Verenigde Staten van Amerika), Commerce Drive 7,

- hebbens als raadslieden Meester Bruno Vandermeulen en Meester Ruben Peeters, advocaten te Brussel, met kantoor te 1040 Brussel, Oudergemlaan 22-28,  (tel. 02/282.6000; e-mail Bruno.Vandermeulen@twobirds.com  resp.  Ruben.Peeters@twobirds.com  ;  ref. ADVTM.0002)

- verzoekende partij, ten deze woonplaats kiezend op het kantoor van ondergetekende Gerechtsdeurwaarder.

Heb ik, ondergetekende, Martine VERGAUWEN,
Gerechtsdeurwaarder met standplaats te Antwerpen,
die kantoor houdt te 2018 Antwerpen 1, Balansstraat 117,

BETEKEND en, met ieder afschrift van onderhavig exploot, een voor gelijkluidend verklaard afschrift gelaten aan:

de onderneming naar Amerikaans recht **PRAXAIR INC.**, waarvan de zetel gevestigd is te Danbury 06810-5113 Connecticut (Verenigde Staten van Amerika), Old Ridgebury Road 39,

Aangezien zij in België geen gekende maatschappelijke zetel, bedrijfszetel of gekozen woonplaats heeft;

Dat haar zetel gevestigd is in de Verenigde Staten van Amerika;

Blz. 1/4

Balansstraat 117
2018 ANTWERPEN 1
Ø 03 259 59 00
Fax 03 259 59 01
e-mail: bdmv@bdmv.net
website : www.bdmv.net
Kantooruren : van 9 uur tot 16 uur

GERECHTSDEURWAARDERS



Johan BOCKLANDT L.J.
Bart GEETS L.J.
Alain VAN DER STEICHEL L.J
kand. gerechtsdeurwaarder



2450/07 GVK
Te vermelden bij iedere
betaling of briefwisseling

Gelet op de Conventie van Den Haag van 15 november 1965;

Dienvolgens heb ik twee afschriften van onderhavig exploot, samen met een vertaling in het Engels en de voorgeschreven formulieren, onder aangetekende omslag met de luchtpost en met kennisgeving van ontvangst, heden afgegeven op het postkantoor te Antwerpen, toegezonden aan :

PROCESS FORWARDING INTERNATIONAL
633 Yesler Way
SEATTLE, WA 98104
USA

met verzoek de afgifte aan geadresseerde te doen bewerkstelligen overeenkomstig art. 5) a., van de bepalingen van voornoemde Conventie.

Tevens heb ik, overeenkomstig art. 40 van het Gerechtelijk Wetboek, een afschrift van onderhavig exploot met een vertaling in het Engels toegezonden aan geadresseerde aan haar hiervoor vermelde adres,

a) onder aangetekende omslag met de luchtpost en met kennisgeving van ontvangst,

b) onder aangetekende omslag met de gewone post en met kennisgeving van ontvangst,

heden afgegeven op het Postkantoor te Antwerpen.

De bewijzen van deze zendingen heb ik aan het origineel van onderhavig exploot gehecht;

- van de uitgifte in uitvoerbare vorm van een beschikking op tegenspraak gewezen tussen partijen door de Beslagrechter in de Rechtbank van Eerste Aanleg van het Gerechtelijk Arrondissement Turnhout, in datum van zevenentwintig september tweeduizend en zeven;

Doende deze betekening tot kennisgeving en leiding van de betekende partij, tot zulke doeleinden als naar recht en onder alle voorbehoud.

Blz. 2/4

402-5501611-59    BjB 645-1008245-62    ING 320-0917406-50    000-0089340-03

Marc **BEERTEN** LIC. JUR. - Martine **VERGAUWEN** - Willy **MERTENS** - Roger **VANDENHENDE** - Jan **DE BELDER**

| Balansstraat | 117 | GERECHTSDEURWAARDERS | |
|---|---|---|---|
| 2018 | ANTWERPEN 1 | | |
| Fax | 03 259 59 00 | | |
| | 03 259 59 01 | | |
| e-mail: | bdmv@bdmv.net | | |
| website : | www.bdmv.net | | |
| Kantooruren : | van 9 uur tot 16 uur | | |

Johan BOCKLANDT L.J.
Bart GEETS L.J.
Alain VAN DER STEICHEL L.J.
kand. gerechtsdeurwaarder

**2450/07 GVK**

*Te vermelden bij iedere betaling of briefwisseling*

<u>WAARVAN AKTE</u> : datum van het exploot.

