STEPHEN V. BOMSE (Bar No. 40686)
steve.bomse@hellerehrman.com
DAVID M. GOLDSTEIN (Bar No. 142334)
david.goldstein@hellerehrman.com
HELLER EHRMAN LLP
333 Bush Street
San Francisco, CA  94104-2878
Telephone:  (415) 772-6000
Facsimile:  (415) 772-6268

NATHAN P. EIMER
neimer@eimerstahl.com
ANDREW G. KLEVORN
aklevorn@eimerstahl.com
CHAD J. DOELLINGER
cdoellinger@eimerstahl.com
EIMER STAHL KLEVORN & SOLBERG LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Telephone:  (312) 660 7600
Facsimile: 312-692-1718

Attorneys for Plaintiff
PRAXAIR, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PRAXAIR, INC., | ) Case No.: C08-00869JW (HRL) |
| Plaintiff, | ) **REPLY MEMORANDUM IN** |
| | ) **SUPPORT OF MOTION FOR** |
| v. | ) **PRELIMINARY INJUNCTION** |
| | ) |
| ATMI, INC. and ADVANCED TECHNOLOGY MATERIALS, INC., | ) **ORAL ARGUMENT REQUESTED** |
| | ) **PUBLIC VERSION** |
| Defendant. | ) Date:  April 21, 2008 |
| | ) Time: 9:00 a.m. |
| | Ctrm: 8, 4th floor |
| | Hon. James Ware |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ........................................................................................ ii

I.     Introduction ......................................................................................................1

       A.    ATMI Has Cornered the Supply of Qualified $B^{11}F_3$ ...........................2

       B.    Boron Products ........................................................................................4

       C.    The Belgian Preliminary Relief ..............................................................5

II.    Factual Background ..........................................................................................6

       A.    The History of $B^{11}F_3$ Supply by BP and NUKEM .............................6

       B.    The Qualification Process .......................................................................7

       C.    ATMI's Exclusive Agreement with NUKEM .........................................9

III.   Argument .......................................................................................................12

       A.    ATMI Must Be Restrained from Cutting Off Praxair's
             Supply of Qualified $B^{11}F_3$ ................................................................12

             1.    ATMI's Supply Agreement Prevents NUKEM
                   from Selling $B^{11}F_3$ to Praxair .................................................14

             2.    ATMI's Exclusive Agreement with NUKEM is
                   Anticompetitive and Unlawful .................................................16

             3.    Limiting NUKEM's Annual Non-ATMI Sales of
                   $B^{11}F_3$ to 100 Kilograms is Anticompetitive ...........................17

             4.    ATMI's Focus on BP is Misleading .........................................19

       B.    ATMI Should be Enjoined from Using the Belgian
             Court's Preliminary Advertising Ban to Inhibit
             Competition in the United States and Around the World .................22

IV.    Conclusion .....................................................................................................25

i

# TABLE OF AUTHORITIES

## Cases

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985)..................................................................................... 16

*Bachchan v. India Abroad Publ'n, Inc.*,
    585 N.Y.S.2d 661 (1992)............................................................................. 24

*Bayview Hunters Point Community Advocates v. Metro. Transp. Comm'n*,
    366 F.3d 692 (9th Cir. 2004)....................................................................... 15

*Benda v. Grand Lodge of the Int'l Ass'n. of Machinists & Aerospace Workers*,
    584 F.2d 308 (9th Cir. 1978)....................................................................... 13

*Cohen v. Cowles Media Co.*,
    501 U.S. 663 (1991)..................................................................................... 24

*EyeTicket Corp. v. Unisys Corp.*,
    155 F. Supp. 2d 527 (E.D.Va. 2001) .......................................................... 13

*General Business Sys. v. North Am. Philips Corp.*,
    699 F.2d 965 (9th Cir. 1983)....................................................................... 21

*Geneva Pharm. Tech. Corp. v. Barr Lab. Inc.*,
    386 F.3d 485 (2d Cir. 2004)........................................................................ 16

*Lands Council v. Martin*,
    479 F.3d 636 (9th Cir. 2007)....................................................................... 12

*LePage's Inc. v. 3M, Corp.*
    324 F.3d 141 (3d. Cir. 2003)....................................................................... 18

*Lorain Journal Co. v. United States.*,
    342 U.S. 143 (1951)..................................................................................... 16

*Microbix Biosystems, Inc. v. Biowhittaker, Inc.*,
    172 F. Supp. 2d 680 (D. Md. 2000) ............................................... 17, 20, 21

*Microsoft Corp. v. Lindows.Com, Inc.*,
    319 F. Supp. 2d 1219 (W.D. Wash. 2004)................................................. 24

*United Shoe Machinery Corp. v. United States*, 258 U.S. 451 (1922) ................ 18

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005)............................................................... 18, 19

*United States. v. Microsoft,*
    253 F.3d 34 (C.A.D.C. 2001) .................................................................................. 19

*Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004) ............................................................................................... 16

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,*
    169 F. Supp. 2d 1181 (N.D. Cal. 2001) ........................................................ 23, 24, 25

## Treatises

Herbert Hovenkamp, *Antitrust Law* ¶ 1802c, 1804c (2d ed. 2005) ..................................... 18

.

## I.    Introduction

Praxair, Inc.'s Electronics division (hereinafter "Praxair") is a recent entrant into the market for sub-atmospheric gas delivery systems, only having begun marketing its UpTime® system to semiconductor manufacturers in 2003.  In undertaking this endeavor, Praxair has tried to inject competition into a market over which the defendant, ATMI, enjoyed a complete monopoly.  Cutting edge innovation, responsive service and increased value to the customer have been the hallmarks of Praxair's efforts to crack the market for sub-atmospheric gas delivery systems.

Yet, at every turn, Praxair has faced an onslaught of anticompetitive activity that ATMI has engineered.  Indeed, Praxair's Motion for a Preliminary Injunction demonstrates the following:

- That ATMI entered into an *exclusive* supply agreement with NUKEM that locks-up the supply of enriched $B^{11}F_3$ and prevents sales to any person or entity that might use it in competing with ATMI. Rather than utilizing an exclusive contract, ATMI could have achieved its ostensible goal of creating a secure supply chain lawfully with requirements contracts, but it did not.

- That NUKEM told Praxair it was unable to sell any $B^{11}F_3$ to Praxair because of ATMI's exclusive contract.  ATMI has never challenged this point nor did NUKEM when it submitted a declaration for this Court to consider.  The collective silence is telling.   It is uncontroverted – and must be deemed admitted for the purpose of this motion – that NUKEM believed it could not sell any $B^{11}F_3$ to Praxair because of the exclusive contract.

    [

    ]

- That NUKEM, the only supplier of qualified $B^{11}F_3$ for the vast majority of Praxair's customers, had little choice but to cede to the wishes of ATMI for exclusivity, given that ATMI has purchased the overwhelming majority of NUKEM's $B^{11}F_3$ over the last several years; thus, absent ATMI's consent, NUKEM has now refused to sell any $B^{11}F_3$ to Praxair.

- That, notwithstanding its claim that another firm, Boron Products ("BP"), can readily and reliably supply vast quantities of qualified $B^{11}F_3$, ATMI itself requires NUKEM, as part of its exclusive supply arrangement, [

    .]

- That ATMI believes it can force Praxair to use a single, less reliable, source of $B^{11}F_3$ (while ATMI has the benefit of what it claims to be "dual-sourcing") and to undertake the risky process of trying to switch customers from one source of $B^{11}F_3$ to another (*i.e.*, from NUKEM to BP).  Given the costs, disruption and time required for a semiconductor fabricator to qualify a new material supplier, such customers may simply abandon Praxair's UpTime® system to avoid these burdens and return to ATMI's product offering.  ATMI thus will have achieved the anticompetitive goal it has sought:  virtually complete dominance of the market for sub-atmospheric gas delivery systems.

