United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Praxair, Inc., | NO. C 08-00869 JW |
| Plaintiff, | **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION; REQUIRING THE PARTIES TO FILE A JOINT STIPULATION** |
| v. | |
| ATMI, Inc., et al., | |
| Defendants. | |

## I. INTRODUCTION

Praxair, Inc. ("Plaintiff") brings this action against ATMI, Inc. and Advanced Technology Materials, Inc. (collectively, "Defendants"), alleging *inter alia*, violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. Plaintiff alleges that Defendants have used their market position to engage in anti-competitive activities. Presently before the Court is Plaintiff's Motion for Preliminary Injunction. (hereafter, "Motion," Docket Item No. 3.) The Court conducted a hearing on April 21, 2008. Based on the papers submitted to date and oral arguments of counsel, the Court DENIES Plaintiff's Motion for Preliminary Injunction.

## II. BACKGROUND

In a Complaint filed on February 8, 2008,[1] Plaintiff alleges as follows:

The parties are competitors in the market for sub-atmospheric gas delivery systems used in the manufacture of semiconductor products. (Complaint ¶ 15.) Sub-atmospheric gas

---

[1] (Complaint, Docket Item No. 1.)

delivery systems are devices that store and release various gases during the manufacturing process. (Id. ¶ 19.) These systems are particularly valuable for toxic gases because they provide greater safety against accidental leaks when compared to ordinary pressurized cylinders. (Id.)

Defendants were the first to market a sub-atmospheric gas delivery system in the mid-1990s. (Id. ¶ 20.) Defendants' patented system, known as SDS® was a commercial success; Defendants soon became the sole provider of sub-atmospheric delivery systems. (Id.) In the late 1990s, non-party UOP developed a competing sub-atmospheric gas delivery system. (Id. ¶ 21.) Plaintiff purchased UOP's technology in 2002. (Id.) Plaintiff completed development of the product and now markets its sub-atmospheric gas delivery system under the brand UpTime®. (Id. ¶ 22.) Plaintiff's product is competitive in terms of cost and productivity. (Id. ¶¶ 23-24.)

The parties engaged in patent litigation over their products in the United States from 2003 to 2006. (Id. ¶ 44.) The result of that litigation was a declaration that both parties' United States patents were either invalid or unenforceable. (Id.)

Despite Plaintiff's entry in to the market, Defendants continue to account for 90% of global sales of sub-atmospheric gas delivery systems. (Id. ¶ 28.) Defendants have used their market position to engage in anti-competitive activities. (Id.) In particular, Defendants have (1) interfered with Plaintiff's supply of boron trifluoride, a gas that accounts for 40% of Plaintiff's sales, and (2) misused its European patents to engage in abusive litigation in Belgium. (Id. ¶ 30.)

On the basis of the allegations outlined above, Plaintiff alleges seven causes of action: (1) monopolization in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; (2) attempted monopolization in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; (3) conspiracy to monopolize in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; (4) unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, (5) declaratory judgment that Belgian Preliminary Relief is

2

unenforceable in the United States, 28 U.S.C. § 2201; (6) unfair business practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and (7) tortious interference with prospective economic advantage.

Presently before the Court is Plaintiff's motion for preliminary injunction.

### III.  STANDARDS

The grant or denial of a preliminary injunction rests within the sound discretion of the district court. Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co., 774 F.2d 1371, 1374 (9th Cir. 1985).  It is an "extraordinary and drastic remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

To obtain a preliminary injunction, the movant must demonstrate either "(1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party." Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc., 240 F.3d 832, 839-40 (9th Cir. 2001). These two alternatives represent "extremes of a single continuum, rather than two separate tests." Clear Channel Outdoor Inc., a Delaware Corp. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003).  Thus, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success must be established by the party.  Id.