<u>KOSTEN</u> : duizend en twee euro en achtenzeventig cent.

De Gerechtsdeurwaarder,



KBC 402-5501611-59          BjB 645-1008245-62          ING 320-0917406-50          000-0089340-03

Marc **BEERTEN** LIC. JUR. - Martine **VERGAUWEN** - Willy **MERTENS** - Roger **VANDENHENDE** - Jan **DE BELDER**

| | | GERECHTSDEURWAARDERS | | |
|---|---|---|---|---|
| Balansstraat | 117 | | | **2450/07 GVK** |
| 2018 | ANTWERPEN 1 | | Johan BOCKLANDT L.J. | |
| ∅ | 03 259 59 00 | | Bart GEETS L.J. | *Te vermelden bij iedere* |
| Fax | 03 259 59 01 | | Alain VAN DER STEICHEL L.J. | *betaling of briefwisseling* |
| e-mail: | bdmv@bdmv.net | | kand. gerechtsdeurwaarder | |
| website : | www.bdmv.net | | | |
| Kantooruren : | van 9 uur tot 16 uur | | | |

| | |
|---|---|
| Vast Recht | 108,52 |
| Afschriften | 65,10 |
| Geschriften | 96,90 |
| Vacatie Artikel 38 | 9,79 |
| Rollen Vertaling | 125,40 |
| Verplaatsing | 8,69 |
| Port buitenland | 45,00 |
| ------------------------------------------- | |
| Totaal rechten | 459,40 |
| | |
| Registratie | 25,00 |
| Vertaling | 429,91 |
| Kosten uitreiking USA | 88,47 |
| ------------------------------------------- | |
| Totaal uitschotten | 543,38 |
| | |
| TOTAAL | 1.002,78 |
| ============ | |



KBC 402-5501611-59    BjB 645-1008245-62    ING 320-0917406-50    000-0089340-03

| | | JUDICIAL OFFICERS |
|---|---|---|
| 117 | Balansstraat | Johan BOCKLANDT L.J. |
| 2018 | ANTWERP 1 | Bart GEETS L.J. |
| Tel. | (03) 259 59 00 | Alain VAN DER STEICHEL L.J. |
| Fax | (03) 259 59 01 | Cand. Judicial Officer |
| E-mail | bdmv@bdmv.net | |
| Website: | www.bdmv.net | |
| Opening hours | from 9 a.m. to 4 p.m. | |

> **07/4174 GVK**
>
> *To be mentioned with every*
> *payment or correspondence*

## NOTIFICATION OF A COURT ORDER

In the year two thousand and seven, on the twenty-first day of December.

### AT THE REQUEST OF:

The Company under American Law **ADVANCED TECHNOLOGY MATERIALS INC.,** the registered office of which is established at Danbary CT 06810 (United States of America), 7 Commerce Drive,

Having as Counsels <u>Maître Bruno Vandermeulen</u> and <u>Maître Ruben Peeters</u>, Barristers-at-Law at Brussels, practising at 22-28 Oudergemlaan, 1040 Brussels, (Tel. 02/282.6000; e-mail Bruno.Vandermeulen@twobirds.com Resp. Ruben.Peeters@twobirds.com; ref. ADVTM.0002)

- The petitioning party, electing domicile for this purpose at the office of the undersigned Judicial Officer.

I, the undersigned, Martine VERGAUWEN,

Judicial Officer resident in Antwerp,
practising at 117 Balansstraat, 2018 Antwerp 1,

<u>HAVE SERVED</u> and with each copy of the present writ have left a certified true copy on:

The company under American Law **PRAXAIR INC.,** the registered office of which is established at 39 Old Ridebury Road, Danbury 06810-5113 Connecticut (United States of America),

Whereas it has no known registered office, branch office or elected domicile in Belgium;

Whereas it is established in the United States of America;

P. 1/3

**Marc BEERTEN - LIC. JUR. - Martine VERGAUWEN - Willy MERTENS - Roger VANDENHENDE - Jan DE BELDER**

| | | JUDICIAL OFFICERS |
|---|---|---|
| 117 | Balansstraat | Johan BOCKLANDT L.J. |
| 2018 | ANTWERP 1 | Bart GEETS L.J. |
| Tel. | (03) 259 59 00 | Alain VAN DER STEICHEL L.J. |
| Fax | (03) 259 59 01 | Cand. Judicial Officer |
| E-mail | bdmv@bdmv.net | |
| Website: | www.bdmv.net | |
| Opening hours | from 9 a.m. to 4 p.m. | |