- That, even if NUKEM were permitted to provide a small portion of its $B^{11}F_3$ output (approximately 100 kilograms annually) to Praxair (as ATMI originally claimed in its opposition), such a limitation effectively places a hard ceiling on Praxair's ability to grow its business and compete with vigor against ATMI. Such "allowance" is, in any event, illusory as there is no requirement that it go to Praxair and may be unavailable if sold to others. In any event, NUKEM has now indicated that, despite requests made by Praxair several months ago that were refused, it has already sold the supposedly available 100 kilograms of $B^{11}F_3$ to other customers.

- That ATMI, consistent with its SEC 10-K representation, has used and is using the provisional relief it obtained in Belgium as an additional sword to constrain Praxair's ability to compete in the U.S. and other geographic areas far beyond those covered by ATMI's disputed patent in a few European countries.

A.    ATMI Has Cornered the Supply of Qualified $B^{11}F_3$

Subsequent to when ATMI filed its opposition, its anticompetitive conduct has been further unmasked. In a remarkable, eleventh-hour filing on April 7, 2008 denominated as "Notice of New Factual Developments," ATMI now admits that what it represented to be true just a few weeks ago in its opposition is, in fact, flatly wrong. Contrary to ATMI's repeated claims to this Court, NUKEM is unable to supply Praxair with the 100 kilograms of $B^{11}F_3$ that it supposedly is allowed to provide under the supply agreement because NUKEM has purportedly already committed such supply to others.[1]  (ATMI's Notice of New Factual Developments ("Notice"), at 1:16 – 1:21.) Having been caught, ATMI then tries to wriggle its way out of the situation by allowing NUKEM to supply Praxair with a one-time delivery of forty kilograms of $B^{11}F_3$ (compared to the *more than approximately*[    ] kil*ograms* of NUKEM-sourced $B^{11}F_3$ that Praxair purchased in 2007 (Declaration of Joe Young ("Young Decl."), ¶ 10.) As it happens, *just a few hours* after ATMI informed Praxair that it had provided such consent, NUKEM – after having refused to supply Praxair with any $B^{11}F_3$ for months – found the ability to provide Praxair with forty kilograms of $B^{11}F_3$, of which ATMI approved.[2]

---

[1] Left unexplained are the circumstances surrounding NUKEM's purported commitment of 100 kilograms of $B^{11}F_3$ to other customers. Praxair asked NUKEM for a supply of $B^{11}F_3$ as long ago as December 27, 2007. (Dkt. 4, ¶ 5.) At that time, Praxair was not told that NUKEM had already made supply commitments to other parties. Instead, NUKEM flatly stated that its exclusive supply agreement with ATMI prevented it from providing any $B^{11}F_3$ to Praxair. (*Id.* ¶¶ 5 – 6.) As discovery proceeds, Praxair may uncover the true chronology of events; however, in the meantime, ATMI ought not benefit from what can only be described as a suspicious chain of events.

[2] ATMI asserts that, at the time it filed its opposition, it was unaware that NUKEM had supposedly already committed its "allowed" 100 kilograms of $B^{11}F_3$ for 2008 to entities other than Praxair. (*See* Notice, 1:17.) Given that, in connection with its opposition, ATMI actually submitted a declaration from NUKEM, it is

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
**PUBLIC VERSION**
(CASE NO. C08-00869 JW (HRL))

1    As these late-disclosed events demonstrate, ATMI has its hand tightly on the spigot of $B^{11}F_3$

2  supply.  It now seeks to dole out a small quantity to Praxair, with the apparent aim of avoiding

3  review of its anticompetitive conduct by this Court.  In ATMI's view, Praxair should have no

4  *immediate* complaint if Praxair is now provided with some NUKEM-sourced $B^{11}F_3$.  But, in fact,

5  the concerns remain.  ATMI has not identified a single legitimate business reason why it should be

6  able to literally hoard NUKEM-produced $B^{11}F_3$ (through the use of stockpiles and exclusivity

7  provisions).  Notably, it has not explained how allowing NUKEM to provide Praxair with the $B^{11}F_3$

8  that it needs will harm ATMI – other than by allowing Praxair to compete fairly against ATMI.

9  ATMI has made no showing that it needs all of NUKEM's gas to supply its customers, let alone

10  that it needs to have NUKEM agree not to deal with Praxair.  Indeed, ATMI has intimidated

11  NUKEM about supplying Praxair to such an extent that, before even offering Praxair the modest

12  forty kilograms that it did, NUKEM sought a "hold harmless" provision from ATMI and requested

13  that they establish "a joint litigation strategy."  (Dkt. 46-2, at 1 – 2.)  Faced [

14                                                      ] with $B^{11}F_3$, NUKEM simply takes its

15  marching orders from ATMI who, in turn, places a chokehold on the available supply to eliminate

16  competition.

17    Of course, the potential availability of forty kilograms of $B^{11}F_3$ from NUKEM is hardly a

18  panacea.  Even with this one-time supply, it is a substantial reduction in the annual amount of

19  NUKEM-sourced $B^{11}F_3$ that Praxair has been able to obtain (from approximately [      ] kilograms in

20  2007).  (Young Decl. ¶ 10.)  And Praxair's plans to grow its business in 2008 and beyond will

21  exacerbate the consequences of such source limitations.  [

22

23

24

25                                                      ] In short, by

26  engineering the cutoff of NUKEM-sourced $B^{11}F_3$ to Praxair, ATMI will have cleared the field of its

27  _____

28  difficult to understand how ATMI could have undertaken appropriate due diligence when preparing an
opposition in an antitrust suit, the heart of which addresses the availability of NUKEM-sourced $B^{11}F_3$.

1  competition and preserved its monopoly – its precise anticompetitive goal.

2       There can be no mistake about what ATMI has done here.  ATMI, recognizing that nearly all of

3  Praxair's customers are qualified using NUKEM-supplied $B^{11}F_3$, has cornered the NUKEM supply,

4  thereby cutting the legs out from under Praxair, its *only* competitor in the sale of sub-atmospheric

5  gas delivery systems.  This is not obtaining a competitive advantage through technical skill,

6  practical ability or superior management.  Rather, it is the raw and unrelenting exercise of market

7  power, and it is precisely the type of predatory conduct the antitrust laws are designed to prevent.

8       B.    Boron Products

9       It is no answer to this problem, as ATMI suggests, for Praxair simply to convert its customers

10  to another source of $B^{11}F_3$.  In fact, ATMI only identifies one other source of $B^{11}F_3$ – BP.[3]  As the

11  accompanying declarations demonstrate, it would take a substantial amount of time and effort for

12  Praxair's customers to convert their semiconductor fabrication facilities to $B^{11}F_3$ sourced from BP.

13  [

14

15

16

17

18

19

20

21

22

23

24

25

---

26  [3] Although this entity has gone through several name/ownership changes, from Eagle-Picher to Ceradyne to
27  BP, Praxair will use "BP" to refer to all of these entities to avoid confusion.
    [4] [

28                                            4                                                ]

1

2

3

4                                                          ]

5          C.      The Belgian Preliminary Relief

6          Of course, as Praxair's complaint and opening papers make plain, ATMI's anticompetitive

7   conduct is not confined to cornering the supply of $B^{11}F_3$. It is also using provisional relief that it

8   obtained from a Belgian court in an ongoing patent dispute with Praxair to preserve unlawfully its

9   monopoly position in geographic areas – such as the United States and Asia – where Praxair and

10  ATMI are supposed to be able to compete freely and openly. Notably, ATMI began such conduct

11  *only after* the U.S. courts finally and conclusively determined that ATMI's U.S. patent was invalid.[5]

12  Having failed to establish a lawful monopoly in the United States, ATMI is now attempting to do

13  an end run around legitimate competition and exclude Praxair through predatory conduct.