Probability of success on the merits does not require "a preliminary adjudication on the ultimate merits." Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1423 (9th Cir. 1984).  Rather, to issue preliminary relief, the court need only find a probability that necessary facts will be established.  Id.  Irreparable injury is an injury that is not remote or speculative, but actual and imminent and for which monetary damages cannot adequately compensate. Dotster, Inc. v. Internet Corp. For Assigned Names and Numbers, 296 F. Supp. 2d 1159, 1162 (C.D. Cal. 2003). Mere conclusory statements do not support a finding of irreparable injury for a preliminary injunction. Am. Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1473 (9th Cir. 1985).

3

Without a minimum showing of irreparable harm, the court need not decide if the suit is likely to succeed on the merits. Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1376 (9th Cir. 1985). However, the court may grant a preliminary injunction if it finds a significant threat of irreparable harm, irrespective of the magnitude of harm. Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999).

## IV. DISCUSSION

Plaintiff moves for a preliminary injunction to enjoin Defendants from (1) enforcing an exclusive supply contract with a third-party that may prevent Plaintiff from obtaining boron trifluoride,[2] and (2) attempting to enforce a Belgian court's preliminary injunction to prevent certain advertising activity. (Motion at 1.) The Court considers each of these grounds in turn.

### A. Enjoining Defendants from Enforcing an Exclusive Contract with a Third-Party

Plaintiff contends that Defendants should be enjoined from enforcing their exclusive supply contract for boron trifluoride because the agreement is in violation of §§ 1 and 2 of the Sherman Act. (Motion at 1, 7.)

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Under § 1, some actions by competitors, such as price fixing, may be *per se* unlawful. Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006). *Per se* liability is reserved for those agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." National Soc. of Professional Engineers v. United States, 435 U.S. 679, 692 (1978). All remaining agreements are judged according to the "rule of reason," under which antitrust plaintiffs "must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive

---

[2] Boron trifluoride is a gas used in the manufacture and fabrication of semiconductors. Both parties' products include delivery systems for boron trifluoride. (Declaration of Raymond Roberge in Support of Plaintiff's Motion for Preliminary Injunction ¶ 29, hereafter, "Roberge Decl.," Docket Item No. 5.)

4

before it will be found unlawful." State Oil Co. v. Khan, 522 U.S. 3, 10 (1997); Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977).

Section 2 of the Sherman Act makes it unlawful to "monopolize" any part of the trade or commerce among the several States. 15 U.S.C. § 2. The offense of monopolization has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). Unlike § 1 of the Sherman Act, alleged violations of § 2 are always analyzed under a standard of reasonableness. Standard Oil Co. v. United States, 221 U.S. 1 (1911); see, e.g., U.S. v. Microsoft Corp., 253 F.3d 34, 58-59 (D.C. Cir. 2001). In considering whether either statute is violated, the relevant analysis concerns harm to "competition, not competitors." See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224 (1993); Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962).

Exclusive supply contracts are usually not unlawful under the antitrust laws "because . . . they establish a vertical relationship among firms that do not compete with each other." See Gen. Bus. Sys. v. N. Am. Philips Corp., 699 F.2d 965, 978 (9th Cir. 1983); Omega Environmental, Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1162 (9th Cir. 1997); Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961).[3] This is because the "defendant, having succeeded in legitimately controlling the best, most efficient and cheapest source of supply" does not have "to share the fruits of its superior acumen and industry." Gen. Bus. Sys., 699 F.2d at 978. To succeed on an exclusive dealing claim, the plaintiff must show that it is "frozen out of a market by the exclusive deal." See Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 45 (1984) (O'Connor, J. concurring). A showing that the moving party will suffer sustained losses, without a further showing the company

---

[3] A vertical agreement is an agreement between those at different levels of the market structure, e.g., an agreement between suppliers and manufacturers or between manufacturers and distributors. A horizontal agreement is an agreement between competitors at the same level of the market structure, e.g., an agreement to allocate territories or fix price. U.S. v. Topco Associates, Inc., 405 U.S. 596, 608 (1972).

will be driven out of business, is insufficient to warrant a preliminary injunction in an exclusive dealing case. Am. Passage Media Corp., 750 F.2d at 1473-74.