---

**07/4174 GVK**

*To be mentioned with every payment or correspondence*

Mindful of the Hague Convention of 15th November 1965;

I have consequently sent two copies of the present writ, together with an English translation and the proscribed forms, under registered cover by airmail and with notice of receipt, deposited today at the Post Office of Antwerp, to:

PROCESS FORWARDING INTERNATIONAL
633 Yesler Way
SEATTLE, WA 98104
USA

with the request to have it served on the addressee in compliance with Art. 5) a., of the said Convention.

I have also sent a copy of the present writ, with an English translation, in compliance with Art. 40 of the Judicial Code, to the addressee at its aforementioned address,

a) under registered cover by airmail and with notice of receipt,

b) under registered cover by normal surface mail and with notice of receipt;

deposited today at the Antwerp Post Office.

I have attached the proofs of registration of these mailings to the original of this present writ;

- of the issue in enforceable form of a Court Order passed in a defended case by the Distraining Judge in the Court of First Instance of the Judicial District of Turnhout, on the date of twenty-seventh of September two thousand and seven;
-
Serving this notice for the notification and guidance of the party served, to such ends as according to law, with all reserves.

P. 2/3

**Marc BEERTEN - LIC. JUR. - Martine VERGAUWEN - Willy MERTENS - Roger VANDENHENDE - Jan DE BELDER**

**JUDICIAL OFFICERS**

117    Balansstraat   Johan BOCKLANDT L.J.
2018    ANTWERP 1   Bart GEETS L.J.
Tel.     (03) 259 59 00  Alain VAN DER STEICHEL L.J.
Fax     (03) 259 59 01  Cand. Judicial Officer
E-mail   bdmv@bdmv.net
Website:   www.bdmv.net
Opening hours from 9 a.m. to 4 p.m.

|  |
|---|
| **07/4174 GVK** |
| *To be mentioned with every payment or correspondence* |

WHEREOF RECORD: Date of the writ.

COSTS:  1.002,78 EURO.

The Judicial Officer,
(signed) (Marc BEERTEN) *read :*

Martine VERGAUWEN ~~Marc BEERTEN~~

P. 3/3

GCL Number: 06/1848/A-
07/1070/A
Rep. Number: 07/8372

*(Circular stamp of the
Clerk of the Court's Office
Turnhout Court of 1st Instance)*

WE, ALBERT II, KING OF THE BELGIANS,

TO ALL NOW PRESENT AND TO COME,

KNOW YE:

<u>First Page</u>

**G.C.L. 06/1848/A-07/1070/A**      **Date: 27.9.2007**         rep. *07 2372*

**DECISION:** delivered in the Court building "Het Kasteel" in Turnhout, Belgium, at the hearing on Thursday **TWENTY-SEVENTH OF SEPTEMBER TWO THOUSAND AND SEVEN**
By the Distraining Judge of at the Court of First Instance of the Judicial District of Turnhout, where were sitting:

**P. PEETERS**, Vice-President –Distraining Judge
**J. THYS**, Clerk of the Court

---

**In the case G.C.L. 06/1848/A**

1. **NV PRAXAIR**, registered in the Turnhout Trade Register under number 63395, Company Number 0438.719.221, the registered office of which is situated at 29 Lammerdries, 2250 Olen, Belgium;
2. **PRAXAIR INC.**, a company governed by the Law of the State of Connecticut (United States of America), the registered office of which is situated at 39 Old Ridgeury Road, Danbury, Connecticut 06810-5113, United States of America

   - Plaintiffs
   - Represented by Maître F. Van Elzen, a Barrister-at-Law on behalf of Maître Glas, a Barrister-at-Law practising at 80 Uitbreidingsstraat, 2600 ANTWERP, Belgium;

**Versus:**

**ADVANCED TECHNOLOGY MATERIALS INC.**, a Company governed by the Law of the United States of America, the registered of which is situated at 7 Commerce Drive, Danbury, Connecticut 06810, United States of America, electing domicile at the offices of the Judicial Officer J. De Belder, 117 Balansstraat, Antwerp, Belgium

   - Defendant
   - Represented by Maître B. Vandermeulen and Maître R. Peeters, Barristers-at-Law at 22-28 Oudergemlaan, 1040 BRUSSELS, Belgium;