14          In response, ATMI tries to portray Praxair's complaint as a frontal assault upon the Belgian

15  court. It is not. Praxair sought no such relief from this Court concerning matters properly aired

16  before the Belgian court. Instead, Praxair is seeking preliminary relief against ATMI because it is

17  brandishing a *Belgian* order – meant to protect patent rights in a limited number of European

18  countries – in a way that directly inhibits competition in the *U.S. and harms American consumers*.

19          There can be little doubt that ATMI is misusing the Belgian provisional relief to affect

20  competition far beyond the handful of European countries in which it arguably currently has a

21  patent right. Indeed, ATMI has reported to its shareholders that the Belgian court has issued an

22  injunction "against the public marketing of the UpTime[®] system *worldwide.*"[6] ATMI's lawyers

23  now attempt to minimize the import of this statement, implying that it is merely exaggerated

24  rhetoric contained in its 10-K filing. This is an odd position, to say the least, given the strict rules

25  of accuracy that pertain to filings made under the securities laws and the potential liabilities that

26  flow from a material misstatement of fact. Yet, ATMI's conduct fully comports with its public

27  ───────────────────────────────

[5] Moreover, even the patent ATMI purportedly holds in a handful of European countries is in dispute and
28  currently under challenge in several European courts and the European patent office.
[6] Dkt. 3, at 20 n.20 (emphasis added).        5

statements. In an effort to extend its purported patent rights in a few European countries beyond their geographic reach, ATMI has sought sanctions against Praxair because (i) an *unrelated* third party displayed UpTime® material on its website in the United States, and (ii) Praxair mentioned on its ".com" website a *Taiwanese* scientific presentation at which the UpTime® technology was discussed. This Court certainly has the authority to prevent a party from engaging in conduct that undermines domestic competition – even if ostensibly based on a foreign court's order. When, as here, a foreign order is used in a way that is repugnant to this country's public policies, including the First Amendment, it cannot stand.

At bottom, ATMI's pattern of increasingly aggressive predatory conduct is permitting it to maintain and expand its unlawful monopoly. Without immediate Court intervention, ATMI may push Praxair – its only real competitor – out of this market entirely. Consequently, Praxair seeks preliminary relief from this Court to prevent such harm from occurring.

## II.    Factual Background

ATMI's opposition papers paint a picture of a properly functioning, competitive market with an unlimited supply of $B^{11}F_3$ and customers who simply do not care about the source of this dopant gas. This story is facially and glaringly inconsistent with the uncontroverted facts.

### A.    The History of $B^{11}F_3$ Supply by BP and NUKEM

In the mid-1990s, BP, a manufacturer located in Oklahoma, was the primary producer of $B^{11}F_3$. (Declaration of Larry Spurgeon ("Spurgeon Decl.") ¶ 3.) Because of the process that BP used (called "KBF4 cracking"), its $B^{11}F_3$ contained an impurity that could manifest itself as a particulate. (*Id.* ¶ 4.) This particulate tended to cause mechanical delivery systems of dopant gases, such as Praxair's later developed UpTime® system, to clog. (*Id.* ¶¶ 4, 7 – 8.)

In the late 1990s, $B^{11}F_3$ became available from a facility in Tbilisi, Republic of Georgia. (*Id.* ¶ 5.) This $B^{11}F_3$ (which was produced using a different process than that used in BP's Oklahoma facility) did not have the problematic impurity of the $B^{11}F_3$ manufactured by BP in Oklahoma. (*Id.*) In about 2000, NUKEM became the distributor of $B^{11}F_3$ produced at the Tbilisi facility. (*Id.* ¶ 6.) Thus, although there were two suppliers of $B^{11}F_3$ when Praxair entered the market in 2003, only one, NUKEM, produced $B^{11}F_3$ that could be used in the UpTime® system. All of Praxair's

1    customers were thus qualified on the UpTime® delivery system with NUKEM's $B^{11}F_3$.  (*Id.* ¶ 8.)

2    Starting in 2005, BP changed the way it manufactured its $B^{11}F_3$ (Declaration of James Waugh) –

3    moving to a process similar to that used in Tbilisi – and thus was able to produce $B^{11}F_3$ without the

4    problematic impurity.  (*Id.* ¶ 9.)  In an effort to obtain an alternative source of $B^{11}F_3$, beginning in

5    2006 Praxair attempted to qualify $B^{11}F_3$ from BP for use in the facilities of new customers that

6    Praxair obtained.  (Young Decl. ¶ 10.)  [



22    ]

23    B.    The Qualification Process

25    [7] [

27    ] Moreover, it is

28    ironic, to say the least, for ATMI to claim that BP, located in Oklahoma, is a viable, alternate supplier when
     ATMI travels halfway around the world, to Tbilisi, Georgia, to secure its own reliable supply of $B^{11}F_3$.

1    ATMI attempts to minimize the importance of the qualification process in semiconductor

2  fabrication, asserting that "nearly everything sold into a fab must be qualified" and that "blanket

3  generalizations [] are of little value." (Opp. 7:1 – 3.) ATMI's "blanket" response wholly ignores

4  the business realities Praxair faces. As set forth below, the qualification process that Praxair's

5  customers would be forced to undertake to re-qualify Praxair's UpTime® delivery system with BP's

6  $B^{11}F_3$ is significant, expensive and time-consuming. [

7

8    ] (Young Decl. ¶ 7.) Thus, by forcing Praxair to re-qualify virtually all of its customers,

9  ATMI would be imposing significant costs and delay upon Praxair. [

10

11

12

13    ] (Young Decl. ¶ 20.) Thus, ATMI would have achieved its anticompetitive aims.

14    Joyce Chen, the President of Praxair's Taiwanese joint venture – and a person with front line

15  knowledge of how customers will be directly harmed if ATMI is permitted to enforce its unlawful

16  exclusive agreement – has submitted a declaration to this Court explaining customers' "very

17  stringent quality control standards regarding the materials that they use in the fabrication of

18  semiconductors." (Chen Decl. ¶ 4.) He explains:

19    Before a particular material can be utilized in a customer's fabrication process, the
20    customer subjects the proposed material to a rigorous qualification process. Although
there are small differences among customers' qualification processes, all UpTime®
21    customers share certain general requirements in common. For dopant gases, the
qualification process includes a review and test of the material, the transfilling location,
22    the delivery package and all related parameters relating to the use of the dopant gas in
the customer's implantation process. The qualification process also involves subjecting
23    the material to a battery of tests using different sized lots of the material, starting with
pilot sized quantities and ending with a full scale production run. This involves the
24    dedication of one or more of the customer's production lines for testing.

25  (Id. ¶¶ 4 – 5.) In short, the qualification process is a major hurdle. ATMI half-heartedly challenges

26  this fact, asserting that "[i]n some instances, qualification of a new gas source [] can take as little as

27  three months." (Opp. 7 n.19.) While it is true that Praxair has seen a customer or two qualify a

28  product in roughly three months, this is by no m8ans the norm. (Young Decl. ¶ 6.) Since Praxair

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
**PUBLIC VERSION**
(CASE NO. C08-00869 JW (HRL)

began selling UpTime®, the average time historically for a customer to qualify the UpTime® system

with $B^{11}F_3$ has been approximately eight months, with some customers taking as long as 15 months.

(*Id.*) It is expected that changing customers from NUKEM's $B^{11}F_3$ to BP's $B^{11}F_3$ – assuming

customers are even willing to make the switch given the inconvenience, costs, and issues

surrounding such a transition – would take up to nine months or longer. (*Id.* ¶ 18; *see also id.* ¶ 20.)