Plaintiff contends that Defendants' use of an exclusive supply contract constitutes a violation of the antitrust laws. (Motion at 7.) The exclusive supply contract at issue involves boron trifluoride. Both parties currently obtain the boron trifluoride for use in their respective delivery systems from the German company Nukem GmbH. (Roberge Decl. ¶ 32.) Defendants have a semi-exclusive supply contract with Nukem that prevents Nukem from selling more than a relatively small, fixed quantity of its boron trifluoride to Plaintiff or any of Defendants' competitors.[4] While Plaintiff contends that the agreement is unlawful because Plaintiff has no viable alternative source for boron trifluoride, Plaintiff concedes that it has and continues to purchase boron trifluoride from another supplier, Boron Products.[5]

Defendants present evidence that they created the market for boron trifluoride by investing in both Nukem and Boron Products. (Fricke Decl. ¶¶ 6-8.) Until a few years ago, Defendants purchased all of their boron trifluoride from Boron Products. (Id. ¶ 8.) However, since 2005, Defendants have maintained their "take or pay"[6] supply contract with Nukem. (Id. ¶ 13.) Defendants pursued the contract with Nukem to protect the supply chain they created and to protect further investment in technology that will produce higher purity boron trifluoride. (Id. ¶¶ 18-19.) The "take or pay" nature of the contract ensured Nukem guaranteed returns and fostered its growth as a company. (Id.)

---

[4] (Declaration of Richard Fricke in Support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ¶ 17, hereafter, "Fricke Decl.," Docket Item No. 32.)

[5] (Reply Memorandum in Support of Motion for Preliminary Injunction at 7, hereafter, "Reply," Docket Item No. 48.)

[6] A "take or pay" agreement is an agreement where a buyer agrees to "take" a certain amount of product at a set price or the market price or else "pay" a penalty to the seller, who is then free to sell the product to others.

6

Applying the rule of reason,[7] the Court finds Plaintiff has not established a strong likelihood that Defendants' exclusive supply contract creates an unreasonable risk of harm to competition.[8] As Defendants state and Plaintiff concedes, there is an alternative source for boron trifluoride, which both parties currently use to augment their supplies. Further, the restraint imposed on Nukem by Defendants is not an entirely new development; Nukem's ability to sell to third parties has been limited for the past three years. Moreover, there is not a serious risk that Plaintiff will be put out of business, since Boron Products can provide an alternative supply of boron trifluoride.

Plaintiff contends that it will be irreparably injured because the boron trifluoride supplied by Boron Products has not been "qualified" on its customers' systems, i.e., due to the sensitivity of semiconductor manufacturing process, manufacturers will not use boron trifluoride from a new source until it has been thoroughly tested. (Motion at 8.) According to Plaintiff, forcing it to re-qualify all of its costumers would impose significant costs and delay on Plaintiff. (Reply at 8.)

Plaintiff provides evidence that semiconductor manufacturers do not easily switch gas distribution systems because of the cost and time associated with qualifying a new source of the gas. (Roberge Decl. ¶ 28.) Plaintiff, however, offers no concrete evidence that it will lose any of its customers if it is required to use boron trifluoride from Boron Products. Defendants state that they spent the time and money to qualify nearly all of their semiconductor manufacturer customers on the boron trifluoride produced by both Boron Products and Nukem. (Fricke Decl. ¶¶ 6, 11.) Thus, it is likely that Plaintiff could qualify its products on an alternate source that would be acceptable to its

---

[7] As a vertical agreement, the contract is certainly not *per se* anti-competitive. Cont'l T.V., Inc. 433 U.S. at 58.

[8] "[V]irtually *every* contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market, namely the portion consisting of what was bought." Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 236 (1st Cir. 1983).