**And in the case G.C.L. 07/1070A**

**NV PRAXAIR**, registered in the Turnhout Trade Register under number 63395, Company Number 0438.719.221, previously with registered office at 29 Lammerdries, 2250 Olen, Belgium, currently at 17 Metropoolstraat, 2900 Schoten, Belgium;

   - Plaintiffs
   - Represented by Maître F. Van Elzen, a Barrister-at-Law on behalf of Maître Glas, a Barrister-at-Law practising at 80 Uitbreidingsstraat, 2600 ANTWERP, Belgium;

**Versus:**

**ADVANCED TECHNOLOGY MATERIALS INC.,** a Company governed by the Law of the United States of America, the registered office of which is situated at 7 Commerce Drive, Danbury, Connecticut 06810, United States of America, electing domicile at the offices of the Judicial Officer J. De Belder, 117 Balansstraat, Antwerp, Belgium

- Defendant
- Represented by Maître B. Vandermeulen and Maître R. Peeters, Barristers-at-Law at 22-28 Oudergemlaan, 1040 BRUSSELS, Belgium;

Mindful of the introductory summons served in the case G.C.L. 06/1848/A on 20.11.2006 by Judicial Officer F. Jennes at Antwerp, regarding the appeal against the order preceding the executive attachment of movable goods dated 15.11.2006 in payment of allegedly forfeited penalties of 600,000 EUR plus interests and costs;

Mindful of the introductory summons served in the case G.C.L. 07/1070/A (previously 07/3460A) on 25.5.2007 by Judicial Officer F. Jennes at Antwerp, regarding the appeal against garnishee order served on 11.5.2007 in the possession of NV KBC-Bank, NV ING Belgium, NV Fortis Bank and serving the notice of garnishment to the aforementioned third party debtors;

Mindful of the decision of the Court of Attachment of Antwerp in the case known under reference 07/3460/A whereby this case was referred to the Court of Attachment of Turnhout, currently known under reference G.C.L. 07/1070/A;

Having heard the parties in the stating of their arguments on which the application is based by their respective Counsels;

The cases referred to under G.C.L. 06/1848/A and 07/1070/A are associated in the meaning of Article 30 of the Judicial Code and are therefore joined.

The parties are suppliers of industrial gas that is presented by them in cylinders, by the Defendant under the name of 'VAC' and by the Plaintiff under the name of 'Up Time'. The Defendant claims that the Plaintiffs are violating its European patent EP 1000 291 B1.

By interim order of the President of the Court of First Instance of Antwerp of 26.10.2006 the Plaintiffs were sentenced awaiting a final judgement on the merits;

*to cease publication and distribution of information and/or publicity presenting the disputed cylinders 'Up Time' as a replacement product of the competitive product of the claiming party* (currently the Defendant) *and prohibiting the defending parties* (currently the Plaintiffs) *to advertise this product in any which way upon forfeit of a penalty payment of 100,000 EUR for each violation established.*

The parties do not dispute that the decision was served upon the Plaintiffs on 30.10.2006.

The Defendant states that after the aforementioned writ was served violations of the prohibitive clauses of the decision were carried out by the Plaintiffs and that by each of the Plaintiffs penalties of 600,000 EUR were forfeited.
The order preceding the attachment of movable property was served on 15.11.2006 and the notice of garnishment was served on 11.5.2007.

The claim of the Plaintiffs regarding G.C.L. 06/1848/A in which relief is sought in a declaration that no penalties are forfeited and to declare null and void the decision of 15.11.2006, compensation of 100,000 EUR due to vexatious and rash execution, and secondary to this to reduce the penalty payment, for as far as forfeited, to 100,000 EUR and only to be imposed on Plaintiff under 2, was declared to be legitimate and admissible.

The claim of the Plaintiff regarding G.C.L. 07/1070/A in which relief is sought regarding the repeal of the garnishment of 11.5.2007 and compensation of 100,000 EUR due to vexatious and rash attachment, was declared to be legitimate and admissible.

The Defendant claims that the demanded penalties were forfeited by the Plaintiffs due to the fact that they advertised the gas cylinder 'Up Time' via the Internet on their websites 'www.praxair.com' (belonging to Praxair Inc.) and 'www.praxair.be' (belonging to NV Praxair). To confirm this Defendant refers to three extracts of web pages of each of the aforementioned websites, whereby the three violations carried out by each of the two Plaintiffs were recorded, according to the Defendant, in writing on 9.11.2006 for the first time "…last week…" and "…this week for the second time…".