Such an extensive qualification process exists in the semiconductor industry because the

consequences of introducing even a minor impurity into a semiconductor production line could be

significant. It is recognized that "trace amounts of impurities or imperfections in a raw material

cause lost production, delay, and increased costs far in excess of the cost of the materials being

used." (Chen Decl. ¶ 6.) Indeed, a minor contamination that leaves even a single batch of chips

unusable could result in hundreds of thousands of dollars in losses for an average-sized

manufacturer and millions of dollars for the largest manufacturers. (Young Decl. ¶ 4.)[9]

[



]

C.    ATMI's Exclusive Agreement with NUKEM

ATMI has had a supply agreement with NUKEM since 2005. For the Court's convenience,

attached to the Declaration of Chad Doellinger as Exhibit A is a chart showing the evolution of the

---

[9] It is for this reason that ATMI's statement that "virtually all of ATMI's customers are unaware of, and indifferent to, whether any given shipment of $B^{11}F_3$ purchased from ATMI originates from NUKEM or BP," (Opp. 7:14 – 15), is unfounded. Indeed, customers with which Praxair has experience most assuredly do not exhibit such indifference. *See* Chen Decl. ¶¶ 4, 6.

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
**PUBLIC VERSION**
(CASE NO. C08-00869 JW (HRL))

1    increasingly restrictive terms of the agreements over time.  Specifically, ATMI has limited

2    NUKEM's ability to sell its excess production to third parties, such as Praxair, with the terms

3    imposed upon NUKEM becoming more restrictive and punitive over time.  Most recently, ATMI's

4    decision just days ago to "permit" NUKEM to provide Praxair with a token and one-time delivery

5    of forty kilograms of $B^{11}F_3$ in 2008 underscores the nearly complete control that ATMI exercises

6    over NUKEM's capacity.  [

7

8                                                                                                    .]

9        Although ATMI correctly notes that NUKEM originally had been able to sell up to 100

10   kilograms of $B^{11}F_3$ outside of its supply arrangement with ATMI, this right has not been unfettered.

11   [

12

13

14

15

16                                                                           ]

17       Most recently, in January 2008, ATMI submitted a new supply agreement to NUKEM.  Its

18   purpose – to corner the supply of qualified $B^{11}F_3$ – is plain from its language.  [

19

20

21

22

23                                                                           ]

24   (Id., Ex. 5, Art. 5.)  Simply put, ATMI's new supply arrangement bars NUKEM from supplying

25   Praxair – ATMI's only real competitor in the sub-atmospheric gas delivery market – with any

26   $B^{11}F_3$.  [

27                                                             ] – in the event that NUKEM violated its

28   terms by, for example, selling $B^{11}F_3$ to Praxair.  (Id.)  Perforce, such a provision must have a

10

1    substantial chilling effect on NUKEM. Thus, although ATMI claims that $B^{11}F_3$ is readily available,

2    it has gone to remarkable lengths to prevent its only meaningful competitor, Praxair, from obtaining

3    access to the $B^{11}F_3$ qualified by Praxair's existing customers and to force customers back to

4    ATMI's product.

5        Most troubling from an antitrust perspective, it seems clear that ATMI's heavy-handed

6    restrictions in the 2008 agreement were prompted by a realization that ATMI had failed to maintain

7    ironclad restrictions upon NUKEM's ability to deal with Praxair.  [

8

9                                                              ]  With the contractual straightjackets

10    removed, NUKEM made $B^{11}F_3$ available to Praxair without restriction.  In fact, during 2007,

11    NUKEM admits it sold as much $B^{11}F_3$ to Praxair as in the three previous years combined.  (Dkt. 31,

12    ¶ 3).  With this additional supply of $B^{11}F_3$, Praxair nearly doubled its sales in 2007 and began to

13    make significant inroads into ATMI's dominant market position.  (*See* Young Decl. ¶ 16.)

14    Apparently realizing its vulnerabilities when competing on the merits, ATMI reacted by claiming

15    that NUKEM misread the contract; to ensure it did not happen again, ATMI imposed

16    anticompetitive and punitive restraints upon NUKEM.  (Dkt. 28, 8 n.25; Dkt. 32-6.)  Through these

17    contractual terms, ATMI thereby raised the specter of a possible damages threat for NUKEM in the

18    2008 Agreement.

19        Recent events attest to the extraordinary efforts ATMI has undertaken to deny Praxair access to

20    the $B^{11}F_3$ it needs to remain a viable competitor.  As set forth in Praxair's opening papers, in the

21    past six months Praxair twice asked NUKEM to provide it with an adequate supply of $B^{11}F_3$.  Both

22    times, NUKEM rebuffed Praxair, saying that it had entered into an exclusive agreement with ATMI

23    that prevented it from supplying any $B^{11}F_3$ to Praxair.  (Dkt. 5 ¶¶ 5 – 6.)  NUKEM further indicated

24    that, if it were to supply Praxair with $B^{11}F_3$, it would subject itself to a substantial penalty.  (*Id.* at

25    7.)  After ATMI filed its opposition, touting the availability of 100 kilograms of $B^{11}F_3$ from

26    NUKEM, Praxair again contacted NUKEM twice – once on March 27 and then on April 4 –seeking

27    a supply of $B^{11}F_3$.  (4/4/08 Declaration of Paul Peeters ¶¶ 3, 5.)  NUKEM demurred, however,

28    remaining completely silent until the overseer of its supply, ATMI, consented just the other day to

1  "allow" Praxair a one-time supply of forty kilograms of $B^{11}F_3$. (*Id.* ¶¶ 4, 6; Dkt. 46-2, pp. 1 – 2.)

2  Within hours, NUKEM offered Praxair the opportunity to purchase forty kilograms of $B^{11}F_3$ that

3  ATMI had doled out.[10] (Declaration of Veerle Slenders, ("Slenders Decl.") ¶ 3, Ex. 1.)

4  Mysteriously, NUKEM claimed that it could not supply Praxair with the full 100 kilogram

5  allotment because it had supposedly already committed such supply to other unnamed customers,

6  notwithstanding Praxair's requests *made as long ago as December 2007 to obtain such supply.*[11]

7  This chronology of events, only fully revealed by ATMI and NUKEM on April 7 – two days ago –

8  speaks volumes as to who has the hand on the spigot controlling NUKEM's $B^{11}F_3$ supply:  it is

9  ATMI, and it uses such control and market power to monopolize the market and thwart competition

10  from Praxair.

11  **III.    Argument**

12         A.    <u>ATMI Must Be Restrained from Cutting Off Praxair's Supply of Qualified $B^{11}F_3$</u>

13         To prevail on its motion, Praxair must show "(1) a likelihood of success on the merits and the

14  possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the

15  balance of hardships tips sharply in [plaintiff's] favor." *Lands Council v. Martin*, 479 F.3d 636,

16  639 (9th Cir. 2007).  In its opening brief, Praxair pointed out that it would suffer irreparable harm

17  absent immediate Court intervention because ATMI's exclusive agreement would drive Praxair out

18  of the market.  Put simply, ATMI, a firm with a dominant position, is using exclusionary tactics to

19  prevent Praxair from competing by denying Praxair access to the one and only truly reliable source

20  of qualified $B^{11}F_3$.  In response, *ATMI never articulates how it would be harmed by the injunction*

21  *Praxair is seeking.*  ATMI does not make any showing – nor does it even try – that it needs all of

22  NUKEM's gas to supply its customers and [                              ] let alone that it needs to have

23  NUKEM agree not to deal with Praxair in order to meet its needs.  ATMI's total silence confirms

24  _____

25  [10] Strangely, NUKEM blames its delay in responding to Praxair's request on travel obligations.  Yet, it is plain from the correspondence attached to ATMI's Notice that ATMI and NUKEM were in regular contact

26  regarding the supply of $B^{11}F_3$ to Praxair, with counsel for ATMI and NUKEM exchanging several e-mails and corresponding with each other over the last few weeks, most of which is undisclosed as of this filing.