7

customers. Although this may require additional investment on the part of Plaintiff, there is no evidence that such investment would be unduly burdensome for Plaintiff.[9]

The Court next considers whether the balance of hardships weighs strongly in favor of granting a preliminary injunction. Defendants present evidence that the status quo has been preserved by their current contract with Nukem because it allows Nukem to sell the same 100 kg of boron trifluoride to Defendants' competitors (such as Plaintiff) which it was able to sell in previous years. (Fricke Decl. ¶¶ 13-16.) It appears, however, that Nukem sold Plaintiff 140 kg of boron trifluoride in 2007.[10] To make up for the difference between the amount Nukem provided last year and the amount allowed under the contract, Defendants represent that they have agreed to permit Nukem to supply Plaintiff with approximately 40 kg of additional boron trifluoride for 2008. (Id., Ex. 1.) This should provide Plaintiff with some lead time to begin the process of qualifying its customers on boron trifluoride from Boron Products. Thus, the Court finds that the balance of hardships does not weigh strongly in favor of Plaintiff.

Accordingly, the Court DENIES Plaintiff's motion for a preliminary injunction to enjoin Defendants from enforcing their exclusive supply contract with Nukem for boron trifluoride.

**B.  Enjoining Proceedings in Belgium**

Plaintiff contends that Defendants should be enjoined from attempting to enforce a preliminary injunction reached in a separate patent litigation action in Belgium because the injunction inhibits competition and violates the First Amendment. (Motion at 20, 22.)

An anti-suit injunction, or an injunction that enjoins proceedings in another action, is only permissible when a later filed action in a foreign forum "would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi*

---

[9] Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of Plaintiff's SEC filings. Plaintiff reported profits of approximately $1.2 billion in 2007, $1 billion in 2006, and $750 million in 2005. Praxair's 2007 Annual Report on Form 10-K, (filed February 27, 2008), *available at* http://www.sec.gov/Archives/edgar/data/884905/000119312508039697/dex1301.htm.

[10] (Declaration of Nukem, Docket Item No. 31; Notice of Factual Developments, Docket Item No. 45; Declaration of Timothy L. O'Mara, Docket Item No. 46.)

8

*in rem* jurisdiction; or (4) where the proceedings prejudice other equitable considerations." E. & J. Gallo Winery v. Andina Licores S.A., 446 F.3d 984, 990 (9th Cir. 2006). However, a threshold question in deciding whether an anti-suit injunction is appropriate is "whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined." Id.

The Belgian action was brought by Defendants against Plaintiff and three of Plaintiff's Belgian subsidiaries for alleged violation of Defendants' European patents, which are not at issue here.[11] In October 2006, the Belgian trial court enjoined Plaintiff[12] from advertising its products in Belgium and certain European countries and set fines for any non-compliance. (Id.) Plaintiff sought reconsideration of the injunction but reconsideration was denied. (Id.) In November 2006, a Belgian bailiff recorded multiple violations of the injunction and, after a hearing, the Belgian trial court imposed monetary sanctions. (Id.) Plaintiff appealed the injunction to the Belgian Court of Appeals. (Id., Ex. E.) In April 2007, the Belgian Court of Appeals affirmed the injunction with regard to advertising and expanded it to further enjoin productions, distributions, and sales in the countries covered by the European patent. (Id.) Plaintiff appealed the Court of Appeal decision to the Belgian High Court, but only with regard to the expansion of the injunction. (Id.) That appeal is currently pending. Plaintiff has also been fined for further violations of the injunction; a hearing on the second fine is scheduled for September 2008. (Id.)