The Plaintiffs first of all dispute that the penalties were forfeited. They state that in the disputed decision only a specific form of advertising was prohibited, in particular such in which 'Up Time' cylinders were projected as a replacement product for the products of the Defendant. They refer to the grounds of the decision in which it is stated that it should be prohibited to the Plaintiffs, awaiting a judgement on the merits, to act in an aggressive manner in order to take over a greater market share of the Defendant. They state that this has been confirmed in the operative part of the decision and also refer to the judgement of the Court of Appeal in Antwerp of 25.4.2007, delivered on appeal against the disputed decision, in which, according to the Plaintiffs, it is decided that only advertising projecting the 'Up Time' cylinders as replacement products of the 'VAC' cylinders of the Defendant is prohibited.

In the disputed decision clearly any advertising for the 'Up Time' cylinders is prohibited. The aforementioned judgement of the Court of Appeal has rejected the appeal of the Plaintiffs against the disputed decision as unfounded and even takes it one step further: upon the interlocutory appeal of the Defendant it has been decided to also prohibit any production of the 'Up Time' cylinders. The position taken by the Plaintiffs can therefore not be upheld.

The Plaintiffs are furthermore stating that in any case the decision is unclear and that there can be no question of an error attributable to them.
They state that they immediately removed any reference to a replacement product.

This ground repeats in fact what was said earlier and contradicts the injunction, explicitly formulated in the disputed decision, imposed on the Plaintiffs to 'advertise in any way whatsoever'.

The Plaintiffs also state that after serving the judgement the contents of the websites have been adapted by stating that the 'Up Time' cylinders would not be available in Belgium and that any reference to the 'Up Time' system as reported on the website was not intended for use in the Belgian market and/or by current or future Belgian clients of Praxair, which adaptation, according to the Plaintiffs, has the result that no violation of the injunction has taken place.

The adaptation of the contents of the website made by the Plaintiffs does not however remove the client-seeking character of the publicity, which means that even after the adaptation, the contents of the web pages would still fall under the injunction on publicity.

The Plaintiffs argue furthermore that no penalty payment can be forfeited because no violation took place in Belgium as both of the aforementioned Internet websites are controlled centrally from the United States of America and advertisements on the web need to be localised at the place where the relevant database is located, from where the contents of the website are determined, this being in this case in Danbury in the USA.

The websites mentioned could be easily consulted in Belgium and undoubtedly also in other European countries where the patent of the Defendant is protected. Publicity via Internet sites has a cross-border character; it is for this reason that this type of publicity is often chosen. This means that the place where the database, which forms the basis of the publicity, is located is only a starting point with the consumer-internet user being the destination. In the case of violation of an injunction on publicity via Internet sites, the offence is not only being carried out at the place where the database is located, but also at the place where the challenged publicity is being seen by the internet-consumer, for instance in Belgium.

The Plaintiffs also state that certainly NV Praxair, based in Belgium, cannot be accused of alleged violation of the injunction on publicity because the contents of the websites is controlled centrally in the United States of America by Praxair Inc., based in the United States of America.

It is not disputed, and it also appears from the statement of the Judicial Officer, that the website 'www.Praxair.be' is owned by NV Praxair. On this website, publicity appears which constitutes a violation of the injunction on publicity imposed by the disputed decision; NV Praxair is responsible for the information and publicity appearing on its website.

The Plaintiffs also argue that no penalty payment can be forfeited by Praxair Inc., based in the United States of America, because "the decision (in which the injunction was imposed) is not enforceable (has not been granted exequatur) in the United States".

The violations via the Internet of the injunction imposed by the disputed decision were carried out by the aforementioned company in Belgium and in other European countries in which the patent of the Defendant enjoys protection.
For the enforcement of the penalty payment related to the violation of the injunction in Belgium a writ of execution in the United States is not required.

The Plaintiffs lastly state that no penalties of 600,000 EUR can be forfeited. They state that the 3 web pages of each of the two Internet sites are only one unit each time which means that it is not possible for 2 x 3 x 100,000 EUR = 600,000 EUR to be forfeited by each of them. They state furthermore that the information on the web pages forms only a single action which can only be held against the company Praxair Inc., based in the United States, and that the penalty payment imposed in the disputed decision was not linked to a violation per time period, which means that the demanded penalty payment should in any case be reduced to 100,000 EUR.