27  (Dkt. 46-2, at 2.)  Thus, NUKEM's explanation is highly suspect.
    [11] It is not inconceivable that the supposed customers' to which NUKEM has purportedly committed its 100

28  kilogram allotment are affiliated with ATMI, as NUKEM has indicated that the customers to which NUKEM has committed its allotment are located in Asia (Slenders Decl. ¶ 3, Ex. 1), and ATMI has licensees in Japan.

1  that the "balance of hardships tip sharply in [Praxair's] favor." (Dkt. 3, 12:1.)[12] This is even more

2  so in light of the recent control ATMI has exhibited over NUKEM's supply of $B^{11}F_3$ and when, as

3  described previously (*supra*, pp. 11 - 12), NUKEM appears to be acting at the behest of ATMI.  At

4  a minimum, these facts suggest that this Court should preserve Praxair's ability to purchase needed

5  quantities of $B^{11}F_3$ from NUKEM [

6                              ] 100 kilogram provisions [

7              ] pending a determination on the merits.

8      Given the substantial irreparable harm Praxair will suffer absent an injunction (and the total

9  absence of harm facing ATMI), Praxair need only show a "fair chance of success on the merits" to

10  obtain injunctive relief. *Benda v. Grand Lodge of the Int'l Ass'n. of Machinists & Aerospace*

11  *Workers*, 584 F.2d 308, 315 (9th Cir. 1978).  Here, the parties essentially agree that an exclusive

12  supply arrangement that impairs a competing firm's ability to participate effectively should be

13  enjoined. (Memo 12:13 – 14:10; Opp. 17:7 – 8.)  Praxair has made such a showing based on the

14  following uncontroverted facts:

15  • Qualified $B^{11}F_3$ is essential to compete in the market for sub-atmospheric delivery systems;

16  • Virtually all of Praxair's UpTime® customers are qualified only with NUKEM's $B^{11}F_3$;

17  • NUKEM abruptly stopped selling $B^{11}F_3$ to Praxair based on an exclusive supply agreement
       that ATMI engineered; and

18
19  • Praxair's supply of qualified $B^{11}F_3$ will run out before it would be able to qualify its
       existing customers with a new source (assuming a reliable alternate source), or,
       alternatively, Praxair may lose its existing customers because they do not wish to subject
20     themselves to a costly and rigorous qualification process.

21  Praxair has established the "very existence of its business life as a competitor is threatened," (Opp.

22  17:7 – 8), and it is therefore entitled to immediate injunctive relief.  Because the vast majority of

23  the facts necessary to prove each of Praxair's claims against ATMI are undisputed, Praxair will

24  focus its analysis on whether the agreement between ATMI and NUKEM raises serious and

25

26  _____
    [12] *See, e.g.*, *EyeTicket Corp. v. Unisys Corp.*, 155 F. Supp. 2d 527, 550 (E.D. Va. 2001) (granting
27  preliminary injunction where "the Plaintiff relies exclusively on [the disputed] technology for its livelihood
    and may go out of business without relief, [but] the Defendant proffers no evidence that it will suffer
28  substantial hardship if the preliminary injunction does issue").

                                          13

1  substantial questions under the antitrust laws, thereby justifying preliminary relief. Praxair

2  respectfully submits that the ATMI-NUKEM exclusive supply agreement meets this threshold, and

3  that a preliminary injunction should issue.

4          1.   ATMI's Supply Agreement Prevents NUKEM from Selling $B^{11}F_3$ to Praxair

5        ATMI asserts that, "[t]he alleged exclusive supply contract at issue does not exist." (Opp.

6  1:18.) This is simply false. As a threshold matter, Praxair offered evidence that NUKEM refused

7  to sell any $B^{11}F_3$ to Praxair based on the exclusive agreement. Mr. Paul Peeters, who has primary

8  responsibility for Praxair's European sourcing of $B^{11}F_3$, declared that NUKEM *twice* refused to sell

9  $B^{11}F_3$ to Praxair because it had entered into a new exclusive supply agreement with ATMI. (Dkt. 4,

10  ¶¶ 5 – 6.) NUKEM further stated that, if it were to supply Praxair with $B^{11}F_3$, it would be subject to

11  a multi-million dollar penalty. (*Id.* ¶ 7.) *ATMI never challenges this testimony.* Although ATMI

12  obtained a declaration from the same person to whom Mr. Peeters spoke, nothing in that declaration

13  contradicts Mr. Peeter's testimony; instead, ATMI simply stated in its opposition that "we are not in

14  a position to contest this claim." (Opp. 8.)[13] Such silence speaks volumes about ATMI's conduct.

15  And the chorus only grows louder with the recent disclosures made by ATMI in its Notice. As

16  described previously, NUKEM agreed two days ago to provide Praxair with the one-time token

17  amount of forty kilograms of $B^{11}F_3$ in 2008 *only after* ATMI gave its blessing to such supply.

18  Whatever label one chooses to attach to these circumstances, they forcefully demonstrate that

19  ATMI, both in practice and in fact, controls NUKEM's supply of $B^{11}F_3$.

20        ATMI's flat denial of exclusivity with NUKEM is even more incredulous in the face of the

21  plain language of the agreement. ATMI explains that all of its contracts have "expressly allow[ed]

22  NUKEM to sell 100 kilograms of $B^{11}F_3$ to third parties each year." (Opp. 1:22 – 23.) This is

23  simply not true. All one needs to do is to look at ATMI's 2008 Supply Agreement with NUKEM to

24  see that ATMI's claim is an illusion. Its [

25

26                                        ], that

27

---

28  [13] It strains credulity that ATMI would not ask Mr. Laucht, NUKEM's declarant, whether Mr. Peeters testimony was accurate. ATMI does concede that "[p]erhaps [Praxair] was so advised." (Opp. 17:20.)

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
**PUBLIC VERSION**
(CASE NO. C08-00869 JW (HRL))

Seller has the option to sell up to 100 kilograms of B-11 F3 per contract year.
(Dkt. 32, Ex. 5, Art. 5, ¶ 1.)  ATMI asserts that, notwithstanding its plain language, this
provision "unequivocally" permits NUKEM to sell up to 100 kilograms of $B^{11}F_3$ to Praxair.
(Opp. 8:18.)  However, the restriction on sales for ion implantation is absolute.  For this
provision to mean what ATMI claims, it would look like this:

[

]

ATMI's litigation re-interpretation of the Exclusivity Provision – which is belied by NUKEM's
repeated refusal to sell $B^{11}F_3$ to Praxair – directly conflicts with the "fundamental" principle of
contract construction that "one provision should not be interpreted in a way which is internally
contradictory or that renders other provisions … inconsistent or meaningless."  *Bayview Hunters
Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 700 (9th Cir. 2004).  The meaning
of the agreement is dependent upon its plain language, giving every word meaning, not what
ATMI's lawyers decide it means after ATMI was caught violating the antitrust laws.  In addition,
NUKEM's behavior reinforces this interpretation.  For one to accept ATMI's interpretation, a
whole clause of the Exclusivity Provision must be ignored.  This makes no sense.

What does make sense is ATMI's purpose in constructing the Exclusivity Provision and the
multi-million dollar penalty for violating it:  denying Praxair access to the qualified $B^{11}F_3$ that is
critical to its survival as ATMI's lone competitor in the sub-atmospheric gas delivery market.  That
is why, after Praxair's significant growth in 2007, ATMI promptly prevented NUKEM from
supplying $B^{11}F_3$ to any other firm that supplies gases "for the purpose of ion implantation."  [

] Such predatory behavior
should not be tolerated.