Plaintiff fails to make a strong showing as to why proceedings to enforce the injunction reached after exhaustive litigation in the Belgian courts should be enjoined. Plaintiff concedes that Defendants have "every right to seek relief in other jurisdictions to protect whatever intellectual property rights it may claim to have there," and acknowledges the validity of the orders issued by

---

[11] (Declaration of Bruno Vandermeulen in Support of Defendants Opposition to Plaintiff's Motion for Summary Judgment ¶ 4, hereafter, "Vandermeulen Decl.," Docket Item No. 30.)

[12] Jurisdiction in Belgium was likely proper because Plaintiff maintains a manufacturing plant in Belgium where its UpTime® products are filled. (Id., Ex. 3 at 4.)

9

the Belgian court. (Motion at 22; Reply at 23.) Moreover, since the Belgian action was filed first, the traditional rule for anti-suit injunction does not apply.

The crux of Plaintiff's claim is that enforcement of the advertising ban infringes its First Amendment rights in the United States. Plaintiff contends that the ban restricts its ability to post information on its United States based website, which is accessible in Belgium. A similar issue was raised in Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme ("LICRA"), 433 F.3d 1199 (9th Cir. 2006) (*en banc*). In that case, LICRA had obtained an injunction in a French court enjoining Yahoo! from selling Nazi memorabilia on a website accessible to users in France. Id. at 1202-1203. Yahoo! sought a declaratory judgment that any monetary fines imposed by the French court would not be enforceable in the United States. Id. at 1204-05. The Ninth Circuit dismissed the action after finding, *inter alia*, that Yahoo!'s claim to First Amendment protection would be limited because the "French court's interim orders do not by their terms require Yahoo! to restrict access by Internet users in the United States. They only require it to restrict access by users located in France." Id. at 1221. The Ninth Circuit found that Yahoo! did not have a First amendment right to violate French law in France. Id.

Similar to Yahoo!, the Belgian court's order clearly explains that Plaintiff was fined for advertising its products "in Belgium and in other European countries in which the patent of the Defendant[s] enjoy protection." (Vendermuelen Decl., Ex. F at 21.) Plaintiff does not contend that restricting access to its U.S. website by users in the protected European countries is either not feasible or unduly burdensome. Thus, Plaintiff has failed to show that the Belgian courts' injunction infringes its First Amendment rights in the United States.

Accordingly, the Court DENIES Plaintiff's motion for a preliminary injunction to enjoin Defendants from pursuing remedies available to them in the parties' Belgian action.

## V. CONCLUSION

The Court DENIES Plaintiff's Motion for Preliminary Injunction. However, consistent with representations Defendants have made before the Court, the parties shall file a Joint Stipulation as

10

1  follows: (1) Defendants will not interfere with Plaintiff's ability to receive the 100 kg of boron
2  trifluoride Nukem is permitted to supply to third parties under its contract with Defendants; and (2)
3  Defendants will permit Nukem to supply Plaintiff 40 kg of boron trifluoride in addition to what it is
4  permitted supply under its contract.

5        The parties shall appear for a Case Management Conference presently scheduled for **June
6  30, 2008 at 10 a.m.** Pursuant to the Civil Local Rules, the parties shall meet and confer and file a
7  Joint Case Management Statement on or before **June 20, 2008.** The Statement shall set forth a good
8  faith discovery plan, including a proposed date for close of all discovery.

10 Dated: June 5, 2008

11                                               JAMES WARE
                                              United States District Judge

**United States District Court**
For the Northern District of California

11

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Andrew G. Klevorn aklevorn@eimerstahl.com
Chad J. Doellinger cdoellinger@eimerstahl.com
Daniel Murray Wall dan.wall@lw.com
Nathan P. Eimer neimer@eimerstahl.com
Sadik Harry Huseny sadik.huseny@lw.com
Stephen V. Bomse sbomse@hewm.com
Timothy L. O'Mara tim.omara@lw.com

**Dated: June 5, 2008**                                         **Richard W. Wieking, Clerk**

                                                                **By:   /s/ JW Chambers**
                                                                      **Elizabeth Garcia**
                                                                      **Courtroom Deputy**