The Defendant states that the prohibited publications were placed on 3 different web pages on each of the two Internet sites and that such had been established twice, which means that on account of each of the two Plaintiffs 6 violations have been established and that both of them have forfeited a penalty payment of 600,000 EUR.

From the statement of the judicial officer of 3.11.2006 it appears that violations have been established on 2.11.2006 and 3.11.2006 on account of each of the two Plaintiffs on the various web pages of the respective Internet sites. The various web pages, which form the Internet site of NV Praxair, form a single unit in the way the various web pages of Praxair Inc. also form a single unit. Consequently, each of the two companies committed a violation on the two aforementioned dates, which means that each of them has forfeited a penalty payment of 2 x 100,000 EUR = 200,000 EUR. Contrary to what the Plaintiffs state, to maintain a website with prohibited publicity produces a continuous series of violations instead of a single violation as the consequences continue to exist, if this was not the case the Plaintiffs would be able to continue their publicity unpunished after a single compensation payment, which is not the purpose of the penalty payment (K. Wagner, 'Dwangsom' (Penalty Payment), A.P.R., No. 110 Page 106).

Any violations that have taken place after 3.11.2006 are not relevant in the framework of the current dispute as the order and attachment do not contain a claim for any penalties that would have been forfeited after the latter date.

As penalties were forfeited there is absolutely no reason for compensation.

**FOR THESE REASONS,**
And the proceedings having taken place in the Dutch language, in compliance with the Articles 2, 34, 36, 37 and 41 of the Act of 15 June 1935 concerning the use of languages in Court proceedings.

WE, **P. PEETERS**, Vice-Chairman of the Court of Attachment, assisted by: **J. THYS**, Clerk of the Court,

Ruling after having heard the parties

Join the cases known under 06/1848/A and 07/1070/A.

Declare the claims admissible and founded as follows, with rejection of the otherwise and additionally claimed as unfounded.

State in the case known under 06/1848/A that each of the two Plaintiffs have forfeited penalties to the amount of 200,000 EUR.

Declare the order of 15.11.2006 valid for as far as served for penalties of 200,000 EUR payable by each of the two Plaintiffs to be increased by the costs stated in the order, and dismissing the remainder.

Declare in the case 07/1070/A the garnishment of 11.5.2007 against the Plaintiff valid for penalties of 200,000 EUR to be increased by the costs stated in the order, and dismissing the remainder.

Order the Defendant to withdraw the attachment served for more than the aforementioned amounts and costs within 48 hours after the service of this decision and rule that in the case of default of a voluntary compliance this decision will serve as withdrawal to such extent.

Order the Plaintiffs, in the case 06/1848/A, to pay the costs of the proceedings and estimate the costs up to the present day on account of the Defendant to be 123.95 EUR (court fees) and of the Plaintiffs 257.90 EUR (summons + registration) + 123.95 EUR (court fees).

Order the Plaintiffs, in the case 07/1070/A, to pay the costs of the proceedings and estimate the costs up to the present day on account of the Defendant to be 123.95 EUR (court fees) and of the Plaintiffs 313.850 EUR (summons + registration) the court fees not being estimated, as these have not been declared.

**J. THYS**                                        **P. PEETERS**

GCL Number: 06/1848/A-
07/1070/A
Rep. Number: 07/8372

*Direct and ordain that all Judicial Officers commissioned to this effect shall enforce this judgement;*
*That Our "Procureurs Généraux" and Our Public Prosecutors at the Courts of First Instance shall not deviate from this judgment and that all commanders and officers of the public authorities shall give assistance to the law in case they are lawfully commissioned for this purpose;*
*In witness whereof the present this judgement is signed and the sealed with the seal of the Court, or the Public Notary.*

*(Circular stamp of the*
*Clerk of the Court's Office*
*Turnhout Court of 1st Instance)*

Office of the Clerk of the Court: Court of First Instance

UR: 53/5        BUR: 7/80          Certified a true copy
delivered to:

6 pages x 2.85 Euro                 For: Maître R. Peeters
Dues paid: 17.10 Euro               For: Advanced Technology
Materials INC

Turnhout, 16 October 2007           Turnhout, 16 October 2007

The Clerk of the Court,              The Clerk of the Court,
*(Illegible signature)*              *(Illegible signature)*
I. Sterckx                           I. Sterckx

Certified a true copy
The Judicial Officer

Final Page