15

2.  ATMI's Exclusive Agreement with NUKEM is Anticompetitive and Unlawful

Exclusive dealing agreements, such as the one at issue here, present significant antitrust risk. As ATMI candidly admits, "[t]he antitrust concern is that by 'locking-up' scarce supplies or distribution outlets, one competitor can impair 'the ability of competitors . . . to reach the market.'" (Opp. 15:17 – 18.) This is precisely the effect of ATMI's exclusive contract with NUKEM. It has locked-up Praxair's only supply of qualified $B^{11}F_3$ required by the vast majority of its customers and has left Praxair with no options to meet their immediate demand.

ATMI's response is essentially that the law should not provide Praxair with "a free pass from establishing and qualifying a $B^{11}F_3$ supply chain." (Opp. 19:10.) Although ATMI is correct that it has no obligation to assist Praxair, ATMI may not erect illegitimate and anticompetitive roadblocks with impunity. This is especially so given ATMI's market power. The Supreme Court has made clear that a dominant firm may not take actions to disturb a competitor's existing distribution or important business practices without compelling, procompetitive reasons for doing so. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 (1985).[14] A firm with market power is on even thinner antitrust ice when, as here, it interferes with a rival's relationships with customers or suppliers. *See Lorain Journal Co. v. United States*, 342 U.S. 143, 152, 154 – 55 & n.8 (1951). When an exclusive supply agreement allows a dominant firm to "freeze out competition," it is unlawful. *Geneva Pharm. Tech. Corp. v. Barr Lab. Inc.*, 386 F.3d 485, 509 (2d Cir. 2004).

The competitive harm here combines both (i) *Aspen Skiing*'s concern about a firm with market power changing established distribution strategies for no reason but to harm competitors and (ii) *Lorain Journal*'s prohibition on monopolists requiring suppliers not to deal with competitors. From ATMI's own evidence, it is clear that NUKEM had little choice but to cede to the wishes of the party that has purchased the vast majority of its $B^{11}F_3$ over the last several years. Indeed, the recent choreographed activities of ATMI and NUKEM (*supra*, pp. 11 – 12) only serve to emphasize the degree of control that ATMI exercises over NUKEM's $B^{11}F_3$ supply.

---

[14] The Supreme Court recently reaffirmed the holding of *Aspen Skiing* that a monopolist may not terminate an established course of dealing to the detriment of smaller competitors without incurring potential liability under the monopolization provisions of the Sherman Act. *See Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 – 10 (2004).    16

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
**PUBLIC VERSION**
(CASE NO. C08-00869 JW (HRL))

In any event, contrary to its *post hoc* litigation assertions (Opp. 20:7 – 13), ATMI does not need an exclusive agreement to protect its supply. If ATMI wanted to make sure that it obtained an adequate supply of $B^{11}F_3$, it could have done so through a requirements contract. There was no reason – except the illegitimate one of impairing competition – for ATMI to now insist upon exclusivity. *See generally Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680 (D. Md. 2000).[15]

ATMI's eleventh-hour efforts to arrange for a one-time sale of forty kilograms of NUKEM-sourced $B^{11}F_3$ for Praxair does nothing to mitigate these concerns. They show that, given Praxair's dependence on NUKEM-supplied $B^{11}F_3$, the commercial viability of Praxair is subject to the whim of ATMI, which only decided to provide Praxair with any $B^{11}F_3$ in 2008 after its anticompetitive activities were thrust into the spotlight by this lawsuit. They also show that, even with the forty kilograms of NUKEM-sourced $B^{11}F_3$ that ATMI has allowed NUKEM to make available, Praxair will still have its supply cut back substantially in 2008, [

] (Young Decl. ¶ 10). Such a token amount does nothing to change the anticompetitive and predatory nature of the ATMI-NUKEM exclusive relationship. In short, there can be no doubt that ATMI's exclusive supply agreement with NUKEM is anything less than an unlawful, anti-competitive reaction to Praxair's increased competition and growing market share. It therefore should be enjoined.

### 3. Limiting NUKEM's Annual Non-ATMI Sales of $B^{11}F_3$ to 100 Kilograms is Anticompetitive

ATMI contends that its Agreement with NUKEM is not "exclusive" because it permits NUKEM to sell up to 100 kilograms of $B^{11}F_3$ per year to third parties, including Praxair. Even if one accepts this proposition for the sake of argument (a point with which Praxair disagrees (*see supra*, pp. 13 – 15), the Agreement is still unlawful, for it has the practical effect of eliminating any

---

[15] The *Microbix* court explained: "[C]ontrary to Defendants' contention, the exclusive agreement was not the only means for ensuring a steady supply of HNK cells. A requirements contract (as opposed to an exclusive arrangement) could have secured a stable supply of HNK cells that [defendant] would need for its [medical product] production. Such a contractual arrangement, without an exclusivity feature, would be adequate to protect [defendant's] 'investment' in [supplier], because [supplier] would continue to satisfy [defendant's] needs first. Since [plaintiff] would be allowed to purchase only the excess cells, there would be little, or no, 'free riding.'" 172 F. Supp. 2d at 693.7

"real threat" to ATMI's monopoly and provides an artificial barrier to Praxair's ability to grow its market share. Indeed, limiting Praxair's annual $B^{11}F_3$ supply to 100 kilograms – [                    ] – rolls back Praxair's growth in 2007 and unlawfully places a ceiling on Praxair's future growth. In effect, by limiting Praxair's access to a vital raw material, ATMI can corral Praxair's growth opportunities, thereby inoculating itself from widespread competition, all to the detriment of customers. It is a clear violation of the antitrust laws.[16] [

                    ] And nowhere does ATMI identify how providing Praxair with the $B^{11}F_3$ that it requires would in any way prevent ATMI from obtaining the $B^{11}F_3$ that it claims to need. Put simply, ATMI is hoarding $B^{11}F_3$ in order to inhibit competition. *See* Herbert Hovenkamp, *Antitrust Law* ¶ 1804c (2d ed. 2005) ("[A] provision in an agreement whose only apparent purpose is to deny a rival's access to some input insofar as it is not actually purchased by the defendant should be regarded as presumptively illegal.")

Even ATMI candidly admits that the agreement is "exclusive as a practical matter." (Opp. 1:21.) This is all that has ever been required to violate the antitrust laws. *See generally United Shoe Machinery Corp. v. United States*, 258 U.S. 451 (1922).[17] Given the facts and circumstances of this case, an exclusive agreement – with an unreasonably small carve-out – is clearly anticompetitive and unlawful. Indeed, "[t]he proper inquiry is not whether [ATMI's carve-out] enable[s] [Praxair] to 'survive' but rather whether [it] 'poses a real threat' to [ATMI]'s monopoly." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005). Here, limiting Praxair's potential annual purchases to 100 kilograms of qualified $B^{11}F_3$, [

---

[16] *See generally* Herbert Hovenkamp, *Antitrust Law* ¶ 1802c (2d ed. 2005) ("A set of strategically planned exclusive dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its products or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.").

[17] *See also LePage's Inc. v. 3M, Corp*, 324 F.3d 141, 157 (3d. Cir. 2003) ("3M also disclaims as exclusive dealing any arrangement that contained no express exclusivity requirement. Once again the law is to the contrary. No less an authority than the United States Supreme Court has so stated. In *Tampa Electric . . .* , the Court took cognizance of arrangements which, albeit not expressly exclusive, effectively foreclosed the business of competitors.")

18

1  [18] will keep Praxair's sales "below the critical level necessary for [it] to pose a

2  real threat to [ATMI]'s market share." *Id.* at 191.[19]  It will limit Praxair's current growth in the

3  market and effectively cap it at a level well below its 2007 market share.  Moreover, this

4  "availability" is illusory for it is not available in 2008 and may not be thereafter.  At bottom,

5  ATMI's agreement is, in the words of the Third Circuit, "a solid pillar of harm to competition." *Id.*

6  The fact that the agreement carves out some minimal volume of $B^{11}F_3$ that may remain available to

7  competitors is little more than a fig leaf; a futile attempt to avoid antitrust liability.

8      4.  ATMI's Focus on BP is Misleading

9      ATMI makes much of the supply of $B^{11}F_3$ purportedly available from BP.  Because BP

10  independently produces $B^{11}F_3$, the argument goes, Praxair failed to "meet its burden of showing

11  that it cannot purchase $B^{11}F_3$ from suppliers other than NUKEM." (Opp. 17:16-17.)  This assertion

12  disregards the realities of the semiconductor fabrication business – including the lengthy

13  qualification process necessary to convert a customer from one source of gas to another – [

14                                                                                        ][20]

15      As a threshold matter, it is incontrovertible that the vast majority of Praxair's customers have

16  not qualified BP-produced $B^{11}F_3$ for Praxair's UpTime® system; they use NUKEM-produced $B^{11}F_3$.

17  ATMI knows that customers cannot easily qualify another source of $B^{11}F_3$.  In Praxair's experience,

18  customers, on average, have required approximately eight months to qualify a new material (and

19  have taken as long as fifteen months). (Young Decl. ¶ 6).[21]  In fact, one of Praxair's leading

20  customers requires Praxair to provide notice of at least one year of any such changes.  (*See*

21  Spurgeon Decl. ¶ 10.)  Subjecting customers to such a difficult qualification process and

22

23  [18] [

24                                                                                        ]

25  [19] *See also United States. v. Microsoft*, 253 F.3d 34, 71 (D.C. Cir. 2001) ("By ensuring that a 'majority' of
    all [internet access provider] subscribers are offered [Microsoft's product] either as the default browser or as

26  the only browser, Microsoft's deals with the [internet access providers] clearly have a significant effect in
    preserving its monopoly; they help keep usage of [the rival product] below the critical level necessary for

27  [the rival product] or any other rival to pose a real threat to Microsoft's monopoly.")
    [20] [                                          ,] it is simply improper for ATMI to force Praxair to use a single

28  source when it has the benefit of what it claims to be "dual-sourcing."
    [21] *See also* Spurgeon Decl. ¶ 12.                    19
    REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
    **PUBLIC VERSION**
    (CASE NO. C08-00869 JW (HRL))

[

]

*Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680 (D. Md. 2000) is instructive. Plaintiff Microbix alleged that when it sought to enter the market for urokinase (a protein enzyme for blood clots), the manufacturer with a dominant market share entered into an exclusive supply agreement with the sole FDA-approved supplier of certain cells that were essential to the manufacture of urokinase. *Id.* at 682 – 83. Defendants countered that another source of cells was available. *Id.* at 694. Yet because the agreement locked-up the sole FDA-approved manufacturer of needed cells, the court rejected this argument as "disingenuous." *Id.*

The reasoning of *Microbix* applies here. Facing an ever increasing competitive threat from Praxair, ATMI locked-up the only source of qualified $B^{11}F_3$ required by Praxair's customers. [

---

[22] ATMI also implies that most of Praxair's customers are already qualified with BP because they were previously qualified with BP when they were customers of ATMI. This argument misses the mark because a qualification does not last in perpetuity and ATMI's qualification is no substitute for Praxair's qualification. (Chen Decl. ¶ 6; Young Decl. ¶¶ 5, 19; *see, supra,* pp. 6 – 8.) Because these customers have not been re-qualified with BP's $B^{11}F_3$ (let alone BP's $B^{11}F_3$ delivered via UpTime®), a customer's legacy qualification on ATMI's SDS® system does not eliminate the irreparable harm Praxair is facing.

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
**PUBLIC VERSION**
(CASE NO. C08-00869 JW (HRL)

].[23]

Moreover, as was the case in *Microbix*, [




]

Apparently recognizing its predicament, ATMI's grasps at one last straw, arguing that Praxair *could* have avoided all of this if it had been proactive and preemptively qualified a back-up supplier of $B^{11}F_3$ for each of its customers. (Opp. 9:9 – 9:10.)  In other words, ATMI is claiming that Praxair should have prepared for the eventuality that ATMI would violate the antitrust laws and use its market power to lock-up the only source of qualified $B^{11}F_3$ required by Praxair's customers.

This is absurd.  Notably, ATMI does not cite a single case to support this "*ex ante* failure to mitigate" antitrust exception, nor could it.  Praxair should not be forced to spend considerable time and resources [

] to prepare for the situation that a monopolist will violate the antitrust laws and use its market power to cut off Praxair's supply of a necessary commodity.  This is

---

[23] *General Business Sys. v. North Am. Philips Corp.*, 699 F.2d 965 (9th Cir. 1983) – relied on by ATMI – is not to the contrary.  This is not a situation where Praxair is complaining that BP's $B^{11}F_3$ is unacceptable because it costs more to purchase.  Instead, Praxair simply has no viable alternate supplier of *qualified* $B^{11}F_3$.
[24] Dkt. 32, ¶¶ 8 – 9; Ex. 1 – 3, 5.
[25] *See also id.*, Ex. 2, Art. 3; Ex. 3, Art. 3; Ex. 5, Art. 3.

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
**PUBLIC VERSION**
(CASE NO. C08-00869 JW (HRL)

1   particularly true when, as here, a back-up source would need to be periodically re-qualified at great

2   expense and inconvenience to the customers and Praxair.  (Young Decl. ¶¶ 2 – 5.)  As discussed

3   *supra*, the law is clear that a firm like ATMI with market power may not intentionally interfere in

4   the supply chain of a competitor.  Once it has done so, it certainly cannot avoid liability by

5   complaining that the harmed competitor should have prepared better for unlawful conduct.

6       In short, absent immediate injunctive relief that would permit NUKEM to supply Praxair with

7   qualified $B^{11}F_3$, Praxair will be unable to confidently supply its customers, its business will be

8   essentially gutted and its customers will be bereft of competitive options.  This is the paradigm of

9   irreparable harm.  To all this, ATMI has no response.  Instead, ATMI dismisses such irreparable

10  harm as mere "whining."  (Opp. 7:6.)  The antitrust laws, though, hold otherwise.  Under those

11  laws, a firm has a legitimate complaint when a monopolist cuts off its supply of qualified product to

12  eliminate it from the market.  Indeed, this is the very essence of market foreclosure and

13  anticompetitive effect that the antitrust laws were designed to prevent.

B.     Should be Enjoined from Using the Belgian Court's Preliminary Advertising
       Ban to Inhibit Competition in the United States and Around the World

16      Praxair also seeks immediate injunctive relief because ATMI is misusing its purported patent in

17  certain European countries to violate the laws of the United States and to inflict irreparable harm

18  upon Praxair and its customers.  Based on alleged patent infringement by Praxair in Belgium,

19  ATMI obtained what it claims in a 10-K filing made with the SEC to be preliminary relief "against

20  the public marketing of the UpTime[®] system *worldwide.*"[26]  ATMI first used this preliminary

21  relief – shortly after its U.S. patents were deemed invalid – to prevent Praxair from displaying

22  UpTime® material on its ".com" website, in spite of a clearly visible disclaimer that the product was

23  not available for sale in Belgium.  Recently – just a few months after the Federal Circuit affirmed

24  the invalidity of ATMI's U.S. patents – ATMI has grown even more aggressive, now seeking to

25  impose sanctions on Praxair for (i) the display of UpTime® material on the ".com" website of an

26  unrelated third party, and (ii) a notice on its ".com" website mentioning a presentation in Taiwan

27  about a variety of topics, including the UpTime® system.  (Compl. ¶¶ 41 – 42.)  Such overreaching

28  ---
[26] Dkt. No. 3, at 20, n.20.

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
**PUBLIC VERSION**
(CASE NO. C08-00869 JW (HRL)

1  conduct undermines the very essence of competition embodied by the antitrust and patent laws, and

2  clearly infringes upon Praxair's fundamental right to engage in truthful commercial speech and, by

3  extension, vigorously compete. (Dkt. 3, 23:19 – 25:12.) ATMl puts forth no defense for this, nor

4  can it. In fact, ATMl does not spend a *single sentence* in its opposition addressing this recent

5  unlawful conduct.

6      Instead, ATMI goes to great lengths to confuse and obfuscate the issues surrounding the

7  Belgian preliminary relief, spending the bulk of its effort arguing that Praxair is not entitled to an

8  anti-suit injunction. (Opp. 23:15 – 27:9.) This is a red herring. *Praxair is not asking this Court to*

9  *enjoin a Belgian court or overrule its order.* Instead, Praxair is simply asking this Court to declare

10  that ATMI's actions are a misuse of the Belgian preliminary relief and that ATMI should not be

11  able to use a Belgian court order as a club that beats down competitors and competition in

12  locations, such as the United States and Asia, where the Belgian preliminary relief is and should be

13  of no moment.

14      That ATMI's unlawful and anticompetitive conduct is ostensibly predicated upon a foreign

15  court's order is inapposite. Plainly, ATMI's use of the Belgian court has the effect of hampering

16  competition *in the United States* and unlawfully extending its purported patent beyond the handful

17  of European countries in which it is currently recognized. ATMI is now preventing Praxair from

18  publicizing its product in markets in which ATMI has no right to exclude it. Even more ridiculous,

19  ATMI is attempting to hold Praxair liable for the truthful commercial speech of an unrelated third

20  party. Put simply, ATMI has stepped well beyond the bounds of its purported patent in a few

21  European countries and is attempting to thwart competition, in its own words, "worldwide."

22      Importantly, this Court need not defer to a foreign order that is repugnant to a public policy of

23  the United States. (Dkt. 3, 22:17-25:19.) *Yahoo! Inc. v. La Ligue Contre Le Racisme Et*

24  *L'Antisemitisme*, 169 F. Supp. 2d 1181 (N.D. Cal. 2001), is instructive. There, a French court

25  entered a broad injunction against Yahoo!, requiring Yahoo! to prevent French citizens from

26  accessing certain content on its ".com" website. *Id.* at 1184-85. Yahoo! promptly filed suit in the

27  United States against the parties that obtained the injunction in France, seeking a declaratory

28  judgment that the order was unenforceable in the United States because Yahoo! could not comply

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
**PUBLIC VERSION**
(CASE NO. C08-00869 JW (HRL)

1    with the order without eliminating such conduct from its ".com" website entirely. The district court

2    granted Yahoo!'s motion for summary judgment, holding that it was not required to take down such

3    content because construing the French order so broadly interfered with Yahoo!'s free speech rights

4    and thus was repugnant to the First Amendment. *See id.* at 1194.[27]   *See also Bachchan v. India*

5    *Abroad Publ'n, Inc.*, 585 N.Y.S.2d 661, 662 (1992) (stating that "[i]f … the public policy to which

6    the foreign judgment is repugnant is embodied in the First Amendment to the United States

7    Constitution … the refusal to recognize the judgment should be, and it is deemed to be,

8    'constitutionally mandatory'").[28]

9        This is precisely the situation Praxair is facing. The only way it could comply with the Belgian

10    order was to remove all UpTime® content from its ".com" website based in the U.S. Moreover, and

11    even more troubling than in the *Yahoo!* case, ATMI has been further brandishing the order in ways

12    that unquestionably violate American law and policy, objecting to references to a Taiwanese

13    scientific conference and discussions of the UpTime® technology by parties other than Praxair.

14    Such overreaching conduct prevents truthful commercial and other forms of speech, impedes fair

15    competition on the merits, and extends a patent-like monopoly into countries where no such rights

16    exist. Again, ATMI simply has no answer for this and stands mute in its opposition.[29]

17        It does not matter that ATMI has made the strategic decision to not yet attempt to directly

18    enforce the order's "global" scope in the United States. Indeed, courts will not only evaluate such

19    abuses where a party attempts to enforce orders in a U.S. court, but also where a party in the foreign

---

20    [27] ATMI notes that the District Court's opinion in *Yahoo!* was reversed. (Opp. 27 – 28, n. 73.) ATMI's
21    claim that the Ninth Circuit reversed on the merits (Opp. 27, n.73) is wrong. The Ninth Circuit reached its
     result because it determined that the matter lacked prudential ripeness (*i.e.*, it was unclear whether Yahoo!
22    would be sanctioned for its "substantial compliance"). Here, in contrast, this matter is ripe as there is no
     doubt that Praxair is facing sanctions. (Dkt. 5, ¶¶ 52 – 61.)
23    [28] *Cf. Microsoft Corp. v. Lindows.Com, Inc.*, 319 F. Supp. 2d 1219, 1223 – 24 (W.D. Wash. 2004)
     (recognizing that a preliminary injunction issued in the Netherlands could inappropriately infringe free
24    speech rights of the defendant if the Dutch order had the effect of shutting down the defendant's website).
     [29] ATMI asserts that the First Amendment cannot be implicated without state action. (Opp. 24, n.70.) But
25    Praxair did not bring this suit alleging that a direct violation of the First Amendment occurred. Rather,
     Praxair's point is that this Court need not defer to the Belgian order because it may not be used in a way to
26    adversely affect Praxair's constitutional rights. Praxair has more than demonstrated that the Belgian order is
     being brandished in a way that is repugnant to the public policy underlying the American antitrust and patent
27    laws. (Memo 24:17 – 25:12.) Moreover, judicial enforcement of a judgment that conflicts with
     constitutional provisions is, in fact, state action, particularly with respect to the First Amendment. *See, e.g.,*
28    *Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991).

action brings a declaratory judgment action in the United States because the effect of the foreign order reaches the U.S. *See Yahoo! Inc.*, 169 F. Supp. 2d 1181.[30]  To hold otherwise would allow a party to seek out an overly broad foreign order, brandish it in a way grossly inconsistent with domestic public polices and laws, and avoid any consequences by choosing not to bring an enforcement action in the United States – an action it knows it would lose.  Permitting such a blatant end run around domestic courts, while leaving competitors (and competition) irreparably harmed, is antithetical to the very purpose of the Declaratory Judgment Act.

Apparently recognizing all of this, ATMI shifts to a procedural objection, half-heartedly asserting that Praxair has waited too long to challenge the Belgian court's order.  (Opp. 29:16 – 30:7.)  ATMI's position is again premised on the false view that Praxair is asking this Court to overrule the Belgian court.  This is simply not the relief Praxair is seeking.  Instead, Praxair is asking that ATMI be enjoined from continuing to wield its lawfully obtained Belgian preliminary order in a way that both infringes upon Praxair's First Amendment right to engage in truthful commercial speech with its own (and future) customers *in the United States* and hampers competition *in the United States*.  That ATMI is *currently* pursuing two such actions against Praxair demonstrates that a current controversy exists and belies ATMI's concerns about timeliness.

At bottom, ATMI's ongoing and repeated use of its Belgian order to interfere with Praxair's right to make truthful commercial speech, to undermine competition, and to extend its purported patent in certain European countries into the United States is improper.  ATMI's unlawful and anticompetitive conduct must therefore be enjoined.

## IV.    Conclusion

For the foregoing reasons and those set forth previously, Praxair respectfully requests that this Court grant its motion for a preliminary injunction.

April 9, 2008                                    Respectfully submitted,

By: /s/ ROBERT HAWK
Attorney for Plaintiff Praxair, Inc.

---

[30] Notably, contrary to ATMI's suggestion, the Yahoo! case did not involve a party attempting to enforce the French order in the U.S.  In fact, the defendants represented that "they do not presently intend to seek enforcement of the French order in the United States." *Yahoo!*, 169 F. Supp. 2d at 1190.  In other words, ATMI's only basis to distinguish this controlling decision is factually mistaken.  (Opp. 27:17 – 28:2.)

25